SHAWN HALBERT (CSBN 179023)
214 Duboce Avenue
San Francisco, California 94103
Telephone: (415) 703-0993
shawn@shawnhalbertlaw.com

Attorney for Defendant Larry J. Gerrans

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) CASE NO. CR 18-00310 EMC |
|---|---|
| v. | ) **DEFENDANT'S RESPONSE TO GOVERNMENT'S OPPOSITION TO RELEASE OF LARRY GERRANS** |
| LARRY J. GERRANS, | ) Date and Time: Telephonic Hearing Requested[1] |
| Defendant. | ) Court: Honorable Edward M. Chen |

**INTRODUCTION**

Larry Gerrans is an almost 50-year old man with a number of health issues – including heart abnormalities, hypertension, obesity, an autoimmune condition, and a recent staph infection in his foot acquired while at Santa Rita Jail. Mr. Gerrans' current detention at San Francisco Jail during an unprecedented health pandemic will unequivocally expose him to an increased risk of serious illness or death. COVID-19 has already reached the jail where Mr. Gerrans is being held pending sentencing: A

---

[1] The defense asks the Court to release defendant Larry Gerrans on the papers in light of the fact that each day in custody presents an additional danger to Mr. Gerrans and others. Otherwise, the defense requests a telephonic hearing.

1

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310 EMC

deputy who worked in County Jail No. 4 on the 7th Floor of 850 Bryant Street, where Mr. Gerrans is being held, tested positive for the virus on Sunday, March 22, 2020.[2]

The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Mr. Gerrans' release is warranted for both: the necessity of preparing his case for sentencing as well as the compelling reason of personal health and safety. Mr. Gerrans cannot receive effective assistance of counsel under the current conditions of his confinement. The jail is safe for neither Mr. Gerrans nor his counsel. Contact visits are not permitted and counsel is not permitted to give any documents or other materials to Mr. Gerrans. Nor do the jail conditions permit the defense to set up meetings with an appropriate professional to consider any mental or emotional health conditions that may need to be considered in connection with sentencing.

The government's suggestion (it does not actually make the argument, nor could it) that Mr. Gerrans is a danger to AUSA Harris or his brother is both baseless and incendiary. Mr. Gerrans has no criminal history or history of violence; the only use of force that the government can attribute to Mr. Gerrans is that he poked his brother in the chest during a heated argument, which does not come close to making him a violent offender. Mr. Gerrans is a religious man with five children who has been involved in his community and his children's school for his entire adult life. While he faces a prison sentence for the conduct for which he was convicted, he does not deserve to be exposed to an unnecessary risk of death prior to his sentencing. The pretrial concern that Mr. Gerrans would try to influence his brother's testimony is now moot.

Given the conditions in jails and prisons and the predictions of epidemiologists, new COVID-19 cases in California prisons and BOP facilities are being reported on a daily basis. Jails in the Bay Area and across California and the country are taking extreme measures to limit jail populations by releasing non-violent offenders. Mr. Gerrans is a non-violent offender and should be released from custody

---

[2] Counsel will file a short, under seal declaration with additional details regarding this issue.

2

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310 EMC

pending sentencing. The Court can order Mr. Gerrans to be on home confinement on electronic monitoring with U.S. Pretrial Services for as long as safety requires.

**DISCUSSION**

**A. APPLICABLE LAW**

Mr. Gerrans seeks his release from custody pursuant to Title 18, Section 3142(i) ("Contents of Detention Order") which provides that, where a person (like Mr. Gerrans) has been detained pursuant to a detention order, "[t]he judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." *See also* 18 U.S.C. § 3142(c)(3) (judicial officer "may at any time amend [release] order to impose additional or different conditions of release").

In deciding whether Mr. Gerrans should be detained or released on stringent conditions of home confinement and electronic monitoring, this Court can, of course, consider the fact that there is a worldwide health pandemic that is altering the fundamental ways that society is currently functioning.[3] Just as governments and other state actors can find that the benefits of shuttering businesses, closing schools and requiring the population to remain inside and away from other people is necessary because of the health hazards to doing otherwise, so too can this Court decide that the benefit to the community (which includes Mr. Gerrans himself) requires a reconsideration of the conditions of Mr. Gerrans' pre-sentencing status.

