Theresa A. Kristovich (SBN 66490)
tkristovich@kcozlaw.com
Allison B. Holcombe (SBN 268198)
aholcombe@kcozlaw.com
**KABAT CHAPMAN & OZMER LLP**
333 S. Grand Avenue, Suite 2225
Los Angeles, CA 90071
Telephone: (213) 493-3980
Facsimile: (404) 400-7333

Shawn Halbert (SBN 179023)
shawn@shawnhalbertlaw.com
**Law Offices of Shawn Halbert**
214 Duboce Avenue
San Francisco, CA 94103
Phone: (415) 703-0993

*Counsel for Defendant Lawrence J. Gerrans*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No: CR 18-00310-EMC |
| v. | **DEFENDANT LAWRENCE J. GERRANS' MOTION FOR NEW TRIAL PURSUANT TO F.R.CR.P. 33** |
| LAWRENCE J. GERRANS, a/k/a LARRY GERRANS, | **(Declarations of Allison B. Holcombe and Lawrence J. Gerrans filed concurrently herewith)** |
| Defendant. | DATE: June 25, 2020<br>TIME:  2:30 p.m. |

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................... 1

II.  FACTUAL BACKGROUND ..................................................................... 3

   A. Overview Of Larry Gerrans' History Prior To Sanovas And Relationship With Co-Founder Erhan Gunday ................................... 3

   B. The Gerrans Bankruptcy ................................................................. 4

   C. Structure And Operation Of Sanovas .............................................. 4

   D. Deteriorating Relationship Between The Co-Founders In 2012 And 2013 .... 6

   E. Potential Financial Issues Relating to Deferred Compensation ...................... 9

   F. Sanovas After Mr. Gunday's Departure ........................................ 10

   G. The Sanovas Board ....................................................................... 11

   H. Mr. Gerrans' Purchase Of The Greensborough Property ............... 12

   I. Continuing Trouble With Mr. Gunday ......................................... 12

   J. The Trial ........................................................................................ 13

III. TRIAL COUNSEL'S FAILURE TO INVESTIGATE KEY EVIDENCE IN SUPPORT OF MR. GERRANS' ONLY DEFENSE WAS CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL .. 14

   A. Trial Counsel Failed To Interview Or Otherwise Investigate Any Of The Professionals Who Advised Mr. Gerrans In Connection With His Financial Transactions With Sanovas ................................. 16

   B. Trial Counsel Failed To Adequately Investigate And Rebut The Claims Of Government Witnesses That Larry Gerrans Was Not Entitled To The Money He Received From Sanovas ........................... 19

   C. Trial Counsel Failed To Adequately Investigate And Present Key Evidence Regarding The Encounter Between Larry And Chris Gerrans .................. 35

IV.  TRIAL COUNSEL'S ACTIONS AND LACK OF PREPARATION EFFECTIVELY PREVENTED MR. GERRANS FROM TESTIFING IN HIS OWN DEFENSE .................................................................... 37

V.   TRIAL COUNSEL FAILED TO REQUEST A CRITICAL WIRE FRAUD JURY INSTRUCTION .................................................................... 38

VI.  THE GOVERNMENT MADE IMPROPER ARGUMENT TO WHICH TRIAL COUNSEL FAILED TO OBJECT .................................................. 40

i

VII.   TRIAL COUNSEL'S SERIES OF ERRORS RESULTED IN
       CUMULATIVE PREJUDICE TO MR. GERRANS AT TRIAL..................44

DEFENDANT LAWRENCE J. GERRANS' MOTION FOR NEW TRIAL - CR 18-00310-EMC

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Casiano-Jiménez v. United States*,
817 F.3d 816 (1st. Cir. 2016) ............................................................... 37

*Crace v. Herzog*,
798 F.3d 840 (9th Cir. 2015) ............................................................... 39

*Deutscher v. Whitley*,
884 F.2d 1152 (9th Cir. 1989 ............................................................... 15

*Evans v. Lewis*,
855 F.2d 631 (9th Cir. 1988) ............................................................... 15

*Goodman v. Bertrand*,
467 F.3d 1022 (7th Cir. 2006) ............................................................. 44

*Harris By & Through Ramseyer v. Wood*,
64 F.3d 1432 (9th Cir. 1995) ............................................................... 44

*Hodge v. Hurley*,
426 F.3d 368 (6th Cir. 2005) ............................................................... 40

*Kimmelman v. Morrison*,
477 U.S. 365 (1986) ........................................................................... 40

*Lord v. Wood*,
184 F.3d 1083 (9th Cir. 1999) ............................................................. 14

*Reynoso v. Giurbino*,
462 F.3d 1099 (9th Cir. 2006) ............................................................. 15

*Richards v. Quarterman*,
566 F.3d 553 (5th Cir. 2009) ............................................................... 39

*Rock v. Arkansas*,
483 U.S. 44 (1987) ............................................................................. 37

*Sanders v. Ratelle*,
21 F.3d 1446 (9th Cir. 1994) ............................................................... 15

i

*Souliotes v. Grounds*,
  No. 1:06-CV-00667 AWI, 2013 WL 875952 (E.D. Cal. Mar. 7,
  2013) ................................................................................................. 15

*Strickland v. Washington*,
  466 U.S. 668 (1984) ................................................................. 14, 15

*Turner v. Duncan*,
  158 F.3d 449 (9th Cir. 1998) ............................................................ 15

*United States v. Alferahin*,
  433 F.3d 1148 (9th Cir. 2006) .......................................................... 39

*United States v. Allen*,
  491 F.3d 178 (4th Cir. 2007) ............................................................ 39

*United States v. Burrows*,
  872 F.2d 915 (9th Cir. 1989) ............................................................ 15

*United States v. Jackson*,
  13 F. App'x 581 (9th Cir. 2001) ....................................................... 37

*United States v. Lemire*,
  720 F.2d 1327 (D.C. Cir. 1983) ....................................................... 39

*United States v. Lore*,
  26 F. Supp. 2d 729 (D.N.J. 1998) .................................................... 38

*United States v. Martinez*,
  883 F.2d 750 (9th Cir. 1989) ............................................................ 37

*United States v. Miller*,
  953 F.3d 1095 (9th Cir. 2020) ..................................................... 38, 39

*United States v. Regent Office Supply Co.*,
  421 F.2d 1174 (2d Cir. 1970) ........................................................... 39

*United States v. Starr*,
  816 F.2d 94 (2d Cir. 1987) ............................................................... 39

*Zapata v. Vasquez*,
  788 F.3d 1106 (9th Cir. 2015) .......................................................... 40

**Statutes**

Cal. Lab. Code § 204c .................................................................................. 32

Cal. Lab. Code § 207 ................................................................................... 32

Fed. Rule of Crim. P. 15 ........................................................................... 5, 29

Fed. Rule of Crim. P. 29 ....................................................................... 2, 18, 22

Fed. Rule of Crim. P. 33(a) ........................................................................... 1

I.R.C. § 409A ........................................................................................... 34

**Constitutional Provisions**

U.S. Const. amend.V ....................................................................... 1, 35, 38

U.S. Const. amend.VI ........................................................................ 1, 3, 45

**TO THE GOVERNMENT AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 25, 2020 at 2:30 p.m., or as soon as the matter may be heard, before the Honorable Edward M. Chen, United States District Judge, Defendant LAWRENCE J. GERRANS, by and through counsel, will move the Court for a new trial.

This Motion is based on this Notice and the attached Memorandum of Points and Authorities, the Declarations of Lawrence J. Gerrans and Allison B. Holcombe and accompanying exhibits filed concurrently herewith and is brought pursuant to Federal Rule of Criminal Procedure 33(a), the Fifth and Sixth Amendments to the United States Constitution, all applicable judicial and statutory authority, and any oral or documentary evidence to be presented by counsel at oral argument.

DATED: May 27, 2020              KABAT CHAPMAN & OZMER LLP

By: s/ Theresa A. Kristovich
Theresa A. Kristovich

LAW OFFICES OF SHAWN HALBERT

By: s/ Shawn Halbert
Shawn Halbert

*Attorneys for Defendant Lawrence J. Gerrans*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

The Sixth Amendment to the Constitution of the United States unequivocally provides that a criminal defendant is entitled to effective assistance of counsel in all criminal prosecutions. In this matter, not only did Defendant Larry Gerrans not receive effective assistance, he essentially received no assistance at all.

Mr. Gerrans is accused of taking or receiving improper payments from Sanovas—the company he ran and co-founded—in connection with personal expenditures and with falsifying documents in an alleged cover-up attempt.  Mr. Gerrans was also charged with contempt, witness tampering, and obstruction of justice based on an interaction he had with his brother, Chris Gerrans, after the investigation began.  (Dkt. No. 57.)  The central theme of Mr. Gerrans' defense was that any money Mr. Gerrans took money from Sanovas was taken under the good faith belief that he was entitled to the entire amount as compensation.  As trial counsel stated to this Court: "Intent is a, if not *the*, central issue for the jury to decide in this case."  (Dkt. No. 136 at 2.)  However, trial counsel failed to develop the evidence needed to show that Mr. Gerrans lacked the requisite intent.

The deficiencies in the case presented to the jury are demonstrated by trial counsel's post-evidence filings related to jury instructions.  (Dkt. Nos. 136.)  Before and during trial, the parties disputed whether to instruct the jury that "[g]ood faith is a defense to wire fraud."  (Dkt. No. 137.)  The instruction informed the jury that it may consider "whether a defendant had an honest, good faith belief in the truth of the specific misrepresentations alleged in the indictment in determining whether or not the defendant acted with intent to defraud."  (*Id.* at 17.)  The government did not believe that enough evidence of good faith had been presented at trial to justify a good faith instruction.  (Dkt. No. 135.)  Trial counsel disagreed but was only able to identify one piece of evidence supporting Mr. Gerrans' good faith belief that he was entitled to the monies he received.  (Dkt. No. 136.)  While the Court ultimately gave

the instruction (Dkt. No. 137 at 1), the jury did not hear adequate evidence or testimony to find that Mr. Gerrans' lacked the required intent in this case. However, there was additional evidence of Mr. Gerrans' good faith and lack of intent available—trial counsel simply failed to either pursue or present it.

As described below, and as the Court observed first-hand during the brief trial of this matter, Mr. Gerrans' trial counsel introduced **no witnesses** and **no exhibits** on Mr. Gerrans' behalf**.**  This was the result of trial counsel's failure to conduct the most elemental trial strategy of identifying and interviewing key percipient witnesses, securing expert witnesses to challenge the financial documents the government introduced, and investigating topics for cross-examination to countermand the government's theories of the case. The failure to introduce such evidence meant there was no testimony or evidence to consider in connection with the defendant's good faith belief he was entitled to money received from Sanovas that form the basis for Counts 1-6.  These deficiencies also affected the defense to Counts 7-9 as there was no effort to counter the government's assertion that Mr. Gerrans' statements to the FBI were false (and there was no motion to dismiss such charges based on clear statute of limitations issues).[1]

Trial counsel's lack of investigation and ineffective trial presentation also failed to elicit important testimony to counter the government's accusations related to the interaction with his brother that form the basis for Counts 10-12.  Mr. Gerrans was free to communicate with his brother about any topic other than the criminal case—which is what he did during the encounter that led to the government's additional charges.  However, because trial counsel failed to investigate and cross-examine witnesses effectively (including Chris Gerrans), the key supporting evidence was never presented to the jury.

---

[1]  The significant statute of limitations issue is addressed in Mr. Gerrans' Rule 29 Motion filed concurrently with this Motion.

1       Finally, trial counsel failed to object to inappropriate comments and

2   misleading statements made by government counsel to the jury in closing.  After no

3   substantive defense, the jury's last impression of the case before deliberations began

4   was based on unchallenged misstatements by the government.

