SHAWN HALBERT (SBN 179023)
LAW OFFICES OF SHAWN HALBERT
214 Duboce Avenue
San Francisco, California 94103
Telephone: (415) 703-0993
shawn@shawnhalbertlaw.com

THERESA A. KRISTOVICH (SBN 66490)
tkristovich@kcozlaw.com
KABAT CHAPMAN & OZMER LLP
333 S. Grand Avenue, Suite 2225
Los Angeles, California 90071
Telephone: (213) 493-3980
Facsimile: (404) 400-7333

Attorneys for Defendant
LAWRENCE J. GERRANS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 18-0310 EMC |
| Plaintiff, | |
| vs. | **DEFENDANT LAWRENCE J. GERRANS' MOTION TO DISMISS BASED ON PROSECUTORIAL MISCONDUCT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| LAWRENCE J. GERRANS, a/k/a LARRY GERRANS, | |
| Defendant. | Second Superseding Indictment Filed: August 27, 2019 |
| | (Declaration of Shawn Halbert and Exhibits filed concurrently herewith) |
| | Hearing: July 15, 2020 Time: 2:30 p.m. |

**TO THE GOVERNMENT AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 15, 2020 at 2:30 p.m., or as soon as the matter may be heard, before the Honorable Edward M. Chen, United States District Judge, Defendant LAWRENCE GERRANS, by and through counsel, will and hereby does move for dismissal of the Second Superseding Indictment and all related charges based on the improper conduct of the government in connection with bringing those charges and presenting the matter to the jury at the trial of this case.

This Motion is based on this Motion, the attached Memorandum of Points and Authorities, the Declaration of Shawn Halbert and exhibits attached thereto filed concurrently herewith, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

DATED: June 12, 2020                LAW OFFICES OF SHAWN HALBERT

By: s/ Shawn Halbert

     Shawn Halbert


KABAT CHAPMAN & OZMER LLP

By: s/ Theresa A. Kristovich
     Theresa A. Kristovich

*Attorneys for Defendant Lawrence Gerrans*

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     SUMMARY OF ARGUMENT ..............................................................2

III.    LEGAL STANDARD ............................................................................3

    A.   General Duties Of A Federal Prosecutor ...................................3

    B.   The Government Has A Specific Duty To Collect Exculpatory
        Evidence, And Not Argue Statements Or Inferences It Has A
        Strong Reason To Doubt Or That Are Not Supported By The
        Evidence .........................................................................................4

IV.    ARGUMENT..........................................................................................5

    A.   The Government Presented Misleading And Incomplete Evidence
        Relating To The Fraud Allegations Against Mr. Gerrans And Made
        Improper Argument Based On Such Presentation ...........................5

          1.   The Government Misled The Jury By Presenting Evidence It
                Knew Or Had Reason To Know Was False That Larry
                Gerrans Stole Money From Sanovas In 2013................................5

          2.   The Government Misled The Jury By Presenting Evidence It
                Knew Or Had Reason To Know Was False About Erhan
                Gunday's 2014 Separation From Sanovas.....................................8

    B.   The Government Misled The Jury By Presenting And Arguing
        Evidence It Knew Or Had Reason To Suspect Was False Re Larry
        Gerrans' Contact With His Brother Chris Gerrans (Contempt,
        Witness Tampering And Obstruction Of Justice (Counts 10-12)) .........11

    C.   The Government Also Falsely Portrayed The Evidence Against
        The Defendant In Its Closing Argument.................................................16

    D.   At Minimum, Reversal Of Mr. Gerrans' Convictions Is Warranted .......18

V.     CONCLUSION ...............................................................................18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Berger v. United States*,
  295 U.S. 78 (1935)................................................................................................3, 19

*Commonw. of N. Mariana Islands v. Bowie*,
  243 F.3d 1109 (9th Cir. 2001) ...............................................................................2, 4

*Darden v. Wainwright*,
  477 U.S. 168 (1986)...................................................................................................17

*Gaither v. United States*,
  413 F.2d 1061 (D.C. Cir. 1969) .................................................................................4

*Miller v. Vasquez*,
  868 F.2d 1116 (9th Cir.1989) .....................................................................................4

*U.S. v. Miguel*,
  338 F.3d 995 (9th Cir. 2003) ....................................................................................17

*United States v. Bernal-Obeso*,
  989 F.2d 331 (9th Cir. 1993) ......................................................................................4

*United States v. Chapman*,
  524 F.3d 1073 (9th Cir. 2008) ..................................................................................18

*United States v. Gray*,
  876 F.2d 1411 (9th Cir. 1989) ....................................................................................4

*United States v. Kojayan*,
  8 F.3d 1315 (9th Cir. 1993) .......................................................................3, 5, 18, 19

*United States v. Munoz*,
  No. CR 05-00668(A) MMM, 2009 WL 10700741 (C.D. Cal. Aug. 19, 2009),
  aff'd, 409 F. App'x 117 (9th Cir. 2010).....................................................................4

*United States v. Reyes*,
  660 F.3d 454 (9th Cir. 2011) ...................................................................................4, 5

*United States v. Sayetsitty*,
  107 F.3d 1405 (9th Cir. 1997) ....................................................................................4

*United States v. Schuler*,
  813 F.2d 978 (9th Cir. 1987) ......................................................................................4

*United States v. Small,*
   74 F.3d 1276 (D.C. Cir. 1996) ....................................................................5

*United States v. Smith,*
   982 F.2d 681 (1st Cir. 1993) .......................................................................5

*United States v. Williams,*
   504 U.S. 36 (1992) ....................................................................................18

*United States v. Young,*
   470 U.S. 1 (1985) ......................................................................................17

