DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ROBIN L. HARRIS (CABN 123364)
LLOYD FARNHAM (CABN 202231)
Assistant United States Attorneys

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7200
     FAX: (415) 436-7321
     Robin.Harris2@usdoj.gov
     Lloyd.Farnham@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 3:18-CR-00310 EMC |
| | ) |
| Plaintiff, | ) **UNITED STATES' OPPOSITION TO** |
| | ) **DEFENDANT'S MOTION FOR NEW TRIAL** |
| v. | ) **AND MOTION TO DISMISS INDICTMENT** |
| | ) (Fed. R. Crim. Pro 33(b) and 12) |
| LAWRENCE J. GERRANS, | ) |
| a/k/a LARRY GERRANS, | ) Date: July 15, 2020 |
| | ) Time: 2:30 p.m. |
| Defendant. | ) Honorable Edward M. Chen (via Zoom) |
| | ) |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ..................................................................................................... 3

I.      PROCEDURAL HISTORY .............................................................................................. 3

II.     STATEMENT OF FACTS ............................................................................................... 5

      A.     The Government's Pre-trial Discovery Production ......................................... 5

      B.     Defendant's Withdrawn Pre-trial Motion to Dismiss ..................................... 6

      C.     The Evidence at Trial ..................................................................................... 8

ARGUMENT ............................................................................................................................ 17

III.    APPLICABLE LEGAL STANDARDS ....................................................................... 17

      A.     The Mandatory Claims Processing (Rule 33) .............................................. 17

      B.     Standard for Reviewing Ineffective Assistance of Counsel claims ................ 17

      C.     Dismissal is a Drastic and Disfavored Remedy ............................................ 18

IV.    ANALYSIS ..................................................................................................................... 20

      A.     Defendant's Motion is Time Barred and Must be Dismissed ......................... 20

           1.     The Court did not extend the deadline for filing a Rule 33 motion .................... 20

           2.     Gerrans has not even attempted to show, let alone established, excusable neglect justifying ignoring the otherwise applicable mandatory time bar ................................................................................. 23

      B.     Defendant's Ineffective Assistance of Counsel Claims Cannot be Evaluated on this Record and Should be Deferred to Collateral Proceedings, Per the Ordinary Course ......................................................................................... 24

      C.     On the Merits, Trial Counsel Rendered Effective Assistance at Trial .............. 26

           1.     Trial Counsel's Alleged Failure to Call Certain Witnesses ................................ 26

           2.     The Cross-Examination of Christopher Gerrans at Trial ..................................... 28

           3.     Defendant Waived His Right To Testify In His Own Defense ........................... 30

           4.     Trial Counsel Was Not Ineffective for Failing to Request *Miller* Wire Fraud Jury Instruction ..................................................................... 32

           5.     American Express Theft ..................................................................................... 34

           6.     Alleged Failure to Impeach Board of Director Witnesses ................................. 35

7.     Defense Counsel Was Not Ineffective For Not Objecting To The Government's Closing Arguments .................................................................. 37

D.     The Motion To Dismiss Is Without Merit .................................................. 40

1.     There was No Prosecutorial Misconduct in Presenting Testimony of Lloyd Yarborough and Arguing Reasonable Inferences of this Evidence .................................................................. 40

2.     There was no Prosecutorial Misconduct in the Investigation or Presentation of Evidence regarding Ehran Gunday's Separation from Sanovas.................................................................. 43

3.     There was no Prosecutorial Misconduct regarding the Evidence of the Altercation at the Storage Facility.................................................................. 45

CONCLUSION.................................................................. 48

**TABLE OF AUTHORITIES**

**Federal Cases**

*Bateman v. United States Postal Service*, 231 F.3d 1220 (9th Cir. 2000)...............................23

*Dows v. Wood*, 211 F.3d 480 (9th Cir. 2000) ............................................... passim

*Eberhart v. United States,* 546 U.S. 12 (2005) .............................................. passim

*Funchess v. Wainwright*, 772 F.2d 683 (11th Cir. 1985) .............................................32

*Guam v. Muna*, 999 F.2d 397, 399 (9th Cir. 1993) .............................................19

*Harrington v. Richter*, 131 S. Ct. 770- (2011) ............................................... passim

*In re Rains*, 428 F.3d 893 (9th Cir. 2005) .............................................24

*Lemoge v. United States*, 587 F.3d 1188 (9th Cir. 2009).............................................23

*Lowry v. Lewis*, 21 F.3d 344 (9th Cir. 1994) .............................................32

*Matylinsky v. Budge*, 577 F.3d 1083 (9th Cir. 2009).............................................18

*Medley v. Runnels*, 506 F.3d 857 (9th Cir. 2007) .............................................31, 32

*Neder v. United States,* 527 U.S. 1 (1999).............................................33

*Pincay v. Andrews*, 389 F.3d 853 (9th Cir. 2004) .............................................23

*Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) ...................................23

*Russ v. Standard Ins. Co.*, 120 F.3d 988 (9th Cir. 1997) .............................................21

*Smith v. McKee*, 598 F.3d 374 (7th Cir. 2010) .............................................32

*Spaziano v. Singletary*, 36 F.3d 1028 (11th Cir. 1994).............................................32

*Strickland v. Washington*, 466 U.S. 668 (1984).............................................17, 18, 39

*United States v. Atcheson,* 94 F.3d 1237 (9th Cir. 1996).............................................45

*United States v. Birges*, 723 F.2d 666 (9th Cir. 1984) .............................................38

*United States v. Chang Da Liu*, 538 F.3d 1078 (9th Cir. 2008) .............................................33

*United States v. Christophe*, 833 F.2d 1296 (9th Cir. 1987) .............................................47

*United States v. De Rosa,* 783 F.2d 1401 (9th Cir.1986).............................................19

*United States v. Fredeerick,* 78 F.3d 1370 (9th Cir. 1996) .............................................19, 42

*United States v. French*, 748 F.3d 922 (9th Cir. 2014).............................................33

*United States v. Fuchs*, 218 F.3d 957, 964 (9th Cir.2000).............................................19

*United States v. Gladding*, 775 F.3d 1149 (9th Cir. 2014) .............................................23

*United States v. Gray,* 876 F.2d 1411 (9th Cir. 1989).............................................19

*United States v. Henderson,* 241 F.3d 638 (9th Cir. 2000) .............................................42

*United States v. Hinton*, 31 F.3d 817 (9th Cir. 1994).............................................47

*United States v. Honoum*, 33 F.3d 1128 (9th Cir. 1994) .................................................... 2, 17

*United States v. Jackson*, 13 F. App'x 581 (9th Cir. 2001) ............................................ 31

*United States v. Joelson*, 7 F.3d 174 (9th Cir. 1993) ...................................................... 30

*United States v. Kearns*, 5 F.3d 1251 (9th Cir. 1993) ................................................... 19

*United States v. Laurins*, 857 F.2d 529 (9th Cir. 1988) ................................................ 37

*United States v. McGowan*, 668 F.3d 601 (9th Cir. 2012) ........................................ 25, 26

*United States v. McKoy*, 771 F.2d 1207 (9th Cir. 1985) ............................................... 39

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ......................................... passim

*United States v. Necoechea,* 986 F.2d 1273 (9th Cir. 1993) ...................................... 19, 39

*United States v. Prairie Pharmacy, Inc.*, 921 F.2d 211 (9th Cir. 1990) ........................ 23

*United States v. Ross*, 338 F.3d 1054 (9th Cir. 2003) .................................................... 17

*United States v. Ruiz*, 710 F.3d 1077 (9th Cir. 2013) .................................................... 37

*United States v. Rush*, 749 F.2d 1369 (9th Cir. 1984) ................................................... 17

*United States v. Sadler*, 480 F.3d 932 (9th Cir. 2007) ............................................. 21, 22

*United States v. Samang,* 607 F.2d 877 ........................................................................ 19

*United States v. Sayetsitty*, 107 F.3d 1405 (9th Cir. 1997) ...................................... 37, 38

*United States v. Steele*, 733 F.3d 894 (9th Cir. 2013) .............................................. 24, 25

*United States v. Thongsy*, 577 F.3d 1036 (9th Cir. 2009) ............................................. 33

*United States v. Venegas,* 800 F.2d 868 (9th Cir.1986) ................................................. 19

*United States v. Villalobos*, 748 F.3d 953 (9th Cir. 2014) ............................................. 33

*United States v .Span*, 75 F.3d 1383 (9th Cir. 1996) .................................................... 18

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004) ............................................. passim

**Federal Statutes**

18 U.S.C. § 1343 ................................................................................................................ 3

18 U.S.C. § 1957 ................................................................................................................ 3

**Federal Rules**

Fed. R. Crim. P. 12 ........................................................................................................... 4

Fed. R. Crim. P. 33 .................................................................................................... passim

Fed. R. Crim. P. 33(b)(2) ............................................................................................ 17, 20

Fed. R. Crim. P. 45(b) .................................................................................................... 20

Fed. R. Crim. P. 45(b)(1)(B) ........................................................................................23

Fed. R. Crim. P. 52(a) ................................................................................................17

## INTRODUCTION

On January 29, 2020, a federal jury convicted the defendant, Lawrence Gerrans of all 12 counts in the second superseding indictment. That same day, the Court asked defense counsel whether he intended to file any post-trial motions. RT 1/29/20 pg. 163. Defense counsel advised the Court and government that he would notify the Court if he intended to file any such motions. Defendant's trial counsel never advised the Court of any post-trial motions and none were filed within the statutory 14-day period. On March 20, 2020, current defense counsel filed a substitution of attorney and became counsel of record for the defendant. Dkt 162. New defense counsel never advised the Court of any intention to file a new trial motion; nor did she attempt seek relief from the unambiguous time limits imposed by Rule 33. Instead, four months after the verdict, the defendant filed this untimely motion for a new trial. Dkt 235. The defendant's belated new trial motion is premised entirely on fact-based allegations that his trial attorneys provided him ineffective assistance of counsel under the Sixth Amendment of the United States Constitution.

On June 12, 2020, without leave of the Court, the defendant filed yet another untimely and meritless motion styled as a "motion to dismiss for prosecutorial misconduct." Dkt 247. Defense counsel concedes that the so-called motion to dismiss has "substantial overlap in content with the [other two] motions," Dkt 247, pg. 7 and further admits "defense counsel argued an abbreviated version of prosecutorial misconduct in the motion for new trial in terms of trial counsel's role in not objecting," *Id.* at fn. 2. The "motion to dismiss" is largely a resubmission and expansion of the defendant's 53-page motion for new trial, though defendant seeks an even more drastic and legally unsupportable remedy: dismissal of the indictment after a jury verdict. Because the motion to dismiss is mainly based on arguments that were also raised in the new trial motion, the government files this omnibus opposition to both motions.

The United States opposes defendant's motion for new trial, Dkt 235, and motion to dismiss, Dkt 247, for all of the following reasons:

First, pursuant to the Supreme Court's holding in *Eberhart v. United States,* 546 U.S. 12, 19 (2005), the government moves to enforce the mandatory claims processing rule under Fed. R. Crim. P. 33, which requires a defendant to file a motion for a new trial within 14 days of the verdict or finding of

guilty, both of which occurred on January 29, 2020. Dkt 144. Defense counsel did not seek relief from the mandatory 14 day rule and because the motion is not based on "newly discovered evidence," it is time-barred. The Supreme Court has made it clear that "district courts must observe the clear limits of the Rules of Criminal Procedure when they are properly invoked." *Id*. The government has invoked the "clear limits" of Rule 33 and under *Eberhart*, this Court's dismissal of defendant's motion is mandatory.

Second, the motion is predicated on very broad claims that defendant's trial team failed to provide adequate legal assistance. These claims cannot and should not be considered without development of facts outside the current record. Moreover, ineffective assistance of counsel claims based on evidence not known to the defendant at the time of trial does not constitute newly discovered evidence and cannot support a motion for a new trial. *See, United States v. Honoum*, 33 F.3d 1128, 1130 (9th Cir. 1994).

Third, although the factual record regarding trial counsel's strategy and decision-making process is not properly developed, many of defendant's claims of ineffective assistance can be summarily denied on the merits as, on their face, counsel's trial decisions were reasonable and well within the bounds of reasonable professional judgment. *Williams v. Woodford*, 384 F.3d 567, 610 (9th Cir. 2004).

Finally, the motion to dismiss the indictment filed just two weeks ago is untimely, unprecedented and without merit. To the extent that the defendant is seeking dismissal of the second superseding indictment five months after the jury's verdict, that relief must ordinarily fall within in some rule of Federal Criminal Procedure. Defendant cites none. To the extent the defendant is claiming that he is entitled to a new trial because of alleged prosecutorial misconduct, this claim should have been brought under Rule 33 and was not. Most, importantly, the defendant presents no evidence of actual misconduct, and the instances defendant claims were misconduct were not. The defendant only points to purported steps the government did not take to investigate, or purported facts that the government did not present at trial, on ancillary issues to the primary fraud—these allegations do not come close to meeting his heavy burden of showing prosecutorial misconduct. There is no basis to grant a new trial, let alone the extraordinary and disfavored remedy of dismissal of the indictment after the jury's verdict.

//

//

# FACTUAL BACKGROUND

## I.    PROCEDURAL HISTORY

On July 12, 2018, a federal grand jury returned its original indictment charging defendant Lawrence Gerrans with wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1957) Dkt 1. On July 23, 2018, Magistrate Judge Maria Elena-James (Ret.) issued an order setting conditions of release. Dkt 5. The terms of the bond included a special condition that "defendant shall have no contact with Chris Gerrans re: criminal case outside the presence of Chris Gerrans' counsel." *Id*.

On August 12, 2019, Defendant filed a motion to dismiss all counts of the indictment. Dkt 42. This motion was supported by declarations from Gary Krausz, Kevin Day, Anne Hipshman and Fred Davis. *Id*. On August 15, 2019, the government moved to revoke defendant's bond and Magistrate Judge Elizabeth Laporte remanded the defendant into custody. Dkt 46. On August 21, 2019, the defendant requested the Court to take his motion to dismiss off calendar. Dkt 51.

On August 23, 2019, the Court issued its Third Amended pre-trial order. Dkt 52. This order required that all pre-trial motions be filed by November 26, 2019. *Id*. The motion to dismiss the indictment (Dkt 42) was never re-filed nor placed back on calendar at any time prior to trial.

