DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ROBIN L. HARRIS (CABN 123364)
LLOYD FARNHAM (CABN 202231)
MATTHEW M. YELOVICH (NYBN 4897013)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7321
    Robin.Harris2@usdoj.gov
    Lloyd.Farnham@usdoj.gov
    Matthew.Yelovich@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:18-CR-00310 EMC |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL** |
| v. | (Fed. R. Crim. Pro 29) |
| LAWRENCE J. GERRANS, a/k/a LARRY GERRANS, | Date: July 15, 2020 |
| Defendant. | Time: 2:30 p.m. |
| | Honorable Edward M. Chen (via Zoom) |

# TABLE OF CONTENTS

INTRODUCTION...........................................................................................................................1

FACTUAL BACKGROUND .......................................................................................................1

ARGUMENT ................................................................................................................................2

I.       Defendant's Motion for Acquittal is Untimely Under the Limits of Rule 29 ...........................2

II.      The Court Must Consider Only the Evidence Admitted at Trial to Determine the
         Sufficiency of the Evidence to Support the Convictions under Rule 29...................................3

III.     The Evidence at Trial Showed that Gerrans had an Intent to Defraud Sufficient to
         Support the Wire Fraud and Money Laundering Verdicts ..........................................................4

         A.       A Revised Instruction Would Not Change the Jury's Verdict and the Evidence
                  at Trial Supports Conviction Under *United States v. Miller*...............................................5

                  1.       Trial Evidence Shows That Gerrans Intended to Deceive and Cheat ...................6

                  2.       The Jury Properly Concluded Gerrans Knowingly Participated in a
                           Scheme to Obtain Money Through False Statements ...........................................7

         B.       The Evidence at Trial was Sufficient to Prove to that Gerrans Intended to
                  Deceive and Cheat in Connection with the use of Sanovas Funds for Personal
                  Benefit....................................................................................................................................9

                  1.       The Evidence at Trial Showed that Gerrans Obtained Money and
                           Property by Means of False and Fraudulent Pretenses, with an Intent to
                           Defraud ............................................................................................................... 10

                  2.       Other Evidence of Intent in Connection with the Scheme to Defraud
                           Sanovas is Sufficient to Show Gerrans' Intent to Deceive and Cheat.................. 11

                  3.       Gerrans' Argument that he was Entitled to the Money from Sanovas
                           Relies on a Debunked and Unreliable Opinion not Introduced at Trial ............... 12

IV.      The Evidence was Sufficient to Support Convictions for False Statements and
         Documents ................................................................................................................................ 13

         A.       The Evidence Showed That the Statements in The Documents Were False.................... 14

         B.       The Evidence Showed the False Statements Were Material to the FBI'S
                  Investigation .................................................................................................................... 16

         C.       The False Documents were Made in a Matter Within the Jurisdiction of the
                  Executive Branch ............................................................................................................. 18

V.       The Evidence Proved that Gerrans Committed Contempt of Court, Witness
         Tampering, and Obstruction of Justice...................................................................................... 21

CONCLUSION............................................................................................................................22

# TABLE OF AUTHORITIES

## Federal Cases

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................................. passim

*United States v. Facchini*, 874 F.2d 638 (9th Cir. 1989) ...................................................18

*United States v. Holden*, 806 F.3d 1227 (9th Cir. 2015)....................................................20

*United States v. Loftis*, 843 F.3d 1173 (9th Cir. 2016) ................................................ 19, 20

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ........................................ 5, 6, 7, 8

*United States v. Nelson*, 419 F.2d 1237 (9th Cir. 1969) .....................................................3

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) ................................................ 7, 10

*United States v. Peterson*, 538 F.3d 1064 (9th Cir. 2008) ........................................16, 17, 18

*United States v. Pharis,* 298 F.3d 228 ............................................................................19

*United States v. Rodgers*, 466 U.S. 475 (1984) ...............................................................18

*United States v. Somsamouth*, 352 F.3d 1271 (9th Cir. 2003) .........................................17

*United States v. Tisor*, 96 F.3d 370 (9th Cir. 1996) ..........................................................3

*United States v. Wellman,* 830 F.2d 1453 (7th Cir. 1987) ...............................................19

*United States v. Williams*, 217 F.3d 751 (9th Cir. 2000) .........................................20, 21, 22

*United States v. Yossunthorn*, 167 F.3d 1267 (9th Cir. 1998) .............................................3

## Federal Statutes

18 U.S.C. § 1001 ......................................................................................... 17, 18

18 U.S.C. § 1001(3) ...................................................................................... 16, 17

18 U.S.C. §§ 1341 ........................................................................................ 19, 20

U.S.C. § 533 ....................................................................................................19

## Federal Rules

Fed. R. Evid. 404(b) ..........................................................................................20

# INTRODUCTION

The United States submits this opposition to the defendant's motion for acquittal on all counts under Rule 29 of the Federal Rules of Criminal Procedure. The motion must be denied for the following reasons. First, it was filed outside the 14-day deadline for renewing a motion for acquittal after a verdict, and the defendant provides no reason for missing the deadline and does not show excusable neglect that would allow his to file after the deadline. Second, the defendant makes only scant reference to the trial evidence in purporting to justify the motion, and instead relies on a withdrawn pre-trial motion to dismiss that includes false documents and dubious analysis that the defendant chose not to present at trial.

Finally, the evidence presented at trial was more than sufficient to permit a rational jury to reach a guilty verdict on all 12 counts of conviction. As discussed below, the evidence showed that defendant Lawrence Gerrans engaged in a scheme to defraud Sanovas and that Gerrans acted with the intent to defraud. The evidence also proved that the defendant provided false documents to the FBI during the investigation, and that he knew they were false, they were material to the investigation, and the documents were provided in connection with a matter in the jurisdiction of the FBI. Likewise, the evidence was more than sufficient to sustain the convictions for contempt, witness tampering, and obstruction of justice. The motion for acquittal should be denied in its entirety.

## FACTUAL BACKGROUND

For the purposes of this opposition to the defendant's motion for acquittal under Rule 29, the government incorporates the statement of facts presented in its omnibus opposition to the defendant's motions for a new trial and to dismiss the indictment. Those facts and citations to the trial record summarize the proof at trial, and summarize the extensive and compelling evidence of Gerrans' scheme to defraud, his intent to defraud, and the false statements and omissions he made in order to carry out the scheme. *See* United States' Opposition to Motions for New Trial and to Dismiss, filed June 26, 2020.

