1  SHAWN HALBERT (CSBN 179023)
   LAW OFFICES OF SHAWN HALBERT
2  214 Duboce Avenue
3  San Francisco, California 94103
   Telephone: (415) 703-0993
4  shawn@shawnhalbertlaw.com

5  THERESA A. KRISTOVICH (SBN 66490)
   tkristovich@kcozlaw.com
6  KABAT CHAPMAN & OZMER LLP
7  333 S. Grand Avenue, Suite 2225
   Los Angeles, California 90071
8  Telephone: (213) 493-3980
   Facsimile: (404) 400-7333
9
10 Attorneys for Defendant
   LAWRENCE J. GERRANS
11

12              THE UNITED STATES DISTRICT

13       FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15 UNITED STATES OF AMERICA,          | Case No.: CR 18-0310 EMC

16              Plaintiff,

17                                    | **DEFENDANT LAWRENCE J. GERRANS'**
        vs.                          | **REPLY IN SUPPORT OF MOTION TO**
18                                    | **DISMISS ON THE BASIS OF IMPROPER**
   LAWRENCE J. GERRANS,              | **GOVERNMENT CONDUCT**
19
                Defendant.           | Second Superseding Indictment Filed:  August
20                                    | 27, 2019
21                                    | Hearing: July 15, 2020
                                      | Time: 2:30 p.m.
22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................... 1

II.     ARGUMENT ............................................................................................................ 2

        A.      Given the Circumstances, the Motion is Not Untimely ............................... 2

        B.      The Government Willfully Presented Misleading Information to the Jury
                Regarding the Defendant's Entitlement to Monies (Counts 1-9) ................ 3

        C.      The Government Misled the Jury Regarding The Defendant's Interaction With
                his Brother, Chris (Counts 10-12) ................................................................. 9

        D.      The Government's Inappropriate Portrayal of the Defendant in Its Closing
                Argument ..................................................................................................... 15

III.    CONCLUSION ...................................................................................................... 15

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Bowie*, 243 F.3d at 1117

5
    aff'd, 409 F. App'x 117 (9th Cir. 2010) ........................................................................ 9

6
*United States v. Bernal-Obeso*,
    989 F.2d 331, 333 (9th Cir. 1993) ............................................................................... 9

7
*United States v. Fredeerick*,

8
    78 F. 3d 1370 (9th Cir. 1996) ...................................................................................... 1

9
*United States v. Munoz*, No. CR 05-00668(A) MMM, 2009 WL 10700741, at *7
    (C.D. Cal. Aug. 19, 2009) ........................................................................................... 9

10
*United States v. Reyes*,

11
    660 F.3d 454, 462 (9th Cir. 2011) ............................................................................. 15

12
*United States v.  Reyes*,
    577 F.3d at 1069, 1077 (9th Cir. 2009) ..................................................................... 15

13
*United States v. Young*,

14
    470 U.S. 1, 18-19 (1985) ........................................................................................... 15

15
**Statutes and Rules**

16
Fed. R. Crim. P. 33 ................................................................................................................ 2

17

18

19

20

21

22

23

24

25

26

27

28

## I.   **INTRODUCTION**

In its Opposition to the Motion to Dismiss Based on Improper Government Conduct, the government concedes that in making a determination, the issue is whether, in the context of the entire trial, the conduct appears likely to have affected the jury's duty to discharge its duty to judge the evidence fairly. *United States v. Frederick*, 78 F. 3d 1370 (9th Cir. 1996). The simple answer here is that the government's conduct *did*. When taken in conjunction with the lack of any defense provided by trial counsel, the distortion of witness testimony and misleading arguments by the government improperly tainted the jury's verdict and mandate a reversal of the convictions.

Examples of the government's false narrative—communicated in large part through his brother, Chris—is that the defendant ran Sanovas like a piggy bank and there was no financial oversight. Not only was that untrue, but the government failed to acknowledge or call to testify Sanovas' two Chief Financial Officers from 2009-2011 and 2012-2014, Sanovas' Chief Operating Officer from 2014-2015, the bookkeeper hired in 2014 and 2015 to review all of the company's bank statements, or the accountant from a large accounting firm that audited Sanovas (at Larry Gerrans' request) from 2016-2018—even though each of them had pertinent information regarding the operations of Sanovas and the defendant's conduct in relation to financial matters.

Likewise, the government did not even attempt to obtain company emails that would have provided direct and incontrovertible evidence of what transpired at Sanovas between 2010 through 2019. Instead, the government's chief witnesses were co-founder, Erhan Gunday, who left the company in disgrace in 2014 and may have solicited confidential information from Sanovas employees for years after his departure; Lloyd Yarborough, the Sanovas controller who was loyal to Mr. Gunday and was himself fired for conduct detrimental to the company; the defendant's brother, Chris Gerrans, who embezzled over a million dollars from the company over a period of years, carried on an elaborate cover-up that undermined the company's efforts to audit the company books, and only admitted a limited amount of fraud when he was confronted by Sanovas' lawyers in mid-2018 (at Larry Gerrans' request); and three members of the Board of Directors whose testimony was tainted by government's false narrative about Halo when they were interviewed by Jason Richards, and who have civil liability for not properly discharging their duties. The government case agents

failed to even familiarize themselves with key corporate governance and formation documents, employment agreements, monies flowing from Sanovas' personal account to Sanovas, or the financial conduct of Mr. Gunday.