---

[3] The discussions about the provisions of Sections 3143 and 3145 of Title 18 are not particularly useful since the question is whether Mr. Gerrans should be released both to assist in the preparation of his sentencing defense and because there is a compelling reason to temporarily release Mr. Gerrans in light of COVID-19. Every person who is being released from jails right now (and there are thousands) are people who would otherwise be in jail but for COVID-19. As it always does, Section 3143 governs the release of people post-trial and pre-sentencing, but the government is correct that the "extraordinary circumstances" analysis under section 3145 is not relevant here, as Mr. Gerrans' crimes of conviction are *not* those that would require mandatory remand unless the defense were able to show extraordinary circumstances. However, the government is incorrect that the Court cannot consider COVID-19 in making its decision.

3

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310 EMC

Some courts are making findings that whole categories of people should automatically have their bail status reconsidered in light of COVID-19. *See, e.g.*, *In The Matter Of Statewide Response By Washington State Courts To The Covid-19 Public Health Emergency*, Order No. 25700-B-606 (filed on March 18, 2020)[4] at 6 ¶12 (order issued by Supreme Court of Washington states that for inmates "identified as part of a vulnerable or at-risk population by the Centers for Disease Control, COVID-19 is presumed to be a material change in circumstances" for the purposes of pre-trial release motions. And for individuals not presently identified as the most at-risk, the Order directs that "COVID-19 crisis may constitute a 'material change in circumstances' [] and 'new information' allowing amendment of a previous bail order or providing different conditions of release []"). Similarly, a federal district court in the Southern District of New York reopened a bail hearing in part due to the changed circumstances presented by the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic," specifically the "heightened risk" the pandemic poses to the jail and prison populations, and ultimately ordered the defendant released from custody. *United States v. Dante Stevens,* 15-cr-95 (SDNY), Order dated March 19, 2020 at 2-3.

**B. IMPACT OF COVID-19 ON JAILS AND WIDESPREAD RELEASES OF DETAINEES**

Health officials, civil rights activists, and participants in the criminal justice system including sheriffs have expressed great concern that jail facilities will become a breeding ground for the spread of infectious diseases.[5] Jail populations are amongst the most vulnerable to a virus like COVID-19 for all of the reasons that make them unsafe even under normal conditions. A recent article in the ACLU National Prison Project Statement alerting readers to the danger posed by COVID-19 explained that "once a contagious illness enters, conditions in correctional facilities are highly conducive to it

---

[4] www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/Supreme%20Court%20Emergency%20Order%20re%20CV19%20031820.pdf

[5] Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State and Local Leaders from Public Health and Legal Experts in the United States (https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final covid-19_letter_from_public_health_and_legal_experts.pdf ("Special attention must be paid to the needs of people in long-term care or confinement, who are particularly vulnerable.")

4

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310 EMC

spreading."[6] Reasons include that people in jails live in close proximity to each other, the ventilation is frequently inadequate, people in jails "are often denied adequate soap and cleaning supplies, making infection control nearly impossible," medical staff are stretched thin, detainees often do not have access to the same level of medical care, and if medical or correctional staff become ill or are quarantined, there will be even fewer people to look out for who might be sick in the facility. *Id.*

Specifically with respect to the San Francisco County Jail where Mr. Gerrans is incarcerated, both Dr. Brie Williams, director of the Criminal Justice and Health Program at UC San Francisco, and Dr. Lisa Pratt, the Director of Jail Health Services for County Jail, "believe that San Francisco should reduce its inmate population to get ahead of a possible outbreak."[7] Dr. Pratt specifically addressed the issue of danger to the public from releasing detainees or prisoners: "At this point, public safety is related to public health," Dr. Pratt said. "*While there may be a risk to public safety from letting people out, there is a greater risk to public safety if we have an outbreak* of 1,100 people who are in the jail as well as employees who are coming and going everyday" (emphasis added). *Id.*