5       While individually each of these errors by trial counsel was prejudicial,

6   together they amount to a complete lack of effective assistance of counsel and

7   violated Mr. Gerrans' Sixth Amendment rights.  As a result, Mr. Gerrans respectfully

8   requests the right to a new trial so that a jury may decide his case based on a full and

9   fair presentation of the evidence.

10  **II.       FACTUAL BACKGROUND**

11  **A.       <u>Overview Of Larry Gerrans' History Prior To Sanovas And</u>**

12  **<u>Relationship With Co-Founder Erhan Gunday</u>**

13      Because this Court presided over a trial in which defense counsel so

14  profoundly failed to present a context for Mr. Gerrans' involvement and role in

15  Sanovas, the defense submits a short factual background about Mr. Gerrans that is

16  important to understanding his role in founding and running the company as well as

17  events that led to his break with Erhan Gunday, the co-founder of Sanovas.

18      As could have been elicited through a number of witnesses, Sanovas was a

19  labor of love for Larry Gerrans. After majoring in Business Administration, Mr.

20  Gerrans found work that combined his interest in medicine with business and worked

21  for a number of companies in the medical field such as DePuy (a subsidiary of

22  Johnson & Johnson that dealt with orthopedic implants), Stryker, Smith & Nephew.

23  From 2005 to 2008, Mr. Gerrans was the Director of Sales and Product Development

24  in the Western United States for Globus Medical.  His specialty was minimally

25  invasive procedures including orthoscopic procedures for shoulders, knees, joints,

26  ankles and wrists and, during this time, he even attended surgeries and procedures

27  to observe engineers and scientists work on cadavers to gain a greater understanding

28  of concepts, procedures and materials in which Mr. Gerrans specialized.

Over time, Mr. Gerrans became devoted to the idea of treating lung diseases such as cancer and asthma with minimally invasive surgery after dire experiences with his friends dying from lung cancer or almost dying from an asthma attack.  Mr. Gerrans hoped he could be the person to develop technology to change the world of treating lung disease.  Based on a shared idea and a handshake with Erhan Gunday in 2002, the two looked to a day when they could found a company that they hoped would revolutionize the treatment of lung disease.

**B.**      **The Gerrans Bankruptcy**

The Gerrans, like many others, were victims of the 2008 financial markets crash.  During that same time period, his wife, Shelly, had a hysterectomy which resulted in at least 11 subsequent surgeries and a medical malpractice lawsuit, and the Gerrans family also lost their family home to foreclosure.  In light of his dire financial circumstances, Mr. Gerrans sought legal counsel who advised him that his best alternative was to file for bankruptcy relief. [2]

In April 2010, as part of the bankruptcy proceedings Mr. Gerrans and his wife, Shelly, made several statements about their employment and income.  Specifically, Ms. Gerrans stated that she was a homemaker who did not earn an income.  Mr. Gerrans stated that he was not earning income from Sanovas or Halo and was still working in a sales/consulting position for San Gro (a subsidiary of the Sorin Heart Valve Group).  At the time the statements were made, they were accurate.  As of April 2010, there were no funds to pay anyone at Sanovas, and the actual structure of Sanovas was not solidified until July 2010.

**C.**      **Structure And Operation Of Sanovas**

---

[2] The decision to file as a Chapter 13 bankruptcy was counsel's who almost immediately changed the filing to a Chapter 7.

1        Sanovas was formed by legal counsel from the Dentons firm as a Nevada

2  Limited Liability Corporation in 2009 with its founding members being Ehran

3  Gunday's company, ES Medical, LLC, and Larry Gerrans' company, Halo

4  Management Group, LLC. (Ex. 1.)[3]  Sanovas, LLC was converted into a Nevada C-

5  Corporation on May 18, 2010 (Ex. 4),  and on April 12, 2011, the Company was

6  converted into a Delaware C-Corporation (Ex. 4A).  All of these filings were done

7  by legal counsel.  Messrs. Gunday and Gerrans planned to work together on

8  pulmonary technologies with Mr. Gerrans' area of expertise being physician and

9  institutional relationships, administrative functions, clinical affairs, sales and

10  marketing.  Given his background in engineering, Mr. Gunday's domain was

11  research, development, engineering, regulatory and manufacturing issues and

12  operations.

13        Contrary to the government's theme, Sanovas was not run with minimal to no

14  structure nor did Larry Gerrans unilaterally or without justification or accountability

15  simply take funds.  Rather, starting in 2010, there were a series of lawyers and law

16  firms that created a significant amount of documentation concerning the operation

17  of Sanovas as well as how the founders would be paid which included the creation

18  of governance documents and employment agreements in July 2010 by Stafford

19  Matthews of the Dentons law firm.  The employment agreement that Mr. Matthews

20  prepared for the defendant (and for co-founder Ehran Gunday also) was signed on

21  July 15, 2010 "to continue the employment" of Mr. Gerrans as President and CEO.

22  (*See* Ex. 2.)[4]  As the Agreement set forth, annual compensation was $250,000 per

---

[3]    All Exhibits ("Ex.") references refer to exhibits to the Declaration of Allison B. Holcombe filed concurrently with this motion.

[4]    Remarkably, it appears from a review of the record that trial counsel failed to use these documents to examine any of the witnesses in support of Mr. Gerrans' right to his salary, bonuses, and deferred compensation though, as counsel admitted, this was the basis for Mr. Gerrans' good faith defense.  (*See* Dkt. No. 136.)  Even Mr. Gunday acknowledged at his Rule 15 examination that it was his signature on

year with a 5% increase per year and a $75,000 bonus,  and it was further agreed that Mr. Gunday and Mr. Gerrans were owed deferred salary of $333,333.33 for work from January 1, 2009 through April, 2010, to be paid only after the company had received 2 million dollars in funding.  (*Id* at Section 4(b).)

In addition, Mr. Gerrans' Employment Agreement was updated on July 15, 2012 (effective January 1, 2012) by counsel for Sanovas to provide that Mr. Gerrans and Mr. Gunday would receive a base salary of $300,000 as well as a 5% increase annually plus a number of other benefits including bonuses. (Ex. 3).

Like many start-ups, Sanovas was funded by investor capital.  It also operated with a team of engineers that worked on developing the non-invasive procedure to treat lung cancer.  Mr. Gerrans also secured another 60 patents for various other devices and procedures that he hoped to have Sanovas develop.

D.     **Deteriorating Relationship Between The Co-Founders In 2012 And 2013**

Trouble between the two founders started fairly early in their relationship. Mr. Gerrans' sought out the counsel of Ed Basile, a former Chief Counsel for the FDA, who was Chair of Life Science Group at King & Spalding LLC in Washington, D.C. He and Mr. Gunday's meetings with Ed Basile convinced Mr. Gerrans that Sanovas' regulatory procedures were going to have to improve. Mr. Gerrans became concerned that Mr. Gunday was not willing to accept their attorney's advice that they needed to have better quality systems and compliance. Thus began a contentious year with Mr. Gunday, whom Mr. Gerrans felt was unable or unwilling to comply with new rigorous FDA regulations. Mr. Basile recommended that a Quality System person, Anne Kelly, be sent to Sanovas to evaluate their processes. When Mr. Gunday rejected the suggestions and materials provided to him by Ms.

---

the Operating Agreement (Ex. 1), the July 15, 2010 Employment Agreement (Ex. 2), and the January 1, 2012 Executive Employment Agreement (Ex. 3.).  (Ex. 25 at 21, 24, 29-30.)

Kelly, Mr. Basile sent Mr. Gerrans and Mr. Gunday a memorandum that outlined that they needed to create a quality system consistent with the documents that King & Spalding had provided, and expressed concern that Sanovas lacked in house capacity to create the final quality system.  (*See* Ex. 36.)[5]

The quality system fell under Mr. Gunday's domain and was his responsibility. When Mr. Gerrans saw that Mr. Gunday was not following the direction of King & Spalding, he sent Mr. Gunday a Governance Memorandum, dated November 30, 2012.  (Ex. 5.)  In that Memorandum, which was provided by at least one witness to the government and produced in discovery (USAO-FBI-002423-2428), Mr. Gerrans listed in great detail the deficiencies in the quality system including "gaps, suggested remedies, due dates, and persons in charge of each." (*Id.* at 1.)  Mr. Gerrans further noted the fact that with three years and ten million dollars, they had only gotten their first product "over the fence."  (*Id.* at 2.)  Mr. Gerrans also called out Mr. Gunday's inappropriate treatment of certain staff and asked him to maintain a higher level of professionalism rather than screaming at people. (*Id.* at 3.)  Even a cursory review of the Governance Memorandum shows Mr. Gerrans' concern about Mr. Gunday's deficiencies and sincere efforts to encourage Mr. Gunday to fulfill his responsibilities.

In January 2013, after the first submission to the FDA went very poorly due to failures attributable to Mr. Gunday, tensions escalated.  Mr. Gerrans brought in professionals recommended by his attorney in Washington, D.C., to deal with FDA regulations.  The government introduced evidence at trial from Lloyd Yarborough that in 2013 Mr. Gerrans stole money from the company by claiming expenses to which he was not entitled.  In fact, Sanovas' CFO Robert Farrell had approved the

---

[5]     Much of this material is relevant to the how Erhan Gunday should have been cross-examined and is referenced *infra*, Section III B, but it is also included in this chronological summary because it is relevant to the events that transpired at Sanovas during the years in question.

expenses and explained this to Mr. Gunday. (*See* Ex. 6 (email exchange with attachment explaining that Mr. Gerrans had been entitled to reimbursement for expenses pursuant to their governing document and in accordance with GAAP).)

Shortly thereafter it was decided that Mr. Gunday should leave the company, but the process of obtaining a Separation Agreement took almost a year and eventually involved negotiations between Sanovas' attorneys at King & Spalding and Mr. Gunday's attorneys at Pillsbury Winthrop Shaw Pittman LLP. Mr. Gunday demanded to be paid in excess of $1.5 million dollars in addition to generous stock options.

On January 12, 2014, Mr. Gerrans sent Mr. Gunday Governance Memorandum No. 3 which listed in great detail the numerous complaints made by company employees against Mr. Gunday and also noted Mr. Gunday's inappropriate behavior with employees as well as the fact that "[a]fter 3 years and $20 million, we have no commercially viable products to speak of." (Ex. 7.) Mr. Gerrans further pointed out that not only did they not have a commercially viable product in 2014, but they still did not have a quality system. (*Id.*)

Mr. Gunday's response was to send an email on January 20, 2014 suggesting that no one at Sanovas should talk to consultant Roy Morgan (who Mr. Gerrans had hired to take over Engineering) citing "confidentiality concerns." (Ex. 30.) In response, Mr. Gerrans sent an email out to approximately fifteen people at Sanovas (as well as Sanovas' attorney) stating that Sanovas needed consultants because of the failures of the company to adhere to proper procedures:

> The clear failures in Sanovas' product development apparatus are evidenced…by the lack of project management and, in the most egregious example, by the lack of adherence to the codification of policies, procedures and documentation mandated by the FDA which, consequently, directly attributed (sic) to the failure of our FDA submission in December 14, 2013. We must seek the cooperation and assistance of experts who possess the domain knowledge and domain experience requisite to the remediation of our

current product devilment initiatives and to disciplining this organizations (sic) execution going forward!

(*Id.*)  Not only were Mr. Gunday and Mr. Gerrans at odds, but their disagreement was very public within the company.  Mr. Gunday finally left Sanovas on April 2014.

## E.  Potential Financial Issues Relating to Deferred Compensation

During the 2013 period of escalating tensions before Mr. Gunday's departure from the company in April 2014, certain financial issues also came to light. However, rather than being swept under the rug as the government suggested at trial, the company received advice of counsel on how to proceed.  Specifically, on July 10, 2013, Jack Capers, Jr. of King & Spalding, who was Sanovas' corporate attorney at that time, and his King & Spalding partner, Eleanor Banister, who was the company's ERISA attorney, advised Messrs. Gerrans and Gunday that the employment agreements that were written by prior counsel were not in keeping with IRS 409A requirements and that significant monies were owed to the two founders that would result in serious tax consequences if the monies were not paid.  (*See* Ex. 8.)