**Statutes**

18 U.S.C. § 401(3) .............................................................................................1

18 U.S.C. §1001(a)(3) .......................................................................................1

18 U.S.C. §1343 ................................................................................................1

18 U.S.C. §1512(b)(1) .......................................................................................1

18 U.S.C. §1957 ................................................................................................1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On January 30, 2020, Larry Gerrans was convicted of all charges in the August 27, 2019 Second Superseding Indictment in this case, which alleged violations of 18 U.S.C. §1343 (wire fraud) and 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified unlawful activity, arising out of conduct during Larry Gerrans' employment as the President CEO and co-founder of Sanovas Inc. ("Sanovas")), as well as violations of 18 U.S.C. §1001(a)(3) (false statement), 18 U.S.C. § 401(3) (contempt), and 18 U.S.C. §1512(b)(1) (witness tampering, the final counts concerning Mr. Gerrans' conduct vis-à-vis his brother Chris Gerrans ).[1]

This Motion is based on facts that Mr. Gerrans' counsel have learned since May 27, 2020, when they filed the Motion for a New Trial and Motion for a Judgment Notwithstanding the Verdict. Undersigned counsel's access to facts has been hampered because the government has declined to provide the defense with an index of discovery provided to prior counsel, or even the letters and emails that accompanied prior discovery productions that would list the discovery that was provided. (*See* Letters between Defense and Government Counsel from June 2, 2020 to June 11, 2020, attached to the Declaration of Shawn Halbert ("Halbert Decl." as Ex. 1.)  Mr. Gerrans' prior counsel provided the defense with electronic discovery and a hard copy of a discovery but no discovery letters or indices, such that the only guide to discovery that undersigned counsel possess is the one-page attachment for discovery produced to Mr. Getz on November 1, 2020 and sent to counsel yesterday.  (Halbert Decl., Ex. 2.)

Undersigned counsel appeared on behalf of Mr. Gerrans on March 20, 2020, understanding that Mr. Gerrans simply needed representation in connection with sentencing. However, due to issues that have been discovered by Mr. Gerrans' new counsel, undersigned counsel have a duty to Mr. Gerrans and this Court to raise arguments based on their review of the file and their

---

[1]    Mr. Gerrans hereby incorporates the factual and trial background contained in Defendant's Motion for a New Trial.  (Dkt. No. 235.)

investigation to date. Counsel are filing this motion almost five weeks before the hearing date of July 15, 2020, and two weeks before the government's responses to defendant's previously filed motions are due. Given the substantial overlap in content with the motions, the defense respectfully requests that the motion be heard with the two other defense motions on July 15, 2020.[2]

## II.    <u>SUMMARY OF ARGUMENT</u>

In preparation for and at trial, the government failed to meet its constitutional obligation "to collect potentially exculpatory evidence, to prevent fraud upon the court, and to elicit the truth." *Commonw. of N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117 (9th Cir. 2001). Based on defense counsel's review to date, there are at least three major areas of testimony in which the government either presented misleading testimony or failed to present all relevant materials to the jury and argued material facts that had not been introduced into evidence.

First, despite possessing evidence from Sanovas' Chief Financial Officer Robert Farrell that there was nothing improper about Mr. Gerrans' claimed business expenses in 2013, the government introduced false and misleading testimony from Lloyd Yarborough that Mr. Gerrans was stealing money from Sanovas in 2013. Further, by not requiring Erhan Gunday to produce documents related to his 2014 Separation Agreement with Sanovas, the government deprived the jury of evidence that, at the time he left Sanovas in 2014, Mr. Gunday received exactly the same amount of money that Mr. Gerrans had received for business expenses in 2013.

Second, the government failed to require Mr. Gunday to produce documents that were obviously relevant to his separation from Sanovas, failed to adequately investigate claims Mr. Gunday made during his deposition, and restricted its own government accounting witness (Phillip Villanueva) from reviewing Mr. Gunday's withdrawals from the company. The government then used the absence of information to argue, without any factual basis, that Mr. Gunday's departure from Sanovas deprived Mr. Gerrans of his equal right to past compensation from Sanovas.

---

[2]    Defense counsel argued an abbreviated version of prosecutorial misconduct in the motion for a new trial in terms of trial counsel's role in not objecting. Since the filing of that motion, the defense has learned new information that forms the independent basis for this motion, but materials cited in this motion will nonetheless be familiar to the prosecution.

Finally, after eliciting very limited information from Chris Gerrans at trial about the substance of his interaction with Larry Gerrans at Public Storage on August 13, 2019, the government improperly argued that Larry Gerrans had attacked Chris Gerrans for cooperating in the criminal case against Larry Gerrans, even though there was no testimony supporting that accusation. Regarding Chris Gerrans' credibility, the government also failed to investigate the scope of Chris Gerrans' conduct and statements he had made to his father about what he expected to get in return for his cooperation, which came out during the grand jury testimony of Art Gerrans Sr.

Not only was each of these matters highly significant to the government's case against Mr. Gerrans, but the behavior took place during a trial in which the government made a number of inferences that were not supported by the facts and relied on a personal attack on Mr. Gerrans' character. The result was that Mr. Gerrans was deprived of his right to a fair trial, thus, his convictions should be reversed, and the case against him should be dismissed.

## III.   LEGAL STANDARD

### A.   General Duties Of A Federal Prosecutor

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done . . . .  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

The Ninth Circuit has held that government attorneys are held to different standards than other attorneys: "Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (citing *Berger*, 295 U.S. at 88). "While lawyers representing private parties may - indeed, must - do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules." *Id.* (citing *United States v. Hill,* 953 F.2d 452, 458 (9th Cir. 1991), Barbara Allen

Babcock, *Fair Play: Evidence Favorable to an Accused and Effective Assistance of Counsel,* 34 Stan. L. Rev. 1133, 1141 (1982); *see also United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) ("'It's the easiest thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply to win.'") (citing *Kojayan*, 8 F.3d at 1324)).