On August 27, 2019, the grand jury returned a second superseding indictment. Dkt 57. On January 6, 2020, the parties selected the jury. Dkt 114. Trial began on January 13, 2020. Dkt 120. On January 29, 2020, the jury returned guilty verdicts on all twelve counts in the second superseding indictment. Dkt 144. After the verdict, the Court asked defendant's attorney "Do we need to set a date for motions? For post-trial motions?" RT 1/29/20 pg. 168. Defense counsel informed the Court "Not at this time, but I will inform the Clerk of the Court…if I think that ought to be heard in advance of sentencing." *Id*.

Defendant never notified the Court, within 14 days of the verdict, or at any point thereafter that he intended to file a motion for new trial pursuant to Fed. R. Crim. P 33. On March 17, 2020, defendant filed a motion for release from custody pending sentencing. Dkt 160.

On March 20, 2020, attorney Shawn Halbert filed a notice of substitution of attorney and she became counsel of record for the defendant. Dkt 162. Attorney Halbert never notified the Court of an intention to file a motion for new trial. Nor did Ms. Halbert seek relief from the mandatory 14 day time

period of Rule 33. Instead, on March 23, 2020, Ms. Halbert filed a motion for additional time to respond to the government's opposition to the motion for post-conviction release. Dkt 163. On April 10, 2020, Ms. Halbert filed a motion to continue the sentencing date. Dkt 200. Neither of these continuance motions made any mention of a motion for new trial; nor did these submissions set forth any request or basis for the Court to grant relief from the mandatory 14 day post-verdict filing deadline in Rule 33.

On April 14, 2020, the Court denied defendant's motion for release pending sentencing. Dkt 207. On April 23, 2020, a Clerk's Notice issued *sua sponte* which set a deadline of May 27, 2020 for defendant to "file any post-trial motions." Dkt 212. On May 27, 2020, a second *sua sponte* Clerk's Notice issued which stated "any post-trial motions are due on July 9, 2020." Dkt 232. Both of these Clerk's Notices were issued without either party requesting a briefing schedule or notifying the Court of an intention to file post-trial motions, let alone a Rule 33 motion, which was already time-barred some four months earlier.

On May 27, 2020, Ms. Halbert contacted the Court *ex parte* and without notice to the government requesting that the post-trial motions hearing date, which was set in accordance with the vacated May 27, 2020 filing deadline, remain in effect. Dkt 236. That same day, defense counsel filed an *ex parte* motion seeking to preserve the June 25, 2020 hearing date and, in order to do so, filed both a motion for judgement of acquittal and a time-barred new trial motion under Rule 33. Dkt 233, 234, 235.

On June 4, 2020, the Court held a video hearing regarding scheduling a hearing for the pending motions. Dkt 244. The Court granted the defendant's request that his post-trial motions (Dkt 234, 235) be heard in advance of sentencing and scheduled the hearing for July 15, 2020. The Court ordered the government to respond by June 26, 2020 and any reply briefs to be filed by July 3, 2020. Dkt 244. The Court did not give defendant leave to file any further motions. Nevertheless, on June 12, 2020, the defendant filed a motion to dismiss the second superseding indictment. Dkt 247. Without waiving the government's objection to the motion to dismiss being time-barred under both Fed. R. Crim. P. 12 and 33 and this Court's scheduling orders, the government includes its opposition to Dkt 247 herein.

//

//

# II. STATEMENT OF FACTS

## A. The Government's Pre-trial Discovery Production

The government produced voluminous and fulsome discovery throughout the pre-trial process. Two of these productions are directly relevant to the claims raised in defendant's motions for a new trial and post-trial dismissal of the indictment. Specifically, on November 5, 2019, the government provided to the defense additional discovery and an index describing and referencing the discovery by bates numbers. *See* Exhibit 1 attached hereto. This discovery production included an FBI 302 of a September 2019 interview of Bob Farrell, the former CFO of Sanovas, who left the company in the spring of 2014. A true and correct copy of this 302 is attached hereto as Exhibit 2. During his September 2019 interview with the FBI, Farrell recalled that Ehran Gunday asked Sanovas' Controller, Lloyd Yarborough to conduct an internal audit of company payments to the defendant and his family. Farrell also learned of large payments from Sanovas to the defendant's wife Shelly Gerrans which the defendant claimed were for Shelly's services decorating the office. Farrell opined that the payments to Shelly Gerrans and amounts were inappropriate. Farrell also discussed learning about Gerrans' shell company, Halo, and stated that it would be double billing and a "conflict of interest" if Gerrans, who was the CEO of Sanovas, was separately charging Sanovas for Gerrans' consulting to Sanovas through Halo. *See* Exhibit 2 attached hereto. Farrell further stated that when he confronted Gerrans about the double dipping with Halo, Gerrans became defensive and dismissive. *Id*.

On November 5, 2019, the government also provided the defense with the complete transcripts of the grand jury testimony of Christopher Gerrans and Arthur Gerrans Sr. Accordingly, any grand jury testimony by either Chris Gerrans or Art Gerrans, Sr. that the defendant currently claims was either exculpatory or impeaching was provided to the defense approximately 10 weeks before the trial commenced. *See* Exhibit 1 attached hereto.

On November 8, 2019, the government received documents that were voluntarily produced by Ehran Gunday, including Gunday's separation agreement (Trial Exhibit 113) and transmitted those documents to the defense the same day they were received. *See* Exhibits 3 and 3A attached hereto. Notably, after Ehran Gunday separated from Sanovas in April 2014, he relocated to Turkey, and, as such, was not within the government's trial subpoena process. Gunday trial testimony pg. 62. A copy

of the transcript of Ehran Gunday's Rule 15 testimony, which was given to the jury to aid them in listening to the audio recording of Gunday's testimony, is attached hereto as Exhibit 4. By stipulation of the parties, this Court issued an order permitting a Rule 15 foreign deposition of Ehran Gunday, which took place on November 14, 2019 in Athens, Greece. The testimony Ehran Gunday gave via deposition on November 14, 2019 was played in its entirely during the trial. Defendant's attorney attended the deposition and extensively cross-examined Gunday, including about the documents Gunday voluntarily provided on November 8, 2019. The defendant was present by telephone during Gunday's deposition and was given the opportunity to confer privately with his attorney, outside the presence of the prosecutor.

**B.    Defendant's Withdrawn Pre-trial Motion to Dismiss**

On August 12, 2019, the defendant filed a motion to dismiss the indictment. Dkt 42. The motion was supported by declarations from Gary Krausz, Anne Hipshman, Fred Davis and Kevin Day. Exhibit B to Krausz's declaration was a list of exhibits that Krausz relied on in formulating the opinions and conclusions in his declaration. One of the documents Krausz said he relied upon was a December 18, 2009 employment agreement purporting to memorialize Shelly Gerrans hiring as an Administrative Assistant at Sanovas. Dkt 42-1. This document, which became Trial Exhibit 106, was demonstrably fraudulent. Ehran Gunday testified that Shelly Gerrans was never employed at Sanovas in any capacity from 2009 until Gunday left the company on April 1, 2014. Gunday trial testimony pg. 43. Gunday further testified that Shelly Gerrans was not hired by Sanovas to serve as an Administrative Assistant to the tune of $60,000 per year and that, at the time of the bogus employment agreement (Trial Exhibit 106), Sanovas' Administrative Assistant was a woman named Kelly Sturgen [sic]. Gunday trial testimony pg. 44.

Lloyd Yarborough also testified that Shelly Gerrans never worked at Sanovas and was not an Administrative Assistant, or any other employee of the company. RT 1/13/20 pg. 23. Chris Gerrans, whom the defendant installed as Controller after he fired Yarborough, also testified that Shelly Gerrans was not an Administrative Assistant at Sanovas. RT 1/15/20 pg. 91. Shelly Gerrans, herself, admitted under oath during an April 13, 2010 hearing before the bankruptcy trustee (*see* discussion *infra*) that she was a full-time homemaker and that she had not worked for the past 10 years. Trial Exhibit 5. The

phony Shelly Gerrans employment agreement, Trial Exhibit 106, purported to memorialize Ms. Gerrans employment with Sanovas to commence in July 2010. *Id*. However, in November, 2010, when Shelly Gerrans filled out an application for the rental of 29 Timothy Avenue, she again confirmed that she was a full time homemaker with no outside income. Trial Exhibit 24.

In addition to the fake Shelly Gerrans Employment Agreement, there was yet another, and even more problematic, fraudulent document that Krausz considered in formulating the calculations in his declaration. Exhibit G to Krausz's declaration is a so-called "Unanimous Written Consent" dated December 3, 2013, which was supposedly signed by Ehran Gunday and the defendant. Dkt 42-1, pgs. 90-93. This document was also Trial Exhibit 105. Ehran Gunday testified that he had never seen Exhibit 105 and that his signature was forged on Exhibit 105. Ehran Gunday trial testimony, pg. 37. Mr. Gunday also explained why he never would have signed Exhibit 105 in December 2013, or at any time when he was at Sanovas. As Gunday explained, December 2013 was a period of tremendous strain between him and the defendant. *Id*. at pg. 38. During the December 3, 2013 time-frame, which is the supposed date of Exhibit 105 (Exhibit G to Krausz's declaration) Gunday was negotiating his separation agreement and never would have signed a document purporting to grant additional compensation to the defendant. *Id*. at pg. 38. The second reason Gunday would never have signed Exhibit 105 is that the bogus document provided for a financing incentive bonus for defendant which had been an ongoing source of friction between Gunday and the defendant and was a provision that Gunday had repeatedly refused to sign off on. *Id*. Finally, the fake document contains a clause claiming that the defendant had liquidated his IRA at the inception of the company and had used the proceeds of his IRA in furtherance of the business. Gunday had never heard of the defendant supposedly liquidating his IRA and using the proceeds to seed Sanovas, (*Id*. at pg. 39) which of course, did not happen as the trial testimony of Phil Villanueva conclusively proved. *See* discussion *infra*.

The Anne Hipshman declaration, aside from being completely irrelevant and inadmissible to any issue in the criminal case, similarly relied on false information provided by the defendant. For example, Exhibit E to Hipshman's declaration purports to be a document memorializing the salaries of all Sanovas employees and their start date. Dkt 42-2 pg. 88. This document lists the defendant's daughter, Sarah Gerrans, as a Sanovas employee with a start date of June 1, 2009 and an annual salary of $32,000.

*Id.* Exhibit E also describes defendant's daughter's job title as "Administrative Assistant" *Id.* at pg. 90; *See also*, Exhibit F to Hishman declaration, Dkt 42-2, pg. 92, similarly describing defendant's daughter's job title as "Administrative Assistant." Exhibit E to Hishman's declaration also falsely identifies the defendant's wife, Shelly Gerrans, as a Sanovas employee with the job title "Vice President of Marketing." Not only does Exhibit E, Dkt 42-2 pg. 88, falsely list both Shelly and Sarah Gerrans as Sanovas employees, but it also contradicts the bogus Shelly Gerrans' Employment Agreement (Trial Exhibit 106) which has Sanovas purportedly hiring Shelly as an "Administrative Assistant." Ehran Gunday confirmed that Shelly Gerrans was never employed by Sanovas in any capacity at any time. Gunday trial testimony pg. 43. In fact, even though Exhibit E to Hishman's declaration lists the defendant's daughter as a Sanovas employee with a start date of June 1, 2009, for all of 2009, there were no employees of Sanovas, other than Gunday and the defendant. Gunday trial testimony pg. 22. *See also*, RT 1/13/20 pg. 22 (Yarborough testimony that Shelly Gerrans was not an employee of Sanovas and was not Sanovas' Administrative Assistant).

On August 21, 2019, defendant's trial attorney requested the Court to take defendant's motion to dismiss off calendar. Dkt 51. The motion to dismiss was never re-filed which is not surprising because the material produced by the government in discovery and the Gunday Rule 15 deposition had exposed that the analysis and declarations used to support the motion relied on a number of false documents and false entries in the corporate accounting records.

### C. The Evidence at Trial

The background section of the defendant's new trial motion makes almost no reference to the evidence introduced and admitted at trial, and instead consists nearly entirely of a self-serving narrative asserting so-called "facts" without citations, let alone citations or reference to the trial evidence. Dkt 235 at 3-14 (filed May 27, 2020). The citations that are included in the defendant's purported description of the facts are only to a declaration by an employee at the law firm now representing the defendant, and that declaration includes many documents that were not offered or admitted at trial. *See* Dkt 235-1 (Declaration of Allison B. Holocombe). The factual recitation below is based on the trial testimony and exhibits that were actually presented at trial.

The defendant Lawrence Gerrans was the President and CEO of Sanovas, a start-up company

originally headquartered in Sausalito, California.[1]  Gunday Trial testimony pgs. 30, 35.  Gerrans co-founded Sanovas with Ehran Gunday, who served as Sanovas' Chief Technology Officer.  *Id*. at pg. 35. Sanovas' stated objective was to create medical devices and to patent these devices.  According to the Sanovas LLC "Operating Agreement," Sanovas was formed on January 1, 2009 as a limited liability company (LLC) under the laws of Nevada.  Trial Exhibit 100.  Neither Gunday nor the defendant made any capital contribution to Sanovas.  Gunday Trial testimony pg. 15.

Almost from the outset, Gunday and the defendant had numerous conflicts about the management of Sanovas.  The disharmony between Gunday and the defendant largely related to Gunday's concern that the defendant was improperly charging Sanovas for personal items and expenses. RT 1/13/20 pg. 17 (Lloyd Yarborough trial testimony).  The tension between the two was palpable in 2013 and there were weekly arguments between them centering around Gunday's view that the defendant was improperly expensing personal items to the company.  RT 1/13/20 pg. 20-21.  By December 2013, Gunday's relationship with the defendant was "very combative" and "very stressful." Gunday trial testimony pg. 40.  The situation had deteriorated to the point that Gunday determined that either he or the defendant would have to leave Sanovas.  Gunday trial testimony pg. 56.  Gunday retained an attorney to negotiate the terms of his separation from the company.  Sanovas was also represented by counsel during the separation negotiations.  *Id*. at pg. 57.

The terms of Gunday's separation were memorialized in a written agreement between Gunday and Sanovas.  Trial Exhibit 113.  Gunday testified, that the "general terms" of his separation from Sanovas were as follows:  Gunday would be paid $1.5 million in return for leaving the company. Gunday trial testimony pg. 58.  In return for Gunday receiving this payment package, the defendant would retain control of Sanovas with one important caveat: Gunday insisted, that a new Board of Directors (BOD) be convened and that this BOD be comprised of investors who were specifically named in the written separation agreement.  Trial Exhibit 113, pg. 5.  As is discussed below, three of the board members who were identified in Gunday's separation agreement—Ken Koen, Bruce Nichols and Rob Georges—testified at trial.