Procedurally, there are several aspects of the record before the Court relevant to the motion for acquittal. On January 22, 2020, at the close of the government's case-in-chief, the defendant's counsel made a motion for acquittal under Rule 29. RT 1/22/2020 pg. 157. The defendant argued that the

evidence was insufficient to support verdicts of guilty on any counts, and counsel went through each count in the indictment and argued that the government's evidence did not support the charge and that therefore acquittal was required for each count in the indictment. *Id.* at pg. 157-163. The Court did not grant the motion as to any count, but took the motion under submission for potential renewal by the defendant. *Id.* at pg. 163-64.

After the jury verdict on January 29, 2020, the Court invited the defendant to renew the Rule 29 motion and offered to set a date and briefing schedule for defendant's post-trial motions. RT 1/29/2020 pg. 163. Defendant's counsel stated that if motions needed to be heard in advance of sentencing, he would contact the clerk of the court. *Id.* The Court then set a briefing schedule for a government motion regarding forfeiture. *Id.* at pg.164-65. There was no discussion of extending the 14-day time limit under Rule 29 for renewing the motion, and the Court did not set a schedule that would have provided a new deadline for this motion.

The defendant's new counsel filed a notice of appearance in the case on March 20, 2020, and did not file this motion for acquittal until more than two months later, without seeking to extend the already-passed deadline. The motion for acquittal was filed four months after the verdict.

# ARGUMENT

## I. Defendant's Motion for Acquittal is Untimely Under the Limits of Rule 29

Like his motion for a new trial, the defendant brings this motion months after the deadline has passed. Even if this motion renews the motion for acquittal made at the close of the government's case, under Rule 29 it was brought too late. The only possible relief from the deadlines of Rule 29 is Rule 45(b), which permits the extension of certain deadlines provided that the defendant show "excusable neglect." *See* Rule 29 (Committee Notes on Rules—2005 Amendment) ("under Rule 45(b)(1)(B), if for some reason the defendant fails to file the underlying motion within the specified time, the court may nonetheless consider that untimely motion if the court determines that the failure to file was the result of excusable neglect"). The defendant does not even address the untimeliness of the Rule 29 motion, or present any showing of excusable neglect, and he should not be allowed to present such argument in

reply, without an opportunity for the government to respond. For this reason, the motion should be denied as untimely.

## II. The Court Must Consider Only the Evidence Admitted at Trial to Determine the Sufficiency of the Evidence to Support the Convictions under Rule 29

When considering a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir. 1998) (same); *United States v. Tisor*, 96 F.3d 370, 379 (9th Cir. 1996) (same). In deciding a motion for acquittal, it is

> undisputed that the evidence must be taken in the light most favorable to the verdict—that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences from the proven facts. Therefore the reviewing court must assume that the jury resolved all such matters in a manner which would support the verdict

*United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969) (affirming denial of a motion for acquittal).

The question on a Rule 29 motion is whether the *evidence* presented to the jury supports the verdicts, drawing all inferences in favor of the prosecution. Yet the defendant's motion for acquittal provides only passing references to the trial record, witness testimony at trial, or admitted exhibits. Instead, the motion purports to incorporate statements and documents that are entirely outside the trial record and the admitted evidence. These statements and documents were not evidence, cannot be relied upon by the Court in ruling on this motion and should be disregarded in their entirety. And, many references in this motion are to the arguments of the government attorneys, but as the defendant knows and the Court instructed the jury the arguments of counsel are also not evidence.

First, the motion for acquittal purports to incorporate the "factual and trial background" contained in the defendant's motion for a new trial. Dkt 234 at 2 (filed May 27, 2020). However, the background section of the defendant's new trial brief also makes very little reference to the evidence introduced and admitted at trial, and instead that recitation of the "factual background" consists almost entirely of a narrative asserting facts without citations, let alone citations or reference to the trial

evidence. *Id*. at 3-14. The citations that are included in that purported description of the facts are only to a declaration by an employee at the law firm now representing the defendant, and that declaration includes many documents that were not offered or admitted as evidence at trial. *See* Dkt 235-1 (Declaration of Allison B. Holocombe).

Second, the motion for acquittal also purports to rely on and cites to a previously-filed, and then withdrawn, motion to dismiss the indictment filed prior to the trial in this case. *See* Dkt 42. This motion was withdrawn from consideration by the Court, and the information and purported facts in it were not presented at trial. The withdrawn motion to dismiss sets forth the same argument that the defendant makes in his motion for acquittal, namely that certain corporate records and agreements gave Gerrans near carte blanche to pilfer money from the company at his discretion, and that he therefore cannot be charged and prosecuted—regardless of evidence of deception, cheating, and false statements—for the large transfers of Sanovas money for personal use. As discussed in the government's opposition to the new trial motion, his pre-trial motion to dismiss was withdrawn presumably because the analysis and the supporting declarants relied on a number of false documents and false entries in the corporate accounting, according to evidence and testimony later admitted at trial. The defendant's withdrawn pre-trial motion to dismiss does not provide the Court with any basis to grant the pending Rule 29 motion and these "alternative" facts differing from the evidence at trial should be rejected by the Court.

The defendant's motion should be rejected on the grounds that is does not even argue that the facts presented at trial do or do not support the verdict. In any event, the Court should consider only the trial record in determining whether the evidence was sufficient to support the verdicts on the charged counts, and the trial record here supports the jury's verdicts of guilt on each count.

### III. The Evidence at Trial Showed that Gerrans had an Intent to Defraud Sufficient to Support the Wire Fraud and Money Laundering Verdicts

The defendant first argues that the evidence at trial was insufficient to show that he acted with an intent to defraud, challenging the convictions on the wire fraud counts and the related money laundering count the is based on the wire fraud conviction.

The motion does not argue that any other elements of wire fraud or money laundering were not met by the evidence, and nor could they. For example, the evidence at trial was clear that Gerrans

transferred $2.6 million out of Sanovas in early 2015, that this money went almost entirely to purchase his house, a personal benefit, and that he later used the Sanovas corporate credit card to pay for personal expenses. The defendant's motion for acquittal also does not argue that the evidence is insufficient on other aspects of the scheme to defraud, and seems to acknowledge that the prosecution presented evidence of deception. In fact, the evidence at trial showed that Gerrans made numerous false statements and omissions in connection with those transfers and expenditures. For example, the evidence of false statements and deception included proof that he lied to the Sanovas board about how he had used the funds withdrawn from his IRA in 2013 and 2014, and that he lied to the board about the timing of the payments of for what he would later assert were deferred salary and bonuses and appropriate and authorized "reimbursement" of IRA retirement funds used for the business.