In an effort to convict Mr. Gerrans where the appropriate witnesses and competent evidence were lacking, the government presented evidence that it knew or had reason to know was false, argued facts that the government knew was not supported by the record, and withheld evidence that was necessary for the jury to make an informed decision about the charges against Mr. Gerrans. While the government was aided by Mr. Gerrans' trial counsel's complete failure to investigate or defend the case, the government violated its duty to discharge its own independent duties and for this reason a dismissal is mandated.[1]

## II.   ARGUMENT

### A.   Given the Circumstances, the Motion is Not Untimely

The defense incorporates the arguments in its Motion for a New Trial regarding timeliness though this post-trial motion is not brought pursuant to Rule 33 (although the Court could grant a new trial if it chooses not to dismiss). The motion was filed before the revised date the Court *sua sponte* set for filing post-trial motions—July 9, 2020 and thus is timely. Dkt No. 232. As described in the Supplemental Halbert Declaration, counsel did not know the facts that formed the basis for this motion until after May 27.  As the motion was filed two weeks before the government's oppositions were due, and the government was able to respond to the motion by June 25, there was no need to have the motion heard on a different schedule.[2] It is not an understatement to say that Mr.

---

[1] The government filed a single brief responding to Defendant's Motion for a New Trial and Defendant's Motion to Dismiss. The defense is filing a separate reply because the subject of this motion is the government's conduct, not the defense attorney's.

[2]  If this Court decides to consider a new trial as a remedy for the prosecutorial misconduct, the defense arguments regarding excusable neglect under Rule 33 apply. *See also*, Supplemental Halbert Declaration ("Supp. Halbert Decl.") filed in support of this motion. Any untimeliness in bringing the instant motion was not Mr. Gerrans' fault because of the paucity of materials current defense counsel received from Mr. Gerrans' trial counsel and the government's steadfast refusal to augment what current defense counsel has been able to receive. *See generally* Supp. Halbert Decl.,¶¶ 3-9. It is ironic that the government refused to extend the simplest of professional courtesies of providing critical information when advised it was not available through the defendant's trial counsel, and then argues that current defense counsel should have been prepared more quickly.

1    Gerrans' life has been destroyed by the government's misconduct. Mr. Gerrans should not have to

2    wait for years of appellate procedures for a determination that should, in the interests of justice,

3    happen now.

4    **B.    The Government Willfully Presented Misleading Information to the Jury Regarding the**
     **Defendant's Entitlement to Monies (Counts 1-9)**

5

6        **Expenses from 2009-2013.** The government committed misconduct when it presented

7    evidence through witnesses Yarborough, Fruehaff, Declaris and Villanueva that Mr. Gerrans had

8    used Sanovas funds to pay expenses such as rent, a trip to a medical convention and trade show in

9    Hawaii, and other miscellaneous expenses, when in fact the government possessed a May 31, 2013

10   email from Sanovas' Chief Financial Officer, Robert Farrell, that these were all legitimate,

11   reimbursable expenses pursuant to the company's By-Laws and Mr. Gerrans' employment

12   agreements. It was misconduct for the government to repeatedly refer to the controller, Yarborough,

13   as the Chief Financial Officer of the company in closing argument, to call numerous witnesses to

14   testify that Sanovas (improperly) paid the Gerrans' rent, and to argue that Mr. Gerrans "looted" the

15   company and used it "as a slush fund" when it had evidence that these expenses had been approved

16   by Mr. Farrell, Mr. Yarborough's boss.

17       What is the government's response? To claim (untruthfully) that it only *briefly* referred to

18   Mr. Yarborough's testimony in closing, and that CFO Farrell's email was simply one document

19   which did not explain the legitimacy of defendant's use of these monies and was not introduced

20   because CFO Farrell was not a witness at trial (and if he had been, would have "looked ridiculous"

21   and thus would have been a bad witness for the defense).  (Opp'n at 40-42.)

22       There is no wiggle room here. The question is whether the government misled the jury, and

23   the answer is yes.  As his May 2013 email reflects, Mr. Farrell approved approximately $170,000 in

24   expenses that included $53,400 in payments to Declaris, a work trip to Hawaii for a business

25   convention, the executive (not family) athletic membership, and a number of other expenses, and

26   told Mr. Gunday that the expenses were authorized.  (*See* Holcombe Declaration, Dkt 235-1,

27

28

DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS BASED ON IMPROPER CONDUCT

1    ("Holcombe Decl." Ex. 6.)[3] Further, and contrary to the government's misrepresentation, in his

2    email Mr. Farrell explained the reason each and every expense was authorized and in accordance

3    with GAAP, citing to specific sections of the Employment Agreement and/or Sanovas by-laws.[4]