There is a clear consensus among epidemiologists and local law enforcement health officials that the safest course of action for society at large is to remove non-violent detainees from local jails at this time. Dozens of elected prosecutors throughout the United States, including the District Attorneys in San Francisco and Contra Costa County, "are calling for the country's jail and prisons to release numerous groups of people in an effort to stave off the spread of COVID-19."[8] Federal officials do not seems to be moving as quickly as state and local officials. San Francisco County Jail released approximately 26

---

[6] Maria Morris, *Are our Prisons and Jails Ready for COVID-19?* National Prison Project at the ACLU (https://www.aclu.org/news/prisoners-rights/are-our-prisons-and-jails-ready-for-covid-19/)

[7] Michael Barba, *SF moves to release inmates fearing coronavirus outbreak behind bars,* SF Examiner, March 20, 2020 (https://www.sfexaminer.com/news/sf-moves-to-release-inmates-fearing-coronavirus-outbreak-behind-bars/amp/)

[8] Megan Cassidy, San Francisco Chronicle, March 18, 2020, Coronavirus: San Francisco, Contra Costa prosecutors join national call for jail releases (https://www.sfchronicle.com/crime/article/Coronavirus-San-Francisco-Contra-Costa-15137291.php)

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310  EMC

detainees on March 20[9] and is trying to release dozens more as quickly as possible,[10] while Santa Rita Jail released more than 300 detainees.[11]

Developments within the past several days are drastically affecting the ability of jails and courts to function normally during this time. For example:

- A sheriff's deputy assigned to the San Francisco County Jail tested positive for COVID-19 on March 22. The jail is trying to determine each and every person, including detainees and staff, with whom the deputy sheriff had contact over the past 14 days;[12]

- Quarantines are in place in Silicon Valley after a public defender who visited a Santa Clara County jail tested positive for coronavirus;[13]

- California prisons experienced their first COVID-19 cases with one prisoner and five prison workers at three different facilities testing positive for the disease;[14]

- On March 23, the U.S. District Court for the Northern District of California announced that the San Jose Courthouse will be closed to staff and the public entirely, effective March 24, 2020 until April 7, 2020, due to a single courthouse visitor's treatment for COVID-19. *See* General Order 73 (Temporary Restrictions on Courthouse Access due to Coronavirus Disease Public Health Emergency; San Jose Courthouse Closure, amended on March 23, 2020).

This trend is going to get worse before it gets better.

### C. MR. GERRANS HAS SEVERAL RISK FACTORS FOR CONTRACTING AND/OR DYING FROM COVID-19

---

[9] https://www.sfgate.com/news/bayarea/article/Sheriff-To-Release-26-Inmates-To-Reduce-Jail-15147277.php

[10] *See* Barba, n. 5

[11] Cary Espinwall et al., Coronavirus Transforming Jails Across the Country, *The Marshall Project*, March 21, 2020, < https://www.themarshallproject.org/2020/03/21/coronavirus-transforming-jails-across-the-country> ("In the Bay Area, the Alameda County Sheriff's Office has released more than 300 people from Santa Rita Jail, one of the state's biggest, with a population that hovers around 2,600 each day. Those released included people nearing the end of their sentences, as well as older and medically vulnerable people.")

[12] Michael Barba, SF Examiner, March 23, 2020, "Inmates under quarantine at SF Hall of Justice after deputy tests positive for COVID-19 (https://www.sfexaminer.com/news/inmates-under-quarantine-at-sf-hall-of-justice-after-deputy-tests-positive-for-covid-19/)

[13] https://www.themarshallproject.org/2020/03/21/coronavirus-transforming-jails-across-the-country

[14] Paige St. John, Los Angeles Times, March 23, 2020, First inmate in California's prison system tests positive for coronavirus (https://www.latimes.com/california/story/2020-03-22/coronavirus-first-california-prisoner-tests-positive-los-angeles-county)

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310 EMC

     Mr. Gerrans has several risk factors that increase his vulnerability to contracting COVID-19 and potentially dying from it.