Accordingly, Robert Farrell, then CFO of Sanovas was taxed with preparing an analysis of monies due the two founders and, in that regard, prepared a chart entitled "Deferred Amounts Owed to Larry Gerrans and Erhan Gunday" that was provided to the King & Spalding attorneys on August 22, 2013 and showed that Sanovas owed at least $816,585 to Mr. Gunday and $723,900 to Mr. Gerrans.  (*See* Ex. 9.)  According to the advice of the corporate attorneys, if the executives were not paid the outstanding amount owed to them immediately "the Executives will be attributed income equal to the present value of the vested 409 Compensation plan plus an additional 20% tax on that compensation."  (Ex. 8 at 2.)

In connection with the separation agreement King & Spalding attorneys prepared for Mr. Gunday, on November 27, 2013, Mr. Farrell provided Messrs. Gunday and Gerrans with a report chronicling proposed amounts to be paid to

1    Gunday totaling $1,577,661.63. (Ex. 10). Mr. Farrell's report documents the

2    contemporaneous understanding of how much money Sanovas owed each of its

3    founders even though Mr. Gerrans—who was staying on at the company—was not

4    being paid out at the time.

5        **F.**    **Sanovas After Mr. Gunday's Departure**

6           At trial, the government described the second half of 2014 as a time when

7    Mr. Gerrans took advantage of Mr. Gunday's departure to pillage the company with

8    the assistance of his brother, Chris. Contrary to the government's suggestion,

9    however, the actual scenario was quite different.  After Mr. Gunday finally left the

10   company in April 2014, Mr. Gerrans actually moved to fortify the company by hiring

11   several key individuals Jeff Her as Chief Operating Officer and Roy Morgan as Vice

12   President of Research, Development.   The company also moved some of their

13   operations into a 28,000 square foot facility in San Rafael that had 48 rooms on the

14   first floor including laboratories and procedures rooms.  Mr. Gerrans believed that

15   with Mr. Gunday gone and with a new group of officers, his vision of working to

16   develop significant lung treatments would finally be realized.  To that end, in June

17   2014, Mr. Gerrans contacted Sanovas' attorney in June 2014 with a slate of topics

18   he wanted to cover, including Company Valuation, Series A-1 Investment Offering,

19   the Agenda Items and Preparation for a September, 2014 Board Meeting, Crowd

20   Funding and Hedge Funding propositions, Human Tissue Bank and Employment

21   Agreement.  (Ex. 11.)

22         Moreover, contrary to the government's argument at trial, as reflected in a

23   chart from the 2016 Board Minutes, 2015 was the most successful year the company

24   had in terms of fund-raising and saw an increase in the number of employees to a

25   high of 52.  (Ex. 12.)  Further, in 2014, Mr. Gerrans did everything possible to fix

26   the mess of records that Mr. Yarborough had left behind.  Given that his brother

27   Chris, who had been hired by Gunday and working in operations, actually had a

28   degree in business and finance, Mr. Gerrans moved Chris Gerrans to the financial

side to help put the financial records in order.  Contrary to his testimony at trial, Chris Gerrans did not operate without oversight but actually reported to Ray Gamini until Mr. Gamini left the company. Chris then reported to the new Chief of Operations, Jeff Her.  In fact, even before Mr. Gamini's departure, Mr. Gerrans was gathering resumes and interviewing candidates for a CFO and Comptroller and, after Mr. Gamini's departure, Mr. Gerrans hired a bookkeeper, Tammi Griffith, to go through Sanovas' entire financial history.  As Ms. Griffiths told the FBI, Larry Gerrans also ordered Chris Gerrans to provide her with all of the company's financial records. (Ex. 13.)  Importantly, it was beginning in 2014 that Chris Gerrans began to commit years of fraud within the company, as he admitted on cross-examination, which created a conflict in his willingness to be the bridge between bookkeepers and records lest his own malfeasance was discovered.

In the post-Gunday world, Mr. Gerrans was dedicated to bringing Sanovas products to market and expanding the business—not to running the financial affairs which he believed he had others like Tami Griffiths and his brother, Chris, to do.

### G.   The Sanovas Board

In January 2015, Mr. Gerrans took steps to convene the Board, asking Sanovas' attorney his availability in late January, early February. (Ex. 14.)  Due to scheduling issues, the meeting for the newly formed board was eventually  scheduled for March 2015.  Mr. Gerrans also provided the Board with materials relating to the operation of the company including an Executive Employment Agreement and other governing documents. When the Board members indicated they needed more time to assimilate the materials, Mr. Gerrans concurred.

Because of scheduling conflicts among the board members, the meeting was ultimately set for and took place on May 9, 2015.  However, before that time, when the board members had questions about the proposed salary arrangement for Mr. Gerrans, he provided them with a published survey which demonstrated that his salary (which had the same base structure as the agreement created by attorney

Stafford Matthews) was well within the reasonable range for executives of his stature and position.  (Ex. 15.)  When the Board of Directors finally met in May 2015 after receiving materials in March 2015, they ratified Mr. Gerrans' employment contract.  (Ex. 27.)

### H.   Mr. Gerrans' Purchase Of The Greensborough Property

Larry Gerrans' employment agreement had specifically provided he could borrow money from Sanovas to purchase a home.  (Ex. 26.)  As of the end of 2013, Mr. Gerrans also was entitled to past due bonus amounts totaling $225,000 (*id.*) and other deferred compensation, totaling $723,000, as reflected in Robert Farrell's Wage Analysis.  (Ex. 10.)  Further, as disclosed to the board, Mr. Gerrans had used his own retirement funds to cover family expenses when Sanovas could not pay him what he was owed and expected to pay substantial penalties for such use.

### I.   Continuing Trouble With Mr. Gunday

Even after Mr. Gunday left the company, Mr. Gerrans' troubles with him continued, as Mr. Gerrans discovered evidence that he believed showed that beginning in 2014, Mr. Gunday was violating the non-competition terms of his Separation Agreement and trying to lure employees to a new company he was forming using Sanovas technology.  The contact with Sanovas engineers continued through 2017.  After Mr. Gerrans was forced to leave Sanovas in December 2018 because of the pending Indictment, in January 2019, Mr. Gerrans presented the Gunday  materials to Dr. Jerry Katzman, the Sanovas CEO who had replaced him, along with binders of evidence to show that Mr. Gunday had violated the terms of his Separation Agreement almost as soon as he left Sanovas by working with Sanovas engineers to steal Sanovas technology to start a new company.  (Ex. 16.)[6]

As described in more detail below, Mr. Gerrans' confrontation with Chris Gerrans at the storage locker in August 2019 had absolutely nothing to do with Mr.

---

[6]     The binders of supporting materials not attached but are available.

Gerrans' criminal case but instead occurred only after Larry Gerrans' discovery on August 9, 2019 that Chris Gerrans was working with Dr. Katzman to bring Mr. Gunday back to the company and that Chris Gerrans had aligned with Dr. Katzman and against his own brother, Larry, about whether Larry should receive the compensation he was owed or be repaid for electricity costs Larry had incurred in the Spring of 2019.

Just this past week Mr. Gerrans' worst fears were realized when he learned in a Shareholder communication that Mr. Gunday has returned to Sanovas as the Chief Technology Officer. (Ex. 17.) Mr. Gunday is once again working with Chris Gerrans, who remains employed at Sanovas in spite of his admitted theft of approximately a million dollars from the company.

## J.    The Trial

The government presented its case through 16 witnesses.  In contrast, Mr. Gerrans' trial counsel did not call a single witness or introduce a single exhibit.  The most that trial counsel did was engage in a lackluster cross-examination of the government witnesses which he as much as conceded to government counsel in an email shortly before trial when advised on the government's proposed witnesses for January 13, 2020:

> Thank you, Lloyd. I hope you have comprehensive direct exams because there may be short crosses. I will cross all of them but when you think about the evidence there are some excellent lawyers who faced with these witnesses would not cross some of them at all.

(Ex. 18.)  Indeed, during trial, when told about upcoming exhibits and witnesses, trial counsel advised the government "Fine on exhibits, little or no cross." (Ex. 19.)

The decision to put on no affirmative defense is surprising because Mr. Gerrans' trial counsel conceded that his defense strategy at trial was to show that Mr. Gerrans was entitled to all of the money he received from Sanovas, *i.e.* that Mr. Gerrans lacked the necessary intent to commit fraud.  (Dkt. No. 137 at 2.)  Despite

1   the importance of the issue, trial counsel failed to call a single witness who could

2   explain to the jury why Mr. Gerrans was entitled to the money that he received from

3   Sanovas.   Most notably, trial counsel did not call an expert to rebut the crucial

4   testimony of government witness Phillip Villanueva who testified that Mr. Gerrans

5   was not entitled to the money he took.

6       After trial counsel rested his case, the jury convicted Mr. Gerrans on all

7   counts.   However, if trial counsel had presented the witness who were available to

8   rebut the government's case and not made several other crucial errors, it is

9   reasonably probable that the jury would have reached a different verdict.

## ARGUMENT

### III.   TRIAL COUNSEL'S FAILURE TO INVESTIGATE KEY EVIDENCE IN SUPPORT OF MR. GERRANS' ONLY DEFENSE WAS CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL

14      The Supreme Court held that there are two components to an ineffective

15   assistance of counsel claim: (a) "deficient performance" and (b) "prejudice."

16   *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

17      "Deficient performance" in this context means unreasonable representation

18   falling below professional norms prevailing at the time of trial.  *Id.* at 687–89. To

19   show "deficient performance," petitioner "must identify the acts or omissions of

20   counsel that are alleged not to have been the result of reasonable professional

21   judgment." *Id.* at 690. To overturn the strong presumption of adequate assistance,

22   petitioner must demonstrate that "the challenged action cannot reasonably be

23   considered sound trial strategy under the circumstances of the case."  *Lord v. Wood*,

24   184 F.3d 1083, 1085 (9th Cir. 1999).

25      To meet his burden of showing the distinctive kind of "prejudice" required by

26   *Strickland*, petitioner must affirmatively "show that there is a reasonable probability

27   that, but for counsel's unprofessional errors, the result of the proceeding would have

28   been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Strickland*, 466 U.S. at 669, 694. "When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice." *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998), *as amended on denial of reh'g* (Nov. 24, 1998); *Souliotes v. Grounds*, No. 1:06-CV-00667 AWI, 2013 WL 875952, at *56 (E.D. Cal. Mar. 7, 2013), *R&R adopted as modified*, No. 1:06-CV-00667 AWI, 2013 WL 1563273 (E.D. Cal. Apr. 12, 2013) (cumulative effect of failure to call expert and lay witnesses was deficient performance).

In order to be effective, "counsel must, at a minimum, conduct *a reasonable investigation* enabling him to make informed decisions about how best to represent his client." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) citing *Strickland*, 466 U.S. at 691. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

The Ninth Circuit has regularly found counsel to be deficient where counsel failed to conduct a reasonable investigation into possible defenses or provide strategic reasons for failing to do so. *See United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989) (holding counsel's conduct deficient where he failed to investigate a possibility of a mental illness defense); *Deutscher v. Whitley*, 884 F.2d 1152, 1160 (9th Cir. 1989) (holding that counsel did not make a strategic decision where the defense was based on petitioner's psychiatric problems, yet counsel failed to "even consider investigating evidence which would have bolstered that defense"), *vacated on other grounds*, 506 U.S. 935 (1992); *Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir. 1988) (holding that a failure to investigate a possibility of mental impairment "cannot be construed as a trial tactic" where he did not even bother to view relevant documents that were available).