**B.     The Government Has A Specific Duty To Collect Exculpatory Evidence, And Not Argue Statements Or Inferences It Has A Strong Reason To Doubt Or That Are Not Supported By The Evidence**

There is a "constitutional obligation of the State and its representatives to collect potentially exculpatory evidence, to prevent fraud upon the court, and to elicit the truth." *Bowie*, 243 F.3d at 1117.

"[A] bad faith failure to collect potentially exculpatory evidence would violate the due process clause." *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir.1989); *see also United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) (vacating a conviction and granting evidentiary hearing where the government failed to investigate discrepancies in a paid informant's statement and then presented informant's testimony at trial). "[T]he prosecution has a duty to investigate potentially exonerating 'concrete documentary evidence,' and that its bad faith failure to do so violates due process." *United States v. Munoz*, No. CR 05-00668(A) MMM, 2009 WL 10700741, at *7, n.51 (C.D. Cal. Aug. 19, 2009), aff'd, 409 F. App'x 117 (9th Cir. 2010) (citation omitted).

Criminal defendants have a constitutional right "not to be convicted except on the basis of evidence adduced at trial." *United States v. Schuler*, 813 F.2d 978, 980 (9th Cir. 1987). Prosecutors have an affirmative "obligation . . . to avoid making statements of fact to the jury not supported by proper evidence introduced during trial." *Gaither v. United States*, 413 F.2d 1061, 1079 (D.C. Cir. 1969). While prosecutors may suggest that the jury make "reasonable inferences" from the evidence presented at trial, *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997), "it is improper to base closing arguments upon evidence not in the record." *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989).

"[I]t is improper for the government to present to the jury statements or inferences it knows to be false or has very strong reason to doubt." *United States v. Reyes*, 660 F.3d 454, 462 (9th Cir. 2011), citing *United States v. Reyes*, 577 F.3d at 1069, 1077 (9th Cir. 2009). "Faithful adherence to

these principles is particularly important because a 'prosecutor's opinion carries with it the imprimatur of the Government' and making false or misleading assertions 'may induce the jury to trust the Government's judgment rather than its own view of the evidence.'" *Reyes*, 660 F.3d at 462, citing *Reyes*, 577 F.3d at 1077 (quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985)).

It is improper for a prosecutor to argue an unsupported factual claim. *Kojayan*, 8 F.3d at 1321 (stating that prosecutor "actually made unsupported factual claims" and explaining that "[w]hen a lawyer asserts that something not in the record is true, he is, in effect, testifying. He is telling the jury: 'Look, I know a lot more about this case than you, so believe me when I tell you X is a fact.' This is definitely improper."). "[T]he government must take care to ensure that statements made in opening and closing arguments to the jury are supported by evidence introduced at trial." *United States v. Small*, 74 F.3d 1276, 1280 (D.C. Cir. 1996). It is well settled that in its closing argument the prosecution may not rely on knowledge or evidence unavailable to the jury. *United States v. Smith*, 982 F.2d 681, 683 (1st Cir. 1993).

## IV.   ARGUMENT

### A.   The Government Presented Misleading And Incomplete Evidence Relating To The Fraud Allegations Against Mr. Gerrans And Made Improper Argument Based On Such Presentation

#### 1.   The Government Misled The Jury By Presenting Evidence It Knew Or Had Reason To Know Was False That Larry Gerrans Stole Money From Sanovas In 2013

The government's theme at trial was that Larry Gerrans began stealing from Sanovas in 2013 by falsely claiming certain expenses as business expenses, and that such fraud was able to increase after co-founder Erhan Gunday and Lloyd Yarborough left the company in 2014.

The centerpiece of this argument was the testimony of Lloyd Yarborough, a comptroller at Sanovas from 2012 to 2014. The government elicited hearsay testimony from Mr. Yarborough that Mr. Gunday had approached him in 2013 to review the company finances because Mr. Gunday believed Mr. Gerrans was using company funds for his personal expenses. *See* January 13, 2020 Testimony of Lloyd Yarborough, Halbert Decl., Ex. 3 at 17:2-9. The government questioned Mr. Yarborough extensively on how, at Gunday's direction, Yarborough made a worksheet that listed Gerrans' expenses that Mr. Yarborough "knew were personal" as well as expenses that Gunday

thought were personal. (*Id.* at 17:13-15.) Mr. Yarborough testified that he went through Quickbooks, credit cards, the checking account and bank statements to gather information. (*Id.* at 17:23-18:3.) The government then introduced Exhibit 251A, which was Mr. Yarborough's summary spreadsheet with all the pages of expenses that he and Mr. Gunday had identified. (*Id.* at 18:11-19:5.) The government elicited testimony as to which expenses Mr. Yarborough "knew" were personal, like Sausalito mini-storage and DeClaris. (*Id.* at 19:6-20:5.) In response to the government's questioning, Mr. Yarborough testified that he brought his boss, Robert Farrell into it, (*id.* at 17:10-11) and that he reviewed his summary and the backup sheets with Mr. Farrell and Mr. Gunday. (*Id.* at 20:4-6.) Mr. Yarborough also specifically identified the payment to DeClaris as an illegitimate expense. (*See id.* at 19:17-21.)

The government began its closing argument by arguing its theory that Mr. Gerrans started out by stealing smaller amounts of money but that his theft escalated after Mr. Gunday left the company:

> [Y]ou heard evidence that even before Larry Gerrans gained full control of Sanovas, he was stealing at every opportunity, small amounts. Taking his family to Hawaii and charging it to the company. Buying a family membership at the Bay Club. Those were small thefts that were totally inappropriate and wrong.