---

[1] In April or May 2014, Sanovas moved its headquarters to San Rafael, California.  RT 1/15/20 pg. 92.

During his testimony Gunday was asked:"[]did Mr. Gerrans, as part of the negotiations that you had to leave, was he also promised the same financial arrangement that you got here?" Gunday specifically and unequivocally responded "no." Gunday trial testimony pg. 59. Gunday further confirmed that the settlement he negotiated with Sanovas provided for the defendant to retain control of the company (along with the BOD) and, in return, Gunday would receive a payout of approximately $1.5 million.  *Id*. at pg. 59. Mr. Gunday also testified that, during the negotiations that led to the separation agreement (Trial Exhibit 113), there was no consideration of the defendant receiving an identical payment as Mr. Gunday in return for signing the separation agreement. *Id*. at pg._62. In fact, if defendant [also receiving $1.5 million from Sanovas] "was ever up," Gunday would have refused to sign the settlement agreement. *Id*. About a week after Gunday left Sanovas, the defendant called a meeting of the remaining employees and told them "these are my family and my friends, these are my investors. This is my company. This is my technology." RT 1/14/20 pg. 24 (Chris Gerrans).

In September 2012, Lloyd Yarborough was hired to serve as Sanovas' Controller.  RT 1/13/20 pg. 6. Yarborough reported to Bob Farrell, who at the time, was Sanovas' Chief Financial Officer. *Id*. Yarborough came to know Gunday "very well" and thought Gunday was "extremely honest." *Id*. at pg. 9. While Yarborough was employed at Sanovas, the company had no revenue and the only source of funds to pay employees, including Gerrans, came from investors. *Id*. at pg. 14.

In 2013, Gunday asked Yarborough to put together a worksheet because Gunday was concerned that the defendant was spending Sanovas' money for Gerrans' own personal expenses. RT 1/13/20 pg. 17. Yarborough reviewed the company expenses and put together a spreadsheet with items he considered personal expenses for Gerrans that Sanovas paid for. Trial Exhibit 251. These expenses included, among other things, a Gerrans' family trip to Hawaii, (RT 1/13/20 pg 45), $3000 monthly payments to the defendant's daughter, even though she was a full-time student who was away at college (RT 1/13/20 pgs. 21-22), and a Gerrans family membership at the Bay Club. RT 1/13/20 pg. 48. Yarborough did not consider the expenses that Gerrans charged to Sanovas (as reflected on the spreadsheet he prepared) to be appropriate Sanovas business expenses. *Id*. at pgs. 36-37.

In December 2013, after Yarborough confronted Gerrans about a large expense for a consultant at a time when Sanovas did not have enough money to meet its payroll, defendant tried to fire him. RT

1/13/20 pgs. 30, 31. However, when Gunday, who was en route to Turkey, found out that Gerrans had unilaterally attempted to fire Yarborough, Gunday reinstated Yarborough. *Id*. In May 2014, about a month after Gunday formally separated from Sanovas, the defendant, who was now in full control of Sanovas, fired Yarborough. RT 1/13/20 pg. 30. Shortly thereafter, the defendant asked his brother Chris Gerrans to "take over the financial apparatus…do the Quickbooks, the Controller work." RT 1/14/20 pg. 31 (Chris Gerrans).

In July 2014, the defendant directed Chris Gerrans to enter voluminous Halo invoices dating back to 2009 into Quickbooks (Sanovas' accounting software) purporting to document services defendant and Shelly Gerrans provided to Sanovas, along with invoices supposedly reflecting "facilities fees" and "automobile allowances." RT 1/15/20 pg. 42. *See also* Trial Exhibit 259A. The total liability supposedly owed by Sanovas to Halo (the defendant's shell company) as reflected by the spreadsheet the defendant emailed to Chris Gerrans was approximately $1.6 million. RT 1/15/20 pg. 54. It took Chris Gerrans several days to enter into Quickbooks all of the Halo invoices on the defendant's spreadsheet. After Chris Gerrans finished this project for the defendant, Chris Gerrans printed out a report showing the newly entered invoices and brought this report to the defendant, who was in his office. *Id*. pg. 55. When Chris Gerrans got to the defendant's office, the defendant pulled out a binder filled "with every Halo invoice reflected in [the] spreadsheet." *Id*. Although some of the Halo invoices were dated 2009, five years earlier, "the binder was new. The documents were crisp. It looked like it was hot off the press." *Id*.

Some of the Halo invoices that Chris Gerrans entered into Sanovas' Quickbooks were for services Larry and Shelly Gerrans both supposedly provided to Sanovas during January through March 2010. These Halo invoices, including those for January through March 2010, were given to the FBI by Gerrans on June 5, 2017. RT 1/21/20 pg. 71 (SA Jason Richards) and Trial Exhibits 215 and 216. The defendant was informed that the FBI was there to discuss the approximate $1.5 million that Sanovas had paid to Halo in 2014 and 2015. *Id*. at pg. 65.

The 2010 Halo invoices that the defendant provided to the FBI on June 5, 2017 were false documents that were intended to bolster defendant's lies about the source of the money used to buy 28 Greensburgh Lane and his entitlement to that money. One of the many ways that the government

proved the falsity of the 2010 Halo invoices at trial was through sworn admissions the defendant and Shelly Gerrans made during their 2010 bankruptcy. On April 7, 2010, the Gerrans' filed a written "schedule of current income of individual debtors." This court filing, (Trial Exhibit 2), was made under penalty of perjury and was electronically signed by both Larry and Shelly Gerrans. Gerrans and his wife listed Shelly's occupation as "homemaker" and her monthly income as "0.00." Gerrans also listed "0.00" for both himself and his wife in response to the section requesting "other monthly income."

On April 13, 2010, Gerrans and his wife answered questions under oath at a 341 hearing conducted by the Bankruptcy Trustee.[2] The April 13, 2010 hearing was audio recorded and was played for the jury at trial. Trial Exhibit 5. Shelly Gerrans testified that she was a full-time homemaker and that she had not worked for the past 10 years. Mrs. Gerrans also confirmed that she was not owed money by anyone or any business. *Id*.

On June 5, 2017, defendant gave the FBI Halo invoices purporting to document $25,000 per month for "consulting" services he provided to Sanovas in 2010, during the same period of time that he testified in bankruptcy court that Halo never took shape and that nothing ever happened with Halo. Trial Exhibit 5. Gerrans also testified that he was not owed money by anyone or any business. Gerrans testified that his employer was "Sorin Group" and mentioned nothing in either his sworn written filings or in his oral testimony about deriving income or being owed money from Sanovas or Halo. *Id*.

In November 2010, the Gerrans rented a home at 29 Timothy Avenue in San Anselmo, California. In a rental application for this property, Shelly Gerrans listed her employment as "homemaker" and her monthly income as "0." Trial Exhibit 24. Shelly Gerrans also listed "0" on the category of the rental application that asked about "other monthly income." Trial Exhibit 24. On June 5, 2017, however, Gerrans gave the FBI Halo invoices purporting to document $5000 per month for Administrative Assistant services allegedly provided by Shelly Gerrans for 2009 and 2010 (including January through March 2010) during the same period of time when Shelly Gerrans testified under oath that she had no monthly income and was a full time homemaker. Trial Exhibit 5.

Beginning in approximately February 2013 and continuing through March 16, 2015, Gerrans

---

[2] A 341 hearing is a meeting of creditors conducted by the appointed trustee at which the individual debtors are questioned about their assets and liabilities.

rented a house at 28 Greensburgh Lane in San Anselmo, California. In late 2014, Wade Declaris, the owner of the home decided to sell the property and told Gerrans that if he wanted to buy the house, he had to do so now. The urgency for a quick sale and closing was because Declaris thought needed to close sometime before April 2015 to avoid a tax situation he was facing in the United Kingdom.

At the time, Gerrans did not have sufficient funds or income to facilitate the purchase. In fact, in December, 2014, Chris Gerrans testified that Larry told him and his brother Art Gerrans Jr. that he (Larry) wanted to buy the house, but that he would have to pay all cash to do so. Gerrans explained to his brothers that he could not get a loan because of a prior bankruptcy and instructed his brother Art, who was in charge of investor relations at Sanovas, to go out and raise a bunch of money so that Larry could buy the house. RT 1/15/20 pgs. 73-77.

On January 6, 2015, Wade Declaris emailed the defendant and offered him the right of first refusal on the house. Trial exhibit 23. Declaris set the price at north of $2.7 million. *Id*. There was, however, a major obstacle standing between the defendant and his ability to purchase the house: As of January 6, 2015, the defendant had only $8.24 in his bank account. Trial Exhibit 220, pg. 7209. Accordingly, Declaris' decision to sell 28 Greensburgh Lane triggered a series of fraudulent actions by Gerrans in which he looted Sanovas and convened a recently created BOD to retroactively rubber stamp his financial self-dealing.

On February 13, 2015, Gerrans created the shell company Hartford Legend Capital Enterprises. RT 1/21/20 pg. 61 and Trial Exhibit 69. On March 3, 2015, Gerrans opened a bank account in Hartford's name, RT 1/21/20 pg. 60, and used Hartford to conceal the source (which was Sanovas) of vast sums of money that he wire transferred from Sanovas to Halo and also, in some instances, directly from Sanovas to Hartford. When Gerrans was interviewed by the FBI on June 5, 2017, he falsely told the FBI that Hartford was a company that he (Gerrans) started *before* Sanovas and that he funded Hartford with a $550,000 retirement account that he had. *Id*. at pg 64.

The government proved at trial that, Gerrans systematically transferred millions of dollars from Sanovas to himself and lied to the newly created Sanovas Board of Directors (BOD) in an effort to gain the BOD's imprimatur on payments Gerrans previously diverted to himself from Sanovas. Gerrans arranged for nearly $2.5 million to be wire transferred from Sanovas to himself (via the shell companies,

Halo and Hartford) in an approximate six-week period so that he could use the money to purchase a luxury house for cash in San Anselmo, CA. Between January 20, 2015 and March 13, 2015, defendant deposited six checks into Halo's WF bank account ending in 6937. Each of these checks, which totaled $1,435,544.25, was drawn from Sanovas' JPMC bank account. Defendant obtained these checks by ordering his brother, Chris Gerrans, to draft them on his behalf. On March 13, 2015, defendant deposited two checks into Hartford's WF account from Sanovas' JPMC bank account totaling $314,750. That same day, defendant wired $80,000 from Sanovas' JPMC bank account to Halo's WF account. On March 16, 2015, defendant wired $130,000 from Sanovas' JPMC bank account to an existing joint checking account in his and another individual's name, ending in 6055. Each of these transfers ultimately contributed towards the purchase of 28 Greensburgh Lane.

Between April 2, 2013 and May 7, 2014, Gerrans also liquidated his personal IRA ($500,000) and all three Board Members (Nichols, Georges and Koen) testified at trial that the defendant falsely told the BOD at both the March 6, 2015 and May 9, 2015 board meetings that Sanovas should reimburse him for the entire amount of the IRA and associated penalties for the liquidation because he used the funds in furtherance of Sanovas' business. In fact, as the government proved at trial, the IRA money was used for Gerrans' personal expenses, including lavish luxury items such as a Maserati car, a $55,372 diamond ring for his wife, spa treatments, extravagant vacations and rent on his personal residence. Gerrans also told the BOD that he had incurred tax liabilities and penalties when he liquidated his IRA and that he was entitled to reimbursement from Sanovas for these taxes and penalties. However, Gerrans specifically directed Equity Trust (which managed his IRA) not to withhold any money for taxes and penalties. Thus, Gerrans requested and received reimbursement for the IRA liquidation based upon two material lies to the BOD: (1) that the monies were used to fund or seed Sanovas in furtherance of Sanovas' business (intent to deceive); and (2) that he had paid taxes and penalties on the IRA liquidation (intent to cheat), when he had not.

In 2016 and 2017, Sanovas obtained American Express corporate credit cards, RT 1/15/20 pg. 95, including one in the name of Lawrence Gerrans ending in 81006. After Gerrans purchased the home at 28 Greensburgh Lane, he and his wife went on a spending binge using the Sanovas American Express corporate credit cards for a myriad of personal items, including handmade designer carpets and property

tax payments on the Gerrans' personal residence at 28 Greensburgh Lane. The government proved that Gerrans instructed Chris Gerrans to make false entries on the Sanovas check register and to book these personal charges as "Materials and Supplies." These false entries conclusively demonstrated both the defendant's intent to deceive and his intent to cheat. *See* discussion *infra* of *United States v. Miller,* 953 F.3d 1095, 1099 (9th Cir. 2020). First, the bogus entries were intended to conceal (*i.e.* deceive) the personal nature of the credit card charges. Second, many of the charges were booked to "Materials and Supplies" or, in some instances, R & D, in order to obtain a tax credit to offset Sanovas payroll taxes, which proved the defendant's intent to cheat.

Specifically, on April 10, 2017, Gerrans charged $32,395.77 on the Sanovas American Express corporate credit card ending in 81006, which was for payment of property taxes on his personal residence at 28 Greensburgh Lane (Count 4). The Sanovas check to American Express covering this property tax payment was booked as "Materials & Supplies" in Sanovas' check register. On April 29, 2017, Gerrans charged $12,500 to Busra Carpets and Gifts on the Sanovas American Express corporate credit card ending in 81006 which was for the purchase of luxury carpets for his personal residence at 28 Greensburgh Lane (Count 5). Again, at the defendant's express direction, the Sanovas check to American Express for this charge was booked as "Materials & Supplies" in Sanovas' check register.