The motion for acquittal on the wire fraud counts then rests entirely on whether the government presented sufficient evidence to support a verdict on the issue of whether the defendant "intended to cheat" Sanovas or its investors. On that and all other elements, the evidence was sufficient to prove Gerrans acted with an intent to defraud, and verdicts on wire fraud and money laundering must stand.

### A. A Revised Instruction Would Not Change the Jury's Verdict and the Evidence at Trial Supports Conviction Under *United States v. Miller*

Gerrans contends that the jury's verdict must be vacated and judgment of acquittal entered in his favor based on *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020). In *Miller*, the Ninth Circuit held that the crime of wire fraud requires the intent to deceive and cheat, rather than the intent to deceive or cheat, language that had been included in the circuit's model jury instruction on this issue. *Id.* at 1099. An examination of *Miller* itself reveals that Gerrans' reliance upon it is unavailing, particularly in the procedural posture of a Rule 29 motion, because the evidence at trial allowed a rational juror to conclude that Gerrans intended to deceive and cheat, and the jury instructions as a whole properly instructed the jury regarding the intend to fraud..

In *Miller*, the defendant wrote himself checks from his employer, and disguised the payments by calling them internal transfers in the company's ledger. 953 F.3d 1099. At trial, Miller contended that he always intended to repay the amount he took and that he believed the payments were loans he was authorized to make to himself. *Id.* at 1100. The trial court rejected Miller's request for a jury instruction

stating that he must have intended to deceive and cheat, and instead gave the Ninth Circuit model instruction defining an intent to defraud as an intent to deceive or cheat. *Id.* The Ninth Circuit held that "to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions. In other words, a defendant must intend to deceive *and* cheat." *Id.* at 1101. While the prosecution in *Miller* emphasized the "deceive or cheat" distinction in closing argument, the Ninth Circuit nevertheless affirmed Miller's conviction, finding the error in the jury charge harmless for two reasons. *Id.* at 1103.

First, the Court reasoned that Miller's primary defense, that he intended to repay the funds, is no defense to wire fraud. *Id.* Second, the Court found that Miller's other defense, that he believed the funds to be "bona fide loans that he was fully authorized to issue to himself," raised the claim that Miller intended to deceive but not to cheat his employer. *Id.* However, the Ninth Circuit found that there was no way the jury could have made this determination because "the district court's instruction on the 'scheme to defraud' element of the wire fraud counts told the jury that it must find that Miller 'knowingly engaged in a scheme or plan to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises.'" *Id.* The Ninth Circuit concluded that the jury did not seek further instruction, which they would have done if they "believed that there was any inconsistency between this language and the subsequent language about 'deceive or cheat.'" *Id.*

While the use of the model jury instruction for intent to defraud was incorrect in light of *Miller*, that error does not justify judgment of acquittal for the same reasons the conviction was affirmed in *Miller* itself (on a much more defendant-friendly posture, appeal from denial of a motion for new trial). The error was harmless in light of the trial evidence and other jury instructions. Likewise, as discussed further below, the evidence showed that Gerrans acted with the required intent to defraud even under the *Miller* holding, and therefore that case does not support the arguments for acquittal.

### 1. Trial Evidence Shows That Gerrans Intended to Deceive and Cheat

First, at trial, the government proved that the defendant not only used lies and deception, but did so in order to obtain money or property—in other words to cheat the company. This was not a case in

which the defendant did nothing more than make false statements and omissions in connection with a good faith belief that he was "entitled" to the money. Indeed, as was shown at trial, the defendant cheated by obtaining money and property from the company by means of false statements and omissions and used that money for personal uses. The false statements included the statements that Gerrans told the board to get them to approve the revisions to his employment agreement. For example, the defendant told them that he was entitled to, and the board should approve reimbursement of, funds, withdrawal penalties, and taxes incurred as a result of the withdrawal of $499,000 from his IRA account at Sanovas' inception in furtherance of the company. However, the government proved that the IRA liquidation was in 2013 and 2014, not during the company's inception, and that defendant had, in fact, used significant portions of the IRA proceeds for his own personal use and the purchase of luxury items unrelated to the company. RT 1/13/2020 pg. 245-247 (Rob Georges); RT 1/22/2020 pg. 9-18 (Phillip Villanueva); Trial Exhibit 271. In May 2015 he also falsely told the board members, and omitted true facts that were material to their decision, that any funds he took from the company were to be taken out in the future, after board approval of his compensation, when in fact he had already directed transfers from the company for all of the $2.6 million to purchase the house and $52,000 to purchase a Mercedes for his wife. RT 1/14/2020 pg. 69 (Georges) RT 1/14/2020 pg. 42 (Bruce Nichols). Gerrans' argument for acquittal fails under the *Miller* because trial evidence showed false statements made in furtherance of the scheme to obtain money or property. His arguments for acquittal that rely on *Miller* also ignore the incredibly demanding standard here, namely that he must establish that no rational jury could have found that Gerrans acted with the intent to deceive and cheat. *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010).

Unlike in *Miller*, here the government did not argue that the jury needed only to find that the defendant had the intent to either deceive or cheat. Instead, the government argued that the evidence showed both that Gerrans intended to deceive and to cheat. *See, e.g.,* RT 1/29/2020 pg. 62, 76 (closing argument).

## 2. The Jury Properly Concluded Gerrans Knowingly Participated in a Scheme to Obtain Money Through False Statements

In addition to being precluded by the trial record, Gerrans' argument for acquittal fails because

the jury instructions already required the jury to find that he acted with the requisite intent. The Court here gave an instruction with very similar language described in *Miller* that the Ninth Circuit noted makes clear that the jury could not have found an intent to deceive but not cheat. *See Miller*, 953 F.3d at 1103. The Court here told the jury wire fraud requires the defendant "knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts." RT 1/29/2020 at pg. 31-32 (final jury instructions). As in *Miller*, the jury did not seek further instruction indicating any concern over inconsistency between this instruction and the language regarding "deceive or cheat," indicating that the jury did not find the defendant guilty based on deception alone. *Miller*, 953 F.3d at 1103–04. In *Miller*, the Court termed these considerations the "[m]ost important[ ]" in its discussion of harmlessness. *Id.* This Court should reject the defendant's argument on the same basis, particularly under the significantly more demanding standard for a motion for judgment of acquittal, where all inferences must be drawn in favor of the verdict.