4    Notably, as reflected in the FBI 302 prepared after the FBI's interview of CFO Farrell, either the

5    government decided not to question CFO Farrell about the email confirming all of the expenses

6    questioned by Messrs. Gunday and  Yarborough, or failed to memorialize his responses. Either

7    scenario is wrong. This evidence was not peripheral to the government's case, but was its central

8    theme. It was the entire basis of the testimony of Yarborough and Fruhoff, and a significant portion

9    of the testimony of Chris Gerrans, Declaris, Gunday, and Agent Villanueva. The government

10   highlighted Mr. Yarborough's testimony repeatedly in closing argument (which the government

11   claims it was entitled to do since Mr. Farrell did not testify), even repeatedly and inaccurately

12   referring to Mr. Yarborough as the CFO.[5] It even emphasized this same narrative in its rebuttal

13   closing.  *See* RT 1/29/20 at 131:11-132:3 (using Mr. Yarborough's expenses chart as Slide 8) and

14   132:10-11, 133:2-5, and135:15 (referring to Sanovas as Mr. Gerrans' personal slush fund multiple

15

16

17   [3] CFO Farrell's email and attachment had identical listed expenses to the ones in the government's
     Exhibit 251A, Mr. Yarbourough's chart, excepting a reference to a payment to Sarah Gerrans. Ms.
18   Gerrans did data entry and was not required to be on site, and the issue was apparently never raised
     by Mr. Yarborough to CFO Farrell.
19   [4] The email exchange shows that the Gundays were well aware that rent payments were authorized.
     Sema Gunday (Mr. Gunday's wife) was upset because the Gerrans' rents were more than the
20   Gundays ("Simply because his rent and storage expenses being higher does not make it equal!")
     (Holcombe Decl., Ex. 6 (June 4, 2013 email)). Mrs. Gunday apparently mistakenly thought that all
21   of the $168,000 was for rent and storage. The government possessed bank records showing that the
     Gundays were taking tens of thousands of dollars per year to pay for "rent/relocation." Supp. Halbert
22   Decl., Ex. 1 (showing payments from Sanovas' primary account 9874 of tens of thousands of dollars
     to Gunday (ES Medical) in 2011 through mid-2012 including for relocation/rent, and more than
23   $100,000 going to made to the Operations account 9406 for which Chris Gerrans was responsible).
     [5] *See* RT 1/29/20 at 41:20-21 ("you heard testimony from Lloyd Yarbrough who was the former
24   chief financial officer of the company"), 44:4-9 ("Lloyd Yarbrough's . . . . That's the chief financial
     officer . . . .  And you will recall that Mr. Yarbrough showed you the spreadsheet of the audit he had
25   done, while he was the chief financial officer"), 45:10-11 ("Larry has successfully gotten rid of
     Lloyd Yarbrough who had 30 years of experience as a chief financial officer"), and 46:1-7 ("Now,
26   you know that Larry Gerrans could not possibly have had these fake invoices entered on Sanovas's
     books when Lloyd Yarbrough was the chief financial officer").

27

28

1   times and describing him as "looting" the company and treating it like "an ATM machine").

2   Incredibly, in rebuttal the government even sought to bolster Yarborough's credibility by pointing

3   out that he raised his concerns with CFO Farrell. RT 1/29/20 at 128:26 – 129:3 ("And [Yarborough]

4   did -- he did raise a red flag. He talked to the CFO at the time, Bob Farrell. So when Lloyd

5   Yarbrough was testifying, he talked about that. And you should consider whether he's reliable.")

6          It is untrue that the government was justified in relying on Mr. Yarborough's testimony

7   (Gov. Opp'n at 40-43) when it knew that CFO Farrell had explicitly approved the expenses. It was

8   also untrue when the government told the Court that the entire basis for Count 1 was "the false

9   invoices that were entered in 2014 by Chris Gerrans," RT 1/29/20, at 180:21-181:2, and falsely

10  shifted the question of Mr. Gerrans' entitlement to deferred compensation to the Halo invoices.

11  Sanovas' CFO and attorneys had determined that Mr. Gerrans was entitled to $723,900 as deferred

12  compensation in mid-2013; the Halo invoices had nothing to do with creating the compensation but

13  simply memorialized it. The false presentation was highly prejudicial as it went directly to Mr.

14  Gerrans' defense that he rightfully believed he was only taking/receiving money he was entitled to.

15  The government's reliance on Mr. Yarborough's conclusions that Mr. Gerrans was stealing money

16  from Sanovas in 2013 when CFO Farrell concluded the opposite was true, and the government knew

17  it, is the quintessential example of prosecutorial misconduct.