     Mr. Gerrans has several diagnosed medical conditions: (1) Hypertension (for which Mr. Gerrans receives Amlodipine, benazepril or lisinopril, and hydrochlorothiazide); (2) heart issues diagnosed using an electrocardiogram, specifically right bundle branch block with left anterior fascicular block; (3) dyslipidemia with a pattern suggesting the possibility of developing diabetes because triglycerides are high and HDL is low; (4) exogenous obesity; (5) autoimmune issues; and (6) a recent staph infection.[15] Mr. Gerrans has been to the emergency room and seen a cardiologist several times over the past several years for chest pain. While counsel would point out to the Court that the records show that a stress test did not reveal myocardial ischemia, this absolutely does not mean that Mr. Gerrans does not have blockage of his arteries, and in fact the males on his father's side of the family have either died of heart disease or had surgery (his father having had triple bypass surgery).

     It goes without saying that counsel and the Court are not physicians, and there are new developments every day about what risk factors and medications may relate to COVID-19. The defense is not asking this Court to make a medical finding or prediction, nor could it; however, there should be no dispute that Mr. Gerrans has an elevated risk of having an adverse outcome if he contracts COVID-19, which is substantially more likely if he remains incarcerated. To that point, attached hereto as Exhibit B is a letter from Dr. Rex Young, an Adjunct Professor at Johns Hopkins School of Medicine, explaining his personal and professional relationship with Mr. Gerrans through Sanovas and opining on the dangers that Mr. Gerrans faces in custody from COVID-19.

     Mr. Gerrans' hypertension, right bundle branch block with left anterior fascicular block, and dyslipidemia with a pattern suggesting the development of diabetes, increase his risk of severe illness if he is exposed to COVID-19. Studies show that for COVID-19, the "case fatality was higher for patients

---

[15] Attached as Exhibit A, which the defense requests be filed under seal, are the medical records that Mr. Gerrans' wife was able to obtain from his cardiologist. Because San Francisco County Jail will not allow counsel to give Mr. Gerrans a written waiver to sign for her, undersigned counsel has been unable to obtain a medical waiver from Mr. Gerrans that would enable the USM or the jails to provide Mr. Gerrans' medical records to her or her to talk directly to Mr. Gerrans' doctors.

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310  EMC

with comorbidities: 10.5% for those with cardiovascular disease, 7% for diabetes, and 6% each for chronic respiratory disease, hypertension, and cancer."[16] *See also* Why Some Heart Patients May be Especially Vulnerable to COVID-19, *Science News*, March 20, 2020.[17] Public-health experts have issued guidelines showing that high blood pressure (hypertension) is associated with a heightened risk of severe illness in people who are exposed to COVID-19.[18]

Mr. Gerrans also has autoimmune issues. In August 2019 Mr. Gerrans contracted methicillin-resistant Staphylococcus aureus (MRSA) infection of his foot and toes while at Santa Rita Jail, which required the administration of both systemic and topical antibiotics over a period of many months. Mr. Gerrans also reports having osteoarthritis desiccants ("OCD"), a debilitating joint disease that degrades the articular cartilage and soft tissues of the joints and causes significant and painful inflammation. Accordingly, Mr. Gerrans takes maximum doses of acetaminophen and ibuprofen to regulate his inflammation and pain. The danger with acetaminophen (Tylenol) is that it masks the potential fever that accompanies COVID-19. As reported in the International Business Times, explaining why Ireland added autoimmune issues to its list of high-risk people for COVID-19, people with autoimmune disorders "release autoantibodies[] which then attack the healthy cells[,]…patients with autoimmune diseases are at higher risk of getting infected with coronavirus and developing more serious complications."[19]

Mr. Gerrans is also at increased risk because he is obese, with a Body Mass Index of over 35 (his last recorded BMI was 37.4 and obesity is defined as a Body Mass Index of greater than 30). Obesity has been correlated with higher rates of death. *See, e.g.* Connor Boyd, *Almost two thirds of critically ill coronavirus patients are overweight and 37% are under 60, NHS audit reveals*, March 23, 2020.[20]

---

[16] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

[17] https://www.sciencenews.org/article/coronavirus-covid-19-why-some-heart-patients-especially-vulnerable.