The Ninth Circuit has also found the failure to investigate sources of cross-examination to amount to ineffective assistance of counsel. *Reynoso v. Giurbino*,

462 F.3d 1099, 1112 (9th Cir. 2006) ("[Trial counsel's] failure to investigate the matter more fully, given the information she possessed, rendered her performance deficient. In addition, her failure at trial to question [witnesses] about the . . . [matter] cannot under any theory be deemed a 'sound trial strategy.'").

As described below, trial counsel was aware of witnesses whose testimony would have further demonstrated that Mr. Gerrans was acting in good faith with respect to the money he received from Sanovas; witnesses who could have rebutted the government's evidence and topics of cross-examination that could have challenged the credibility of the government's witnesses and narrative.  However, trial counsel failed to conduct an adequate investigation by even contacting or interviewing key witnesses who could have provided support for Mr. Gerrans' good faith belief that he was entitled to the monies he received.  He therefore could not possibly have made a reasoned decision as to who should be called to testify on Mr. Gerrans' behalf.  Trial counsel also failed to elicit the necessary witnesses who were called to testify.  This deficient performance prejudiced Mr. Gerrans by keeping crucial information from being heard by the jury and amounted to ineffective assistance of counsel.

**A.** <u>**Trial Counsel Failed To Interview Or Otherwise Investigate Any Of The Professionals Who Advised Mr. Gerrans In Connection With His Financial Transactions With Sanovas**</u>

One of the most notable deficiencies by trial counsel was the failure to highlight and introduce the extensive advice that Mr. Gerrans sought and received from attorneys and accountants in conducting the affairs of Sanovas including those directly at issue with respect to the charges in the Indictment.   Trial counsel acknowledged the importance of this advice when he pointed to reliance on the governance documents created by lawyers as the key piece of trial evidence supporting Mr. Gerrans' good faith.  (Dkt. No. 136.)  However, the only testimony about the purpose and effect of these documents came from government witnesses.

1  Trial counsel did not conduct any investigation into witnesses he could call who

2  could support Mr. Gerrans on this crucial topic.

3       Specifically, the original corporate governance documents and employment

4  agreements were drafted by Stafford Matthews of Dentons.  However, there is no

5  sign that Mr. Matthews was even interviewed by trial counsel, and he was certainly

6  not called to testify regarding his preparation of those documents.  (Holcombe Decl.

7  ¶ 4.)

8       Nor did prior counsel interview or call Jack Capers, Jr. or Eleanor Banister,

9  the King & Spalding attorneys who specifically identified the deferred compensation

10  issue and need for Larry Gehrans and Ehran Gunday to take the 409A monies they

11  were due. (Ex. 8; Holcombe Decl. ¶ 4.)  Similarly, prior counsel failed to interview

12  much less call Robert Farrell to discuss the 409A analysis he prepared in August

13  2013.  (Holcombe Decl. ¶ 3.)

14       Robert Farrell's analysis was critical as it showed that at least $723,900 was

15  owed to Mr. Gerrans based on the 409A analysis and that $816,585 of the total

16  $1,577,661.63 Erhan Gunday received at the time of his separation from Sanovas

17  was for deferred compensation.  (*See* Ex. 10).  Had Mr. Farrell been called to testify

18  he could have authenticated this email and confirmed the monies owed to Mr.

19  Gerrans.  This was a critical failure because the government had alleged that Mr.

20  Gerrans committed three counts of wire fraud in March 2015 (one wire transfer of

21  $80,000 on March 13, 2015 and two wire transfers of $250,000 on March 15, 2015)

22  totaling $580,000.  (Dkt. No. 57.)  The government argued that Mr. Gerrans was not

23  entitled to that money when there was documentary evidence that Sanovas owed him

24  more than that as of the end of 2013 and no evidence that as of March 2015, Sanovas

25  owed Mr. Gerrans less than the $580,000 he was charged with taking in Counts 1-3.

26       Trial counsel also failed to call Kevin Day, who provided a declaration in

27  support of Mr. Gerrans' motion to dismiss, which demonstrated (and Mr. Day would

28  have testified)  that Larry Gerrans consulted with him starting in August 2014 about

creating an Estate Plan and Asset Protection Trust to provide for his family (including Mr. Gerrans' five children).  (Dkt. No. 42-4 ¶ 16.)  As Mr. Day would have explained that Halo Management and Hartford were placed in that trust in keeping with the generally accepted practices for asset protection and with no intent to defraud anyone.  (*Id.* ¶ 17). Indeed, Mr. Gerrans and his wife quitclaimed the property to the Trust in June 2015 in keeping with this asset protection philosophy. (Quitclaim deed).

Furthermore, though the government charged in Count 5 that Mr. Gerrans committed wire fraud by sending $2,303,966.42 to purchase the Greensborough house, as Mr. Day could have testified, in having Mr. Gerrans create Hartford he also had him open a bank account for Hartford.  (Ex. 31.)  As Mr. Gerrans stated in connection with having the Hartford Legacy bank account opened and the loan documents et al set up "We need to be appropriately administrated and prepared to start transferring funds compliantly." *Id.* This evidence itself goes directly to the issue of Mr. Gerrans' good faith. As described by Mr. Krausz *(infra* Section B and in the accompanying Rule 29 motion), the money used to buy the house was money owed to Mr. Gerrans. Such money was wired into the Hartford account so that the house would be held in the trust. The details of these events were critical and the testimony would have undercut the government's claims of fraud with respect to both Hartford itself as well as the transaction charged in Count 6.

Trial counsel's failure to interview and determine whether to present these witnesses at trial was highly prejudicial as it left the jury hearing testimony only from the government's chosen witnesses.  If trial counsel intended to show that Mr. Gerrans acted as he did because he believed that he was entitled to the money he received from Sanovas, someone needed to affirmatively explain the documentary evidence that supports that position. The government witnesses certainly did not tell his story and the former attorneys and CFO Farrell were certainly readily identifiable to trial counsel who just failed to bother.

As a result, the jury had no countervailing evidence to consider in determining whether Mr. Gerrans acted with a good faith belief he was entitled to the monies in question.  It is reasonably probable that presentation of that evidence at a minimum would have raised reasonable doubt about the government's claims that Mr. Gerrans intentionally and wrongfully took the monies he received from Sanovas.  Such failures standing alone are tantamount to ineffective assistance of counsel.

> **B.**    **Trial Counsel Failed To Adequately Investigate And Rebut The Claims Of Government Witnesses That Larry Gerrans Was Not Entitled To The Money He Received From Sanovas**

Mr. Gerrans' trial counsel failed to call a single witness in Mr. Gerrans' defense.  Trial counsel likewise failed to investigate and elicit important testimony on cross-examination from several key government witnesses including Lloyd Yarborogh, a former Sanovas controller; three former Sanovas board members who testified for the government at trial (and for whom trial counsel received 302 witness interviews); Chris Gerrans, Mr. Gerrans' brother; and Mr. Gunday.  Trial counsel also failed to call Gary Krausz (or any forensic accountant) though Mr. Krausz had prepared a detailed analysis (and provided a Declaration in support of the Motion to Dismiss) that showed why Larry Gerrans was entitled to the money he was charged with illegally taking. Nor did trial counsel call Art Gerrans, another Gerrans brother who also worked for Sanovas, despite being aware that he had unique and important information to rebut the government's claims.

**Lloyd Yarborough.**    Mr. Yarborough, the Sanovas controller between September 2012 and May 2014, was called by the government to elicit testimony about Sanovas' financial difficulties and allegedly inappropriate personal expenses by Mr. Gerrans. (Dkt. No. 142 at 2:20-25; 4:24-5:4.)  Much of his testimony could have been challenged on cross-examination based on documents that trial counsel failed to introduce and by the testimony of Robert Farrell, the Sanovas CFO who was not contacted or called to testify for the defense.  (Holcombe Decl. ¶ 3.)

1    The government tried to show through Mr. Yarborough's testimony that
2   money was tight at Sanovas implying that Mr. Gerrans' withdrawals from the
3   company were harmful and could not have been justified.  (Dkt. No. 142 at 14:16-
4   15:6.)   However, documents related to investor funding call this testimony into
5   question as they show that there was an exponential increase in funding after Mr.
6   Gunday's departure and in fact 2015 was Sanovas' most successful year in raising
7   funds.  (*See* Ex. 12.)  However, Mr. Yarborough was never asked about Mr. Farrell's
8   analysis or the increase in funding.

9    Mr. Yarborough also testified (without objection for hearsay) that Mr. Gunday
10   had approached him in 2013 to review the company finances because Mr. Gunday
11   believed Mr. Gerrans was using company funds for his personal expenses.  (Dkt. No.
12   142 at 17:2-9.[7]).  However, this testimony contradicts the work of Sanovas CFO
13   Robert Farrell (*see* Ex. 6) who Mr. Yarborough admitted was actually in charge of
14   finances and had a greater understanding of the financial profile of Sanovas than Mr.
15   Yarborough did. (Dkt. No. 142 at 51:21-24.)

16    In late May and early June 2014, Mr. Farrell communicated with Mr.
17   Gunday about the allegedly personal expenditures that concerned Mr. Yarborough
18   and Mr. Gunday.  (Ex. 6.)  In the spreadsheet he prepared, Mr. Farrell explained to
19   Mr. Gunday why certain expenses such as a trip to Hawaii for business purposes
20   were permissibly billed to Sanovas under Mr. Gerrans' Employment Agreement and
21   the company by-laws.  (*See* Ex. 6 (the records show that of $172,222.74 submitted
22   expenses, all but $6,227.75 were approved).)   Mr. Farrell also prepared an analysis
23   of amounts owed to both Mr. Gerrans and Mr. Gunday that subtracted any personal
24   expenses for which Mr. Gerrans owed the company and still showed that Sanovas

25

26   _____

27   [7]    Mr. Yarborough testified that in making his chart of Mr. Gerrans' expenses
he largely relied on Mr. Gunday—who had significant personal conflicts with Mr.
28   Gerrans—to determine which expenses were appropriate.  (Dkt. No. 142 at 57:5-9
("[I]t was his word basically on some of them.").)

owed Mr. Gerrans $723,900.  (Ex. 9.)  Mr. Yarborough was never asked about his knowledge of communications between Mr. Gunday and Mr. Farrell or Mr. Farrell's analyses.  Trial counsel also failed to call Mr. Farrell—a decision that could not have been strategic because Robert Farrell was not even interviewed by trial counsel. (Holcombe Decl. ¶ 3.)

The failure to impeach Mr. Yarborough prejudiced Mr. Gerrans by allowing the government to assert the unchallenged theory during its closing that Mr. Gerrans started out by stealing smaller amounts of money but that his theft escalated after Mr. Gunday left the company:

> [Y]ou heard evidence that even before Larry Gerrans gained full control of Sanovas, he was stealing at every opportunity, small amounts. Taking his family to Hawaii and charging it to the company. Buying a family membership at the Bay Club. Those were small thefts that were totally inappropriate and wrong.

(Ex. 29 at 42:6-12.) The government also argued that Mr. Gerrans had to get rid of Mr. Yarborough after Mr. Gunday left the company:

> Gunday's gone. But there's one big obstacle. Lloyd Yarbrough's still there. That's the chief financial officer[8] who's been bird-dogging Larry Gerrans about the thefts he's taking from the company. These completely inappropriate charges. And you will recall that Mr. Yarbrough showed you the spreadsheet of the audit he had done, while he was the chief financial officer. So what does Larry Gerrans do? He fires Lloyd Yarbrough….

(Ex. 29 at 44:3-10.)  Had trial counsel provided evidence of Mr. Farrell's work, the jury would have had the opportunity to decide whether the personal expenses were signs of dishonesty or simply the subject of an accounting dispute between the

---

[8]    Yarborough was not the CFO, but the comptroller, who reported to the CFO. (Dkt. No. 142 at 5:1-4; 7:1-8.)

founders.  The jury, however, was denied that opportunity which could reasonably have affected the verdict at trial.