(Government Closing Argument, January 29, 2020, Halbert Decl., Ex. 4 at 42:6-12.). The government specifically argued that Mr. Yarborough was credible because he testified that he had brought up his concerns about Mr. Gerrans' personal expenses with his boss, Mr. Farrell. (*Id.* at 128:23-129:3.) In closing, the government described the $170,000 taken by Mr. Gerrans for those expenses, prejudicially, as "looting." (*Id.* at 131:11-132:15.)

In fact, this testimony was completely misleading and the government's argument improper. The government was in possession of an email from Chief Financial Officer Robert Farrell to Erhan Gunday on May 31, 2013, in which Mr. Farrell, who was Mr. Yarborough's boss, went through item by item of the expenses to which Mr. Gunday and Mr. Yarborough had objected and explained why the expenses were permissible under the Employment Agreements and the by-laws. (*See* USAO-FBI-002243, included as part of Halbert Decl., Ex. 5) Mr. Farrell identified the DeClaris and Storage expenses as examples of legitimate expenses. He found that of $172,222, all but $6,227

(approximately 3%) were authorized and that the balance was being offset against money owed to Mr. Gerrans. *Id.* Thus, the government presented evidence that was at best extremely misleading because Mr. Yarborough's concerns had been overruled by the CFO of the company and were arguably unfounded if not false. Notably, the government also failed to call Robert Farrell as a witness or introduce the significant worksheet he prepared that identified the legitimacy of Mr. Gerrans' expenses. This was intentionally misleading.

Further, by not requiring Erhan Gunday to produce documents related to his Separation Agreement with Sanovas in 2014, discussed in more detail below, the government deprived the jury of learning that, as part of his separation from Sanovas, Mr. Gunday received the exact amount of money Mr. Gerrans had received for business expenses in 2013, approximately $176,645.68, that Robert Farrell specifically identified Mr. Gunday had claimed as "Amount Equal to Company Paid Expenses Received by Larry Gerrans," (Dkt 235-1 at p. 129/319, (Exhibit 10)).

In connection with the false narrative that Mr. Gerrans had to get rid of Mr. Gunday and Mr. Yarborough because they discovered that Mr. Gerrans was stealing money from Sanovas in 2013, the government made two arguments to the jury that were not supported by the testimony. First, the government argued that Mr. Gerrans' "biggest opportunity where he could steal millions of dollars came when he gained control of Sanovas. And that, *not surprisingly,* also coincided with Wade DeClaris's decision to sell the house. (Halbert Dec., Ex. 4 at 42:14-16) (emphasis added).) In fact, the timing of Mr. Gunday's departure could have had nothing to do with Mr. DeClaris telling Mr. Gerrans he wanted to sell the house because Mr. Gunday's separation process, which involved legal counsel, began in the Fall of 2013, and thus preceded by a year the October 2014 notice from Mr. DeClaris about selling his house.

The government also argued in closing that Mr. Gerrans had to delay his scheme to defraud the company until he could fire the comptroller, Mr. Yarborough:

 Gunday's gone. But there's one big obstacle. Lloyd Yarbrough's still there. That''s

the chief financial officer[3] who''s been bird-dogging Larry Gerrans about the thefts he's taking from the company. These completely inappropriate charges. And you will recall that Mr. Yarbrough showed you the spreadsheet of the audit he had done, while he was the chief financial officer. So what does Larry Gerrans do? He fires Lloyd Yarbrough . . . .

(Halbert Dec., Ex. 4 at 44:3-10.)  Not only was it false that Mr. Yarborough had uncovered illicit expenses, but the government's own witness had testified that he never discussed the spreadsheet or expenditures with Mr. Gerrans. (*Id.* at 20:7-8.) Thus, the government's narrative was false from start to finish and was predicated on presentation of testimony that the government knew or had reason to know was untrue.

### 2. The Government Misled The Jury By Presenting Evidence It Knew Or Had Reason To Know Was False About Erhan Gunday's 2014 Separation From Sanovas

Erhan Gunday's deposition testimony and Separation Agreement were central to the government's allegation that Mr. Gerrans took money to which he was not entitled.  Unfortunately, the government admitted into evidence at trial Mr. Gunday's 2014 Separation Agreement that *on its face* was incomplete, missing significant exhibits such as how the money Mr. Gunday received was calculated.  Both the incomplete materials obtained from Mr. Gunday as well as the questions at Mr. Gunday's Rule 15 examination in November 2019 made it clear that the government was not seeking the truth, but rather, was asking Mr. Gunday questions that would support its theory at trial that Mr. Gerrans was not entitled to any deferred compensation from Sanovas.

Government Trial Exhibit 113, which was admitted at trial, was Mr. Gunday's Separation Agreement with only exhibits B and D attached.  Since filing motions on May 27, 2020, undersigned counsel learned that other exhibits to Mr. Gunday's Separation Agreement were not presented to the jury, and that it does not appear that the government made any attempt to get the exhibits from Mr. Gunday, from whom they had received the Separation Agreement. Attached hereto as Exhibit 6 to the Halbert Declaration is the Separation Agreement with Exhibits C, F and G to that Agreement attached.  Exhibit C to the Separation Agreement is particularly important because it breaks out the

---

[3]    This was a misstatement. Yarborough was not the Chief Financial Officer, but the comptroller, who reported to the CFO. (Halbert Dec., Ex. 3 at 5:1-4; 7:1-6.)

deferred compensation owed to Mr. Gunday from the years 2009 to 2012 as of his departure in 2014; it also specifically calculates his severance pay as 18 months of future pay at $300,000 per year, a rate that the government elicited at trial was excessive.[4]

Without the exhibit that showed the way that Mr. Gunday's payments were calculated in evidence, the government argued to the jury that:

> Mr. Gunday gets $1.5 million to leave the company. . . . And in return, what Larry Gerrans gets is control of the company. There is no reciprocal payout for Larry Gerrans. Erhan Gunday gets $1.5 million. Larry gets control of the company. That's the severance agreement. You have it in evidence. It's Government's Exhibit 113. Nothing for Larry Gerrans in terms of a payout.