After the defendant was indicted and released on a bond that included the standard conditions that he shall not harass, intimidate or retaliate against any witness and a special condition which specifically prohibited him from having any contact with Chris Gerrans about the criminal case outside the presence of Chris Gerrans criminal counsel, defendant engaged in a campaign of attempted witness intimidation of Chris Gerrans in violation of the bond. These instances of witness intimidation and improper communication about the criminal case outside the presence of Chris Gerrans' attorney included the following: (1) After the indictment, the defendant showed up at Chris Gerrans home uninvited and was "pissed" and "in a rage." He berated Chris Gerrans for not taking "the 5th" when Chris testified before the grand jury. RT 1/15/20 pg. 116; (2) blaming Chris Gerrans for the indictment against the defendant (*id.*); (3) defendant gave Chris Gerrans a burner phone so that the two could surreptitiously communicate with one another, *id.* at pg. 120; (4) toward the end of June 2019, the defendant further talked with Chris about his criminal case outside the presence of Chris Gerrans'

attorney at their niece's birthday party (*id*. pg. 129); (5) defendant enlisted his father as a messenger to deliver various directives to Chris about the defendant's criminal case, RT 1/15/20 pgs. 133-136 (6) when Chris retrieved the truck he had loaned to the defendant, the defendant yet again discussed his criminal case with Chris, including some of the discovery the government had provided in his criminal case. RT 1/15/20 pgs 138, 139**.**

The government also proved that on August 13, 2019 (one day after defendant filed his motion to dismiss the indictment, *see* Dkt 42), the defendant initiated a verbal and physical altercation with Chris at San Rafael Storage. During this confrontation, the defendant yelled and screamed at Chris in a "barbaric" voice (RT 1/15/20 at pg. 147); demanded that Chris resign from Sanovas; claimed that when he (the defendant) got "his case" dismissed, he would take the company back and come after Chris. RT 1/15/20 pgs 143-147. The defendant "slugged" Chris in the chest. RT 1/15/20 pg 147. Chris Gerrans also testified that he was "scared" and that "the situation had gotten to the point where I almost felt like somebody's going to leave in a body bag." RT 1/15/20 pg. 147.

Portions of the San Rafael Storage facility altercation were captured on surveillance video recordings, which were shown to the jury. Trial Exhibit 78. The confrontation was also witnessed by Ryan Swisher, the Area Manager of the storage facility. Swisher testified that on August 13, 2019, the on-site manager telephoned Swisher and requested Swisher's assistance with an altercation that was developing in the reception area. RT 1/21/20 pg. 22 (Swisher). When Swisher arrived at the storage facility, he saw an argument between Larry and Chris Gerrans in which Larry was "agitated" and "upset" and was yelling at Chris. *Id*. at pg. 23. Swisher asked Larry and Chris to move outside from the reception area because what was occurring between them was inappropriate and "way too loud" for an office. *Id*. at pgs. 23, 33. When Larry and Chris went outside, Swisher was still able to see and hear them. *Id*,

Larry continued to be upset with Chris and was yelling and gesturing and was in Chris' "personal space." RT 1/21/20 pg. 24. Swisher saw Larry make physical contact with Chris. *Id*. Swisher specifically heard Larry tell Chris that the indictment was "bullshit" and that Chris had sold him up the river. *Id*. at pg. 25. The portion of the altercation that Swisher saw and heard lasted about 15 minutes. *Id*. at pg. 25. Swisher never heard Chris raise his voice during the altercation. *Id*. at pg. 33. After Chris

1  extracted himself from the confrontation, the defendant returned to the reception area and told Swisher

2  "if there weren't as many cameras in the facility, he would have killed him [Chris]." RT 1/21/20 pg. 36.

3  **ARGUMENT**

4  ## III. APPLICABLE LEGAL STANDARDS

5  ### A. The Mandatory Claims Processing (Rule 33)

6  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the

7  interest of justice so requires." Fed. R. Crim. P. 33. A motion for a new trial "should be granted only in

8  exceptional cases in which the evidence preponderates heavily against the verdict." *United States v.*

9  *Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984) (internal quotation marks omitted). "Any error, defect,

10  irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P.

11  52(a). This harmless error rule applies to consideration of a motion for a new trial. *See* Fed. R. Crim. P.

12  52(a), advisory committee's note.

13  "Any motion for a new trial grounded on any reason other than newly discovered evidence must

14  be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). New trial

15  motions based on claims of ineffective assistance of counsel are not considered grounded in "newly

16  discovered evidence" for purposes of this deadline. *United States v. Hanoum*, 33 F.3d 1128, 1130–31

17  (9th Cir. 1994); *accord United States v. Ross*, 338 F.3d 1054, 1057 (9th Cir. 2003) (affirming denial of

18  new trial motion as untimely and citing *Hanoum* for rule that "evidence of ineffective assistance doesn't

19  fit within the exception for newly discovered evidence"). This timeliness requirement is a mandatory

20  claims-processing rule that assures relief to the party raising it—when invoked, the Court's duty to

21  dismiss is "mandatory." *Eberhart v. United States*, 546 U.S. 12, 18 (2005).

22  ### B. Standard for Reviewing Ineffective Assistance of Counsel claims

23  To succeed on a claim of ineffective assistance of counsel, the defendant must show *both* that

24  "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant

25  by the Sixth Amendment" *and* that "the deficient performance prejudiced the defense." *Strickland v.*

26  *Washington*, 466 U.S. 668, 687 (1984). Failure to establish either prong of the *Strickland* test dooms a

27  claim of ineffective assistance of counsel. *Id.* at 697.

28  As to the first prong, review of counsel's performance is "highly deferential" and there is a

"strong presumption" that counsel rendered adequate assistance and exercised reasonable professional judgment. *Williams v. Woodford*, 384 F.3d 567, 610 (9th Cir. 2004). Performance must fall below "an objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Trial counsel's performance is reviewed in the light of the facts and circumstances at the time. *Id* at 690.

The Court may "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight…." *Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009). Indeed, the Supreme Court is cognizant that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. The petitioner bears the burden to show that "counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 131 S. Ct. 770-787 (2011).

As to *Strickland*'s second prong, a defendant must show that counsel's deficient performance prejudiced the defense. *Id*. at 692. To prove prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's errors and omissions, the result of the proceeding would have been different. *Id* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *United States v .Span*, 75 F.3d 1383, 1387 (9th Cir. 1996). "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 131 S.Ct. at 791-92. Rather, the issues is whether, in the absence of counsel's alleged error, it is "'reasonably likely' "that the result would have been different. *Id* at 792 (*quoting Strickland*). "The likelihood of a different result must be substantial, not just conceivable." *Id*.

## C. Dismissal is a Drastic and Disfavored Remedy

Defendant's untimely June 12, 2020 motion to dismiss (Dkt 247) is largely a regurgitation of the factually unsupported and legally meritless arguments he previously made in his motion for new trial. Dkt 235. To the extent that defendant is seeking a new trial based on alleged prosecutorial misconduct, he should have included these allegations in his Rule 33 motion (Dkt 235) but did not. Most important,

even if the examples of alleged misconduct had been included in the defendant's motion for a new trial, none of the claims he makes in the motion to dismiss support a new trial, let alone the far more extreme and disfavored remedy of dismissal of the indictment. When prosecutorial misconduct is alleged "the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." *United States v. Fredeerick,* 78 F.3d 1370, 1379 (9th Cir. 1996). It is not misconduct for the prosecutor to argue reasonable inferences based on the record. *United States v. Necoechea,* 986 F.2d 1273, 1279 (9th Cir. 1993). A prosecutor must be given reasonable latitude to fashion closing arguments. *United States v. Gray,* 876 F.2d 1411, 1417 (9th Cir. 1989). Here both of the prosecutors' closing statements argued reasonable inferences that were grounded in the trial testimony and admitted exhibits. Not one of the so-called incidents of misconduct the defendant cites in Dkt 247 is misconduct at all, let alone in the context of the entire trial. None, standing alone, or cumulatively, is sufficient to warrant a new trial. Accordingly, defendant's desperate eleventh hour attempt for an even more drastic remedy—outright dismissal of the indictment—fails in the first instance. Defendant has shown neither flagrant misconduct nor substantial prejudice, both of which are required before the court can even consider dismissal of an indictment. *United States v. Kearns,* 5 F.3d 1251, 1253 (9th Cir. 1993).

Dismissal of an indictment is "considered a 'drastic step' and is generally disfavored as a remedy." *United States v. Fuchs,* 218 F.3d 957, 964 (9th Cir.2000) (quoting *Guam v. Muna,* 999 F.2d 397, 399 (9th Cir.1993)); *see also United States v. Samang,* 607 F.2d 877, 881 (9th Cir.1979) ("The Court's power to dismiss an indictment on the ground of prosecutorial misconduct is frequently discussed but rarely invoked."). An indictment may be dismissed pursuant to the court's supervisory powers "only in flagrant cases of prosecutorial misconduct." *United States v. De Rosa,* 783 F.2d 1401, 1406 (9th Cir.1986). Dismissal under the court's supervisory powers for prosecutorial misconduct requires both (1) flagrant misbehavior; and (2) substantial prejudice. *Kearns, supra* 5 F.3d at 1253. Furthermore, dismissal is an especially disfavored remedy after the conclusion of trial. *Muna,* 999 F.2d at 399; *United States v. Venegas,* 800 F.2d 868, 869 (9th Cir.1986) (holding that a defendant who challenges an indictment based on prosecutorial misconduct "bears a heavy burden"). Accordingly, the defendant has not come close to meeting his burden for a new trial, let alone satisfying the even higher

1 hurdle for the far more drastic and disfavored remedy of dismissal of the indictment after a verdict.

2 **IV.    ANALYSIS**

3     **A.    Defendant's Motion is Time Barred and Must be Dismissed**

4     As an initial and dispositive matter, Rule 33 has a mandatory 14-day timeliness requirement, and

5 failure to meet that deadline leads to compulsory dismissal under binding Supreme Court case law.

6 "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed

7 within 14 days after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(2).  In this case, for the

8 reasons set forth below, Gerrans' motion is not based on newly discovered evidence.  The verdict of

9 guilty was returned on January 29, 2020.  Dkt 144.  Gerrans therefore had until February 12, 2020, to

10 file a motion for a new trial under Fed. R. Crim. P. 33.  There is no dispute that he did not do so.

11 Accordingly, the government moves to dismiss the motion without consideration of the merits.

12     Under binding Supreme Court authority, this Court must grant dismissal where, as here, the

13 timeliness requirement is invoked by the government.  In *Eberhart v. United States*, 546 U.S. 12, 19

14 (2005), the Supreme Court held that Rule 33's timeliness requirement, though not jurisdictional in that it

15 could be forfeited where not raised, was mandatory if invoked.  *Id.*  In other words, "claim-processing

16 rules [such as that in Rule 33] thus assure relief to a party properly raising them, but do not compel the

17 same result if the party forfeits them."  *Id.*  Consistent with past cases, the Court reiterated that "when

18 the Government objected to a filing untimely under" the rule, "the court's duty to dismiss . . . was

19 mandatory."  *Id.* at 18.  The Court noted the same rule for post-verdict motions for judgment of

20 acquittal:  "when the prosecutor objects" on timeliness grounds, a court "may not grant" such a motion.

21 *Id.*  Accordingly, where, as here, the government properly invokes the timeliness requirement of Fed. R.

22 Crim. P. 33, the court's "duty to dismiss" is "mandatory."  *Id.*  Gerrans' motion must be dismissed.

23     The only exceptions to the mandatory nature of the timeliness requirement are found in Fed. R.

24 Crim. P. 45(b), which provides that a court may extend the time for filing a new trial motion or for good

25 cause may do so on a party's motion made (1) before the original time expires or (2) after expiration

26 with a showing of excusable neglect.  *Id.*  In this case, none of these exceptions apply.

27       **1.    The Court did not extend the deadline for filing a Rule 33 motion**

28     First, this Court did not extend the time for filing a new trial motion at all, and certainly did not

do so during the 14-day timeliness period or with the government's consent. Gerrans was convicted on January 29, 2020. Dkt. 144. On April 23, 2020, a "Clerk's Notice" entry appeared on the docket stating, without elaboration, stating, "Deadline for Defendant to file any post-trial motions is set for May 27, 2020." Dkt. 212. A similar notice issued on May 27, 2020, stating, "Any post-trial motions are due 7/9/20," with the "hearing on any post-trial motions" set "together with the sentencing hearing." Dkt 232. None of these *sua sponte* text-only clerk's docket entries referenced Rule 33 or resetting its timeliness requirements, and the government has steadfastly invoked those requirements even in the face of *ex parte* briefing on post-trial motion scheduling issues. *See* Dkt 238 at 2 (explicitly invoking Rule 33 time bar upon defendant's filing of *ex parte* motion for new trial).

These general clerk's notices are most readily understood to set a deadline where otherwise one would not apply, or, in other words, to set a deadline for motions that would otherwise be timely. This follows from the well-established rule that, "ordinarily" the "more specific rule" governs "over one more general." *Russ v. Standard Ins. Co.*, 120 F.3d 988, 990 (9th Cir. 1997) (rejecting district court's invocation of general discretionary authority to obviate strict compliance with Fed. R. Civ. P. 39). To conclude otherwise would be to read the docket entries as reopening all manner of motion practice, as any motion filed after trial regardless of timeliness would be by definition a "post-trial motion[ ]." In other words, it is difficult to envision what the limiting principle would be for precluding Gerrans' filing new motions to suppress, motions to dismiss for defects in the indictment, or motions in limine, to name a few examples, if this general order obviated otherwise-applicable deadlines for each of those avenues for relief. That cannot have been the Court's intent. Accordingly, Gerrans' instant motion is untimely and must be dismissed, as the general clerk's notices in this case not mentioning Rule 33 cannot operate silently to obviate that Rule's specific and strict timeliness requirements.

This conclusion is particularly apparent when one considers the record in this case, which displays not one missed opportunity to make a timely filing but serial instances in which Gerrans' counsel chose not to abide by the strictures of Rule 33 for nearly five months.[3] First, immediately after

---

[3] Of course, the claims-processing rule is *mandatory*, meaning that even if this Court found the record somehow sympathetic for Gerrans and wished to consider not enforcing the deadline, it would not have the option of doing so. *See United States v. Sadler*, 480 F.3d 932, 940 n.10 (9th Cir. 2007) (citing *Eberhart* and describing claims-processing rules as "mandatory," even though Court noted that circumstances of that case were "an example of one in which we would consider declining [to enforce

the verdict, the Court specifically asked Gerrans' counsel whether it needed to set out a date for post-trial motions. Tr. 163. Gerrans' counsel declined, and said that he will "contact the Clerk of the Court" if he "think[s] that ought to be heard in advance of sentencing." *Id.* Defense counsel then added that he was not prepared to answer such a question at that moment, and the Court said: "All right. All right. Then I'll leave it to you," to which Gerrans' counsel responded "Thank you." *Id.* Gerrans' counsel never reached out to the Clerk of the Court afterward to set a briefing schedule, let alone in the 14-day window in which he needed to do so as mandated under Rule 33. Therefore, defendant's motion was untimely as of February 12, 2020.