The defendant also argues acquittal is required on the wire fraud counts for two nonsensical reasons not based in law or fact. First, he argues that the government did not prove that the employment agreement approved by the board of directors at the May 9, 2015 meeting "was not a valid contract." Motion at 8. Relatedly, the defendant also argues that the question of whether an employment agreement is "a valid contract" is a civil matter, not a criminal one. Motion at 10. These two arguments, if they were valid at all, seem to create a Catch-22 for any wire fraud case involving a written agreement: the government must prove beyond a reasonable doubt that an agreement is not valid, but that has to be decided in a civil case between the parties, not a criminal case. The defendant cites no legal authority for these assertions, and they should be rejected. Likewise there is no legal authority for the premise that in this case the government could not prove the elements of fraud if the board approved this contract because of the severability clause. As described in this opposition and the omnibus opposition to the other motions, the government presented compelling evidence of the scheme to defraud, the intent to defraud, and that the defendant obtained money and property through false and misleading statements or omissions.

As discussed further below, the evidence at trial proved that lying to the board about the money he had taken, and lying to the board in connection with their consideration of the 2015 employment agreement, was part of the scheme to defraud. Gerrans intended to use the agreement as after-the-fact cover for the money he had stolen from the company in the weeks prior to the board meeting. His intent to deceive the board is clear from language he put in the proposed agreement itself, such as the language stating that Gerrans was entitled to reimbursement of funds he took from an IRA at the inception of the company and in furtherance of the business—a false statement. Gerrans also drafted it to be retroactive to 2012, though he already had an employment agreement in place. Gerrans added a provision about the company being able to loan him money to "establish permanent residence." *Compare* Trial Exhibit 103 at pg. 4, with Trial Exhibit 135 at pg. 13. The agreement that the defendant claims must exonerate him and the lies he told the board of directors related to this agreement were a key part of the scheme to defraud. The jury agreed by convicting the defendant of the fraud scheme presented at trial, and the defendant is not entitled to acquittal based on an argument that this "valid contract" entitled him to the money he took from Sanovas.

**B.** **The Evidence at Trial was Sufficient to Prove to that Gerrans Intended to Deceive and Cheat in Connection with the use of Sanovas Funds for Personal Benefit**

There is no question, and the defense does not dispute, that at least $2.6 million was paid or transferred by Sanovas to Gerrans for his personal benefit, in order to purchase a house he put into the name of him and his wife. The motion also does not dispute, or even address, that the evidence showed that Gerrans improperly used the corporate American Express card for personal expenditure. Instead, he argues instead that he was "legally entitled" to that money, and that the government did not prove he was "not legally entitled to the money he received," and therefore cannot have acted with the intent to cheat even if he intended to deceive. Dkt 234 at 2, 3 (Motion for Acquittal). That argument is both not rooted in the proper standard that the Court should apply in considering the sufficiency of the evidence, but also mischaracterizes the evidence that was adduced at trial.

The argument that Gerrans cannot be guilty of wire fraud because the government did not show he was "not entitled" to even more than the pilfered amounts is incorrect. The question presented by the jury instructions regarding wire fraud is not whether Gerrans deserved or was entitled to the money he

took; the question is whether took the money "by means of false or fraudulent pretenses, representations, or promises," and whether he acted with an intent to defraud. The evidence proved that he did. On a motion for acquittal, "the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or 'rule out every hypothesis except that of guilt beyond a reasonable doubt.'" *Nevils*, 598 F.3d at 1164, citing *Jackson v. Virginia*, 443 U.S. 307, 326 (1979).

### 1. The Evidence at Trial Showed that Gerrans Obtained Money and Property by Means of False and Fraudulent Pretenses, with an Intent to Defraud

Gerrans' actions as proven at trial are entirely inconsistent with the argument made in the motion for acquittal that Gerrans was "owed" more than amount that he took from Sanovas, or that he had a compensation contract ratified by the board that "entitled" him to take the money. The uncontroverted evidence of the convoluted manner in which transferred the money he took, and the steps he took to lie and cover it up the transfers, are evidence that proves he acted with an intent to defraud.

A central and significant part of Gerrans' scheme to defraud involved his efforts to have the newly-constituted board of directors approve, or appear to approve, the huge payouts that Gerrans needed and had already stolen to purchase the house at 28 Greensburgh from Wade DeClaris. In fact, within days of on January 7, 2015 when Gerrans confirmed to DeClaris that he would buy the house in an all-cash purchase, Gerrans asked three new board members if they could meet in January or early February. Trial Exhibit 23. This would be the first time that Gerrans had even attempted to convene this board. That meeting was not scheduled until March 5, but at that meeting Gerrans asked the board to approve an amended compensation plan that would include lucrative retroactive payouts, and purported to allow reimbursement of retirement funds Gerrans told board members he had withdrawn and used for Sanovas. The evidence was clear that Gerrans made a number of false statements to the board, both verbally and in the documents he gave them, at that March 5 meeting. And Gerrans omitted material facts he had a duty to tell the board: Gerrans had already started taking out massive payouts that he would later purport had been justified by the very board resolution he was now pushing. The board refused to ratify the agreements as Gerrans requested on March 5, but the lies and deception were central to Gerrans plan—already formed and in the process of being executed—to use money taken from

Sanovas to purchase the house at 28 Greensburgh Lane.

Using money stolen from Sanovas, Gerrans closed on the house purchase on March 17, 2015. Trial Exhibit 275. But the lies to the board regarding both the money he already took from Sanovas, and lies to the board that bear on the question of what Gerrans now claims he was "entitled" to take out all along, continued. At a May 9, 2015 meeting of the board, Gerrans again told the board that he had used the IRA money for the company, and therefore was entitled to be repaid that amount including the tax penalties he had paid. RT 1/14/2020 pg. 65-66 (Rob Georges). He intentionally omitted that he had taken $2.6 million from Sanovas in the weeks prior, and he told them that any transfers under the new "compensation plan" would be taken in the future and in a manner that would not harm the company. These lies and deception were also a means through which Gerrans obtained the house using Sanovas funds—if had told the truth on May 9, the fraud would have unraveled and Gerrans would not have been able to continue to pilfer money from Sanovas, and the scheme continued through at least 2016..