18         **Misuse of Erhan Gunday Separation Agreement.**   In order to prove its case, the

19  government had to prove that Mr. Gerrans was not entitled to take the $580,000 in payments alleged

20  in Counts 1-3. To do so, however, was a problem because Mr. Gerrans was legally entitled to much

21  more than that simply in deferred compensation.[6] In this regard, and as the government knew, when

22

23  [6] The government's argument that any payments to Mr. Gerrans through Halo for past work were
24  illegitimate was directly belied by the documents circulating between Mr. Gerrans, Mr. Gunday,
    CFO Farrell and the Sanovas attorneys. Mr. Gerrans' association with Halo Management was as
25  transparent as was Mr. Gunday affiliation with ES Medical. Sanovas LLC was started by Halo
    Management LLC and ES Medical LLC; Mr. Gerrans was the manager of Halo and Gunday was
26  manager of ES Medical. Gov. Ex. 100. Chris Gerrans explained this in his grand jury testimony.
    Supp. Halbert Decl., Ex. 2 (Chris Gerrans July 12, 2018 Grand Jury testimony at 10:5-11:25
27  (describing how Halo was Larry/Shelly and ES Medical was Gunday's for 1099 purposes). In his
    grand jury testimony, Chris Gerrans also testified that he did not have any questions about Larry
28                                                                    *(Footnote continued)*

Messrs. Gerrans and Gunday entered into formal employment agreements, they awarded themselves retroactive pay for work they had done to bring the company into existence between 2009 to 2012. However, Sanovas still did not have enough money to pay them the amounts owed which accordingly was referred to as "deferred compensation." So Sanovas owed them this money.

The government's argument that Mr. Gerrans' entitlement to 409A money was "a made-up justification for the looting that happened later" (*id.* at 35:15-17) was improper because the government possessed emails showing that Sanovas' attorneys had identified the 409A issue for deferred compensation, meaning it had to be taken as soon as possible. That is why when he left the company, Mr. Gunday received his deferred compensation and, due to the 409A issues that Sanovas' lawyers had identified (Holcombe Decl. Ex. 8),[7] Mr. Gerrans needed to obtain his deferred compensation as soon as possible and took it in early 2015.

The government's charges that Mr. Gerrans unlawfully took the $580,000 (Counts 1-3) are in fact belied by the determinations of CFO Farrell and Sanovas' attorneys, Jack Capers and Eleanor Banister, that he was entitled to at least $723,900 in deferred compensation as of December 31, 2012. This was reflected in a chart those parties prepared and circulated that showed the amount of deferred compensation both Messrs. Gerrans and Gunday were owed from 2009 through 2012. (*See* Holcombe Declaration, Dkt. No. 235-1, Ex. 10)  As highlighted there, the 2010 Payments Due includes $333,333 for salary for work performed during 2009 through March 2010, and $166,667 for salary for work from April through December 2010.  (*Id.*)  The chart openly notes that some monies received by Messrs. Gunday and Gerrans during those years were paid through Halo and ES Medical and treats them identically to payments made directly to them personally.  (*Id.*)  Further, the deferred compensation due to Shelly Gerrans is clearly stated and not disputed by Sanovas' attorneys or Mr. Gunday.  (*Id.*)

wanting the enter the Halo invoices because Mr. Gunday had just gotten $2 million dollars from the company and that Larry was worried that Gunday and Yarborough had erased invoices. *Id.* at 17-18.
[7] Up to that point, monies for items like facilities rentals were paid through Halo (for Gerrans) and ES Medical (for Gunday).  (*See, e.g.*, Supp. Halbert Decl. Ex. 1 (payments to ES Medical for rent/relocation expenses as well as other payments).)

1      The government also had CFO Farrell's August 22, 2013 email to Sanovas' attorneys

2   showing that, based on the 409A analysis, at least $723,900 was owed to Mr. Gerrans (who was

3   staying on at the company) and $816,585 of the total $1,577,661.63 Erhan Gunday would receive at

4   the time he left Sanovas was for deferred compensation.[8] The government does not deny that it had

5   this email; its only defense to failing to introduce this critical information to the jury at trial was

6   because CFO Farrell was not called as a witness. That is just wrong. The government cannot

7   misrepresent the truth simply by not calling a witness.[9]

8      Further, contrary to the evidence in its possession, the government told the jury that Mr.

9   Gunday's testimony about his own Separation Agreement *legally* meant that Mr. Gerrans was no

10  longer entitled to his deferred compensation after Mr. Gunday left the company. This was not a

11  reasonable inference; it was a lie. The government argued that Mr. Gunday's payment to leave

12  Sanovas was in exchange for giving Mr. Gerrans control of Sanovas and waiving Gerrans' right to

13  his deferred compensation as of December 31, 2012:

14          Mr. Gunday gets $1.5 million to leave the company. And some of that is
            severance, some of it is considered pay. But that is the figure that Sanovas's lawyer
15          and Mr. Gunday's lawyer arrive at. And in return, what Larry Gerrans gets is
            control of the company. There is no reciprocal payout for Larry Gerrans.  Erhan
16          Gunday gets $1.5 million.  Larry gets control of the company. That's the severance