[18] *See* CDC, People Who are at Higher Risk for Severe Illness, March 22, 2020, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html

[19] https://www.ibtimes.com/autoimmune-disease-covid-19-are-you-high-risk-2942769

[20] https://www.dailymail.co.uk/news/article-8142005/Being-obese-raises-coronavirus-risk-Medics-warn-patients-high-BMI-likely-die.html

8

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310 EMC

The government argues that Mr. Gerrans is not at risk because he is not yet 50 years old. However, as has been widely reported, it is not correct that people under age 55 are low risk, because in fact close to 40% of all patients *hospitalized* for the virus are between the ages of 20 to 54 years old.[21] Men appear to have a higher risk of mortality than women (large studies showed men were 1.7 times as likely to die of the coronavirus).[22]

The idea that the jail is somehow going to manage to be a sufficiently sanitary place to stop the spread of COVID-19 is inherently incredible. Not only does any jail face substantial challenges, but San Francisco Jail has a history of health hazards, a recent one leading to a settlement in January 2020 of a lawsuit concerning inmates living for months in raw sewage. County Jail No. 4 was described in the San Francisco Chronicle yesterday as "the decrepit, seismically dangerous lockup on the top floor of the Hall of Justice at 850 Bryant St."[23] Even hospitals are having trouble having sufficient masks and other supplies required to keep COVID-19 contained. Laguna Honda Hospital, which was putting in place very strict procedures and is not a custodial setting, just yesterday reported three cases of COVID-19. The San Francisco School District announced today that all schools will be closed through May 1. It is simply not possible that the jail is going to be able to maintain an adequate level of protection when every major institution is either closing or reporting new cases of COVID-19.

**D. MR. GERRANS IS NOT A DANGER TO THE COMMUNITY**

Mr. Gerrans seeks to be released from pretrial detention on conditions that would promote his health and the health of others at the jail, while addressing any risk that he poses of flight or of danger to the community. By definition, all of the people who are being released from custody would have been in custody otherwise; the balance involved in what it means to protect the community has changed.

---

[21] See, e.g. March 19, 2020 report of March 18 CDC report (https://globalnews.ca/news/6704349/us-cdc-report-coronavirus-hospitalized-younger-adults/)

[22] https://www.cnbc.com/2020/02/18/coronavirus-is-more-fatal-in-men-than-women-major-study-suggests.html

[23] Dominic Fracassa, *Decrepit jail shuttered by Nov. 1 under supe's plan*, San Francisco Chronicle, March 24, 2020

9

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310 EMC

The question is whether Mr. Gerrans is more like the detainees who are being released, or the "violent offenders" who are being held in jail even though their detention creates a health hazard. Mr. Gerrans is not a violent offender. There is no basis to assert that Mr. Gerrans poses a danger or threat to either his brother or anyone else (and notably the government provides none). While pre-trial, the government presented evidence that Mr. Gerrans was trying to persuade his brother not to cooperate with the investigation, both the investigation and trial are over. The prior communications between the brothers were fraught with business and sibling issues that developed over decades, but the government offers no information to support the conclusory assertion that Larry Gerrans' release would pose any danger. Perhaps recognizing that a poke on the chest cannot possibly be a basis for a showing of potential violence to Mr. Gerrans' brother (whom Larry Gerrans will not see, in any event), the government cites to the fact that Mr. Gerrans is said to have told a storage employee that he would have killed his brother but for the cameras. While this may have been admitted at trial to show Mr. Gerrans' anger, it cannot possibly be evidence of a truth. If Mr. Gerrans had actually wanted or intended to kill his brother, he had plenty of opportunity to do so as they saw each other regularly before his incarceration; he did not. There is nothing to suggest that the statement to a random stranger was anything more than an expression of anger.