**American Express Charges.**  Trial counsel also failed to introduce evidence to rebut the charge in Count 4 that Mr. Gerrans improperly used the Sanovas American Express card to pay for his personal property taxes or the charge in Count 5 that Mr. Gerrans improperly wired money to Busra Carpets for a carpet for his personal home.  (Dkt. No. 57.)  In fact, as Mr. Gerrans' own bank records showed, he had personally paid for certain items for Sanovas and thus was entitled to reimbursement for those amounts well in excess of the $32,395.77 at issue in Count 4 or the $12,500 at issue in Count 5.  (Exs. 32, 33.)  Indeed, in a February 12, 2016 email, Mr. Gerrans advised his brother, Chris, that he paid $50,000 from his personal account to cover the January bill.  (Ex. 38.)  He also detailed how he had wired other monies including $150,000 from his personal account to cover payroll, medical and PG&E. *Id.*

Not only did trial counsel fail to show that the American Express charges were merely a means to repay Mr. Gerrans for monies he had personally advanced on behalf of Sanovas but trial counsel also failed to show that Mr. Gerrans was entitled to these amounts anyway since, as Gary Krausz explained in his Declaration, Sanovas still owed Mr. Gerrans  over a million dollars at the end of 2018.  (Dkt. No. 42-1.)  As detailed in Mr. Krausz's declaration, the compensation earned, paid and owed to Mr. Gerrans from 2010 to 2018 was $8,484,804, but he had been paid $7,040,171 (even including the full costs of the home in 2015). [9]  (*See id.* ¶¶ 20-21.) The chart shows that he was still owed money even if the entire amount of the IRA and liquidation penalties were excluded from the calculation.  (*Id.*)

---

[9] A more detailed discussion of the Krausz analysis of related monies Mr. Gerrans was still due at the end of 2018 is set forth in great detail in the concurrently filed Rule 29 Motion and thus will not be repeated here.

1    **Board Members Koen, Nichols and Georges.** The government
2    elicited testimony from three former members of the Board of Directors who
3    testified at trial that they would not have authorized Mr. Gerrans' May 2015
4    Employment Agreement had they known certain facts. (*See, e.g.*, Dkt. No. 140 at
5    46:22-25.)   The former board members also testified as to their understanding of the
6    contractual language of his employment agreement, specifically that Mr. Gerrans
7    would only get money prospectively under the Agreement. (*See, e.g.*, *id.* at 42:8-
8    12.)  Defense counsel failed to effectively cross-examine these witnesses (nor had
9    he made any effort to meet with them before trial).

10          First, defense counsel failed to cross-examine each Board member about his
11    independent due diligence duty though the Board members had legal liability for the
12    decisions they made while on the Board and sought and secured indemnity
13    agreements to protect themselves as a result. (*See, e.g.*, Exs. 34, 35.)  All of the
14    Board members who testified at trial were represented by attorneys and faced their
15    own legal liability for failing to discharge their duties while on the Board at Sanovas.
16    For example, they could have been cross-examined about the fact that if they did not
17    obtain the materials they wanted or needed to make a decision, (*see*, *e.g.*, Dkt. No.
18    154 at 14:31-4), it was their legal responsibility to obtain the materials or refrain
19    from making a decision at that time.  Their potential legal liability affected their
20    credibility as witnesses because it gave them an incentive to blame their decisions
21    on Mr. Gerrans—something that was simply not brought out or explored.

22          Second, after the government elicited testimony from the three former Board
23    members indicating that they felt that $300,000 was a high salary and that $75,000
24    bonuses were a lot for a start-up company (Dkt. No. 140 at 24:20-25-2; 43:3-11),
25    trial counsel failed to cross-examine the former Board members about the fact that
26    they each had been provided with a 2013 Ernst & Young CompStudy for Life
27    Sciences and Healthcare showing that Mr. Gerrans' salary was within the
28    appropriate range given to executives in comparable companies.  (*See* Ex. 15.)

1   Likewise, they also received copies of the salaries provided to other executives at

2   Sanovas.  (*See* Ex. 20.)  Further, Mr. Gerrans' employment agreement had explicitly

3   stated that he would be entitled to these bonuses (Ex. 26, Sch. A), and that Mr.

4   Gunday had received these past bonuses and had a severance agreement that

5   assumed a $300,000 salary.  (Ex.37.)   Indeed, had Stafford Matthews been called to

6   testify, he could have confirmed the fact that the 2012 employment agreement he

7   drafted had included a provision for retroactive payment of bonuses to Mr.

8   Gerrans—a fact that would have been critical for the jury to consider in relation to

9   whether retroactive approval of such benefits is appropriate.  (Ex.26, Sch. A.)

10      Third, without any objection from the defense, the Board members were asked

11  questions about their "understanding" of the terms of the contract where such

12  understanding was not relevant because the contractual language spoke for itself.

13  (*See*, *e.g.*, Dkt. No. 154 at 16:24-17:9 (testifying that it was his understanding that

14  prior to May 9, 2105, Mr. Gerrans had not already taken any deferred compensation,

15  and that Koen was not asked to approve any past action).)  Defense counsel could

16  have cross-examined the former Board members on the explicit language of the

17  contract, which did not make any representations as to *when* Mr. Gerrans would take

18  his 2015 salary, and explicitly stated that the Employment Agreement was effective

19  January 1, 2012, which made it retroactive by definition.  (Ex. 26.)  The late claim

20  by Board members that they were not approving past action is directly refuted by the

21  explicit language of the contract.

22      Fourth, government counsel asked the former Board members a number of

23  questions to suggest that they would not have authorized the Employment

24  Agreement had they known that Mr. Gerrans was also being paid by Halo (*see*, *e.g.*,

25  Dkt. No. 140 at 53:6-15), or that he had just purchased a home with Sanovas funds

26  (*see*, *e.g.*, *id.* at 52:21-24.)  The former Board members should have been cross-

27  examined about the fact that neither the CFO of the company nor the founders had

28  ever made a distinction between their income from Sanovas and their income from

Halo (for Mr. Gerrans) or ES Medical (for Mr. Gunday).  (*See, e.g.* Ex. 9 (equating monies received by individual or related company for purposes of compensation).) Regarding their self-serving statements that they would not have signed the Employment Agreement if they had known that Mr. Gerrans used funds from Sanovas to purchase a home, the former Board members were not cross-examined about the fact that the Employment Agreement they signed specifically authorized Mr. Gerrans, retroactively, to borrow money to buy a home, with  no restrictions on sales price, repayment or interest rates.  (Ex. 26.)

**David Gravell.**  The government's first witness at trial was David Gravell, the bankruptcy trustee for the Gerrans' bankruptcy. Mr. Gravell testified as to several issues designed to attack Mr. Gerran's integrity and credibility.  Most significantly, Mr. Gravell testified that schedules summarizing the Gerrans' assets and liabilities were filed on April 10, 2010 which allegedly stated that Mr. Gerrans listed his employment as "sales" for Sorin Gro and that Shelly Gerrans identified herself as "homemaker."  (Ex. 28 at 72:18-73:16.)  Further, Mr. Gerrans listed his monthly income as $15,400 with $8,044 in take home pay and Shelly Gerrans identified that she had no monthly income. (*Id.* at 73:25-74:14.)  Mr. Gravell further identified that there was no reference to Mr. Gerrans receiving income from Halo Management during the subject time frame (2010-2011) nor was Sanovas mentioned. (*Id.* at 76:12-77:11.)  He further identified that neither Larry nor Shelly Gerrans identified receipt of any monies for consulting work with Halo Management during the subject period.  (*Id.*)

The government tried to use these statements to show that Mr. Gerrans was lying about his right to compensation that he received from Sanovas.  But, in actuality, the statements the Gerrans made during the bankruptcy proceedings were accurate and consistent with Mr. Gerrans' defense in this case.  As of April 2010, neither Shelly nor Larry Gerrans were receiving any income or payments from Sanovas or from Halo Management.  Sanovas did not have any cash to make such

payments even if Halo eventually charged Sanovas for work that was unpaid at the time.  Similarly, the Gerrans did not declare an ownership interest in Sanovas because they did not have one—Halo Management was the limited liability partner in Sanovas.  (Ex. 1 at 52.)

Indeed, Mr. Gravell should have been cross-examined or a forensic accountant should have been called to rebut the testimony of Mr. Gravell regarding these financial matters.  Failure to do so left the conclusory and overreaching statements of Mr. Gravell essentially unrebutted.

**Chris Gerrans.**  At trial, the government relied heavily on the testimony of the defendant's brother, Chris Gerrans.  The government argued that Mr. Gerrans had installed his brother in a financial position and allowed him to steal money to get his cooperation with Mr. Gerrans' alleged theft.  (Ex. 29 at 44:17-45:7.)   Chris Gerrans also provided testimony regarding Halo invoices that the government used to argue that Mr. Gerrans had fraudulently produced them.  (Ex. 29 at 45:14-46:11.) Trial counsel failed to effectively counter Chris Gerrans' testimony on cross examination including showing the history of the relationship between the two brothers or the multiple motives Chris Gerrans had to lie.

First, trial counsel failed to accurately elicit the true relationship between Mr. Gerrans and Chris, which is that historically Chris was jealous of and competitive with Larry, while Larry was always helping to get Chris on his feet when he got into trouble.  The nature of their relationship was significant to the case because it was at odds with the government's theory that Larry used his close relationship with Chris to make him a partner in crime.

There were a number of important points where the true nature of Larry Gerrans' relationship with his brother was relevant and defense counsel failed to effectively impeach Chris Gerrans.  For example, trial counsel inexplicably tried to impeach Chris on his testimony that it was Mr. Gunday and not Mr. Gerrans who brought Chris into the Sanovas (Dkt. No. 130 at 209:17-210:1) when  it ***was*** Mr.

Gunday who brought Chris Gerrans into the company by giving him a job as Director of Operations (for which he was not qualified) over Mr. Gerrans' objection.[10]  Even more significantly, trial counsel failed to elicit information from Chris that at Sanovas he had quickly allied himself with Mr. Gunday.  Most drastically, trial counsel failed to refute the government's notion that Larry put Chris in charge of finances after Mr. Gunday and Mr. Yarborough left Sanovas to start his alleged financial shenanigans when Mr. Gerrans shifted Chris' responsibility from operations to finance because he had a degree in finance (Dkt. No. 5:6-11)—not because Mr. Gerrans needed him to commit fraud.  Chris was actually more qualified for the accounting job than he had been in his position as Director of Operations for which he had no training or experience.

Second, the government claimed that Chris Gerrans was able to steal approximately $1 million dollars from Sanovas because Mr. Gerrans failed to insure sufficient "oversight."  (*See* Dkt. No. 129 at 103:14-21.)  Trial counsel failed to contradict this argument and cross-examine Chris Gerrans about the fact he reported to the new Chief of Operations, Jeff Her, as of May 1, 2014.  This fact was relevant both to undermine Chris' claim that he stole because he lacked "oversight," as well as to dispute the government's claim that Larry Gerrans used Mr. Gunday's departure to eliminate financial oversight.  Nor did defense counsel impeach Chris Gerrans with the fact Larry Gerrans built up Sanovas' financial function and was gathering resumes and interviewing candidates for the CFO and comptroller positions, hired a bookkeeper, Tammi Griffith, to go through Sanovas' entire financial history, and ordered Chris Gerrans to provide Ms. Griffith with all of the

---

[10]     Chris Gerrans testified that Larry said "No way" to hiring Chris. When defense counsel asked, "So can you tell us how it was that you went from zero to director of operations at Sanovas in one hour? How did you do it?, Chris Gerrans answered: "Sometimes in life, sir, you know, the stars align. You don't ask why, you just take it by the reins and go full steam ahead. I mean, who knows." (Dkt. No. 130 211:18-23.)

company's financial records. (Ex 13.)  All of these facts would have shown that Mr. Gerrans was increasing not decreasing oversight over his brother.[11]

Third, trial counsel attempted to impeach Chris Gerrans by suggesting that Chris was inventing problems of addiction and depression in connection with his plea. (Dkt. No. 130 at 214:13-217:1 (eliciting testimony that Chris Gerrans had not discussed his problems with many people).)  In fact, Chris Gerrans' addiction to drugs and gambling over many years were an important factor in questioning the credibility of his testimony against Mr. Gerrans, not only as it related to his inability to recollect important details from the time but as it related to his incentives to steal and cover it up.  Defense counsel could have located a number of witnesses who would have attested to Chris Gerrans' addictions, and their likely connection to his physical violence with partners, car crashes and being barred from a casino for inappropriate conduct.  There was no strategic reason to try to undermine Chris Gerrans' claim that he was an addict when the government was relying on Chris' reliability in relating details about conversations with Larry.