(Ex. 4 at 43:7-17). The government claimed that its argument was based on Mr. Gunday's testimony, but Mr. Gunday's statement was only that Mr. Gerrans did not get anything "in return" for what Mr. Gunday received, and was not promised the same arrangement. A review of the full Separation Agreement makes it clear that the agreement has nothing to do with Mr. Gerrans' compensation, only Mr. Gunday's, because only Mr. Gunday was leaving the company. While Mr. Gunday testified that Mr. Gerrans was going to stay at the company and retain control along with the Board, (*id.*), the government argued without a legal or factual basis that Mr. Gunday's Separation Agreement was in exchange for Mr. Gerrans getting control of the company *and waiving his rights to future deferred compensation*. This was of great significance in light of the fact that the government alleged at trial that, as set forth in Counts 1-3, Mr. Gerrans was not entitled to the $580,000 he took from the company in March 2015.

In its rebuttal, the government emphasized this fact again, quoting the testimony from Mr. Gunday that Mr. Gerrans did not "receive anything in return for the financial arrangement that [Gunday] got when [Gunday] left Sanovas" and that Mr. Gerrans was not promised the same financial arrangement that [Gunday] got [in the Separation Agreement]" in order to argue that this meant that Mr. Gerrans *was not entitled to his deferred compensation*. (Ex. 4 at 134:9-135:14.) The

---

[4]     Counsel does not know if there is a page C-2, though it appears that there should be, as it would complete the calculations of Mr. Gunday's compensation.

government said that the defense argument that Mr. Gerrans was entitled to his past deferred compensation just as Mr. Gunday was entitled to his was "a made-up justification for the *looting* that happened later. It's maybe one part of the cover story. Because remember, the cover story is always changing." (*Id.* at 135:15-17 (emphasis added).) The government even told the jury that because Mr. Gerrans' right to an equivalent 1.5 million dollars was not in *Mr. Gunday's* Separation Agreement, that meant Mr. Gerrans was not entitled to compensation. This misstatement of fact and law was very prejudicial, as the jury likely looked to the government as being experts on the law. "Because where in that separation agreement does it say that Larry Gerrans is entitled to even 1.5 million? It doesn't. It's not in there." (*Id.* at 135:22-24.)

The government's misrepresentation of the import of Mr. Gunday's testimony was critical. There was no factual support for the government's claim that Mr. Gunday's payment for leaving the company was in exchange for Mr. Gerrans *not receiving the money he was owed as deferred compensation*. By its terms, Mr. Gunday's Separation Agreement identified only the compensation Mr. Gunday was to receive; it said nothing about Mr. Gerrans' entitlement to his deferred compensation because it was not Mr. Gerrans' contract. And, to the contrary, the fact that Mr. Gunday received past deferred compensation actually supported Mr. Gerrans' right to *his* deferred compensation. As explicitly stated in Exhibit C to the Gunday Separation Agreement (that the government never sought or obtained from Mr. Gunday or showed to the jury), $816,585 of the money Gunday received as part of his separation was specifically for deferred compensation and bonuses for work from 2009 through 2012. Halbert Decl., Ex. 6. Mr. Gunday's Separation Agreement meant nothing more than that he got his deferred compensation before Mr. Gerrans did, and it was improper for the government to argue otherwise.

As explained in Defendant's Motion for a New Trial, Mr. Farrell also prepared an analysis of amounts owed to both Mr. Gerrans and Mr. Gunday and calculated that Sanovas owed Mr. Gerrans $723,900 and Mr. Gunday $816,585. The defense has since learned that the government had in its possession the November 27, 2013 emails that Mr. Farrell sent to Mr. Gunday calculating the past compensation. (*See* USAO-FBI-002443-2444, included as part of Halbert Decl., Ex. 5.) The government also possessed an August 22, 2013 email from CFO Robert Farrell to Sanovas' lawyers

specifying that the amount in deferred compensation owed to Mr. Gerrans was $723,900 and the amount of deferred compensation owed to Mr. Gunday was $816,585. (*See* USAO-FBI-002441, included as part of Halbert Decl., Ex. 5).[5] The government also had in its possession the August 5, 2013 advice from the corporate attorneys that if the executives were not paid the outstanding amount owed to them immediately "the Executives will be attributed income equal to the present value of the vested 409 Compensation plan plus an additional 20% tax on that compensation." USAO-FBI-2434-2435 (Halbert Decl., Ex. 8 at 5.) Thus, not only was the government's argument not supported by the Separation Agreement, but it was counter to evidence that the government had in its possession. The government's presentation and argument were accordingly both false and intentionally misleading.

**B.** **The Government Misled The Jury By Presenting And Arguing Evidence It Knew Or Had Reason To Suspect Was False Re Larry Gerrans' Contact With His Brother Chris Gerrans (Contempt, Witness Tampering And Obstruction Of Justice (Counts 10-12))**

With respect to the charges set forth in Counts 10-12 (contempt, witness tampering and obstruction of justice), the government argued evidence that either contradicted evidence in the record or was not in the record regarding Larry Gerrans' contact with his brother Chris Gerrans, which formed the basis of Mr. Gerrans' convictions of Counts 10 through 12.

The defense will begin with the most recent alleged conduct, the confrontation between Larry Gerrans and Chris Gerrans at the Public Storage on August 13, 2019, because this was the most serious conduct alleged against Mr. Gerrans and the least substantiated.