Next, on March 20, 2020, Gerrans fired trial counsel and obtained new counsel. Dkt 162. This counsel (attorney Shawn Halbert) similarly failed to file anything suggesting the need for a new schedule for filing a Rule 33 motion within the first two weeks of her appointment or any time thereafter. Moreover, new counsel failed to ever file anything seeking relief from Rule 33's requirements, despite otherwise engaging in robust litigation in this case. *See* Dkt Nos. 162–235 (docket entries between defense counsel's entry in case and filing of new trial motion, ranging from March to May 2020). Gerrans has failed to meet the deadline provided by Rule 33 on multiple occasions, through multiple attorneys, and he should not now be permitted to obviate the Rule's clear and mandatory deadline without a word of justification.

Finally, not enforcing the timeliness requirement would be unfairly prejudicial to the government. Such prejudice is of course not a required part of the analysis. *United States v. Sadler*, 480 F.3d 932, 940 n.10 (9th Cir. 2007) (enforcing claims-processing rule even where "no indication of prejudice to the government" in not doing so and Court expressed). But considering this new trial motion on the merits would permit an unbriefed and unsolicited general clerk's order, issued well after the deadline had passed for filing new trial motions and not mentioning Rule 33 or its requirements, to deprive the government of its mandatory claims-processing relief for this specific type of motion. The government has consistently invoked its rights to timely filing on this precise issue in this case itself. Dkt. 238 at 2. And there is no dispute that, if Gerrans had requested an extension of time on the day that

the timeliness rule] . . . if given the choice" due to counsel being misled as to deadline and no indication of prejudice to government).

the Court issued its clerk's orders, those requests would have been untimely. *See* Fed. R. Crim. P. 33, advisory committee's note ("The defendant may, under Rule 45, seek an extension of time to file the underlying motion as long as the defendant does so within the . . . [14]-day period."); *see generally United States v. Gladding*, 775 F.3d 1149, 1152 (9th Cir. 2014) (courts "give weight in interpreting the Federal Rules of Criminal Procedure" to Advisory Committee Notes). Providing Gerrans a windfall that he did not even bother to request, doing so without briefing, and depriving the government of what courts have repeatedly described as a mandatory claims-processing rule, would not be a just outcome.

### 2. Gerrans has not even attempted to show, let alone established, excusable neglect justifying ignoring the otherwise applicable mandatory time bar

Based on the same record described above, Gerrans cannot establish excusable neglect to avoid the mandatory deadline—but he also has not even attempted to do so, rendering relief from the time bar unavailable to him. Under Fed. R. Crim. P. 45(b)(1)(B), a deadline in the Federal Rules of Criminal Procedure may be extended upon showing of "good cause" after expiration of the deadline if the moving party establishes that the failure was due to "excusable neglect." Generally, "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect." *Pincay v. Andrews*, 389 F.3d 853, 857 (9th Cir. 2004). This is true in criminal cases as well. *United States v. Prairie Pharmacy, Inc.*, 921 F.2d 211, 213 (9th Cir. 1990). Instead, the courts engage in an equitable analysis of the circumstances surrounding the failure. *Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). "To determine when neglect is excusable, we conduct the equitable analysis specified in *Pioneer* by examining at least four factors: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Lemoge v. United States*, 587 F.3d 1188, 1192 (9th Cir. 2009) (internal quotation marks and citations omitted).

Gerrans has not attempted to show that he satisfies any of these categories. It is his burden to do so. *Bateman v. United States Postal Service*, 231 F.3d 1220, 1224 (9th Cir. 2000) (stating that court acts within its discretion where it spells out equitable test for excusable neglect and then denies relief based on conclusion that moving party failed to present evidence relevant to the four factors). In any event, the record does not reveal any support for excusable neglect here: Gerrans has been represented

continuously by able retained counsel who have filed voluminous challenges to his conviction and detention; no reason for any of the delay has been offered; the delay does not discernably speak to good faith; the length of the delay is almost five months from the verdict, well outside the 14-day window established by the rule; and the prejudice to the government is the quite apparent prejudice of having any future retrial delayed by many months while evidence grows stale, court calendars fill, witnesses' memories fade, attorneys and agents turn to other matters, and a global pandemic sets all trials back by innumerable number of months. Such a record does not support a finding of excusable neglect, even if Gerrans had attempted to assert a basis for such a finding. His motion for a new trial should be denied as untimely.

To the extent Gerrans may belatedly attempt to offer justification in reply, this Court should decline to consider such reasons as waived. *See In re Rains*, 428 F.3d 893, 902 (9th Cir. 2005) (noting that district court properly relied on principle that issues cannot be raised for the first time in a reply brief). That is particularly true where, as here, Gerrans has been on notice that the government would invoke its right to timely filing under Rule 33, *see* Dkt. 238 at 2, yet has done nothing to file an amended motion or similar supplementation articulating justification on this issue. In fact, on May 7, 2020, the government emailed defense counsel and specifically advised that a Rule 33 motion was untimely unless based upon newly discovered evidence, which the current motion is not. Ms. Halbert explicitly acknowledged the government's invocation of Rule 33's mandatory time limit responding: "I'm glad to see someone is making sure the trains run on time." *See* Exhibit 5 attached hereto. Accordingly, Gerrans both has not and cannot show excusable neglect in failing to meet the mandatory deadline in Rule 33, and the government's invocation of this claims-processing assures relief—the Court must dismiss the motion as untimely.

**B.** **Defendant's Ineffective Assistance of Counsel Claims Cannot be Evaluated on this Record and Should be Deferred to Collateral Proceedings, Per the Ordinary Course**

Even if his motion were timely, Gerrans premises his request for a new trial on various grounds of ineffective assistance of counsel. "Such claims are generally inappropriate on direct appeal and should be raised instead in habeas corpus proceedings." *United States v. Steele*, 733 F.3d 894, 897 (9th Cir. 2013) (internal quotation marks and citation omitted). While a district court has discretion to

entertain claims of ineffective assistance prior to judgment, the exercise of that discretion depends on "the existence of evidence already in the record indicating ineffective assistance of counsel, or upon the scope of the evidentiary hearing that would be required to fully decide the claim." *Id.* at 897–98. Where, as here, a motion for a new trial raises several different possible sources of ineffectiveness in a "broad-based" claim, "and the evidentiary record to consider" such claims is "sorely lacking," a district court does not abuse its discretion in declining to consider ineffectiveness until the ordinary collateral attack proceeding. *Id.* at 898.

Such an approach is particularly advisable here, where the record currently contains little basis to evaluate whether Gerrans' prior counsel's complained-of decisions were strategic or inadvertent, or otherwise within the wide range of acceptable professional assistance. Gerrans urges constitutional ineffectiveness for failure to call witnesses, failure to adequately cross-examine existing witnesses, failure to prepare him adequately for testimony, failure to object to a model jury instruction, failure to impeach other witnesses, and other classic trial decisions. Motion 14–45. Those decisions fall within the very heart of the kinds of decisions not liable to second-guessing on a bare record.

"Under *Strickland,* counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill. . . . [C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (internal quotation marks and citations omitted). Indeed, "[a] court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal quotation marks and citation omitted).

Furthermore, even beyond these strong presumptions, Gerrans' "counsel has not yet had an opportunity to explain his actions," and therefore this Court "cannot tell from the record whether the [alleged] failure[s were] . . . calculated stratagem or a mere oversight." *United States v. McGowan*, 668 F.3d 601, 606 (9th Cir. 2012) (internal quotation marks, alterations, and citations omitted). As a result, deferring consideration of Gerrans' ineffectiveness claims to collateral proceedings is the appropriate course. *Id.* To hold otherwise would require a lengthy and undefined series of proceedings to

investigate Gerrans' claims, which in turn would entail significant delay in sentencing, an open-ended evidentiary pursuit without the tools and processes in place for habeas proceedings designed to effectuate such inquiries, and would otherwise not promote the well-established public interests in promptness in resolving criminal cases (and imposing judgments on individuals convicted by a jury of significant federal offenses). This Court should not decide Gerrans' ineffectiveness claims, without prejudice to his ability to raise such claims at the appropriate time through collateral proceedings.

## C. On the Merits, Trial Counsel Rendered Effective Assistance at Trial

### 1. Trial Counsel's Alleged Failure to Call Certain Witnesses

Defendant alleges that his trial team rendered ineffective assistance because they did not call various witnesses on his behalf. Dkt 235 pgs. 16-34. Although it is impossible to determine on the current record whether many, if not most, of defendant's attorneys trial tactics were strategic, *McGowan, supra* 668 F.3d at 606, counsel's decision not to call Gary Krausz, Anne Hipshman, Robert Farrell and Art Gerrans, Jr. was clearly objectively reasonable,[4]

As is discussed above, Gary Krausz submitted a sworn declaration in support of defendant's August 12, 2019 motion to dismiss. Dkt 42. The analysis and conclusions in Mr. Krausz's declaration were based on several fraudulent documents defendant provided to Krausz, including Trial Exhibits 105 and 106. Krausz's reliance on demonstrably bogus documents, including the fake Shelly Gerrans Employment Agreement, would have exposed Krausz to a withering cross-examination and would have had the devastating impact of further revealing through a defense "expert" witness the number of counterfeit documents the defendant created and foisted on his own witnesses to try to justify his theft.

Anne Hipshman, a wage and hour attorney, had no meaningful or admissible testimony to offer in the criminal trial. If the defense had attempted to call Hipshman as a witness, the government would have moved *in limine* to preclude her testimony as irrelevant to any issue or legitimate defense in the criminal case. However, even assuming *arguendo* that the Court would have permitted Hipshman to

---

[4] The record is not developed at all regarding trial counsel's strategy in not calling Stafford Matthews, Jack Capers, Eleanor Banister, Kevin Day, or any of the remaining individuals named in the Motion for a New Trial. Dkt 235 *passim*. Accordingly, the government's opposition to the new trial motion cannot meaningfully evaluate or address whether these alleged failures were calculated strategy by defendant's trial team until the trial team is given the opportunity to explain its decisions in collateral proceedings.

testify about California Wage and Hour law—a topic that had no bearing on whether Gerrans embezzled millions of dollars from Sanovas—her declaration and opinions were also based on bogus documents provided to her by the defendant. For example, Hipshman purportedly reviewed a list of Sanovas employees which included their start dates and annual salaries. This list of so-called Sanovas employees included the defendant's daughter, Sarah Gerrans, who supposedly started her employment on June 1, 2009, at a time when there were *no* employees of Sanovas, other than the two founders, Gunday and defendant. The employee list that Hipshman relied upon also falsely listed the defendant's wife, Shelly Gerrans, as Sanovas' Vice President of Marketing, Dkt 42-2 pg.88. This was demonstrably untrue based upon the sworn testimony of Shelly Gerrans herself in the 341 hearing (Trial Exhibit 5) and the trial testimony of Ehran Gunday, Lloyd Yarborough and Chris Gerrans as discussed elsewhere in this memorandum.

That Hipshman was given a phony document by the defendant, which she referred to in her sworn declaration, effectively eliminated her as a defense witness at trial. The fact that the defendant provided bogus documents to Hipshman (Exhibits E and F to her declaration, *see* Dkt 42-2, pgs. 88 and 92) which directly contradicted another one of his phony documents, the bogus Shelly Gerrans Employment Agreement, which the defendant gave to Krausz[5] was yet another entirely reasonable strategic decision for not calling either Hipshman or Krausz as witnesses. These decisions should be given great deference by the Court. *Wood, supra*, 211 F.3d at 487.

As for defendant's complaint that his trial attorney should have called Robert Farrell as a witness, doing so would have been an unmitigated disaster for defendant. Assuming *arguendo* that Farrell could have testified with a straight face that Gerrans' employment agreement permitted the defendant to bill Sanovas for (1) a family vacation to Hawaii; (2) a family membership at the Bay Club and, (3) that it was permissible for Sanovas to pay the defendant's daughter $3000 per month while she was away at college and a full-time student, (*see e.g.* Motion for new trial Dkt 235 pg. 37), Farrell would

---

[5] The employee list that Hipshman relied upon in her declaration (Exhibit E) falsely lists Shelly Gerrans' job title as Vice President of Marketing. Dkt 42-2, pg. 88. The fake Shelly Gerrans employment agreement that defendant provided to Krausz (Trial Exhibit 106) falsely lists Shelly Gerrans' job title as Administrative Assistant. Trial testimony from Gunday, Yarborough, Fruehauf and Chris Gerrans established that Shelly Gerrans was not an employee of Sanovas, let alone the Vice President of Marketing or an Administrative Assistant.

have also testified that defendant's efforts to bill Sanovas for consulting the defendant supposedly provided through Halo was improper "double" dipping. *See* Exhibit 2. Farrell would have further testified that payments from Sanovas to Shelly Gerrans for "decorating" the office were excessive and inappropriate. *Id*. Under the circumstances of the criminal case in which the defendant was charged with creating millions of dollars of bogus Halo receivables, Farrell's testimony would have been devastating to the defense. Defendant's trial attorney's decision to forego calling Farrell was both wise and objectively reasonable.

With regard to trial counsel's decision not to call defendant's brother, Art Gerrans, Jr., the known facts make it abundantly clear why trial counsel chose not to do so. Art Gerrans, Jr. would have corroborated Chris Gerrans' testimony that defendant thought he needed to pay all cash for 28 Greensburgh Lane because of his recent prior bankruptcy. Art Gerrans would also have testified that defendant put him under pressure to raise money from investors so that defendant could buy 28 Greensburgh Lane. Not only would this testimony have served as additional corroboration of Chris Gerrans' testimony, but it would have further portrayed the defendant as willing to use investor monies as his own private slush fund.

Under these circumstances, trial counsel wisely chose not to call all of the above as witnesses at trial. Clearly it is not remotely possible "a reasonable doubt might have been established if counsel acted differently." *Harrington*, 131 S.Ct. at 791-92.