Other evidence at trial showed that Gerrans knew he was not entitled to the money for the house, and intended to cheat. The scheme to defraud and to obtain money or property included the preparation of false documents and false accounting entries—deception as a means to obtain money or property. For example, in July 2014 Gerrans provided Chris Gerrans with a list of invoices, purporting to show amounts owed and payable to Halo from Sanovas in an amount totaling about $1.6 million, and instructing Chris Gerrans to retroactively enter the invoices, dates, amounts, and descriptions into the Sanovas accounting system. RT 1/15/20 pg. 54. Gerrans showed Chris Gerrans a stack of invoices that looked brand new, and "hot off the press." *Id*. at pg. 55. These entries, and the Halo invoices themselves, were part of the fraud, and what Gerrans later gave to the FBI on the day of his June 5, 2017 interview to justify what he said was money he was "entitled" to take. Overall, the evidence of deception goes to the heart of the scheme, and therefore this evidence supports an "intent to cheat."

### 2. Other Evidence of Intent in Connection with the Scheme to Defraud Sanovas is Sufficient to Show Gerrans' Intent to Deceive and Cheat

The trial evidence included many other instances of inappropriate pilfering of money from Sanovas beyond the purchase of the house and the use of the Sanovas American Express card, and these other instances show, beyond a reasonable doubt, that Gerrans had an intent to cheat Sanovas throughout

the scheme. For example, trial testimony showed that Gerrans took more than $52,000 directly traceable to investor money to buy his wife a Mercedes SUV in October 2014. RT 1/22/20 pgs. 122, 123 (Villanueva). The evidence also established that in 2015 and 2016 Gerrans used at least $310,000 from Sanovas to pay his personal federal income taxes. *Id.* at pg. 123. This payment of Gerrans' personal income taxes is especially insidious and illustrative of his corrupt state of mind toward Sanovas investor money. Gerrans had large tax bills for his 2013 and 2014 federal taxes, a total of more than $280,000 in tax liability. The trial evidence showed that this tax liability was incurred primarily because Gerrans had withdrawn $499,000 from his IRA to spend for mostly personal expenses and luxury items. Trial Exhibit 235H; RT 1/22/2020 pg. 85-89. In July and August 2015, Gerrans then used Sanovas funds to pay the taxes that were caused by the withdrawals—even though the withdrawals were not for the benefit of the company, as Gerrans had told the board. Trial Exhibit 276. The payment of taxes was simple theft, as shown the fact that these transfers were recorded on the company's books in a way that hid the fact that they were for Gerrans' personal benefit: "Payroll taxes," and "Accounts Payable." *Id.*; Trial Exhibit 269. The payment of the tax liability by Sanovas also undermines one of Gerrans' many after-the-fact excuse for taking the money in early 2015 to purchase the house, namely that the money was in part reimbursement for the amounts he took from his IRA, along with reimbursement for taxes and penalties incurred. In fact, these "taxes and penalties" were paid later in 2015, directly from Sanovas accounts.

### 3. Gerrans' Argument that he was Entitled to the Money from Sanovas Relies on a Debunked and Unreliable Opinion not Introduced at Trial

As discussed in detail in the government's opposition to the motion for a new trial, the entire basis for the defendant's argument that he was entitled to more money than he stole—namely the analysis of Gary Krausz—is a debunked and flawed analysis that relied on false documents provided to the Krausz by Gerrans. That information could not and should not have been presented to jury in this case, and the Court now should not consider or rely on this material and arguments based on it. Not only was the defendant's pre-trial motion to dismiss (Dkt 42) filed with the Court, with the false supporting documents, and then withdrawn, but the motion, declaration, and analysis were not presented to the jury and therefore have no bearing on the question of whether based on the evidence at trial a

1  reasonable jury could have convicted Gerrans of these fraud counts.

2  The "motion to dismiss" referred to by the defendant in the motion for acquittal was filed on

3  August 12, 2019. Dkt 42. The motion was supported by declarations from Gary Krausz, Anne

4  Hipshman, Fred Davis and Kevin Day. One of the documents Krausz said he relied upon was a

5  December 18, 2009 employment agreement purporting to memorialize Shelly Gerrans hiring as an

6  Administrative Assistant at Sanovas. Dkt 42-1. This document, which became Trial Exhibit 106, was

7  shown to be false. Ehran Gunday testified that Shelly Gerrans was never employed at Sanovas in any

8  capacity from 2009 until Gunday left the company on April 1, 2014. Gunday trial testimony pg. 43.

9  Gunday further testified that Shelly Gerrans was not hired by Sanovas to serve as an Administrative

10 Assistant for $60,000 per year and that, at the time of the bogus employment agreement (Trial Exhibit

11 106), Sanovas had an administrative assistant. Gunday trial testimony pg. 44. Lloyd Yarborough also

12 testified that Shelly Gerrans never worked at Sanovas and was not an administrative assistant or an

13 employee of the company. RT 1/13/20 pg. 23. Chris Gerrans testified that Shelly Gerrans was not an

14 administrative assistant at Sanovas. RT 1/15/20 pg. 91.

15 In addition, Krausz considered in his analysis of what Gerrans was "owed" a so-called

16 "Unanimous Written Consent" dated December 3, 2013, which was supposedly signed by Ehran

17 Gunday and the defendant. Dkt 42-1, pgs. 90-93. This document was also Trial Exhibit 105. Ehran

18 Gunday testified that his signature was forged on Exhibit 105. Ehran Gunday trial testimony, pg. 37.

19 This fake document contains a clause claiming that the defendant had liquidated his IRA at the inception

20 of the company and had used the proceeds of his IRA in furtherance of the business. Krausz assumes

21 that Gerrans is entitled to be reimbursed for the IRA withdrawals. That assumption is based on a false

22 document that was also provided to the Court on behalf of Gerrans. Krausz' conclusions about what

23 Sanovas owed to Gerrans cannot be a basis for acquittal in the face of overwhelming evidence of

24 Gerrans' intent to deceive and cheat in connection with the money he took from Sanovas to purchase the

25 house.

26 **IV. The Evidence was Sufficient to Support Convictions for False Statements and Documents**

27 The government presented various types of evidence to prove that the Halo invoices contained

28

false statements and were not authentic in what they purported to show, namely that Sanovas owed money to Halo Management in 2010. Likewise, the evidence showed that the purported loan document showing a loan from Hartford Legend Capital—a shell entity created just days before—to Lawrence and Shelly Gerrans was also a false document that was not what it purported to be and contained false statements. The evidence regarding those documents, and evidence of how they fit into Gerrans' overall deception in this case, is sufficient to support the jury's verdict on Counts 7, 8, and 9.