17

18

19  _____

    [8] CFO Farrell's attachment was similar to that in Exhibit 10 itemizing the basis for the entitlement to
    deferred compensation.  (Holcombe Decl., Ex. 9)
20  [9] In all the exchanges of these charts with the Gundays, CFO Farrell and Sanovas' lawyers, no one
    objected to Shelly Gerrans' right to compensation for years she had worked without pay, as she had
21  worked for Sanovas from the beginning. From 2009 to 2011, the Gerrans were running the business
    out of their home. Shelly was Larry's assistant, doing everything from filing papers, booking travel,
22  creating investment packets, making Costco runs, reviewing resumes, making arrangement for
    visiting doctors, and even doing janitorial work. Gunday did not even live in California and Chris
23  Gerrans and Lloyd Yarborough were not at the company. The government did not call witnesses
    who worked with Shelly earlier in the company. When Sanovas moved into Liberty Way, Shelly was
24  responsible for preparing the building for occupancy, including choosing and buying all of the
    furniture and interior design. Thus, the government's sarcastic comments in closing argument, ("in
25  January, February, and March of 2010. She's supposedly billing Sanovas for her services. *Really,
    Larry.* Shelly Gerrans, executive administration, $5,000.")(emphasis added), were only possible
26  because the government never called a competent witness. As for later years, there is extensive
    evidence that Shelly Gerrans worked for the company in various capacities, including setting up and
27  working booths at medical conventions and conferences (Erhan Gunday was at some of these
    conferences with Shelly), product development (a skin care line owned by Sanovas).

28

agreement. You have it in evidence. It's Government's Exhibit 113. Nothing for Larry Gerrans in terms of a payout. (RT 1/29/20 at 43: 7-17).

The government's argument was both false and misleading. First, the documents the government had showed, down to the penny, how Mr. Gunday's payment was calculated. Mr. Gunday did not get $1.5 million "to leave the company;" rather, when he left the company, he collected the $816,585 of deferred compensation from 2009 to 2012 to which he was entitled, as well as severance pay pursuant to the terms of his Employment Agreement (including 18 months of salary and bonuses). Exhibit C to the Separation Agreement (which the government failed to obtain) would have made clear how the money was calculated.[10] Second, a review of the full Separation Agreement makes it clear that the agreement has nothing to do with Mr. Gerrans' compensation or what he was entitled to, but only Mr. Gunday's, because only Mr. Gunday was leaving the company. The government knew that there existed no document by which Larry Gerrans waived his right to his deferred compensation ($723,900) and has never produced one. The argument that Mr. Gunday's agreement somehow affected Mr. Gerrans' entitlement to the deferred compensation of at least $580,000 that he was owed and took from the company in March 2015 was flagrantly false and constituted misconduct.[11]

Likewise unavailing is the government's assertion that defense counsel could have sought and obtained the financial spreadsheet (Exhibit C) to Gunday's Separation Agreement itself. That of course ignores the elephant in the room—defendant's trial counsel failed to interview witnesses, review documents or put on a defense. Again, the government conflates its obligations with those of

---

[10] The government argues that it was entitled to make this argument because Mr. Gunday testified that Mr. Gerrans was not "promised the same financial arrangement" that Mr. Gunday received in his Agreement and that he would not have agreed to Mr. Gerrans receiving a comparable payout. (Opp'n at 44.)  Mr. Gunday's agreement was a separation agreement and did not reference Mr. Gerrans' rights to deferred compensation.

[11] The government even told the jury that because Mr. Gerrans' right to an equivalent 1.5 million dollars was not in *Mr. Gunday's* Separation Agreement, that meant Mr. Gerrans was not entitled to compensation.  "Because where in that separation agreement does it say that Larry Gerrans is entitled to even 1.5 million? It doesn't. It's not in there." 135:22-24.

defense counsel and  ignores the legal requirement that the government has a constitutional obligation to collect evidence, to prevent fraud upon the court, and to elicit the truth" *Bowie*, 243 F.3d at 1117, and that its bad faith failure of duty to investigate potentially exonerating 'concrete documentary evidence,' violates due process." *United States v. Munoz*, No. CR 05-00668(A) MMM, 2009 WL 10700741, at *7 (C.D. Cal. Aug. 19, 2009), aff'd, 409 F. App'x 117 (9th Cir. 2010) (citing *Bowie*]; *See also United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) (vacating a conviction and granting evidentiary hearing where the government failed to investigate discrepancies in a paid informant's statement and then presented informant's testimony at trial).

Moreover, it was the government who subpoenaed Erhan Gunday to produce documents related to his 2014 Separation Agreement with Sanovas—not the defendant. Thus, when Gunday failed to comply with the subpoena and produced an Agreement that did not have exhibits attached to it, the burden was on the government to enforce the subpoena and secure the responsive documents. Even apart from Exhibit C to the Separation Agreement, however, the government possessed documents that independently verified how Gunday's payment was calculated and the money to which Mr. Gerrans was entitled as deferred compensation—but failed to introduce it at trial to the detriment of the truth.

**C.**    **The Government Misled the Jury Regarding The Defendant's Interaction With his Brother, Chris (Counts 10-12)**

In its moving papers, the defense described a pattern of misconduct relating to Chris Gerrans which includes the government's failure to pursue or present evidence that contradicted Chris Gerrans' version of his interactions with Larry Gerrans as well as the government's carefully crafted and limited examination of Chris about the substance of his argument with the defendant at the Public Storage facility in August 2019. For the government to now argue that an effective defense lawyer could have refuted the government's version of events, again conflates the fact that what is at issue in this motion is the government's conduct—not defense counsel's.