The government also references the fact that the USM had concerns about Mr. Gerrans vis-à-vis AUSA Harris. It is no secret that the USM was completely frustrated with Mr. Gerrans for his role in the hunger strike that called national attention to the deplorable conditions at Santa Rita Jail.[24] Mr. Gerrans and several others filed a civil rights lawsuit against the jail for the conditions of confinement.[25] While the USM had a very negative reaction to Mr. Gerrans' participation in the hunger strike and lawsuit, in

---

[24] Yolanda Huang and Incarcerated Workers Organizing Committee, *Santa Rita Jail Prisoners Stage Strike and Work Stoppage to Protest Filthy Conditions, Price Gouging and Abuse,* October 30, 2019 (https://sfbayview.com/2019/10/santa-rita-jail-prisoners-stage-hunger-strike-and-work-stoppage-to-protest-filthy-conditions-price-gouging-and-abuse/)

[25] Angela Ruggiero, *Inhumane conditions alleged in civil rights lawsuit by inmates that went on hunger strike,* The Mercury News, November 12, 2019 (https://www.mercurynews.com/2019/11/12/inhumane-conditions-alleged-in-civil-rights-lawsuit-by-inmates-that-went-on-hunger-strike/)

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310 EMC

fact, it was Mr. Gerrans who urged fellow inmates to "act like Gandhi" and not to engage in any of the violence that was planned. With respect to AUSA Harris, Mr. Gerrans made it known to many people, including the USM, that he believed that AUSA Harris should be off the case (recused) because of her connection to Sausalito local politics among other numerous issues; however, he never attempted to or would consider harming her. A theoretical and unsupported risk of harm to someone does not outweigh the actual fact of physical danger to Mr. Gerrans, his counsel, and others in the jail presented by COVID-19.

In fact, if placed on home detention, especially in view of the current critical health crisis where people are not allowed to leave their houses under most circumstances, the notion that he would pose a danger to anyone is completely illogical and baseless. The government raised the issue that Mr. Gerrans legally owns firearms. While there is no allegation that Mr. Gerrans ever used the guns in any illegal way or to threaten anyone while on pretrial release, because the government raised the issue, Mr. Gerrans' wife removed the guns from the home and put them in the possession of a third party who will not return them, which can be verified by Pretrial Services.

### E. MR. GERRANS' RELEASE WILL EFFECTUATE HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

Mr. Gerrans cannot receive this Sixth Amendment right to effective assistance of counsel under current conditions. Counsel cannot have contact meetings with Mr. Gerrans and cannot give him any materials. The visiting room did not look clean when undersigned counsel visited it, and cleaning down multiple phones with Clorox wipes and then trying to communicate with Mr. Gerrans through tiny, semi-audible phones lines is not a recipe for safety or effective assistance of counsel.

Mr. Gerrans had a successful lifetime business career until 2009 with a devotion to medical devices that could accomplish non-invasive surgeries. This was particularly important to him after his wife was temporarily partially paralyzed and continues to suffer from health issues following a botched hysterectomy around 2006. He has participated in raising five children, three of whom are currently in the home (daughters aged 14, 16 and 18), and coached soccer and lacrosse at the local middle and elementary schools. With all the employees and infrastructure that Mr. Gerrans created at Sanovas, there

11

is no evidence that his company was ever intended to be the subject of a fraud. The government's case at trial described a crime of opportunity and desperation. The Court heard testimony that Larry's brother Christopher suffered from addiction and depression and had "terrible" experiences with family members when he was younger. Larry Gerrans grew up in that same family and it may be appropriate for undersigned counsel to have him assessed by a professional to better understand his emotional and mental health. This will be impossible to accomplish in the current setting in San Francisco County Jail. Such lengthy meetings, document review and conversations about Mr. Gerrans personal background will not be able to be accomplished effectively under current conditions at the San Francisco Jail.

## CONCLUSION

For all of the foregoing reasons, the defense respectfully requests that the Court temporarily release Mr. Gerrans from custody subject to home confinement verified by an electronic monitor that will alert if Mr. Gerrans were to step a foot outside his premises, as well as any other conditions the Court believes are appropriate.

Dated: March 25, 2020                                              Respectfully submitted,

                                                                    /s/
                                                                    SHAWN HALBERT
                                                                    Counsel for Defendant Larry J. Gerrans

Def's Response to Government's Opposition to Def's Release
CASE NO. CR 18-00310  EMC