Fourth, defense counsel failed to impeach Chris Gerrans' on a number of factors that impacted his credibility as a witness. Chris had expressed an extreme fear of going to prison because of a prior conviction on his record that would potentially suggest that he was a child molester and expose him to violence in prison. (Holcombe Decl. ¶ 5.)  Trial counsel was aware that Chris Gerrans was scared to go into custody because of this conviction, but defense counsel dismissed it as character evidence. (*Id.*)  In fact, Chris Gerrans' fear of going to prison speaks to his credibility because he had a greater incentive to say what the government wanted him to say as

---

[11]     Nor did defense counsel cross-examine Chris Gerrans on the fact that in light of the fraud he had started to commit, he repeatedly failed to provide bank records to Ms. Griffith and that Mr. Gerrans had to do this instead.  Defense counsel easily could have elicited from Chris Gerrans that had Larry wanted to enter false invoices into the system, it would have been extremely easy to do so by just giving the invoices to Ms. Griffith.

1   he was facing a likely prison sentence from his theft from Sanovas unless the

2   government recommended leniency.

3        Chris Gerrans' testimony gave crucial support to the government's theory that

4   Mr. Gerrans knew that he was not entitled to the money that he took from Sanovas.

5   Mr. Gerrans was prejudiced by trial counsel not only failing to counter Chris's

6   testimony, but bolstering it.

7        **Ehran Gunday.**   Ehran Gunday's testimony was introduced by video and

8   introduced to show, *inter alia,* that defendant Larry Gerrans was not entitled to

9   certain monies he received from Sanovas.   (Ex. 25.)   Specifically, Mr. Gunday

10  discredited the notion that Mr. Gerrans had used IRA proceeds for the benefit of

11  Sanovas for which he was entitled to be reimbursed or that the defendant was entitled

12  to compensation based on a percentage of monies he brought into Sanovas.   (*Id.*)

13  Trial counsel's inadequate preparation left him unable to adequately cross-examine

14  Mr. Gunday about his motives or his volatile history and related disdain for Mr.

15  Gerrans all of which would have undermined the credibility of his testimony.

16       First, trial counsel failed to question Mr. Gunday on the extensive

17  documentation provided by Mr. Gerrans that showed conflicts with Mr. Gunday

18  beginning in 2012 when Gunday failed to deliver on his side of the partnership, *i.e.*

19  to develop and bring to fruition the medical devices that were the basis of the whole

20  company.   (Holcombe Decl. ¶ 6.)   Similarly, having failed to make these inquiries

21  of Mr. Gunday directly at the Rule 15 examination, trial counsel failed to interview

22  former Sanovas employees either before or after the Rule 15 examination to

23  undermine Mr. Gunday's credibility and show Mr. Gunday's motive to destroy the

24  defendant both out of spite based on their ongoing conflicts as well as to facilitate

25  the success of his own new business.

26       Second, trial counsel also failed to cross-examine Mr. Gunday about the fact

27  that, when he left the company, he received more than $800,000 in deferred

28  compensation and knew that Mr. Gerrans was still awaiting his own equivalent

29

deferred compensation.  In fact, Mr. Gunday was a direct witness to the fact that Mr. Gerrans was owed money for his backpay and deferred bonuses.  Nor did defense counsel elicit from Mr. Gunday that a portion of his severance package that was based on salary for the 18 months after his departure from the company based on a salary of $300,000 per year and a bonus based on that salary, the exact same salary that the government argued at trial was unreasonable and excessive.

Third, trial counsel failed to establish through Mr. Gunday the fact that certain alleged "personal expenditures" by Mr. Gerrans (*e.g.* the Hawaii trip) had been explicitly approved by Sanovas CFO Rob Farrell.   (*See* Ex. 6.)  This would have been particularly important to elicit from Mr. Gunday since trial counsel failed to interview or call Mr. Farrell.

As co-founder of the company Mr. Gunday was perhaps in the best position to explain why Mr. Gerrans was entitled to the compensation he received.  However, the relationship between the two former business partners had deteriorated to such a point that Mr. Gunday would never have testified in support of Mr. Gerrans.  Trial counsel failed to take the basic steps to elicit testimony to support Mr. Gunday's bias which prejudiced Mr. Gerrans at trial.  Because Mr. Gunday's testimony was taken prior to trial, trial counsel even had the opportunity to investigate the documents provided to him by Mr. Gerrans even if he chose not to question Mr. Gunday about them.  However, trial counsel failed to conduct such an investigation, and Mr. Gerrans was left without the ability to raise significant questions about Mr. Gunday's credibility at trial.  Had these issues been presented to the jury, it is reasonably probable that the verdict would have been different.

**Gary Krausz.**  Trial counsel failed to call a forensic accountant to rebut the extensive testimony of the government's witness, Phillip Villaneuva, which detailed the monies Mr. Gerrans received.  (Dkt. No. 138.)  Trial counsel was aware of the evidence that Mr. Gerrans was entitled to everything that he received from Sanovas since forensic accountant Gary Krausz had provided an extensive declaration in

1   support of Mr. Gerrans' motion to dismiss that detailed his own financial

2   audit/reconciliation of the monies received by Mr. Gerrans which contradicted Mr.

3   Villanueva.  (Dkt. No. 42-1.)

4        Beginning in February 2016, Mr. Krausz conducted a detailed audit of

5   Sanovas since its inception and accounted for all of the money received by Mr.

6   Gerrans (and Halo) and calculated all of the money owed to Mr. Sanovas over the

7   years of his employment.  (*Id.*)  Mr. Krausz based his analysis on four documents –

8   the 2010 Employment Agreement (Ex. 2), the 2012 Employment Agreement (Ex.

9   3), the 2015 Agreement ratified by the board of directors on May 9, 2015 (which

10  was made retroactive to January 2012) (Ex. 26), and the 2015 Agreement Omnibus

11  Resolution (which ratified retroactive payments to Mr. Gerrans resulting from the

12  2015 Agreement).[12]  (Dkt. No. 42-1.)  As part of his analysis, Mr. Krausz calculated

13  amounts owed to Mr. Gerrans from 2010 to 2018 under the 2010 agreement, the

14  2012 Agreement, and the 2015 Agreement.  (*Id.* at Ex. I.)  The reason that this is

15  important is that one of the effects of the May 2015 Employment Agreement was to

16  give Mr. Gerrans additional compensation based on a schedule A of the agreement

17  which, because it was retroactive, entitled him to money from previous years as well

18  as it related to things like patents and fundraising.  (Ex. 26.)

19       Paragraphs 20 and 21 of Mr. Krausz's declaration show the compensation

20  earned, paid and owed to Mr. Gerrans from 2010 to 2018.  (Dkt. 42.-1.)  Some of

21  the figures are different in the charts because they are based on different accounting

22  assumptions, as described in the declaration, but both charts show that **at the end of**

23  **2018, Mr. Gerrans was owed for his work $8,484,804 and had been paid**

24  **$7,040,171 (this includes the full costs of the home in 2015)**.  Mr. Krausz's charts

25  show that at the end of every year, Mr. Gerrans was still owed money ($352,178) by

---

27  [12]    Trial counsel does not appear to have even attempted to move any of these
28  exhibits into evidence leaving the jury with no basis to determine that Mr. Gerrans
    was entitled to the compensation that he received—the central theme in his defense.

1    Sanovas, including after the end of 2015, when the home was purchased.  (*Id.*)

2         While defense counsel may have decided not to call Mr. Krausz as an expert

3    witness given that he was also a percipient witness, there was no strategic reason not

4    to hire a forensic accountant to conduct an analysis or present the information

5    prepared by Mr. Krausz to the jury. The analysis was important even though the

6    government disputed Mr. Krausz's opinion that Mr. Gerrans was owed money from

7    the IRA that he liquidated and sought to discredit the 2015 Employment Agreement

8    because Mr. Krauz's analysis described the amounts of money to which Mr. Gerrans

9    was entitled under various scenarios.  It was the government's burden to show that

10   Mr. Gerrans was not entitled to the money, and thus trial counsel needed to call Mr.

11   Krausz or another forensic accountant to present this information to the jury. The

12   defense literally did not have a witness to explain the amounts of money to which

13   Mr. Gerrans was entitled under his Employment Agreements.

14        **Anne Hipsham.**  Trial counsel also was deficient in not calling a witness like

15   Anne Hipshman, who filed a Declaration In Support of Defendant Gerrans' Motion

16   to Dismiss All Counts.  (Dkt. No. 42-2.)  As she explained in her Declaration, under

17   California law, Mr. Gerrans cannot be criminally punished for receiving money in

18   the form of wages which the company was required to pay him.  (*Id.* ¶ 13.)  In

19   California, the payment of wages may not be conditioned on future events, consents,

20   or the like, and all sums for work performed must be paid under California law when

21   earned and due based on preset paydays. Cal. Lab. Code §§204c, 207; Dkt. No. 42-

22   2 ¶ 16.

23        Thus, Sanovas was not entitled to defer Mr. Gerrans' compensation. Ms.

24   Hipshman also noted that the other payments made to Mr. Gerrans, explained as

25   reimbursement to Gerrans for his personal IRA deposit used by him to live off of

26   because of Sanovas' inability to pay his wages for a period of time, can also be

27   attributed to earned deferred wages.  (Dkt. No. 42-2 ¶ 28.)  Premature closure of Mr.

28   Gerrans' IRA, including the principal and penalties, could be necessary because Mr.

1    Gerrans needed money to live on while he was working for Sanovas, deferring and

2    not being paid his wages to a time when the company could afford to pay him.[13]

3        The testimony of witnesses like Mr. Krausz and Ms. Hipshman were also

4    relevant to Counts 4-5, the wire fraud charges regarding two small payments in 2017.

5    To the extent that Mr. Gerrans was owed money by Sanovas when these payments

6    were made, he was not cheating Sanovas out of money that did not belong to him.

7        The prejudice of the failure to call any financial expert as a witness is clear.

8    The central issue in the case was whether the government could prove beyond a

9    reasonable doubt that Mr. Gerrans was entitled to the money he received from

10   Sanovas.  Mr. Villanueva says that Mr. Gerrans was not entitled to the money and

11   there was no witness to explain why he was.  Thus, Mr. Gerrans' central defense was

12   left unsupported and the broad sweeping conclusions and allegations of Mr.

13   Villaneuva effectively went unrebutted.

14       **Art Gerrans.**   Trial counsel also failed to call Art Gerrans, Mr. Gerrans'

15   brother and a Sanovas consultant, even though Art Gerrans had significant

16   information to support the defendant's theory of the case.  Specifically, Art Gerrans

17   had told the FBI:

18       •   When problems between Mr. Gerrans and Mr. Gunday escalated in 2013,

19           Mr. Gunday would drink excessively and write emails criticizing Mr.

20           Gerrans.  (Ex. 22.)   Art Gerrans' testimony added context to the

21           relationship between Mr. Gunday and Mr. Gerrans and goes directly to

22           Mr. Gunday's biases and potential motivation in testifying against the

24   [13]    The government's position at trial was that the liquidation of the IRA was

25   relevant only if the money was put directly into the company when it was formed,

26   but as per Ms. Hipshman, this is incorrect because a relevant inquiry is whether Mr.