By way of background, in its Motion for a New Trial, the defense submitted evidence showing that Chris Gerrans and Larry Gerrans were not arguing about Chris Gerrans' cooperation with the Department of Justice on August 13, 2019 at the Public Storage. In addition to the emails provided to the Court with the Motion for a New Trial, Dkt. 235, showing that Larry Gerrans had

---

[5]     The chart entitled "Deferred Amounts Owed to Larry Gerrans and Erhan Gunday" that was attached to that email and was provided to the King & Spalding attorneys on August 22, 2013 was attached to Defendant's Motion for a New Trial at Ex. 9.

discovered several pieces of information about Chris Gerrans that led to the confrontation,[6] the defense has now been able to confirm with Mr. Gerrans' attorney, Larry Murray, that he received the following email from Mr. Gerrans on August 8, 2019, five days before the confrontation at public storage:

> **From:** gerrans.acpriv@innocent.com <gerrans.acpriv@innocent.com>
> **Sent:** Thursday, August 8, 2019 12:57 AM
> **To:** 'bhgetz@pacbell.net' <bhgetz@pacbell.net>; 'daydrmn@aol.com' <daydrmn@aol.com>
> **Subject:** Chris Gerrans is a SELL OUT!
>
> Jerry Katzman has coopted Chris to write a Demand Letter to Sheppard Mullin in an attempt to document that I am not being cooperative with the company, that I am withholding information and that I have stole company property. All of this is a lie.
>
> Nonetheless, this ALL I needed to see! I am sick! I am done with Chris! Let's turn him over to the DOJ and fry his lying, cheating and thieving ass!

(See August 8, 2019 Email from Larry Gerrans to attorneys Brian Getz and Larry Murray, Halbert Declaration, Exhibit 7). This email confirms that Larry Gerrans was angry at his brother about something completely unrelated to his alleged criminal case and is consistent with Chris Gerrans' testimony at trial that Larry Gerrans told him that he was a sell-out. As the defense also argued in the Motion for a New Trial, Larry Gerrans was upset because he had recently learned about a subpoena to Sanovas that requested checks written to Chris Gerrans that suggested that Chris Gerrans had stolen substantially more money from Sanovas than he had previously admitted to Larry Gerrans after the theft had been discovered.[7]

The entirety of Chris Gerrans' testimony about the content of the argument with Mr. Gerrans at Public Storage was as follows: "He was screaming and yelling at me for cooperating with the --

---

[6]    Emails submitted as Exhibits 21 and 24 to Dkt. 235-1 show that in early August, 2019, Mr. Gerrans discovered that (1) Chris had put the new Sanovas CEO, Jerry Katzman, in touch with Erhan Gunday, (2) Chris had prepared for Katzman a memorandum that was being used as a Demand Letter to Sheppard Mullin about the electricity costs that Larry Gerrans had incurred on behalf of Sanovas in the Spring of 2019, and (3) the Sanovas bank account had very little money in it, indicating that Jerry Katzman was not being truthful when he said he was going to pay Mr. Gerrans the severance he had negotiated with Sanovas upon leaving the company.

[7]    *See* Government Subpoena to Sanovas re Chris Gerrans with return date of May 9, 2019, attached as Exhibit 8 to Halbert Declaration. The defense assumes that all of these checks to Chris Gerrans, which appear to total substantially more than a million dollars, have been produced to the defense and that the fraudulent checks have been identified. However, the defense has been unable to locate these documents without an index.

with the subpoenas, and providing information. He told me I was selling him out." (*See* Testimony of Chris Gerrans on January 15, 2020, Halbert Decl., Exhibit 9, at 146:17-19.) Chris Gerrans did not testify that the subpoenas and information were related to Larry Gerrans' criminal case. In fact, based on the email above, entitled "Chris Gerrans is a SELL OUT!", which Larry Gerrans (ironically) told his attorneys made him want to turn Chris Gerrans over to *the Department of Justice*, there should be no doubt that Larry Gerrans was angry at Chris for selling him out with Katzman (the successor CEO) and providing information to Katzman. The government was aware of this as it had sent subpoenas to Katzman about Chris' theft from Sanovas.

Notably, the government did not ask Chris Gerrans what subpoena he was talking about, or to whom Chris Gerrans was providing information. The government deliberately did not solicit further explanation from Chris Gerrans, and it is critical to note that there actually was no testimony at trial that the argument had anything to do with Chris Gerrans cooperating against Larry Gerrans in Larry Gerrans' criminal case. Notwithstanding the absence of such evidence, in closing, the government argued critical facts that were not in the record, specifically that Larry Gerrans screamed at Chris Gerrans "'You sold me up the river' *for cooperating in the criminal case.*'" (Halbert Decl., Ex. 4 at 85:1-2, 24-25 (emphasis added).) But that is not what Chris Gerrans testified to.

Nor is it clear that the government's failure to get clarification from Chris Gerrans at trial was simply oversight. In fact, the two FBI 302s that memorialize the government's interviews with Chris Gerrans almost immediately after the confrontation with Larry Gerrans do not contain a single reference to the subject of their argument and there no reference to Larry Gerrans saying anything about cooperating in the criminal case.

The first FBI 302, from an interview on August 13, 2019, states only that Chris Gerrans said that Larry Gerrans said: "I know what your (sic) up to, you sell out." (Halbert Decl., Ex. 10, USAO-FBI-002363.) The other FBI 302, dated August 14, 2019, simply states that Larry "ranted" at Chris. (Halbert Decl., Ex. 10, USAO-FBI-002368.)

It is extremely strange that neither 302 contains a statement from Chris Gerrans stating that Larry Gerrans was angry at him for cooperating in the criminal case, particularly since he also did

not testify to that at trial. Given three opportunities to elicit such a statement from Chris Gerrans, the government never obtained it, and yet argued it at trial.

Not only did the government use the alleged confrontation with Chris Gerrans at Public Storage to argue that Mr. Gerrans was guilty of Counts 10-12, but significantly the government argued repeatedly throughout closing argument that this conduct was evidence of consciousness of guilt for all of the other counts with which he was charged.