### 2. The Cross-Examination of Christopher Gerrans at Trial

Similarly, the defendant has not come close to showing that the defense counsel's cross examination of Christopher Gerrans was not reasonable and well within the bounds of reasonable professional judgment. As an initial matter, the claims defendant advances regarding the cross examination of Chris Gerrans are nothing more than a re-argument of disputes about inferences to draw from the facts of the case, but without any foundation in the trial record or in the other materials submitted by the defendant with his motion. Instead, the "argument" about trial counsel's cross-examination is just a recitation of unsupported allegations, followed by assertions that Mr. Getz should have "elicited" these facts from Chris Gerrans. This only highlights the fact that the current record is

insufficient for the Court to determine the question of ineffective assistance of counsel at this stage of the proceedings. In any event, the assertions here fall far short of showing ineffective assistance.

Chris Gerrans was subject to cross examination by defense counsel for about two hours over two days during the trial, and the cross examination covered a broad range of topics. The cross examination included Chris Gerrans' theft of money from Sanovas, and whether the defendant knew Chris Gerrans had stolen the money. RT 1/15/20 pg. 168-172. The cross-examination explored in depth how Chris Gerrans used the money he stole from Sanovas, including paying off his student loans and going to Disneyland, buying gold coins and cars. *Id*. at 168, 174-178. Mr. Getz went through the details of how Chris Gerrans embezzled the money, establishing that Chris did so in many cases without the defendant's knowledge. *Id*. at 184-187. Mr. Getz crossed Chris Gerrans on whether he was truthful with Sanovas lawyers when he was first confronted by them about the embezzlement, and also about how Chris Gerrans did not tell the FBI about his fraud when he met with them in 2017. *Id*. at 195-96.

The cross-examination addressed the relationship between the defendant and Chris Gerrans, and Sanovas hiring Chris Gerrans in 2013. *Id*. at 201. The cross-examination included Chris Gerrans admitting that he put personal expenses on company credit cards. RT 1/17/2020 pg. 15-16. It addressed Chris Gerrans' addiction, gambling, and depression. *Id*. at 16-18. Mr. Getz brought out the terms of Chris Gerrans' cooperation plea agreement, and addressed the impact testifying might have on his sentence. *Id*. at 24-25. Mr. Getz also engaged in a lengthy back and forth challenging Chris Gerrans' version of events that occurred at the storage facility in San Rafael. *Id*. at 25-30.

Some of the defendant's claims about the cross-examination of Chris Gerrans are just plain wrong. For example, defendant argues that Mr. Getz "failed to refute" a government "notion" regarding Chris Gerrans' move to heading up the finance function at Sanovas. Motion at 27. In fact, Mr. Getz examined Chris Gerrans on his education, including his finance degree. *Id*. at 202-203.

Other claims by the defendant regarding the cross-examination of Chris Gerrans are purely speculative assertions that certain "facts" could have been elicited from Chris Gerrans' testimony, such as that the defendant intended to build up the finance department, or that there were witnesses who would discuss Chris Gerrans' drug additions and gambling problems. Defendant also argues that counsel "failed to accurately elicit the true relationship" between the defendant and Chris Gerrans,

1  without offering any evidence to support this version of the "true relationship," let alone any support for

2  the assertion that Chris Gerrans would have agreed with defendant's version.

3      A final assertion relates to Chris Gerrans' prior arrest and misdemeanor conviction for cruelty to

4  a child, and charges of inappropriate contact with a minor that did *not* lead to a conviction. Motion at

5  28. This prior arrest and the resulting misdemeanor conviction was the subject of a motion *in limine*,

6  Dkt. 83, and should not have been admitted in any event. And the purported relevance of the charges—

7  that the charges themselves would affect his credibility because of a particularized fear of going to

8  prison—is far-fetched and of minimal relevance beyond the cross examination trial counsel already

9  elicited. Moreover, that line of examination likely would have been precluded by the Court because of

10 the unfairly prejudicial effect, particularly when balanced against the non-existent probative value of the

11 same.

12     The decisions made by Mr. Getz regarding the cross examination of Chris Gerrans were well

13 within the broad scope of effective assistance, and the defendant's list of additional hypothetical topics

14 that could have been explored is self-serving, speculative, and ignores the rules of evidence. The

15 strategic decisions Mr. Getz made regarding how to conduct this cross-examination are given "great

16 deference." *Wood*, 211 F.3d at 487.

17     **3.    Defendant Waived His Right To Testify In His Own Defense**

18     Next, Gerrans claims his counsel was ineffective for supposedly being unprepared for Gerrans to

19 testify at trial and thereby denied him his right to testify. Motion 37–38. "Although the ultimate

20 decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical

21 decision not to have him testify." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993) (citation

22 omitted). In this case, of course, there is no need to rely on this well-established presumption, because

23 Gerrans personally waived his right to testify in open court. Tr. 164:13–21 (Court addressing Gerrans

24 personally to ensure that he knew he had right to testify, had carefully made such a decision, and was

25 prepared to waive his right to testify, and Gerrans personally stating that he wished "to waive it").

26 Therefore, regardless of what counsel did or did not do, Gerrans himself stated that he wished to waive

27 his right to testify, and did not express any reservations about that decision or how it was made.

28

Assigning constitutional error to his counsel on such a record is meritless.[6]

The case law leads to this same conclusion. The familiar *Strickland* standard governs claims of ineffective assistance of counsel regarding denial of the right to testify in one's defense. *Medley v. Runnels*, 506 F.3d 857, 861–62 (9th Cir. 2007) (en banc). As Gerrans concedes, courts "rarely" find ineffective assistance of counsel related to a defendant's right to testify. Motion 37. That is all the more true where the defendant is personally addressed in open court and waives his right to testify, having been informed that it is his decision to make. Tr. 164. Gerrans has not cited a single instance where a successful ineffective assistance of counsel claim in this circuit was premised on not testifying at trial after a defendant personally waived his right to testify in open court. Indeed, Gerrans cites case law standing for the opposite proposition: that a knowing and intentional waiver of the right to testify can be inferred from less evidence than the clear and explicit colloquy in this case. Motion 37 (citing, for example, *United States v. Jackson*, 13 F. App'x 581, 583 (9th Cir. 2001), where knowing and intentional waiver was found based on trial court stating that defendant had choice to testify and defense counsel stating defense would rest). That is perhaps why ineffective assistance claims in this area of the law fail routinely with less clear records than the one here. *See, e.g.*, *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (no ineffective assistance where defendant never raised desire to testify during trial and good reasons existed to advise defendant not to testify). Regardless, it is simply not possible for Gerrans to establish deficient performance on this record, as he personally was advised in open court of his right to testify and told this Court that he wished to waive that right.

Furthermore, even assuming all of the allegations regarding counsel's deficient performance on this point are true, Gerrans does not even attempt to articulate how this allegedly deficient performance prejudiced him under *Strickland*. Instead, he asserts that he was deprived of a meaningful opportunity to exercise his right to testify. Motion 38. But that is not the standard: he must establish that his testimony "would . . . have affected the outcome of the trial." *Medley*, 506 F.3d at 861. Gerrans does

---

[6] Gerrans' current assertion that he "repeated[ly] insist[ed] that he wanted to testify" is at best inconsistent with this record. Motion 38. Similarly, the notion that Gerrans "believed he had no realistic option" but to not testify on counsel's advice is belied by his on-the-record assertion that he personally wished to waive his right to testify, having been advised by this Court that it was his decision to make. Motion 38; Tr. 164. Gerrans' belated and bare self-serving assertions cannot meet either prong of *Strickland*, and certainly cannot do so on this record.

not offer any reason to conclude that he would have testified in a way that would have changed the outcome of the trial. His failure to do so means that Gerrans cannot establish prejudice and therefore "he is not entitled to relief on this issue." *Id.* at 862 (citation omitted). His claim fails.

### 4. Trial Counsel Was Not Ineffective for Failing to Request *Miller* Wire Fraud Jury Instruction

Gerrans next contends that his counsel rendered constitutionally ineffective assistance of counsel by not objecting to use of the Ninth Circuit's model jury instruction as to intent for wire fraud. Dkt 235 pgs. 45-47. The basis for Gerrans' argument is the recent decision in *United States v. Miller*, 953 F.3d 1095, 1099 (9th Cir. 2020), which held that the crime of wire fraud requires the intent to deceive and cheat, rather than the intent to deceive or cheat. *Miller* rendered the previous model instruction incorrect as phrased in the disjunctive, but affirmed the conviction in that case as harmless in light of the instructions on the whole and the evidence presented at trial. *Id.* at 1103–04. Gerrans' argument is meritless.

As an initial matter, courts have repeatedly stated that counsel does not render deficient performance under *Strickland*'s first prong by failing to object to a model instruction or otherwise not advocating a change in the law that had yet to occur. *See, e.g.*, *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) ("[A] lawyer cannot be required to anticipate our decision in this later case, because his conduct must be evaluated for purposes of the performance standard of *Strickland* as of the time of counsel's conduct." (internal quotation marks and citation omitted)); *see also Smith v. McKee*, 598 F.3d 374, 384 (7th Cir. 2010) (concluding that lawyer's failure to object to use of applicable pattern jury instruction does not amount to deficient performance under *Strickland*'s first prong); *Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many times that reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop." (internal quotation marks, alterations, and citation omitted)); *Funchess v. Wainwright*, 772 F.2d 683, 691 (11th Cir. 1985) ("The failure of counsel to anticipate that an otherwise valid jury instruction would later be deemed improper . . . does not constitute ineffective assistance of counsel."). So, too, here: there is no question that the instruction used fit the Ninth Circuit's model instruction then in force. RT 1/29/20 pgs. 31-33 (the Court). Counsel was not constitutionally deficient

for failing to object to its use.

As to prejudice, claims of instructional error are subject to harmless error review. *Neder v. United States,* 527 U.S. 1, 15 (1999); *accord United States v. Thongsy,* 577 F.3d 1036, 1040 (9th Cir. 2009). "If a jury instruction misstates an element of a statutory crime, the error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Villalobos,* 748 F.3d 953, 957 (9th Cir. 2014) (internal quotation marks and citations omitted). In assessing claims of instructional error, a court considers "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Chang Da Liu,* 538 F.3d 1078, 1088 (9th Cir. 2008) (citation omitted); *accord United States v. French,* 748 F.3d 922, 938 (9th Cir. 2014) (stating same in context of reviewing ambiguous instruction regarding intent to defraud and knowing participation). Here, such considerations preclude relief for two reasons.

First, as in *Miller* itself, the remainder of the Court's instructions as a whole render the intent instruction harmless. As in *Miller,* this Court used Ninth Circuit Model Jury Instruction 8.124. RT 1/29/20 pgs. 31-33. That instruction, as given, required the jury to find beyond a reasonable doubt that the defendant "knowingly participated in, devised, or intended to devise (a) a scheme or plan to defraud, or (b) a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, promises, or omitted facts." Dkt No. 137; *see Miller,* 953 F.3d at 1103. As in *Miller,* the jury did not seek further instruction indicating any concern over inconsistency between this instruction and the language regarding "deceive or cheat," indicating that the jury did not find the defendant guilty based on deception alone. Dkt 137; *see Miller,* 953 F.3d at 1103–04. In *Miller,* the Court termed these considerations "[m]ost important[ ]" in its discussion of harmlessness. *Id.* This Court should reject the defendant's argument on the same basis.

Moreover, the trial evidence established overwhelmingly that Gerrans intended to both deceive and cheat. As is set forth *infra* in the factual summary of the trial evidence, among the many examples of both an intent to deceive and cheat, the government proved: (1) the defendant created fake Halo invoices dating back to 2009 which he instructed his brother to retroactively enter into Sanovas' Quickbooks in July 2014 (intent to deceive) in order to create the false appearance that defendant was owed approximately $1.5 million (intent to cheat); (2) the defendant used the Sanovas American

Express credit card for large personal expense (intent to cheat) and then instructed his brother to enter the Sanovas payments for those personal expenses as "Materials and Supplies" or R & D (intent to deceive). Accordingly, as in *Miller* itself, the instructional error was harmless—and therefore Gerrans cannot establish the far more difficult notion that counsel's failure to object to that instruction's use had a reasonable probability of affecting the outcome of the trial.[7] His motion on this ground fails.

### 5. American Express Theft

Defendant also argues that his trial attorneys were constitutionally deficient with regard to the American Express embezzlement (counts 4 and 5) for failing to: (1) show that the defendant had paid for certain personal items on the Sanovas American Express credit card from his personal bank account, and (2) not calling Gary Krausz whose declaration (Dkt 42-1) opined that Sanovas owed defendant money. Motion for new trial, Dkt 235 at pg. 29.

Both of these claims are without merit. First, forensic accountant Phil Villanueva traced the money going into and out of Sanovas' bank accounts. Mr. Villanueva testified that in 2017, all of the money used to pay Larry Gerrans' American Express credit card bills came from Sanovas, except for one $20,000 payment on March 31, 2017 which payment came from the defendant's personal Chase bank account. RT1/22/20 pgs. 105-106 (Villanueva). However, that same day or the day before Gerrans made this $20,000 payment, Sanovas transferred $19,000 to the defendant, which money was then used by the defendant to make the $20,000 payment to American Express. *Id*. at pg. 106. Thus, the trial evidence established that the defendant did *not* use his own funds to pay for $50,000 worth of personal charges on the company American Express card. Instead, the only money the defendant used from his Chase bank account to pay American Express had been transferred from Sanovas to defendant's Chase account immediately before the payment. As Mr. Villanueva testified, this financial

---

[7] In urging otherwise, Gerrans provides in a single sentence his articulation of prejudice for failure to object to the model instruction: the failure was prejudicial "because the government so vigorously pursued the theory that Mr. Gerrans was deceptive while the entire defense was that Mr. Gerrans was entitled to the money . . . ." Motion 40. But, as noted above, the government admitted evidence as to both Gerrans' intent to deceive and cheat, and the jury was required to find that he knowingly participated in a scheme to obtain money or property by false representations—therefore precluding the defense that he "was entitled to the money." In any event, the Motion is bereft of a colorable articulation of prejudice as to the failure to object to the model instruction, and therefore cannot succeed on *Strickland*'s second prong.

1  round-trip from Sanovas to defendant to American Express occurred on one occasion with the net result

2  being that the defendant paid approximately $1000 of his "own" money to cover all of the personal

3  expenses he charged on his Sanovas American Express card. RT 1/22/20 pg. 106.