**A.** **The Evidence Showed That the Statements in The Documents Were False**

Gerrans was convicted of three separate false statements contained in documents he provided to the FBI after he was asked during a voluntary interview on June 5, 2017 about the large transfers to himself, Halo Management, and Hartford Legend Capital in early 2015. The evidence at trial proved that those invoices (Counts 7 and 8) did not accurately reflect work done or money owned to Halo by Sanovas, and that therefore these were false documents. The evidence also showed that Hartford Legend Capital was a shell corporation created to be a conduit for the money used to purchase the house, and that he purported "promissory note" (Count 9) he provided to the FBI was false.

The FBI approached the defendant Gerrans on June 5, 2017, and Gerrans agreed to a voluntary interview at which he was asked about the large transfers of money from Sanovas in 2015. RT 1/21/2020 at pg. 62-63, 65 (Jason Richards). The questions Gerrans was asked, and the responses he gave, regarding those large transfers and the purchase of the house, were the focus of the FBI's fraud investigation at that point. *Id*. at pg. 77. That same day, Gerrans provided to the FBI by email a set of invoices that purported to show money payable to the entity "Halo Management" from Sanovas. *Id*. at pg. 71. Some of those invoices purported to show money due from Sanovas to Halo Management for work by Shelly Gerrans titled "Executive Administration," with the invoices bearing dates ranging from January to March 2010. Trial Exhibit 215. Others purported to show money due from Sanovas to Halo Management for work by Larry Gerrans for "Management Services" during January to March 2010. Trial Exhibit 216.

Evidence and testimony showed that in 2010, during the same time that the invoices appeared to show Gerrans and his wife Shelly Gerrans working for Sanovas, the Gerrans told a bankruptcy court

trustee that they did not work for Sanovas and were not earning any income—either paid out or accruing as an amount owed. April 13, 2010, Gerrans and his wife answered questions under oath at a hearing conducted by the Bankruptcy Trustee. Trial Exhibit 5. Shelly Gerrans testified that she was a full-time homemaker and that she had not worked for the past 10 years. She also confirmed that she was not owed money by anyone or any business. On April 7, 2010, the Gerrans' filed a written "schedule of current income of individual debtors" electronically signed by both Larry and Shelly Gerrans. Trial Exhibit 2. Gerrans and his wife listed Shelly Gerrans' occupation as "homemaker" with no monthly income, and included no monthly income for Gerrans.

Testimony of Chris Gerrans supports the jury determination that these Halo invoices were false documents that did not exist in 2010 and did not show legitimate money owed to Gerrans that he earned in 2010. In July 2014, the defendant directed Chris Gerrans to enter into Sanovas' accounting software a number of Halo invoices, dating back to 2009, purporting to document services defendant and Shelly Gerrans provided to Sanovas, along with invoices supposedly reflecting "facilities fees" and "automobile allowances." RT 1/15/20 pg. 42; see also Trial Exhibit 259A. Over several days in July 2014, Chris Gerrans entered the Halo invoices on the defendant's spreadsheet. After Chris Gerrans finished this project for the defendant, Chris Gerrans printed out a report showing the newly entered invoices and brought this report to the defendant, who was in his office. Id. pg. 55. When Chris Gerrans got to the defendant's office, the defendant pulled out a binder filled "with every Halo invoice reflected in [the] spreadsheet." Id. Although some of the Halo invoices were dated 2009, five years earlier, "the binder was new. The documents were crisp. It looked like it was hot off the press." Id. This testimony supports the inference that the documents were created long after 2010—the dates that appear on the false Halo invoices.

Likewise, the evidence showed that the purported Hartford Legend secured promissory note was a sham document, not a real promissory note, and therefore was a false document provided to the FBI. The Hartford promissory note was provided to the FBI in September 2017, in response to subpoenas, and it purported to be signed by "borrowers" Lawrence and Shelly Gerrans. RT 1/21/2020 pg. 72-73, Trial Exhibit 217. The note said that a loan of more than $2.3 million was secured by the property at 28

Greensburgh Lane, but the so-called loan was not recorded on the title of the property.  *Id.* at 74.

On February 13, 2015, Gerrans incorporated Hartford Legend Capital Enterprises. RT 1/21/20 pg. 47-48, 61; Trial Exhibits 69, 280.  A few days later, on March 3, 2015, Gerrans opened a bank account in Hartford's name. RT 1/21/20 pg. 60; Trial Exhibit 280. The LLC never filed tax returns, and never issued any 1099s or W-2 forms. RT 1/21/20 pg. 47-48, Trial Exhibit 280.  When Gerrans was interviewed by the FBI on June 5, 2017, he told the FBI that Hartford was a company that Gerrans started before Sanovas and that he funded Hartford with a $550,000 from retirement account that he had. *Id.* at pg. 64.  In fact, the funds transferred to Hartford Legend Capital were not from a retirement account, but were from Sanovas, and the transfers had nothing to do with a retirement account.

Documents and testimony regarding a cash-out mortgage loan taken out by Gerrans on 28 Greensburgh Lane in late 2015 also proved that the Hartford Legend Capital note was false.  Chase Bank employee Brett Hellstrom testified that in December 2015, nine months after the purported note was issued and signed, the Gerrans applied for and received a $750,000 cash-out loan from Chase.  RT 01/17/2020 pg. 61-62. In the loan application materials, the Gerrans were required to disclose any liabilities or encumbrances against the property—whether recorded or not.  *Id.* at pg. 69.  However, the Gerrans did not state on the loan applications, which were signed by Gerrans, that there were any loans or encumbrances against the property.  *Id.*, Trial Exhibit 187.  If the promise to repay documented in the Hartford note were legitimate, and it the loan was really "secured by that certain real property at 28 Greensburgh Lane," this fact would have been stated by Gerrans on the loan forms.  Trial Exhibit 217.

The evidence that the Halo invoices in exhibits 215 and 216, and the Hartford promissory note in exhibit 217, includes the evidence of the path of the money through these shell entities, and the fact that when later asked about the large transfers to Halo and Hartford, Gerrans provided these documents to the government to explain the transfers.  The jury verdict that the documents were false, and that Gerrans knew they were false, is supported by the evidence at trial.