Equally inapposite is the government's argument that it did not know about that email between Mr. Gerrans and his attorneys in August 2019 (Gov. Opp. at 45:18-22) which explains why he was so angry at Chris Gerrans and was calling him a "sell-out." The significance is that the

1     government either negligently or intentionally failed to thoroughly examine Chris Gerrans about the

2     actual content of the argument, and yet, in closing argument claimed that Chris Gerrans had testified

3     that Larry Gerrans screamed at Chris Gerrans "'You sold me up the river' *for cooperating in the*

4     *criminal case.*'" RT 1/29/20 at 85:1-2, 24-25 (emphasis added).) That is not what Chris Gerrans said

5     and not what the evidence shows.

6          Notably, the government does not argue that this was a mistake, but rather claims that this

7     was "a reasonable inference." Gov. Opp. at 47:7. But the government's argument was not stated as

8     an inference, but as what Larry Gerrans said. Further, this is not a situation in which the government

9     should need to infer anything – Chris and Larry were involved in a heated and lengthy exchange; if

10    they were talking about cooperation in the criminal case, the government had ample opportunity to

11    elicit that fact from Chris Gerrans, but it did not. As the defense argued in its opening motion, this

12    does this appear to be an oversight given the two separate FBI 302s memorializing the encounter.

13    The government is anything if not thorough, and given three opportunities to elicit such a statement

14    from Chris Gerrans, the government never obtained it, and despite this argued it at trial.[12] Since it is

15    now clear that the storage facility argument was not about Chris' cooperation but related to the

16    business of Sanovas and Chris selling the defendant out, it is highly suspect that the government

17    both failed to elicit the substance of the argument and also that it misrepresented what Chris Gerrans

18    said.

19         Another significant but misleading point related to Art Gerrans Sr. and his grand jury

20    testimony in which he was adamant that he did not write three things on a note, as Chris had

21    claimed. Art Gerrans also raised an important issue relating to Chris Gerrans' credibility, which is

22    that Chris Gerrans told his father that because he was cooperating, he expected to go to "a country

---

23

24         [12] The government argues that the email is "self-serving." Gov. Opp. at 47:9. It cannot be
      self-serving because Mr. Gerrans could not have predicted that his bail would be revoked and he
25    would be charged with three new counts for yelling at Chris that he was a "sell out." As the August
      2019 emails show and is completely consistent with the trial testimony, Larry was upset with his
26    brother for giving information to Jerry Katzman and for Katzman communicating with Ehrhan
      Gunday. The fact that the government even now cannot concede that the altercation related to
27    Sanovas issues and the defendant's sense of betrayal that his brother was helping his successor is a
      reflection of the government's mentality to win at all costs.

28

-10-
DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS BASED ON IMPROPER CONDUCT

club." Def. MTD at 16. The government changed the subject quickly and did not ask Art Gerrans Sr to give more details about this conversation, even though it had a duty to do so. These are serious issues that the government failed to follow up with Chris Gerrans about (as per the 302s). Further, when Chris Gerrans testified on cross-examination that he had "no expectations" of getting anything in exchange for his cooperation, RT 1/15/20 at 105:24-106; 222:9, the government did not follow up even though it had every reason to doubt the veracity of this statement.

Perhaps most egregiously, the government introduced through Chris of evidence it knew to be false; *i.e.*, that his embezzlement from Sanovas started in "early 2015" RT 1/15/20 at 97:1-2, and was in direct response to Larry Gerrans' alleged theft of money for his home: "[A]round that time Larry had taken $2.6 million for the purchase of his home. I thought what's good for the goose is good for the gander." *Id.* at 100:1-4. Finally, Chris Gerrans also testified that after Larry gave him a $10,000 bonus for all the extra work he was doing, Larry started giving him more bonuses (plural), checks that Larry Gerrans knew about and signed. *Id.* at 99.

In actuality, as defense counsel has recently learned, the government's evidence shows that **from July 2014 to December 2014**, Chris Gerrans stole more than $209,000 from Sanovas using 37 false checks. *See* Supp Halbert Decl., Ex. 9. In January 2015, he stole more than $100,000 via 11 false checks; in February 2015, $74,000 via 9 false checks; in March 2015, more than $150,000 via 13 false checks. *Id.* This all was before the defendant purchased the house and directly impeaches Chris Gerrans' lie that it was his brother's alleged misconduct that induced his own, which provided him with an incentive at trial to claim that his brother committed misconduct. The government possessed this evidence and yet presented false testimony to the jury.