     Gerrans had to liquidate his IRA because he was not receiving deferred

27   compensation to which he was entitled.  (Dkt. No. 42-2.)  Whether he chose to spend

     the money on a diamond ring or some other item is irrelevant to whether he was not

28   receiving compensation that he was owed.

1    defendant.

2    • Mr. Gerrans told Art that he was taking $2.3 million out of Sanovas to

3       purchase the house he and his family had been renting and that he

4       believed this was money he was owed.  Art also stated that he had seen

5       documents showing that Sanovas owed Larry Gerrans an additional $2.8

6       million above what he had taken to purchase the house.  (*Id.*)  This

7       testimony is contemporaneous evidence of Mr. Gerrans' good faith belief

8       that he was owed the money he received from Sanovas.

9    • Art stated that Shelly Gerrans, Mr. Gerrans' wife, had in fact helped

10      decorate the Sanovas offices and had an office there herself.  (*Id.*)   This

11      directly contradicts that Sanovas payments for Ms. Gerrans' work were a

12      cover to funnel money to Mr. Gerrans.

13   • Art Gerrans stated that he had been asked to prepare invoices for work he

14      performed for Sanovas in connection with the IRS Code § 409A issue in

15      preparation for a potential public offering by Sanovas.  (*Id.*)   This

16      testimony would have countered the government's assertions that the

17      Halo invoices were falsified by Mr. Gerrans by showing a larger practice

18      at Sanovas of cleaning up bookkeeping issues.

19        The decision not to call Art Gerrans prejudiced Mr. Gerrans because it kept

20   key information from being presented to the jury.  The facts in Art Gerrans'

21   statements to the government were not presented through any other witness and were

22   directly related to Mr. Gerrans' only defense—that he took the monies charged in

23   the Indictment in good faith and thus lacked the requisite intent necessary to commit

24   a crime.  Even if Art Gerrans were subject to cross-examination, it is reasonably

25   probable that his multiple contradictions of government witnesses would have

26   affected the jury's verdict.

27

28

1

2

3

    **C.**    <u>**Trial Counsel Failed To Adequately Investigate And Present Key**</u>
<u>**Evidence Regarding The Encounter Between Larry And Chris**</u>
<u>**Gerrans**</u>

4

5

6

7

8

9

10

11

12

13

    Counts 10 through 12 of the Second Superseding Indictment relate to an encounter between Mr. Gerrans and his brother Chris in August 2019.  (Dkt. No. 57.)  Mr. Gerrans was under court order to have "no contact with [Chris] re: criminal case outside the presence of [Chris's] counsel."  (*Id.* at 10.)  The government claimed that Mr. Gerrans (1) gave Chris a "throw-away" or burner phone in order to communicate about the case; (2) sought to give Chris instructions about the case through family members, and (3) violently confronted Chris about his role in the case at a storage facility.  (*Id.*)  Again, trial counsel failed to investigate topics of cross-examination and elicit testimony from any witness that countered the government's contentions despite such evidence being available.

14

15

16

17

18

19

20

21

22

23

24

    As an initial matter, effective cross-examination of Chris Gerrans would have elicited testimony that, under the terms of Larry Gerrans' release, not only was he permitted to see Chris Gerrans as much as he wanted to, but he was also permitted to speak to Chris Gerrans about *any matter* other than Larry Gerrans' criminal case. (*See id.* at 10.)  Following his arraignment on the Indictment, Mr. Gerrans was released on pretrial supervision, and Mr. Gerrans and Chris Gerrans continued working together at Sanovas.  Obviously, they spoke.  Effective cross-examination would have revealed that because Chris and Larry Gerrans were permitted to see each other and talk about anything other than the case, it would have been absurd for Larry to give Chris a burner phone or try to communicate through family members because Larry had plenty of opportunity to speak privately with Chris.

25

26

27

28

    Chris Gerrans also testified extensively that Larry urged him to take the Fifth and not speak to the government or to take the Fifth when Chris was called before the grand jury.  (*See, e.g.*, Dkt. No. 129 at 114:6-9.)  Trial counsel should also have elicited on cross-examination that the conversations about taking the Fifth

1    Amendment were prior to Larry Gerrans' being indicted. Similarly, the fact that

2    Larry Gerrans showed up at Chris Gerrans' house was not relevant because it was

3    not a crime or a violation of the bond. Larry Gerrans was not obligated to avoid his

4    brother—only to avoid talking to him about the criminal case.

5            Effective cross-examination was also essential to eliciting the truth that

6    Larry Gerrans' argument with Chris at the storage unit had nothing to do with

7    Larry's criminal case, but rather was about separate business issues.  Indeed it came

8    directly on the heels of Larry discovery in early August of 2019 that (1) Chris had

9    stolen substantially more money from Sanovas than Larry had known, (2) Chris had

10   put the new Sanovas CEO, Jerry Katzman, in touch with Erhan Gunday, (3) Chris

11   had prepared for Katz a memorandum that was very unfavorable to Larry about the

12   electricity costs that Larry had caused Sanovas to incur the spring of 2019, and (4)

13   the Sanovas bank account had very little money in it, indicating that Jerry Katzman

14   was not being truthful when he said he was going to pay Larry or Chris the

15   compensation they had been told they would receive.  (*See* Exs. 21, 24.)  It was the

16   content of these emails and not Chris Gerrans' supposed potential testimony in Larry

17   Gerrans' criminal case that was the subject of their argument at the storage facility.

18   Indeed, the fact that the confrontation occurred directly after Larry Gerrans had

19   discovered the emails misconduct is more consistent with the timing of the argument

20   at the storage place than the government's theory that Mr. Gerrans suddenly realized

21   the trial date was close and exploded.

22           Those emails were in the possession of trial counsel yet there is no sign that

23   trial counsel took any steps to investigate them for use at trial.  Further, as described

24   *infra*, he directed Mr. Gerrans not to exercise his right to testify at trial.  Thus, the

25   only other person who could speak to the interactions Larry had with Chris was Chris

26   himself.  It accordingly was crucial that trial counsel bring out this testimony through

27   cross-examination of Chris and it was highly prejudicial that he failed to do so.  Had

28

1  any of this information been available to the jury it is reasonably probable that the

2  verdict would have been different.

3  **IV.    TRIAL COUNSEL'S ACTIONS AND LACK OF**

4  **PREPARATION EFFECTIVELY PREVENTED MR. GERRANS FROM**

5  **TESTIFING IN HIS OWN DEFENSE**

6      A defendant's right to testify in his own defense is a "fundamental

7  constitutional right" and is "essential to due process of law in a fair adversary

8  process." *Rock v. Arkansas*, 483 U.S. 44, 51, 53 n.10 (1987) (quoting *Faretta v.*

9  *California*, 422 U.S. 806, 819 n.15 (1975)). "[T]he most important witness for the

10 defense in many cases is the defendant himself." *Rock,* 483 U.S. at 52. "The

11 defendant's lawyer, rather than the trial judge, bears the primary responsibility of

12 informing and advising the defendant of this right, including its strategic

13 ramifications." *Casiano-Jiménez v. United States*, 817 F.3d 816, 820 (1st. Cir. 2016),

14 citing *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992). "[T]he

15 defendant's lawyer bears the primary responsibility of explaining that the choice of

16 whether or not to testify belongs to the defendant." *Id.*

17      The Ninth Circuit has emphasized that the right to testify in one's own defense

18 is "is fundamental and personal it can only be relinquished by the person to whom it

19 belongs, the defendant in a criminal trial. The general rule is clear that the

20 relinquishment of such a right must be intentional and to be intentional must be

21 known to the one who gives it up." *United States v. Martinez*, 883 F.2d 750, 756

22 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir. 1991). While it

23 is true that under the Ninth Circuit standard, courts have rarely found ineffective

24 assistance of counsel related to a defendant's right to testify, *id.* at 757, *see e.g.*

25 *United States v. Jackson*, 13 F. App'x 581, 583 (9th Cir. 2001), every case depends

26 upon the particular fact pattern before the court. Further, other jurisdictions have

27 found that where defense counsel "called the shots" and told his client he would not

28

testify, the client had received ineffective assistance of counsel. *United States v. Lore*, 26 F. Supp. 2d 729, 732, 740 (D.N.J. 1998).

Mr. Gerrans was deprived a meaningful opportunity to exercise his right to testify in his own defense because (1) his counsel failed to provide him with much of the discovery provided by the government when he was in jail, and thus he had not seen much of the critical evidence before trial began (he even learned after trial that he had not seen items like certain 302s; (3) his counsel never explained that unlike all other trial decisions, the right to testify and to plead were Mr. Gerrans' decisions alone; and (4) despite Mr. Gerrans' repeated insistence that he wanted to testify, trial counsel would always respond that he was not going to testify and never prepared him to testify.  (Declaration of Larry Gerrans ¶¶ 2-12.)  As a result, at the time that Mr. Gerrans was asked by the Court if he wanted to waive his right to testify, Mr. Gerrans believed that he had no realistic option but to follow his advice of counsel. Based on this particular set of factors, Mr. Gerrans was deprived of any meaningful exercise of his Fifth Amendment right and did not knowingly and intelligently waive that right.

## V.  TRIAL COUNSEL FAILED TO REQUEST A CRITICAL WIRE FRAUD JURY INSTRUCTION

Mr. Gerrans was charged in the Second Superseding Indictment with five counts of Wire Fraud, alleging fraudulent wire communications on March 13, 2015; March 16, 2015; April 10, 2017; and April 29, 2017, in violation of Title 18 Section 1343.  (Dkt. No. 57.)  Jury trial in this matter began on January 6, 2020, with jury instructions and closing arguments being given on January 29, 2020.  On January 10, 2020, the Ninth Circuit heard argument in the case of *United States v. Miller*, which considered whether wire fraud requires the intent to deceive *and* cheat (to deprive the victim of money or property by means of deception) rather than to deceive *or* cheat, as stated in the then-existing Ninth Circuit pattern jury instruction. *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020).  In its March 20, 2020

decision, the *Miller* court held that to prove wire fraud, the government must prove that the defendant intended to deceive and cheat ("In other words, a defendant must intend to deceive *and* cheat."), and that the Ninth Circuit pattern instruction was erroneous. *Id.* at 1101.

Trial counsel should have requested a wire fraud jury instruction requiring the government to prove that Mr. Gerrans intended not only to deceive Sanovas but to cheat it by depriving Sanovas of money or property. As of January 29, 2020, when Mr. Gerrans' case went to the jury with the pattern jury instruction, trial counsel should have known that the Ninth Circuit was considering this issue.  Further, as the Court noted in its opinion, even though the Ninth Circuit had previously upheld the language of "deceive or cheat," those holding were "no longer tenable in light of the Supreme Court's intervening ruling in *Shaw v. United States*" and "[i]ndeed, another panel of this court has already acknowledged as much in a non-precedential memorandum disposition." *Id.* at 1102 (citing  *United States v. George*, 713 F. App'x 704, 705 (9th Cir. 2018)).[14]  "A trial attorney's failure to request a jury instruction receives no deference, however, when it is based on 'a misunderstanding of the law' rather than 'a strategic decision to for[ ]go one defense in favor of another.'"  *Crace v. Herzog,* 798 F.3d 840, 852 (9th Cir. 2015).[15]  This failure was

---

[14]     As the Ninth Circuit noted, "[t]his has long been the law of several other circuits" (citing *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993) (mail fraud statute), *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970), *United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987), *United States v. Lemire*, 720 F.2d 1327, 1335–36 (D.C. Cir. 1983) (dicta), *United States v. Allen*, 491 F.3d 178, 187 (4th Cir. 2007) and 2 Sand et al. *Modern Federal Jury Instructions*, Instruction 44-5 (2019) ("'Intent to defraud' means to act knowingly and with the specific intent to deceive, for the purpose of causing some financial or property loss to another."). *Id.* at 1101-02.