The government also claimed that Mr. Gerrans (1) gave Chris a "throw-away" or burner phone in order to communicate about the case, and (2) sought to influence Chris Gerrans' testimony by having their father, Art Gerrans Sr. communicate three things that Chris Gerrans should do – plead after his birthday, acknowledge that Larry Gerrans did not know about Chris Gerrans' theft, and state that Larry Gerrans did not use IRA money for the company.

Underlying these accusations against Larry Gerrans was the government's improper suggestion (and in one instance, outright untrue statement) that Larry Gerrans and Chris Gerrans were not allowed to see each other under the terms of Larry Gerrans' bond. In fact, under the terms of Larry Gerrans' release, not only was he permitted to see Chris Gerrans as much as he wanted to, but he also was permitted to speak to Chris Gerrans about *any matter* other than Larry Gerrans' criminal case. (Government Trial Exhibit 250). Following Chris Gerrans' arraignment on his Indictment, Chris Gerrans was released on pretrial supervision, and he and Larry Gerrans continued working together at Sanovas. They spoke all the time.

At one point the government specifically argued to the jury that contact between the two was not permitted if it was outside the presence of counsel:

> Count 10 is the contempt-of-court count. This is Government's Exhibit 250. It's the bond. We talked a lot about the bond, and all the ways that Larry committed contempt of court. He harassed, retaliated, intimidated and tried to threaten Chris Gerrans. *And most of all, he had contact with Chris Gerrans repeatedly, outside the presence of Chris Gerrans's counsel.* So that's Count 10.

(Halbert Decl., Ex. 4 at 96:6-12 (emphasis added).)[8]

It is only this mistake or misrepresentation by the government that could explain the government's theory about the burner phone or the message for which Larry Gerrans allegedly wanted to use his father as an "intermediary." Larry Gerrans could see or talk to Chris Gerrans privately whenever he wanted to. If he had wanted to secretly talk about the case, he did not need a burner phone or to use his father.

As to the allegation involving Art Gerrans Sr. reading to Chris Gerrans from a note he had written after talking to Larry Gerrans, defense counsel has only just yesterday seen the grand jury transcript of Art Gerrans Sr.'s testimony.[9] Notably, Art Gerrans Sr. testified before the grand jury that in June, 2019, Chris Gerrans told him in front of Larry Gerrans that Larry knew nothing about Chris' theft from Sanovas. (*See* excerpts of Grand Jury Testimony of Art Gerrans Sr., Aug. 27, 2019, Halbert Decl., Ex. 11, at USAO-GJ-000046). This is extremely important. If Larry Gerrans did not know about Chris Gerrans' theft, which he absolutely did not, then telling Chris Gerrans to tell the FBI that Larry knew nothing about the theft is not communication that violated the bond. Larry Gerrans was never charged with aiding and abetting Chris Gerrans' theft – it was not part of Larry Gerrans' case.

Also significantly, Art Gerrans Sr. testified repeatedly before the grand jury that he did *not* write three things down to tell Chris (*i.e.* he wrote nothing about Chris not pleading before his birthday, nothing about the IRA); the only thing Larry wanted his father to remind Chris was that Larry had not known about Chris' theft. See Halbert Decl., Ex. 11, at USAO-GJ-000050, 000053, 000057-62, 000070-71, 000073-74, 000077-78. This was true, and again, was not part of Larry Gerrans' case because he was never charged with that theft. The government did not put that

---

[8]    AUSA Farnham made a similar misstatement in the grand jury when Art Gerrans Sr. was testifying, asking: "At that point did you know that…Larry Gerrans should not be speaking directly to Chris, because he was a potential witness? Did you know that?" Halbert Decl., Ex. 11, at USAO-GJ-000078 lines 3-7.

[9]    Current defense counsel have been unable to find it in the discovery and prior defense counsel had no recollection of ever seeing it. The government produced a copy to the defense on June 11, 2020 upon counsel's request.

evidence before the jury to assist in evaluating Chris Gerrans' credibility.[10] Art Gerrans Sr. also testified before the grand jury that Chris Gerrans had told him that if he cooperated, he would go to a "country club," Halbert Decl., Ex. 11, at USAO-GJ-000045:21-000046:2, a fact that the government did not question Chris Gerrans about at trial, even when Chris Gerrans testified that he had no expectations of what would happen if he cooperated. (Halbert Decl., Ex. 9 at 106:13-107:2.)

Notably, at trial, the government constructed a false narrative that Larry Gerrans did know about Chris' theft and turned a blind eye to it because he wanted Chris to cover up Larry's theft. However, on cross-examination, Chris Gerrans admitted that Larry Gerrans had not known about the theft, and clarified that Larry knew about it only after Larry Gerrans sent Chris Gerrans to the offices of the Orrick firm, Halbert Decl., Ex. 9 at 170:19-23, which Chris Gerrans described elsewhere as an "ambush" by his brother. (*See also* Chris Gerrans Testimony, Halbert Decl., Ex. 9 at 186:12-13 (testifying that he told no one he was stealing the money).) [11]

## C. The Government Also Falsely Portrayed The Evidence Against The Defendant In Its Closing Argument

Prosecutorial misconduct during closing arguments is established when improper remarks are likely to mislead the jury. *Darden v. Wainwright*, 477 U.S. 168, 180–81 (1986) (observing that inflammatory and misleading argument is improper). This court must determine whether the trial was so prejudiced by the prosecutor's misstatements as to affect its outcome, or to warrant a sanction for the purpose of deterring future prosecutorial misconduct. *U.S. v. Young*, 470 U.S. 1, 11 (1985). The government may not argue theories that are unsupported by the evidence. *U.S. v. Miguel*, 338

---

[10]   The government argued, without any basis, that Larry Gerrans thought that if Chris Gerrans did not plead until the second day of trial, Chris could not be a witness. Halbert Decl., Ex. 4 at 80. There is absolutely no basis for the government to suggest this legally untrue supposition. Further, it makes no sense at all that Larry Gerrans would have wanted Chris Gerrans to talk about the IRA when that was in the 2015 Employment Agreement. These other two items were fabricated by Chris Gerrans, which is why Art Gerrans Sr. said there was only one thing, not three. Notably, Chris Gerrans testified that he refused to take the note from his father, so there is no evidence other than his word.