4        Second, despite the evidence at trial that defendant did *not* use any personal funds, save and

5  except $1000, to pay for purely personal American Express charges, the new trial motion argues that the

6  $50,000 referred to in an email between the defendant and his brother, would have been in excess of the

7  amounts defendant charged in counts 4 and 5. Dkt 235 pg. 29. This argument is also unavailing

8  because the personal charges the defendant made on the company American Express card were far in

9  excess of $50,000 and included charges for a lavish 50th birthday party for his wife and a Marriot

10  vacation time-share. Moreover, the defendant instructed Chris Gerrans to book the defendant's personal

11  American Express charges as "Materials and Supplies" in Sanovas' check register. Defendant did so to

12  conceal the personal nature of his credit card charges and to try to obtain a tax credit for Sanovas in the

13  process. Defendant's emails to his brother do nothing to refute the clear proof based on the bank records

14  that defendant used the company's credit card for large personal charges, that these personal charges

15  were paid for by Sanovas and that defendant tried to conceal his fraud with bogus entries in the company

16  check register.

17        As to defendant's claim that Gary Krausz should have been called to somehow explain away

18  defendant's American Express embezzlement (Dkt 235 Motion at pg. 22), the fake documents defendant

19  created (Trial Exhibits 105 and 106) and gave to Krausz eliminated Krausz altogether as a viable

20  defense witness.

21        **6.    Alleged Failure to Impeach Board of Director Witnesses**

22        Gerrans also makes several specious claims alleging that his trial counsel failed to adequately

23  cross examine the three Board Members Koen, Nichols and Georges. Dkt 235 Motion at pg. 30.

24  Defendant argues his trial counsel was constitutionally defective for failing to pursue a line of

25  questioning establishing that the Board Members had a fiduciary duty to the Sanovas shareholders for

26  the decisions they made, including decisions the BOD made that were directly based upon lies they were

27  told by the defendant. Dkt 235, Motion at pg. 30. In other words, defendant argues that his counsel

28  failed to establish that the BOD had a duty to protect the shareholders from defendant's fraud and to

ferret out his misrepresentations rather than relying on the material misstatements and omissions the defendant made to the BOD. To state the proposition is to reveal its absurdity. Trial counsel had no Sixth Amendment obligation to pursue a frivolous avenue of cross-examination, particularly when doing so would only have further highlighted to the jury the numerous misrepresentations and omissions the defendant made to the BOD. [C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (internal quotation marks and citations omitted).

Gerrans also makes the argument that his attorney was ineffective because he should have elicited information that his proposed salary was "within the appropriate range given to executives in comparable companies." DKT 235 Motion at pg. 30. This proposed line of questioning was completely irrelevant to the lies and omissions Gerrans was on trial for. The indictment did not charge Gerrans with fraud because he received a high salary from Sanovas. Rather, the indictment charged Gerrans with embezzling large sums of money from Sanovas based upon lies he told to the BOD, including, but not limited to, falsely telling the BOD that he had liquidated his IRA to seed Sanovas. The uncontroverted evidence at trial conclusively established that defendant liquidated his IRA in 2013 and 2014, not during Sanovas' inception in 2009 and that defendant used his IRA money for lavish personal expenditures including a $55,000 diamond ring for his wife and a luxury Maserati sports car for himself.

The indictment also charged Gerrans with material omissions, including failing to advise the BOD that he had already taken more than $2.5 million from Sanovas in January through March 2015 and had used that money for the all cash purchase of 28 Greensburgh Lane. Clearly any attempt by trial counsel to try to establish the "reasonableness" of the salary Gerrans was seeking the BOD to approve prospectively would have had no bearing whatsoever on the fraud scheme with which he was charged.

As for Gerrans' suggestion that trial counsel should have cross-examined the Board Members about his employment agreement which defendant asserts "specifically authorized Mr. Gerrans, retroactively to borrow money to buy a home…," pursuing that line of questioning would have been devastating to the defendant. First, the defendant provided a bogus promissory note to the FBI purporting to show that he borrowed the money for the house from Hartford Legend Capital Enterprises,

*not* Sanovas (count 9). The proposed cross-examination about defendant's employment agreement supposedly giving him the ability to borrow money from Sanovas to buy a home would have highlighted the fact that not only did defendant *not* take a loan from Sanovas to buy the home, but he also provided a false Hartford loan document to the FBI. The phony Hartford loan document (count 9) was intended to deceive the FBI about the true source of the money defendant used to buy the home.

Second, as was proved at trial, defendant stole all of the money for the house purchase from Sanovas and did not borrow it from any source, including Sanovas or his newly-created shell company, Hartford. Trial counsel made an entirely reasonable strategic decision not to pursue a false line of questioning on cross-examination of the Board Members, especially because doing so would have further exposed the bogus Hartford promissory note as the false document that it was.

### 7. Defense Counsel Was Not Ineffective For Not Objecting To The Government's Closing Arguments

Next, Gerrans claims constitutional ineffectiveness occurred when defense counsel did not object to alleged instances of prosecutorial misconduct during closing arguments. Motion for New Trial at 40-44. This claim cannot withstand scrutiny.

At the outset, the instances Gerrans claims as misconduct were not misconduct. He cites no authority stating otherwise. Gerrans describes as misconduct the prosecution's closing argument, citing its description of him as a "liar and a thief" and reference to his bankruptcy proceedings, its inferential argument that the defendant's business partner's (Gunday) severance agreement was a payout without equivalent for Gerrans, its implication that Gerrans' company was used as a vehicle to obtain investor money for personal purposes rather than medical device purposes, and its supposed misstatements of fact. First, the prosecution described the defendant consistently with what the evidence showed—that he intentionally made false statements and provided false documents (lying) to steal (thief) from Sanovas. The prosecution is permitted to use "argumentative characterizations . . . during argument." *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997). "In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence argue, that one of the two sides is lying." *United States v. Ruiz*, 710 F.3d 1077, 1083 (9th Cir. 2013) (internal quotation marks and citations omitted); *United States v. Laurins*, 857 F.2d 529, 539 (9th Cir. 1988) (calling defendant "liar"

can be construed as comment on evidence presented at trial); *United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984) ("It is neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant . . . ."). And, of course, there was no dispute that the Gerrans filed for bankruptcy in 2010. The prosecutor's reference to the defendant's bankruptcy filing was appropriately tethered to sworn statements the defendant and his wife made during the bankruptcy that were completely at odds with the bogus Halo invoices the defendant gave to the FBI (counts 7 and 8). The Court explicitly permitted this testimony and, by extension, the relevant and permissible inference the government made in closing argument, when it denied the defendant's motion *in limine* seeking to preclude reference to the prior bankruptcy. Dkt 106.

Second, the government's argument about the import of Gundy's severance agreement was supported by the record. Trial Exhibit 113 and Gunday trial testimony at pg. 59. Insofar as Gerrans believes that Gundy's separation agreement "meant" something other than what the government asked the jury to infer it meant, he was free to argue the opposite inference during closing arguments. *See Sayetsitty*, 107 F.3d at 1409 (prosecutor is permitted during closing argument to argue "reasonable inferences from the evidence presented at trial").

Third, the evidence showed that Gerrans fraudulently obtained money from his company, and that company was ostensibly one that solicited investments as a medical device company. Once again, the government was permitted to argue the reasonable inference that investors in that company had not been expecting to invest in Gerrans' luxury home or his wife's Mercedes SUV. *See e.g.* RT 1/14/20 pg. 10 (Nichols testifying that he was told his investment money would be used for "general running of the company. R & D, engineering, accounting."), The government never suggested that the company was a fiction in total, *contra* Motion 43, merely that investors had put their money into a medical device company not knowing it was being used as Gerrans' personal piggybank.

Finally, as to the purported misstatements of fact, the record simply refutes Gerrans' allegations. Gerrans argues that the timing of Gundy's departure "could have had nothing to do" with DeClaris telling Gerrans he wanted to sell the house. Motion 44. But again, the government was permitted to ask the jury to draw the inference given the evidence presented—the timing of Gunday and Yarborough's departure provided the opportunity for Gerrans to loot Sanovas to accomplish the house purchase.

Insofar as Gerrans cites as a misstatement of fact the government's argument that Gerrans waited to defraud the company until the departure of its comptroller, Motion 44, once again such an allegation is not a misstatement of fact. It is a disagreement with the inference that the government was reasonably asking the jury to draw in light of the sequence of events proven at trial—a not altogether foreign scenario in which an embezzler waits until the accountant is not looking to engage in embezzlement. None of these instances amounted to any misconduct, let alone misconduct sufficient to justify a new trial, when the purported inferences were reasonable and were not objected to.

Moreover, even if these instances were somehow misconduct, which they were not, "[t]here is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (internal quotation marks omitted). "Because many lawyers refrain from objecting during . . . closing argument, absent egregious misstatements, the failure to object during closing argument . . . is within the wide range of permissible professional legal conduct." *United States v. Neocoechea*, 986 F.2d 1273, 1281 (9th Cr. 1993) (internal quotation marks and citation omitted). Gerrans cannot overcome these presumptions here, where the record is devoid of any indication of misconduct during closing argument. His challenge fails at the first step of *Strickland*, since he cannot establish that trial counsel's decision not to object during a proper closing argument was incorrect, let alone not tactical or outside the wide range of permissible professional assistance.

But even if counsel's failure to object was objectively unreasonable, Gerrans cannot show that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. That is because this Court cured any alleged failure to object by instructing the jury that their memories of the evidence controlled and that attorney arguments were not evidence. *United States v. McKoy*, 771 F.2d 1207, 1213 (9th Cir. 1985) (prejudicial statements by prosecution during closing argument can be neutralized where jury is instructed that prosecutor's remarks are not evidence and to consider only the evidence in reaching verdict); Dkt 137 and RT 1/29/20 at pg. 27. Accordingly, even if Gerrans could show that the prosecutorial arguments were misconduct—which they were not—and even if defense counsel was constitutionally deficient in not objecting to them— which he was not—Gerrans would still fail under the second step of *Strickland*, as any misconduct was

cured by this Court's instructions. Therefore, his counsel's failure to object contemporaneously cannot give rise to the reasonable probability of a different outcome.

### D. The Motion To Dismiss Is Without Merit

As is set forth earlier in this memorandum, defense counsel has been on notice long before filing the motion for new trial, Dkt 235, that the Government would move to enforce the mandatory claims processing rule under Fed. R. Crim. P 33 and the Supreme Court's holding in *Eberhart, supra* 546 U.S. at 19. Faced with the realization that the new trial motion was time-barred, and undeterred by either the Rules of Criminal Procedure or this Court's scheduling orders, the defendant made the calculated assumption that the Court would forebear from enforcing its prior scheduling order (Dkt 244). Accordingly, defense counsel chose not to inform the Court at the June 4, 2020 scheduling conference that counsel intended to file yet another post-trial motion, which also deprived the government of the opportunity to object and to be heard on the same.

Instead, on June 12, 2020, without seeking leave of this Court, defense counsel filed an untimely and meritless motion to dismiss. Dkt 247. The motion to dismiss makes most of the same arguments that were advanced in the time-barred Rule 33 motion and is a transparent attempt to circumvent the *Eberhart* mandatory claims processing rule, and to present additional arguments regarding the motion for a new trial and motion for acquittal after the deadline for filing those motions had passed. Although the untimely motion to dismiss, Dkt 247, is meritless, considering the motion on the merits would permit the defendant to do an end run around the Rules of Criminal Procedure and will essentially render this Court's prior scheduling orders and scheduling conferences meaningless. If the Court does consider the motion to dismiss, which we respectfully urge was filed in knowing and intentional violation of the Court's prior scheduling orders, the government opposes the motion for all of the following reasons.

#### 1. There was No Prosecutorial Misconduct in Presenting Testimony of Lloyd Yarborough and Arguing Reasonable Inferences of this Evidence

First, the defendant falsely argues that the government misled the jury by arguing in closing argument that even before the defendant gained full control of Sanovas, he was engaging in small thefts from Sanovas such as charging the company for a family vacation to Hawaii and a family membership at the Bay Club. This argument was entirely consistent with the trial testimony of Sanovas' former

Controller, Lloyd Yarborough. It was also consistent with Ehran Gunday, Sanovas' co-founder's concern about improper spending at the company. In 2013, Gunday, who was Farrell and Yarborough's boss, asked Yarborough to put together a worksheet because Gunday was concerned that the defendant was spending Sanovas' money for Gerrans' own personal expenses. RT 1/13/20 pg. 17. *See also*, Gunday trial testimony at pg. 54 ("there were a lot of unexplained personal spending that was coming up."). Yarborough reviewed the company expenses and put together a spreadsheet with items he considered personal expenses for Gerrans that Sanovas paid for. Trial Exhibit 251. These expenses included, among other things, a Gerrans' family trip to Hawaii, (RT 1/13/20 pg 45), $3000 monthly payments to the defendant's daughter, even though she was a full-time student who was away at college (RT 1/13/20 pgs. 21-22), and a Gerrans family membership at the Bay Club. RT 1/13/20 pg. 48. Yarborough did not consider the expenses that Gerrans charged to Sanovas (as reflected on the spreadsheet he prepared) to be appropriate Sanovas business expenses. *Id.* at pgs. 36-37.

Defendant's sole basis for claiming the government committed misconduct during its closing argument by briefly mentioning Yarborough's testimony that defendant's use of company money for a family vacation to Hawaii and a family gym membership was inappropriate is a May 31, 2013 email between Robert Farrell and Ehran Gunday (Halbert decl. Ex. 5). This email was produced to the defense during pre-trial discovery but was not introduced at trial by either party. Nor was Farrell called as a witness for obvious reasons discussed below and elsewhere in this memorandum. Not surprisingly, defendant does not cite any authority for his wild proposition that it is misconduct for the government to refer directly to trial testimony (here Yarborough and Gunday, *see discussion infra*) in closing argument, but not to refer to an email that was never introduced at trial by either party.

In the May 31, 2013 email that was not in evidence at trial, Farrell conveys his views to Gunday about the defendant's spending, but the Farrell email does not mention anything about the legitimacy, or lack thereof, regarding the defendant's use of company money for a family Hawaiian vacation and a family Bay Club membership. These were the only items on Yarborough's spreadsheet that the prosecutor referred to in closing as "small thefts that were totally inappropriate and wrong." RT 1/29/20 pg. 42. Yarborough testified at trial that these two items, among others, were not appropriate company expenses. It was entirely proper for the government to refer to the actual trial testimony in closing

1    argument.  And, if the email in question was at all probative, which it was not, defendant's attorney

2    could have introduced it as an exhibit by calling Robert Farrell as a witness.