**B.     The Evidence Showed the False Statements Were Material to the FBI'S Investigation**

Next, Gerrans argues that acquittal is merited because of insufficient evidence of the materiality of his false statements underlying Counts 7 through 9.  In order to have convicted Gerrans of violating

18 U.S.C. § 1001(3), the jury found beyond a reasonable doubt that each of Gerrans' charged false statements was "material to the activities or decisions of the Federal Bureau of Investigation; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities." Dkt. 137 at 20 (jury instructions). The test is objective. "The Supreme Court has explained that the customary common law test for materiality in false statement statutes such as § 1001 is whether the statement 'has a natural tendency to influence, or was capable of influencing, the decision of the decision making body to which it was addressed.'" *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (citations omitted). There is no requirement that an agency action actually be influenced, or that the statement be capable of "materially" influencing an investigation, in order to prove a Section 1001(3) count, contrary to Gerrans' arguments. *Compare* Motion 13 (arguing that false statements did not "materially affect the investigation"), *with United States v. Somsamouth*, 352 F.3d 1271, 1276 (9th Cir. 2003) ("[A]ctual influence on agency action is not an element of the crime." (internal quotation marks and citations omitted)). Finally, "the materiality requirement in false statement cases does not turn on whether the agency's regulatory distinctions are wise or consistent as a matter of policy; it contains no embedded question of substantive reasonableness." *Peterson*, 538 F.3d at 1073 n.5 (citation omitted). Whether the FBI should have treated the false statements as immaterial is not relevant to the objective materiality test in this case. These legal standards preclude Gerrans' challenge here, particularly viewed under the demanding standard applicable to Rule 29 motions.

The evidence at trial proved that these statements were material, meaning that objectively the false documents had a "tendency to influence, or was capable of influencing" the FBI's activities.

Of course the investigation was *actually* influenced, although that is not required under 18 U.S.C. § 1001. The FBI took steps to verify or refute the Halo invoices, including obtaining the 2010 bankruptcy hearing transcript. The FBI agents obtained additional records, and took steps to determine whether Halo and Hartford were legitimate business entities or just shell companies used by Gerrans. RT 1/21/2020 pg. 78-79. The FBI reviewed available tax records for these entities, as well as tax records of Gerrans individually, to determine the relationship between Gerrans, Sanovas, and the shell companies. *Id*. at 80. In an effort to assess the significance of the false invoices, the FBI and

prosecutors interviewed Christopher Gerrans later in 2017, and he told the government that in 2014 Gerrans had asked him to enter years of purported amounts that were "owed" to Halo by Sanovas, including amounts that matched the date, description and amount of the false invoices in Exhibits 215 and 216. Likewise, the Hartford promissory note required the FBI to obtain witness statements, bank statements, and other information regarding Hartford Legend and its true relationship to Gerrans.

But the false documents do not need to have actually influenced the FBI, and there is no question that the false documents were capable of influencing the investigation. The documents related to the key issue being investigated by the FBI, namely the reasons for large transfers of money from Sanovas to Halo Management and Hartford accounts in 2015. Gerrans provided the documents—the same day of the interview in the case of the Halo invoices—in order to falsely explain the transfers, and for the purpose of influencing the FBI and derailing or having the investigation stop all together at that point. The evidence at trial is sufficient to prove that the false statements in these documents were material to the government investigation.

## C. The False Documents were Made in a Matter Within the Jurisdiction of the Executive Branch

Gerrans also argues for acquittal for his false statement convictions in Counts 7 and 8 because the false statements were "not within the jurisdiction of the Executive Branch." Motion 14; *see* 18 U.S.C. § 1001 (prohibiting certain false statements and writings "in any matter within the jurisdiction of the executive, legislative, or judicial branch" of the federal government). Gerrans argued that conduct in 2010 was "not within the jurisdiction of the government because the government did not have the power to bring a charge relating to work performed or not performed in 2010." *Id.* In other words, Gerrans argues that because the statute of limitations for mail and wire fraud prosecutions would have precluded a substantive charge for a wiring or mailing for conduct in 2010 at the time of the false statements in 2017, the Department of Justice did not have "jurisdiction" within the meaning of Section 1001. *Id.* This argument is meritless, contrary to the evidence, and unsupported by law.

The Supreme Court has defined "within the jurisdiction" under Section 1001 to refer to situations where an agency "has the power to exercise authority in a particular situation" in which the false statement arose. *United States v. Rodgers*, 466 U.S. 475, 479 (1984). "To satisfy section 1001's

jurisdiction requirement, the false statement must concern the authorized functions of an agency or department rather than matters peripheral to the business of that body." *United States v. Facchini*, 874 F.2d 638, 641 (9th Cir. 1989) (en banc) (internal quotation marks and citation omitted). This is not meant to be a "narrow, technical" standard "limiting the statute's protections" given the "myriad governmental activities that we have previously concluded § 1001 was designed to protect." *Rodgers*, 466 U.S. at 480 (citations omitted).

Most significantly, the false Halo invoices were given to the FBI by the defendant in June of 2017, and were provided by Gerrans to purportedly explain transfers of Sanovas money in 2015. The jury found that the documents were false, and were material to the FBI's investigation. The date on the purportedly false document is irrelevant to the question of whether the statement was made on a matter in the "jurisdiction" of the executive branch. The FBI had an open and active investigation regarding Sanovas, and the defendant has not argued that there was anything improper about the FBI opening such an investigation. When Gerrans provided these false invoices to the FBI in 2017, that action was in connection with the valid and active investigation, and therefore the false documents were unquestionably within the valid jurisdiction of the FBI. On top of this, the evidence at trial indicated that the invoices were likely created in 2014, not 2010, so the date on the documents were part of the intent to falsely influence the FBI's investigation, and the date is factually irrelevant for the jurisdiction analysis. The FBI had the authority, the ability, and—after Gerrans used these documents as cover to explain the transfers of Sanovas investor money—the obligation to further investigate the matter and test the validity of the documents Gerrans provided.