Moreover, except for the two bonus checks that Larry Gerrans signed for Chris Gerrans on July 1, 2014 and September 2, 2014 (which are appropriately labeled bonuses for his additional comptroller duties, none of the other checks representing money stolen by Chris during that time period was signed by Larry. Rather, as described below, Chris used the signature stamp, which is distinctive because it is thicker than a regular signature. (In all of the checks from July 1, 2014 through March 2015, there are two legitimate bonus checks to Chris and the remainder are fraudulent checks signed with a rubber stamp except for one payroll check signed by Larry Gerrans

1    on December 22, 2015 on the same day that Chris rubber stamped himself a false check. By way of

2    comparison, on select days (for example, November 14, 2014, December 22, 2014, January 8, 2015,

3    February 4, 2015 and March 20, 2015), when Chris Gerrans was rubber stamping his fraudulent

4    checks, Larry Gerrans was hand-signing legitimate checks. *See* Exs. 3 through 7 of the Supplemental

5    Halbert Declaration (*compare* first fraudulent check rubber-stamped by Chris Gerrans to legitimate

6    checks personally signed by Larry Gerrans on the same day). The totality of the fraudulent checks in

7    Ex. 9 to the Supplemental Halbert Declaration are the same as the checks identified in the May 9,

8    2019 grand jury subpoena to Sanovas re checks made out to Chris Gerrans. (Original) Halbert Decl.

9    Ex. 8. The government presented false testimony at trial when Chis Gerrans testified that he started

10   embezzling from Sanovas after Larry Gerrans purchased his home in March 2015 because Larry was

11   stealing, and that Larry personally signed the checks.[13]

12         The government also submitted false evidence from Chris that in late 2014/early 2015,

13   Sanovas was "$3 million in debt. I was being beat up daily by vendors, workers, consultants,

14   demanding payment." RT at 1/15/20 at 76:9-10. While it is the nature of start-ups that the only

15   income is investor money and that the balance sheets will be different every day, there was no

16

_____

17   [13] This deception was reinforced by the government's argument at trial that Larry and Chris had a
     quid pro quo, a "You help me commit my theft, and I'll turn a blind eye when you do your own." RT
18   1/13/20 at 47:1-15. There no quid pro quo. There was nothing illegal about the Halo invoices, and
     Larry was unaware of Chris' theft until it was discovered by the Gursey accounting firm and Chris
19   was confronted by Orrick's lawyers. The most favorable explanation to the government is that Chris
     lied to the government or withheld emails showing Chris was desperately trying to hide his fraud as
20   Larry was pushing for audit preparedness. For example, attached hereto as Ex. 10 to the
     Supplemental Halbert Declaration are emails between Gary Krausz of Gursey, Larry Gerrans and
21   Chris Gerrans in April and May, 2018, when Gursey was discovering Chris' fraud. Far from hiding
     Chris' activity, the emails show that Larry was ordering Chris to verify the questionable
22   documentation and vendors that Gary Krausz had identified ("Moreover, Chris, I need to see
     documentation and I need explanation from YOU on the following Disbursements and Vendors" and
23   listing 20 items) (April 16, 2018 email from Larry Gerrans to Phuc Main and Chris Gerrans); Larry
     was telling everyone they should have all invoices in order to "put them directly into archive in
24   anticipation of audit preparedness" (April 20, 2018 email from Larry Gerrans to Gary Krausz,
     copying Chris); and chastising Chris for delaying his response to Gursey's request to provide check
25   images from earlier months of 2016 from Chase Online banking and to furnish them with check
     payee names (May 1, 2018 email from Larry Gerrans to Chris Gerrans and Phuc Main, forwarding
26   April 25, 2018 email from Gursey). In early 2016, when due to the currency crisis Mr. Gerrans was
     not taking any salary (as Mr. Villanueva testified at trial) and was making loans to the company,
27   Chris Gerrans stole more than $100,000 from Sanovas from January through March, 2016. *See*
     Original Halbert Decl. Ex. 8.

28

1   corroborating evidence of a $3 million deficit, and in fact, as is evident in the government's own

2   discovery, Sanovas was writing hundreds of checks during that time period. This theme was

3   emphasized by the government in closing argument, describing Chris Gerrans' testimony that in late

4   2014 and early 2015, vendors were "treating Chris as if he was personally affronting them by not

5   paying them. He testified about how stressful it was because Sanovas did not have the money to pay

6   its bills." (RT 1/29/20 at 51:3-10).

7        As the government knew or should have known from government discovery, this was false.

8   Attached hereto as Ex 11 to the Supplemental Halbert Declaration are a sampling of checks paid to

9   vendors, as well as rents checks and checks in March 2015 paying Tami Griffith, the bookkeeper

10  who was reviewing all of Sanovas' bank statements. As the Court will see, Sanovas was having no

11  trouble making approximately 150 large payments to vendors and for large items like rent. This

12  again was false testimony presented by the government.

13       In addition to introducing false testimony by Chris Gerrans, the government exacerbated the

14  false narrative by arguing, in rebuttal closing that "Chris Gerrans' testimony is uncontradicted."

15  (137:12-15). The government's propping up Chris Gerrans' deceit is further evidenced by his

16  testimony at trial that the defendant "punched" him in the chest and "slugged" him," when in fact the

17  eye witness, Ryan Swisher twice referred to it as a "poke" and the video of the incident corroborates

18  Mr. Swisher's account.[14] The government's misleading presentation of the evidence and

19  endorsement of the witness constitutes significant misconduct and was prejudicial to the defendant.