[15]     *Richards v. Quarterman*, 566 F.3d 553, 569 (5th Cir. 2009) (finding ineffective assistance of counsel based on failure to request lesser-included-offense instruction, where such failure was "deficient and not a strategic decision"); *United States v. Alferahin*, 433 F.3d 1148, 1161 (9th Cir. 2006) (holding that trial counsel

prejudicial in Mr. Gerrans' case because the government so vigorously pursued the theory that Mr. Gerrans was deceptive while the entire defense was that Mr. Gerrans was entitled to the money; however, trial counsel did not even request the jury instruction that would have made that theory viable.

## VI.   THE GOVERNMENT MADE IMPROPER ARGUMENT TO WHICH TRIAL COUNSEL FAILED TO OBJECT

In its closing argument, the government made improper personal attacks on Mr. Gerrans' character and misstated the testimony in significant ways. "[C]ounsel's failure to insulate the jury from the prosecutor's grossly improper comments constitute[s] ineffective assistance." *Zapata v. Vasquez*, 788 F.3d 1106, 1111 (9th Cir. 2015). There is "'nothing strategic about failing to object' to the improper comments." *Id.* at 1116. "Unfortunately, when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. A failure to make such an objection can have devastating consequences for an individual defendant." *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005).  Here, the devastating consequences of trial counsel's ineffectiveness in not objecting to the government's misconduct require a new trial.  *See, e.g., Kimmelman v. Morrison*, 477 U.S. 365, 385–87 (1986) (finding ineffective assistance when counsel failed to challenge evidence because of counsel's failure to investigate).

Most egregiously, the government misstated the terms on which Mr. Gunday separated from the company, arguing without a credible legal or factual basis that Mr. Gunday's Separation Agreement was in exchange for Mr. Gerrans getting control of the company *and waiving his rights to future deferred compensation*. This was of great significance in light of the fact that the government alleged at trial that

---

was deficient, where he "did not intend strategically to for[ ]go [a] materiality instruction" but rather "had no idea that such an instruction was available to his client as a matter of right").

in Counts 1-3 that Mr. Gerrans was not entitled to the $580,000 he took from the company in March 2015. Specifically, the government argued in closing:

> Mr. Gunday gets $1.5 million to leave the company. And some of that is severance, some of it is considered pay . . . . And in return, what Larry Gerrans gets is control of the company. There is no reciprocal payout for Larry Gerrans. Erhan Gunday gets $1.5 million. Larry gets control of the company. That's the severance agreement. You have it in evidence. It's Government's Exhibit 113. Nothing for Larry Gerrans in terms of a payout.

(Ex. 29 at 43: 7-17.)

In its rebuttal, the government emphasized this fact again, quoting the testimony from Mr. Gunday that Mr. Gerrans did not "receive anything in return for the financial arrangement that [Gunday] got when [Gunday] left Sanovas" and that Mr. Gerrans was not promised the same financial arrangement that [Gunday] got [in the Separation Agreement]" in order to argue that this meant that Mr. Gerrans *was not entitled to his deferred compensation*. (Ex. 29 at 134:9-135:14.) The government said that the argument that Mr. Gerrans was entitled to his past deferred compensation just as Mr. Gunday was entitled to his was "a made-up justification for the looting that happened later. It's maybe one part of the cover story. Because remember, the cover story is always changing." (*Id.* at 35:15-17.)

The government's misrepresentation of the import of Mr. Gunday's testimony was critical. There was no factual support for the government's claim that Mr. Gunday's payment was in exchange for Mr. Gerrans getting control of the company and *not receiving the money he was owed as deferred compensation*. By its terms, Mr. Gunday's Separation Agreement identified the compensation to which Mr. Gunday was to receive; it said nothing about Mr. Gerrans' entitlement to his deferred compensation because it was not Mr. Gerrans' contract. And to the contrary, the fact that Mr. Gunday received past deferred compensation supported Mr. Gerrans' right to *his* deferred compensation. As explicitly stated in the Separation Agreement that

the government showed to Mr. Gunday and presented to the jury, $816,585 of the money Gunday received as part of his separation was for deferred compensation and bonuses for work from 2009 through 2012. (Ex. 23 at 2.).[16]  As shown in documents submitted with this Motion, the comparable amount of deferred income for Mr. Gerrans was $723,900. (Ex. 9.)  Similarly, the fact that Mr. Gunday's Separation Agreement included $446,686.81, based on a salary for 18 months after he left in 2014 of $300,000 was evidence that $300,000 was a fair base salary. (Ex. 37.) [17] Mr. Gunday's Separation Agreement meant nothing more than that he got his deferred compensation before Mr. Gerrans did, and it was improper for the government to argue otherwise. It was also ineffective assistance of counsel for trial counsel not to explain or even address this.

In addition, the government's closing argument in general was an improper personal attack on Mr. Gerrans' character. Government counsel argued:

> Larry Gerrans is a liar and a thief. He stole millions of dollars from Sanovas's investors. These investors had no idea that the money they were investing *in what they thought was a startup medical device company* would actually be used by Larry Gerrans to buy himself a $2.6 million luxury home, a Mercedes SUV for his wife and to pay for extravagant personal items that Larry Gerrans charged on Sanovas's American Express card, and had Sanovas write the checks for.. . .You remember, you heard from the bankruptcy trustee. He and

---

[16]    As counsel was preparing this motion for filing, they became aware that Exhibit C to Mr. Gunday's Separation Agreement may have been redacted and not presented to the jury. (*See* Ex. 23 (Gov. Ex. 113).)  The actual Exhibit C very specifically identified the calculations leading to Mr. Gunday's receiving $816,585 in deferred compensation. (*See* Ex. C to the Gunday Separation Agreement, attached as Exhibit 37.)  If this document was not shown to the jury, this would raise serious issues, and counsel will endeavor to learn from the government whether the jury was shown Exhibit C to the Separation Agreement.

[17]    Similarly, if the jury was not shown Exhibit C to the Separation Agreement and the government elicited testimony that $300,000 was too high a salary for Mr. Gerrans, this would be problematic.

1
2

> his wife have filed for personal bankruptcy. They have $4.7 million in liability. He can't even get a car loan, let alone a home loan.

3
4
5
6

(Ex. 29 at 38:12-20 (emphasis added); 41:13-15; *see also* id. at 42: 3-4 (arguing that investors "trusted" that their money was "going to be put into developing this technology, not buying Larry Gerrans a 4,000-square-foot mansion.").)   This was improper for three reasons.

7
8
9
10
11
12
13
14
15

First, the government suggested to the jury that Sanovas was not *actually* a startup medical device company at all even though investors *thought* it was, implying it was actually just a slush fund for Mr. Gerrans.  Sanovas was in fact a privately held medical device company with approximately 300 shareholders that held hundreds of patents; it was located in a 28,000 square foot building with state of the art scientific and engineering premises and, at its peak, employed more than 50 people. Defense counsel could have introduced countless witnesses or highlighted these facts on cross-examination to rebut this suggestion by the government.

16
17
18
19
20
21
22
23
24

Second, rather than arguing whether there was evidence that Mr. Gerrans took money to which he was not legally entitled, government counsel attacked Mr. Gerrans' character, calling him a thief and a liar and accusing him of spending extravagantly; the only relevant legal issue was whether Mr. Gerrans was legally entitled to the money, not the government's moral judgment about how he spent his money. Third, the reference to the amount of Mr. Gerrans' prior bankruptcy liability was an implicit attack on him, whereas there was no evidence in the record about the reasons for the bankruptcy and the devastating effect that Shelly Gerrans' medical issues had on the family's finances at that time.

25
26
27
28

Finally, the government's closing argument was replete with misstatements of fact. For example, the government argued that Mr. Gerrans' "biggest opportunity where he could steal millions of dollars came when he gained control of Sanovas. And that, *not surprisingly,* also coincided with Wade DeClaris's decision to sell the

43

house.  (Ex. 29 at 42:14-16) (emphasis added).)  In fact, the timing of Mr. Gunday's departure could have had nothing to do with Mr. DeClaris telling Mr. Gerrans he wanted to sell the house. Sanovas' lawyers exchanged drafts of Separation Agreements with Mr. Gunday for months in 2013, and the process continued for months in 2014 after Mr. Gunday hired counsel from Pillsbury. (*See* Ex. 23 at 2.) There is no dispute that this preceded the October 2014 notice from Mr. DeClaris. The government's theory that Gerrans had to delay his scheme to defraud the company until he could fire the comptroller, Mr. Yarborough, was also inconsistent with the evidence.[18]  In fact, the government's own witness testified that he never discussed the spreadsheet or expenditures with the defendant.  (Dkt. No. 142 at 20:7-8.)  Moreover, it completely ignores the actual spreadsheet prepared by Robert Farrell, Mr. Yarborough's boss, which showed that Mr. Gerrans was entitled to an equivalent sum.   (Ex. 6.)   Defense counsel's failures to object to these clear misstatements of the factual record prejudiced Mr. Gerrans.

## VII.   TRIAL COUNSEL'S SERIES OF ERRORS RESULTED IN CUMULATIVE PREJUDICE TO MR. GERRANS AT TRIAL

"[P]rejudice may result from the cumulative impact of multiple deficiencies." *Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995).  Where trial counsel made several serious deficiencies, the Ninth Circuit did "not hesitate to conclude that there is a reasonable probability that, absent the deficiencies, the outcome of the trial might well have been different."  *Id.; see also Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2006) (given the cumulative errors counsel made at trial, including the failure to object or request a mistrial when the prosecutor made false and derogatory statements during closing argument, counsels performance was

---

[18]     In closing, the government argued, "Gunday's gone. But there's one big obstacle. Lloyd Yarbrough's still there. That's the chief financial officer who's been bird-dogging Larry Gerrans about the thefts he's taking from the company. These completely inappropriate charges."  (Ex. 29 at 44:3-7.)

constitutionally defective and prejudicial).

Here, the deficiencies of trial counsel interact and build on each other to become greater than the sum of their parts. For example, even if one could argue that trial counsel's ineffective cross-examinations described above did not alone prejudice Mr. Gerrans, the same argument cannot be made in the context of trial counsels' other decisions. Trial counsel's decisions not to call any witnesses—including Mr. Gerrans himself—heightened the need for more effective cross-examination in order refute the government's assertion that Mr. Gerrans' knowingly took or received money to which he was not entitled. Similarly, one could argue that the decision to not call a specific witness—for example Mr. Krausz— did not ultimately affect the jury's verdict. But the decision to not call Mr. Krausz **and** the decision to not make any attempt to find a witness who could present the crucial testimony need to rebut Mr. Villanueva's analysis surely affected the jury's decision in this case. Trial counsel's decisions that in isolation may be questionable together amounted to a total failure to mount a defense. Thus, to the extent any one of trial counsel's actions alone is not found to have prejudiced Mr. Gerrans, they are prejudicial in total and denied Mr. Gerrans effective assistance of counsel at trial.

## VIII. CONCLUSION

The multiple errors described above represent deficient performance on the part of Mr. Gerrans' trial counsel. The errors considered on their own and certainly when considered together prejudiced Mr. Gerrans at trial and amounted to ineffective assistance of counsel in violation of his Sixth Amendment rights. Thus, Mr. Gerrans respectfully requests that he receive a new trial and opportunity to actually present his case through the assistance of counsel.

1    DATED:  May 27, 2020                KABAT CHAPMAN & OZMER LLP

2                                        By: s/ Theresa A. Kristovich
3                                            Theresa A. Kristovich

4                                        LAW OFFICES OF SHAWN HALBERT
5
6                                        By: s/ Shawn Halbert
                                             Shawn Halbert
7
                                         *Attorneys for Defendant Lawrence J. Gerrans*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT LAWRENCE J. GERRANS' MOTION FOR NEW TRIAL - CR 18-00310-EMC