[11]   On direct examination, Chris Gerrans testified that *at some point* Larry Gerrans learned about his theft, *See* Halbert Decl., Ex. 9 at 101:19, but he did not say he ever told him, presumably because Larry found out during the Orrick investigation. Chris said that he was able to get away with it because he had little oversight, and Larry did not monitor the banks. *Id.* at 103:20.

F.3d 995, 1001 (9th Cir. 2003). The government's closing argument was also highly improper and further evidence of the government's desire to win at all costs, based on a personal attack on Mr. Gerrans' character, and without acknowledgement of the truth. Government counsel argued:

> Larry Gerrans is a liar and a thief. He stole millions of dollars from Sanovas's investors. These investors had no idea that the money they were investing in what they thought was a startup medical device company would actually be used by Larry Gerrans to buy himself a $2.6 million luxury home, a Mercedes SUV for his wife and to pay for extravagant personal items that Larry Gerrans charged on Sanovas's American Express card, and had Sanovas write the checks for.. . .You remember, you heard from the bankruptcy trustee. He and his wife have filed for personal bankruptcy. They have $4.7 million in liability. He can't even get a car loan, let alone a home loan.

(Halbert Decl., Ex. 4 at 38:12-20 (emphasis added); 41:13-15; *see also id*. at 42: 3-4 (arguing that investors "trusted" that their money was "going to be put into developing this technology, not buying Larry Gerrans a 4,000-square-foot mansion.").) This was improper for three reasons.

First, the government suggested to the jury that Sanovas was not *actually* a startup medical device company at all even though investors *thought* it was, implying it was actually just a slush fund for Mr. Gerrans. Sanovas was in fact a privately held medical device company with approximately 300 shareholders that held hundreds of patents; it was located in a 28,000 square foot building with state of the art scientific and engineering premises and, at its peak, employed more than 50 people. Defense counsel could have introduced countless witnesses or highlighted these facts on cross-examination to rebut this suggestion by the government.

Second, rather than arguing whether there was evidence that Mr. Gerrans took money to which he was not legally entitled, government counsel attacked Mr. Gerrans' character, calling him a thief and a liar and accusing him of spending extravagantly; the only relevant legal issue was whether Mr. Gerrans was legally entitled to the money, not the government's moral judgment about how he spent his money. Third, the reference to the amount of Mr. Gerrans' prior bankruptcy liability was an implicit attack on him, whereas there was no evidence in the record about the reasons for the bankruptcy and the devastating effect that Shelly Gerrans' medical issues had on the family's finances at that time.

## D.    At Minimum, Reversal Of Mr. Gerrans' Convictions Is Warranted

Prosecutorial misconduct that violates a defendant's rights undermines the foundations of judicial integrity or has otherwise been so egregious requires the court to determine whether to retry the defendant or dismiss the indictment with prejudice as a sanction for the government's misbehavior. *See Kojayan*, 8 F.3d at 1323; *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008). Prosecutorial misconduct warrants a dismissal under the court's supervisory powers when the misconduct is both "flagrant" and "prejudicial." *Chapman,* 524 F.3d at 1081; *see also United States v. Williams*, 504 U.S. 36, 47 (1992) (supervisory power "may be used as a means of establishing standards of prosecutorial conduct before the courts themselves.").

Prosecutors also have a heightened duty of candor with regard to the presentation of evidence before the jury. *See* Standard 3-1.4 The Prosecutor's Heightened Duty of Candor, Am. Bar Ass'n, Criminal Justice Standards for the Prosecution Function (2017). "The prosecutor should not make a statement of fact or law, or offer evidence, that the prosecutor does not reasonably believe to be true, to a court, lawyer, witness, or third party . . . . In addition, [] a prosecutor should correct a prosecutor's representation of material fact or law that the prosecutor reasonably believes is, or later learns was, false, and should disclose a material fact or facts when necessary to avoid assisting a fraudulent or criminal act or to avoid misleading a judge or factfinder." *Id.* at 3-14(b). To determine what type of sanction is warranted "[the Court] must consider the government's willfulness in committing the misconduct and its willingness to own up to it . . . [and] whether the misstatement likely affected the verdict." *Kojayan*, 8 F.3d at 1318 (citing *United States v. Lopez–Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992)).

Because of the persistent and pervasive nature of the prosecutorial misconduct in this case, Mr. Gerrans respectfully requests that the Court vacate the judgement against him and dismiss the indictment with prejudice.

## V.    CONCLUSION

The United States Supreme Court has recognized that the government's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger,* 295 U.S. at 88. Unfortunately, here, winning was the goal; not justice as reflected by the government's

persistent pattern of both introducing misleading evidence and withholding key information as well as making improper argument that was not based on the actual evidence in the case. As such, the Second Superseding Indictment and all related charges against Lawrence Gerrans should be dismissed with prejudice as a sanction for the government's continuing misconduct and in the interest of justice.

DATED: June 12, 2020

LAW OFFICES OF SHAWN HALBERT

By: s/ Shawn Halbert

Shawn Halbert

KABAT CHAPMAN & OZMER LLP

By: s/ Theresa A. Kristovich

Theresa A. Kristovich

*Attorneys for Defendant Lawrence Gerrans*