3           Defendant's trial counsel, however, wisely chose not to call Farrell as a witness, especially

4    because, as memorialized in an FBI 302 provided to the defense during discovery, Farrell stated that

5    Sanovas payments to Shelly Gerrans for "decorating" the office were inappropriate and excessive. *See*

6    Exhibit 2 attached hereto.  Farrell also opined that payments by Sanovas to Halo amounted to "double"

7    billing by the defendant and were a clear conflict of interest since Halo and Gerrans were one and the

8    same. *Id.*

9           In short, the government's closing argument was entirely consistent with Yarborough's trial

10   testimony.  It was also consistent with the trial testimony of Farrell's boss, Ehran Gunday, who

11   requested Yarborough to look into the defendant's spending in the first place because of his (Gunday's)

12   concern about improper use of company money for personal expenses. RT 1/13/20 pg. 17.  Given

13   Farrell's specific expressed concerns about the defendant's double billing through Halo, which went to

14   the heart of the wire fraud charged in counts one through three of the indictment, the fact that neither

15   party called Farrell or introduced the May 31, 2013 makes perfect sense. Notwithstanding his May 31,

16   2013 email, Farrell's potential testimony about Halo and the inappropriate and excessive payments to

17   Shelly Gerrans for "decorating the office" would have been extremely damaging to the defense, which is

18   why the defendant did not call him.  And, Farrell would have looked ridiculous attempting to defend

19   clearly indefensible personal spending, such as the Gerrans family trip to Hawaii or the family gym

20   membership, which is why the government did not call him to offer testimony about defendant's Halo

21   double billing and the Shelly Gerrans "decorating" payments. These decisions were neither ineffective

22   assistance by defendant's trial attorney nor misconduct by the government's attorney.

23          When prosecutorial misconduct is alleged, "the issue is whether, considered in the context of the

24   entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the

25   evidence fairly." *United States v. Henderson,* 241 F.3d 638, 652 (9th Cir. 2000) *quoting United States v.*

26   *Fredrick,* 78 F.3d 1370, 1379.  Here, there was overwhelming evidence at trial of defendant's long-

27   standing course of conduct of using Sanovas as his own personal piggy bank.  This evidence included

28   diverting more than $52,000 of investor money to buy his wife a Mercedes SUV in October 2014 (RT

1/22/20 pgs. 122, 123); stealing $310, 581 from Sanovas to pay his overdue personal income taxes (RT 1/22/20 pg. 123) and taking approximately $2.5 million from Sanovas from January through March 2015 to buy 28 Greensburgh Lane for cash. In light of the mountain of evidence about the defendant's use of Sanovas' investor money for large and small personal items and expenses, and the overwhelming evidence of defendant's theft from Sanovas to purchase his home, the prosecutor's brief mention of defendant's use of Sanovas money to pay for a family vacation to Hawaii and a family Bay Club membership (which was based upon Yarborough's trial testimony) was not central to the jury's primary consideration of the wire fraud counts. Nor could the few sentences of the prosecutor's closing argument about the Hawaii trip and the family Bay Club membership, to which there was no objection by the defense, possibly have unfairly affected the jury's verdict.

### 2. There was no Prosecutorial Misconduct in the Investigation or Presentation of Evidence regarding Ehran Gunday's Separation from Sanovas

Next, the defendant alleges the government committed misconduct for not questioning Ehran Gunday about Exhibit C, to Trial Exhibit 113 (Gunday's separation agreement) which was not included in the materials Gunday voluntarily provided shortly before his Rule 15 deposition. Dkt 247, pg. 8. As discussed *supra*, the materials the government received from Gunday were given to the defense on the same day and in the same format as they were received by the government. *See* Exhibits 3 and 3A attached hereto. Accordingly, the defense had Trial Exhibit 113 in advance of the November 14, 2019 Rule 15 deposition and could have asked about Exhibit C, but did not. Defendant was also present by telephone at the Rule 15 deposition and was given the opportunity to confer privately with his attorney after the government finished its direct examination.

It is unclear how the government could possibly have committed misconduct by not asking Gunday about Exhibit C (which is purportedly Exhibit 6 to the Halbert declaration, Dkt 247-1), particularly because defense counsel and the government had the exact same copy of the separation agreement (Trial Exhibit 113) at the Rule 15 deposition. Thus, there was nothing stopping defense counsel from asking Gunday about the missing Exhibit C, but neither party did so. Defense counsel likely did not ask about Exhibit C because he knew full well that the settlement agreement (Trial Exhibit 113) memorializing the payout that was given to Gunday did not contain any reciprocal provision

1    promising the same "payout" to the defendant.

2         In fact, the copy of Exhibit C attached to Ms. Halbert's declaration relates solely to

3    compensation and back pay owed to Ehran Gunday. There is nothing in Exhibit C, as attached to Ms.

4    Halbert's declaration that remotely suggests or infers that the defendant was promised the same payout

5    under the terms of Gunday's settlement agreement. Nor is there any reason to credit defendant's self-

6    serving hypothesis that there may have been another page to Exhibit C. *See* Dkt 247, fn. 4. We further

7    note that Exhibit 6 to Ms. Halbert's declaration is also missing Attachments E, F, G and H. Most

8    important, however, is the fact that nothing the government argued in closing was inconsistent with

9    Gunday's deposition testimony about the payments Gunday received in return for leaving Sanovas or the

10   terms of Trial Exhibit 113. During his testimony Gunday was asked: "[]did Mr. Gerrans, as part of the

11   negotiations that you had to leave, was he also promised the same financial arrangement that you got

12   here?" Gunday specifically and unequivocally responded "no." Gunday trial testimony pg. 59. Mr.

13   Gunday also testified that if defendant receiving some type of comparable payout had been on the table

14   during the separation negotiations, Gunday would have refused to sign Exhibit 113. Gunday trial

15   testimony pg.62.

16        Gunday's testimony was further credible because it was entirely compatible with the defendant's

17   misrepresentations to the BOD in 2015. At no point during either the March 6, 2015 or the May 9, 2015

18   BOD meetings, did the defendant tell the BOD he was entitled to the same payout that Gunday received

19   under Trial Exhibit 113. Instead, defendant told a completely different set of lies to the BOD to try and

20   get the BOD to approve prospective payments to him. Specifically, the defendant told the BOD that he

21   had liquidated his IRA at Sanovas' inception in furtherance of the business and that the employment

22   agreement he wanted the BOD to approve was for prospective payment and was the same as the

23   agreement currently in effect.

24        Finally, defendant has not cited any authority for his astonishing proposition that the government

25   committed misconduct by arguing to the jury exactly what Gunday stated during his testimony: the

26   defendant was not promised the same pay out as Gunday as part of Gunday's settlement agreement. Not

27   only was this a reasonable inference from the testimony, it was an almost verbatim recitation of what

28   Gunday testified to during his deposition. It is not misconduct to argue reasonable inferences from the

trial record, which is exactly what the prosecutor did here. *United States v. Atcheson,* 94 F.3d 1237, 1244 (9th Cir. 1996).

### 3. There was no Prosecutorial Misconduct regarding the Evidence of the Altercation at the Storage Facility

The defendant argues that the government made improper arguments regarding "Larry Gerrans' contact with his brother Chris Gerrans" relating to the contempt, obstruction and witness tampering charges. This allegation is unsupported, and is nothing more than a continuation (and additional pages of briefing) of arguments already made in the new trial motion. The defendant cites no fact that the government knew that remotely contradicted what was presented at trial or stated in closing argument, and there was no misconduct in the issues he now raises.

As the Court is aware and as described in the facts detailed above, the trial evidence in this case showed a long series of communications between the defendant and Chris Gerrans that constituted improper contact regarding the criminal case, efforts to influence or to alter or discourage Chris Gerrans' testimony, and attempts to obstruct justice. The altercation at the storage facility was only the most recent improper encounter the defendant initiated, and it was probably the last one because two days after the storage facility altercation, the court revoked Gerrans bond and he was remanded into custody. Dkt 46.

First, it is important to note that none of the "evidence" that the defendant is now presenting to the Court is newly-discovered evidence. It was already in the possession of the defendant or his counsel, and in many cases was *not* in the possession of the government. For example, the August 8, 2019 email between defendant and his attorneys was clearly privileged, and not provided to the government until the defendant chose to rely on it for these claims. Motion to Dismiss at 12 and Exhibit 7 to Halbert decl at Dkt 247-1. The defendant's email to his lawyers is also completely self-serving and would have been inadmissible hearsay, had the defense attempted to introduce it at trial.

The defendant also argues that the government "deliberately" did not ask certain questions of Chris Gerrans regarding the storage facility altercation. First, this is not misconduct at all. Defendant's attorney had a full opportunity to cross-examine Chris Gerrans and to fill in any "blanks" that defendant belatedly and unconvincingly claims were missing in the government's direct examination. More to the

point, the defendant's argument is also misleading, especially because the defendant intentionally omits salient parts of the record to argue this point. Chris Gerrans in fact testified, on direct examination, that during the storage facility confrontation, Gerrans yelled at him about Sanovas, about Gerrans' belief that the company was still "his," and that Gerrans intended to "take everything" from Chris:

> Q. What happened then?
>
> A. He was screaming and yelling at me for cooperating with the -- with the subpoenas, and providing information. He told me I was selling him out. And he was telling me that he's going to get this company back. He told me he wanted me to resign immediately from the company. It's his company. And when he gets his case dismissed and when he gets the company back, he's coming after me; he's going to take everything.

RT 1/15/2020 pg. 146. Later during the altercation, Chris Gerrans testified that he brought up Sanovas again and offered to resign:

> Q. Excuse me. Where was truck at this point?
>
> A. In the storage facility parking lot, with – probably about five feet or so from where we were talking to one another, where he was yelling at me.
>
> Q. Okay. Did you go back to the truck?
>
> A. Yeah. I said "let me have my keys, just let me go. I don't..." You know. "Whatever you want." You know. "I'll resign; you can have everything." You know, "Whatever makes you happy, dude. Just let me have my keys."

*Id*. at 148. It was clear from this testimony that the criminal case was not the only topic that incensed Gerrans and caused him to yell at and push Chris Gerrans. But the criminal case was part of the altercation and that portion of the discussion was in clear violation of the court's bond. For example, Ryan Swisher testified that he heard Gerrans yelling, and stating that "the indictment is bullshit:"

> Q. Okay. You mentioned that you were also able to hear some of the confrontation. Can you please tell us what you heard Larry Gerrans say to Chris Gerrans?
>
> A. Of the things I did hear, one of which was that Larry was saying that the indictment was bullshit. And the second thing that I heard was that he felt that Chris had sold him up the river.

RT 1/21/2020 pg. 23, 25. The testimony at trial shows that the altercation was about Sanovas, about Chris' role at the company (Gerrans demanded that he resign), and about the criminal case against the defendant.

Moreover, the evidence of contempt, witness tampering, and obstruction was not based on this

single incident. In fact, Chris Gerrans testified about at least three other post-indictment instances where Gerrans met Chris with no attorney present, encouraged Chris to assert "the Fifth," and expressed anger and displeasure that Chris Gerrans had testified before the grand jury. In that context, in closing argument, the government stated the following regarding the storage facility altercation:

> An innocent person doesn't create an altercation in a storage facility that escalates to the point where he is screaming "You sold me up the river" for cooperating in a criminal case.

RT 1/29/20 pg. 85. This statement is a reasonable inference from the totality of the evidence and testimony at trial. In order to argue that it was not, the defendant now relies on a privileged email that he belatedly claims shows what was actually in his heart and mind that day. But defendant's self-serving email—which was not in the government's possession during trial and is being presented now for the first time months after the verdict—cannot support defendant's claims of prosecutorial misconduct during trial. First, defendant cites no authority for his absurd proposition that the government commits misconduct by failing to refer to an email that was unknown to the government before or during trial and was, in any event, a privileged communication between the defendant and his attorneys. Second, courts must consider the full context of the trial when evaluating misconduct claims; this non-existent situation does not come close to constituting misconduct. *See United States v. Hinton*, 31 F.3d 817, 824 (9th Cir. 1994) ("The prosecution's alleged misconduct must be viewed in the context of the entire trial."), citing *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir. 1987).

The defendant next claims that the government argued that it was a violation of the bond for the defendant to have any contact with Chris Gerrans. But that argument plays fast and loose with the facts by relying on a misleading quotation of one portion of the record taken out of context. First, the Court instructed the jury that arguments of counsel are not evidence, and the actual bond was in evidence. Trial Exhibit 250. Second, the government repeatedly recited the entire bond condition regarding contact with Chris Gerrans:

> Then there is a special term which is added in, in handwriting. Larry Gerrans shall have no contact with Chris Gerrans regarding the criminal case, outside of the presence of Christopher Gerrans' counsel.

RT 1/29/2020 pg. 77 (closing argument). See also *Id*. at 90 (language repeated twice). This was an accurate recitation of the bond and was not by any stretch prosecutorial misconduct.

Finally, the defendant makes a vague and undeveloped allegation that the government did not put certain evidence before the jury regarding the message the defendant passed to Chris Gerrans through his father, or question Chris Gerrans about a purported statement his father said to him regarding going to a "country club." Motion to Dismiss at 15-16. The allegation itself is false, but more important, it does not rise to the level of prosecutorial misconduct. In any event, there were some differences between the testimony of Art Gerrans Sr. and Chris Gerrans, and the grand jury transcript of Art Gerrans Sr. was disclosed to the defense ten weeks before trial for that reason. There was nothing improper about not questioning Chris Gerrans about these discrepancies (though the defense could have) because Art Gerrans Sr.'s testimony was not credible on many of the issues raised by the defendant. And, of course, the government produced Art Gerrans Sr.'s grand jury transcript to the defense well in advance of trial giving the defendant plenty of time to subpoena and call Art Gerrans Sr. as a witness if he thought doing so would help his defense.

In sum, there was no prosecutorial misconduct related to the proof at trial, and no misconduct in the arguments of government counsel. Even if there were minor misstatements in the arguments, which there were not, none come even close to the level of impacting the jury's verdict on these counts.

## CONCLUSION

Based on the foregoing, the United States respectfully requests this Court to dismiss and/or deny both defendant's motion for a new trial and motion to dismiss the second superseding indictment.

DATED: June 26, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney


_____/s/_____
ROBIN L. HARRIS
LLOYD FARNHAM
Assistant United States Attorneys