Even if, as the defendant argues, the documents can only be considered as possible evidence of a crime that was committed in 2010, the false documents still would meet the jurisdictional element. Schemes to defraud can last for years can start years prior to the actual wiring charged as the unit of prosecution. First, the FBI had authority to "detect and prosecute crimes against the United States." 28 U.S.C. § 533. Mail and wire fraud are crimes against the United States. 18 U.S.C. §§ 1341, 1343. Second, "[t]he crime charged in a wire fraud prosecution . . . includes not only the specific executions of the scheme alleged as the second element of the offense but also the overall scheme alleged as the first

element of the offense." *United States v. Loftis*, 843 F.3d 1173, 1177 (9th Cir. 2016). That overall scheme can exist for many years prior to the actual execution of the scheme through a mailing or wiring making up the unit of prosecution. *See, e.g., United States v. Pharis,* 298 F.3d 228, 234 n. 3 (3d Cir. 2002) (stating that "mailings that fall outside the statute of limitations can be considered as evidence to prove later fraud that was within the statute of limitations"); *United States v. Wellman,* 830 F.2d 1453, 1464 (7th Cir. 1987) (discussing fact that "the evidence, although it related to acts which took place outside the statutory limitations period, was highly relevant to the existence of the very same scheme to defraud which the mailings in this case were alleged to have furthered," and therefore "fact that the scheme . . . may have extended over a period in part barred by the statute of limitations does not mean that they are irrelevant in determining whether mailings occurring within the statutory period were . . . proscribed by 18 U.S.C. § 1341"); *United States v. Holden,* 806 F.3d 1227, 1232 (9th Cir. 2015) (concluding, in health care fraud scheme, that although "some acts in furtherance of the alleged scheme" were "outside the statute of limitations," the scheme itself remained within the limitations period). Evidence related to the existence of the scheme would be admissible at trial—without even resort to Fed. R. Evid. 404(b). *Loftis*, 843 F.3d at 1177. Accordingly, since existence of the scheme to defraud is a required element of the mail and wire fraud statutes, evidence regarding conduct in years that themselves would be outside the statute of limitations for the mailing or wiring itself would still be relevant and often admissible. As a result, Gerrans' false statements to the FBI about 2010 could have related to a scheme to defraud that was still chargeable in 2017. Therefore, there is simply no basis to conclude that in a wire or mail fraud investigation, questions regarding conduct that could be relevant to the existence of a still-chargeable scheme to defraud would not be within the jurisdiction of the FBI.

Moreover, relevant evidence regarding a chargeable fraud scheme could relate to events in the past. For example, a fraud defendant's previous employment in an industry that gave him specialized knowledge that he used to commit a future fraud under investigation would still be relevant to an investigation of the chargeable offense. Indeed, in this very case, the Second Superseding Indictment contains allegations regarding the charged wire fraud scheme about backdated records to January 2010—and therefore questions about whether events actually did or did not happen in 2010 and

documents that bear a date of 2010 would be within the jurisdiction of the investigating agency. Dkt 57, paragraph 8.

Finally, even if the backdated 2010 invoices had no other relevance to the investigation of fraud, Gerrans' conduct from 2010 could be relevant at sentencing as a part of his charged offense, *United States v. Williams*, 217 F.3d 751, 753-54 (9th Cir. 2000), and therefore questions about such relevant conduct would be within the investigating agency's jurisdiction. Given all of these possible reasons why questions about the purported documents dated 2010 fell within the scope of FBI's authority to investigate offenses against the United States, Gerrans' jurisdictional argument must fail—particularly under the incredibly deferential standards to the jury's verdict in force during these Rule 29 proceedings. //

## V. The Evidence Proved that Gerrans Committed Contempt of Court, Witness Tampering, and Obstruction of Justice

The defendant purports to renew a motion for acquittal on Counts 10, 11, and 12 that was made at the close of the government's case-in-chief. The defendant offers no new argument or justification for judgment on those counts. The evidence proving these counts was straightforward and compelling, and is sufficient for a reasonable jury to have reached a verdict against the defendant.

The contempt charge was based on Gerrans violating the conditions of his bond, namely the standard condition that he not harass, intimidate or retaliate against any witness and a special condition prohibiting him from having any contact with Chris Gerrans about the criminal case outside the presence of Chris Gerrans criminal counsel. The witness intimidation and obstruction of justice counts are based on a pattern of communications, acts of intimidation, and explicit directives regarding how to testify, with the intent to influence or deter Chris Gerrans' testimony in the case or to obstruct or impede justice.

The trial evidence showed that on numerous occasions Gerrans met with Chris Gerrans, usually in person, and that he discussed the criminal case and both intimidated and retaliated against Chris Gerrans for testifying in the grand jury. For example, shortly after the original indictment, the defendant showed up at Chris Gerrans home uninvited and was "pissed" and "in a rage" and berated Chris Gerrans for not taking "the Fifth" when he testified before the grand jury and blaming Chris Gerrans for the indictment against the defendant. RT 1/15/20 pg. 116. On another occasion, the defendant gave Chris

Gerrans a burner phone to allow them to communicate secretly. *Id*. at 120. In June 2019, the defendant talked with Chris about his criminal case outside the presence of Chris Gerrans' attorney at their niece's birthday party. *Id*. at 129. Later, the defendant enlisted his father as a messenger to deliver directives to Chris about the defendant's criminal case, including how he should testify. *Id*. at pg. 133-136. When Chris retrieved a truck he had loaned to the defendant, the defendant discussed his criminal case, including some of the discovery the government had provided in the criminal case. *Id*. at pg. 138, 139.

The pattern of improper contact and intimidation continued until August 13, 2019, when the defendant confronted Chris Gerrans at the San Rafael storage facility, and started a verbal and physical altercation. *Id*. at pg. 147. In addition to viewing video of portions of the incident, the jury heard from a disinterested witness. Ryan Swisher testified that he saw an argument between Gerrans and Chris Gerrans in which Gerrans was "agitated" and "upset" and was yelling at Chris Gerrans. RT 1/21/20 pg. 22-23. Swisher asked Gerrans and Chris Gerrans to move outside from the reception area because what was occurring between them was inappropriate and "way too loud" for an office. *Id*. at pgs. 23, 33. Swisher testified that Gerrans continued to be upset with Chris Gerrans and was yelling and gesturing and was in his "personal space." *Id*. at pg. 24. Swisher saw Gerrans make physical contact with Chris Gerrans and heard Gerrans tell Chris Gerrans that the indictment was "bullshit" and yell that Chris Gerrans had sold him up the river. *Id*. at pg. 25.

Based on the evidence presented by the government at trial, a rational trier of fact could have found the essential elements of those charges beyond a reasonable doubt, and the motion for acquittal on those counts must be denied.

## CONCLUSION

The jury verdicts in this case, on all 12 counts of the Amended Superseding Indictment, were supported by substantial evidence on each element of the charged crimes. Under the standards applicable on a Rule 29 motion for acquittal, the defendant's motion should be denied in its entirety.

DATED: June 26, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney


_____/s/_____
ROBIN L. HARRIS
LLOYD FARNHAM
MATTHEW M. YELOVICH
Assistant United States Attorneys