20       The government misconduct extended to its argument regarding the good faith instruction. In

21  considering whether a good faith instruction was appropriate (even though it was unaware of the

22  evidence the defense has raised in its post-trial briefing), the Court asked specific and nuanced

23  questions of the attorneys that revealed its understanding of the significance of the deferred

24  _____

25  [14] Further evidence of Chris Gerrans' exaggeration and embellishment is his initial statement to the
    government that the defendant was upset that AUSA Harris had a conflict of interest because of her
26  City Council application and where she lived in Sausalito in relation to the Sanovas plant, that then
    morphed into the defendant wanting to "take" AUSA Harris out, which further morphed  to that he
27  wanted to kill her and that his knowledge of where she lived was somehow related to that.

28

1   compensation issues. As to whether Mr. Gerrans might be entitled to a good faith instruction, the

2   Court stated: "[T]here was some testimony that there was no monies early on, and so it

3   was…deferred. Mr. Gunday deferred quite a bit. Hundreds of thousands, if not more. So I think a

4   jury can infer that there was some deferral, at least in the early years of Mr. Gerrans's 250 or 300 a

5   year." RT 1/29/20 at 176:19-24. AUSA Harris responded that "with regard to Counts 1 and 2 and

6   3…There just hasn't been any evidence, really, any threshold showing." *Id.* at 177:22-24. AUSA

7   Harris then "confirm[s] that the sole basis for the offer of proof for the [good faith] instruction is the

8   existence of Exhibit 103, the …employment agreement," which the Court confirmed is correct. Id. at

9   184:20-23. The fact that Mr. Gerrans had to rely on an inference and an employment agreement that

10  contained no calculations when the government possessed evidence confirming that the CFO and

11  Sanovas' lawyers had unequivocally stated that Mr. Gerrans was entitled to that deferred

12  compensation demonstrates the prejudice of the government's misconduct.

13          Further, in discussing whether a good faith instruction was appropriate regarding the

14  American Express expenditures in early 2017, see generally id. beginning at p. 177, defense counsel

15  Eric Krebs noted that Agent Villanueva had admitted on cross-examination that he had not prepared

16  a chart for 2016 and that there could have been payments in 2016, to which AUSA Harris replied

17  that American Express charges in 2016 were irrelevant because Mr. Gerrans' allegedly fraudulent

18  use of the card was in 2017. Id. at 179:7-180:4. In fact, as described in this motion, Mr. Gerrans' use

19  of the American Express card for personal expenses in 2017 was to repay himself for his having paid

20  $50,000 of his own money to the American Express bill in 2016. Ex. At the same time, in February,

21  2016, Mr. Gerrans put $150,000 of his own money into the company. Not only were these payments

22  confirmed by an email to Chris Gerrans, Holcombe Decl. Ex 38 (that he never produced to the

23  government, or if he did, was not produced to the defense), but the government had in its possession

24  bank statements showing the payments, Supp. Halbert Decl. Ex. 12, and had also received from Gary

25  Krausz promissory notes memorializing these loans to the company. Supp. Halbert Decl., ¶ 13. The

26  government argued that the 2016 American Express payments were not relevant to 2017 when it had

27  evidence that Mr. Gerrans had paid a $50,000 corporate American Express bill with his own money

28  and there was no evidence of reimbursement.

D.   **The Government's Inappropriate Portrayal of the Defendant in Its Closing Argument**

The government's conduct falls well below the general standards of civility expected of members of the State Bar. In light of the information in the government's possession, it also was highly improper.

[I]t is improper for the government to present to the jury statements or inferences it knows to be false or has very strong reason to doubt." *United States v. Reyes*, 660 F.3d 454, 462 (9th Cir. 2011), citing *United States v. Reyes*, 577 F.3d at 1069, 1077 (9th Cir. 2009) "Faithful adherence to these principles is particularly important because a 'prosecutor's opinion carries with it the imprimatur of the Government' and making false or misleading assertions 'may induce the jury to trust the Government's judgment rather than its own view of the evidence.'" *Id.*, citing *Reyes*, 577 F.3d at 1077 (quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985)).

The government was aware that trial counsel presented no defense. There was not one witness called and not one document introduced on his behalf. Taking advantage of this unfortunate situation by false innuendo and inflammatory rhetoric only exacerbated an already bad situation and was highly prejudicial. Although it seeks to do so throughout its response to this motion, the government cannot justify its misconduct by reference to defense counsel's failures.

III.   **CONCLUSION**

There simply was no excuse for the government's conduct in this case. Twisting the facts, cherry picking the witnesses, not pursuing exculpatory information and making inflammatory and false arguments is below the standard expected of a representative of the United States and militates in favor of reversal of the defendant's convictions in this case.

DATED: July 3, 2020                    LAW OFFICES OF SHAWN HALBERT
                                       By: s/ Shawn Halbert

                                       KABAT CHAPMAN & OZMER LLP
                                       By: s/ Theresa A. Kristovich
                                          Theresa A. Kristovich

                                       *Attorneys for Defendant Lawrence Gerrans*