UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LAWRENCE J. GERRANS,<br><br>Defendant. | Case No. 18-cr-00310-EMC-1<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR ACQUITTAL, DENYING DEFENDANT'S MOTION FOR NEW TRIAL, DENYING DEFENDANT'S MOTION TO DISMISS, AND DENYING DEFENDANT'S MOTION TO STRIKE**<br><br>Docket Nos. 234, 235, 247, 258 |

## I.    <u>INTRODUCTION</u>

On July 12, 2018, a federal grand jury returned an indictment charging Lawrence Gerrans ("Mr. Gerrans") with wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1957). *See* Docket No. 1.  On August 27, 20219, a second superseding indictment was returned by the grand jury, which charged Mr. Gerrans with 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1957 (money laundering), 18 U.S.C. § 1001(a)(3) (false statement), 18 U.S.C. § 401(3) (contempt), and 18 U.S.C. § 1512(b)(1) (witness tampering).  *See* Docket No. 57.  All of the charges stemmed from Mr. Gerrans's conduct as President and CEO of Sanovas Inc. ("Sanovas"), a medical and surgical device company.  *Id.*  On January 29, 2020, after a jury trial, which began on January 13, 2020 and concluded on January 29, 2020, the jury returned a verdict which found Mr. Gerrans guilty of all charges.  *See* Docket No. 144.  On May 27, 2020, Mr. Gerrans filed a Motion for Judgment NOV and a Motion for New Trial.  *See* Docket Nos. 234, 235.  On June 12, 2020, Mr. Gerrans filed a Motion to Dismiss for Improper Government Conduct.  *See* Docket No. 247.  On June 12, 2020, Mr. Gerrans filed a Motion to Strike the United States' Objection to Reply

United States District Court<br>Northern District of California

Evidence. *See* Docket No. 258. A hearing was held on these motions on July 15, 2020, *see* Docket No. 264, prior to sentencing, which is currently scheduled for September 16, 2020. *See* Docket No. 284.

## II.    BACKGROUND

A.    Factual Background

The Court and the parties are well acquainted with the factual allegations in this case. Thus, they are set forth here only in brief. Defendant, Lawrence Gerrans, was charged with taking millions of dollars from Sanovas, a medical device start-up company, which he co-founded. He was alleged to have billed the company for personal expenses and was accused of taking millions of dollars from Sanovas by fraudulent invoices and book entries, using shell entities, and lying to the board of directors. The money was taken to purchase a multi-million-dollar home, extravagant jewelry and home furnishings, vacations, and expensive cars. Mr. Gerrans was subsequently interviewed by the FBI about the allegations in this case; he made false statements and provided false documents related to his financial dealings involving Sanovas in an attempt to cover up his crimes. After he was indicted, while released on bond, Mr. Gerrans violated the terms of the bond by intimidating, harassing, and improperly communicating with his brother, Chris Gerrans, who was also the subject of a related FBI investigation.

The criminal counts, as described by the Defendant, were as follows:

> The indictment alleged that Mr. Gerrans committed a scheme and artifice to defraud his own company of company funds. Counts 1 through 3 alleged three wire communications transferring a total of $580,000 that were used to buy a family home; Counts 4 and 5 respectively alleged transfers of $32,395.77 and $12,5000 for personal expenses using Sanovas funds to which he was not entitled. Count 6 alleged that Mr. Gerrans committed money laundering by transferring $2,303,966.42 from Hartford [B]ank to Stewart [T]itle for the purchase of a family home. Counts 7 and 8 alleged that Mr. Gerrans violated Title 18 Section 1001(3) by making false statements to the FBI concerning false invoices from Halo Management Group to Mr. Gerrans and his wife for the time period January through March 2010. Count 9 alleged another violation of Section 1001(3) based on the alleged submission to the FBI of a false "Secured Promissory Note" from Mr. Gerrans and his wife to Hartford Legend Capital on March 17, 2015. Counts 10 through 12 alleged that from July 2018 through August 13, 2019, Mr. Gerrans committed contempt, witness tampering and obstruction of justice arising out of his contact with his brother, Chris Gerrans.

United States District Court
Northern District of California

1    Defendant's Motion for Judgment NOV ("JNOV Mot.") at 1, Docket No. 234.

2    B.    Procedural Background

3         On July 12, 2018, a federal grand jury returned an indictment that charged Mr. Gerrans

4    with wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1957). *See* Docket No. 1.

5    Mr. Gerrans appeared on July 23, 2018 and was released on bond, subject to conditions set by

6    Judge James. *See* Docket Nos. 4, 5. On September 18, 2018, Mr. Gerrans's original counsel filed

7    a motion to withdraw as counsel (because no defense coverage was available through Sanovas's

8    insurance), *see* Docket No. 16, and on October 25, 2018, Brian H. Getz entered his appearance,

9    *see* Docket No. 20. On November 8, 2018, a superseding indictment was filed. *See* Docket No.

10   22. On August 12, 2019, Mr. Gerrans filed a Motion to Dismiss, *see* Docket No. 42, but that

11   motion was taken off calendar at Mr. Gerrans's request on August 21, 2019. *See* Docket No. 51.

12   In the intervening period, Mr. Gerrans was remanded into custody (for violating the terms of his

13   conditional release) on August 15, 2019. *See* Docket No. 46. A second superseding indictment

14   was filed on August 27, 2019. *See* Docket No. 57.

15        A jury trial commenced on January 13, 2020, and the case was given to the jury on January

16   29, 2020. *See* Docket No. 143. That same day, the jury rendered a verdict, finding Mr. Gerrans

17   guilty on all counts. *See* Docket No. 144. Sentencing was scheduled for May 20, 2020. *See*

18   Docket No. 143. On March 20, 2020, Shawn Halbert filed a Notice of Substitution of Attorney.

19   *See* Docket No. 162. On April 11, 2020, the Court continued sentencing from May 20, 2020 to

20   June 25, 2020. *See* Docket No. 203. On April 23, 2020, the Court issued a clerk's notice directing

21   Defendant to file any post-trial motions by May 27, 2020. *See* Docket No. 212. On May 15,

22   2020, the Court continued sentencing again to August 18, 2020. *See* Docket No. 225. On May

23   27, 2020, it again continued the deadline to submit post-trial motions to July 9, 2020. *See* Docket

24   No. 232. On May 27, 2020, Mr. Gerrans filed two of the motions currently before the Court: his

25   Motion for Judgment NOV, Docket No. 234, and his Motion for a New Trial, Docket No. 235.

26        On June 4, 2020, the government filed a motion for forfeiture of property. *See* Docket No.

27   243. On June 12, 2020, Mr. Gerrans filed a Motion to Dismiss for Improper Government

28   Conduct. *See* Docket No. 247. After briefing on these motions completed, the government

United States District Court
Northern District of California

3

objected to declarations and evidence that Mr. Gerrans attached to his Reply in support of his Motion to Dismiss. *See* Docket No. 256. Mr. Gerrans moved to strike that response. *See* Docket No. 258.

Finally, in light of the fact that the government raised issues of timeliness in its opposition to Mr. Gerrans's various motions (and therefore the government had no opportunity to respond to the responsive arguments Mr. Gerrans presented in his replies), the Court permitted the government to file a sur-reply addressing Mr. Gerrans's arguments related to timeliness. *See* Docket No. 257. The government filed that response on July 10, 2020. *See* Docket No. 259.

### III.    <u>TIMELINESS</u>

Before reaching the merits of any of Mr. Gerrans's motions, the Court addresses the issue of timeliness. Federal Rule of Criminal Procedure 29 provides: "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(a). Likewise, Federal Rule of Criminal Procedure 33 requires that any motion for a new trial not based on newly discovered evidence "must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b). As is relevant here, ineffective assistance of counsel is not considered "newly discovered evidence." *United States v. Allen*, 153 F.3d 1037, 1045 (9th Cir. 1998) (quoting *United States v. Pirro*, 104 F.3d 297, 299 (9th Cir. 1997)) ("We have rejected the use of a Rule 33 motion for new trial based on 'newly discovered evidence' involving the ineffective assistance of counsel."). Mr. Gerrans does not identify a specific rule pursuant to which his Motion to Dismiss Based on Prosecutorial Misconduct is brought; however, he does request—should the Court consider a new trial as a remedy for the alleged misconduct—that it look to the arguments Mr. Gerrans advanced in support of the timeliness of his Rule 33 motion. Reply in Support of Defendant's Motion to Dismiss for Prosecutorial Misconduct ("MTD Reply") at 2 n.2, Docket No. 253.

Here, the jury returned a verdict convicting Mr. Gerrans on all counts on January 29, 2020. *See* Docket No. 144. After the verdict was returned, the Court discussed post-trial motions with the parties. *See* Transcript of Proceedings from January 29, 2020 ("Jan. 29 Transcript") at 163, Docket No. 180. Counsel for Mr. Gerrans indicated that if there were any post-trial motions that

4

he believed should be heard in advance of sentencing, he would contact the Clerk of the Court. *Id.* As the government notes, "[t]here was no discussion of extending the 14-day time limit under Rule 29 for renewing the motion, and the Court did not set a schedule that would have provided a new deadline for this motion." *See* Opposition to Defendant's Motion for Judgment NOV ("JNOV Opp.") at 2, Docket No. 250. The Court set a sentencing hearing (and a hearing on the government's forfeiture motion) for May 20, 2020. *See* Docket No. 143.

On March 20, 2020, Mr. Gerrans filed a Notice of Substitution of Attorney, indicating that Shawn Halbert would be henceforth representing him. *See* Docket No. 162. However, no motion to extend the deadlines for post-trial briefing was made. On April 11, 2020, the Court issued a clerk's notice, which continued Mr. Gerrans's sentencing hearing from May 20, 2020 to June 25, 2020. *See* Docket No. 203 ("Sentencing hearing is CONTINUED from May 20, 2020 to June 25, 2020 at 2:30 pm. PSR deadlines to be governed by Local Criminal Rules 32-4 and 32-5."). On April 23, 2020, the Court issued a second clerk's notice indicating that any post-trial motions were to be filed by May 27, 2020. *See* Docket No. 212 ("Deadline for Defendant to file any post-trial motions is set May 27, 2020."). In response to a motion filed by Mr. Gerrans (on May 13, 2020), on May 15, 2020, the Court continued Mr. Gerrans's sentencing until August 20, 2020. *See* Docket Nos. 224, 225. Shortly thereafter, on May 27, 2020 (the prior post-trial motion deadline), the Court issued a clerk's notice clarifying that—in light of the new sentencing date—"[a]ny post-trial motions are due 7/9/20." *See* Docket No. 232.

Mr. Gerrans's Motion for Judgment NOV and Motion for New Trial were not filed until May 27, 2020 (the deadline set by the clerk's notice at Docket No. 212). *See* Docket Nos. 234, 235. Mr. Gerrans's Motion to Dismiss for Prosecutorial Misconduct was not filed until June 12, 2020. *See* Docket No. 247.

As to Mr. Gerrans Motion for Judgment NOV and Motion for New Trial, he contends that they were timely filed because they "complied with the Court's schedule." Defendant's Motion for New Trial ("MNT") at 3, Docket No. 240-1. While this argument wholly ignores the fact that the deadline for filing a Rule 33 or Rule 29 motion lapsed approximately two months before the Court set a new deadline (May 27, 2020) for post-trial motions, the Court acknowledges that the

broad language of the clerk's notices, which referred to "any" post-trial motions without limitation, would be understood as resetting the deadline for *all* post-trial motions.  *See* Docket Nos. 212, 232.  Mr. Gerrans advances the same argument regarding his Motion to Dismiss, which he contends complied with the Court's July 9, 2020 deadline.  *See* MTD Reply at 2.  For the same reasons as above, the Court acknowledges that Mr. Gerrans's position is not an unreasonable interpretation of the relevant clerk's notices.  Although it was not the Court's intent to reset the deadlines for post-trial motions whose deadlines had already lapsed, and although the government advances persuasive arguments why the motions are untimely, *see* Opposition to Defendant's Motion for New Trial and Motion to Dismiss ("Omnibus Opp.") at 1–2, Docket No. 249; Government's Sur-Reply Re: Timeliness of Defendant's Post-Trial Motions ("Sur-Reply"), Docket No. 259, the Court finds the motions timely in light of the language of the clerk's notices and will address the merits.

## IV.     MOTION FOR JUDGMENT NOV

A.     Legal Standard

Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for a judgment of acquittal after a jury verdict.  A Rule 29 motion challenges the sufficiency of evidence.  "In ruling on a Rule 29 motion, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Alarcon–Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) (emphasis in original).  "[I]t is not the district court's function to determine witness credibility when ruling on a Rule 29 motion."  *Id.*

B.     Analysis

In his Motion for Judgment NOV, Mr. Gerrans seeks a judgment of acquittal on all counts.  *See* JNOV Mot. at 2.  As the motion explains, he seeks acquittal on Counts 1 through 6 on the grounds that "the government did not prove beyond a reasonable doubt that Mr. Gerrans was not legally entitled to the money he received from Sanovas"; he seeks acquittal on Counts 7 through 9 on the grounds that, *inter alia*, "the government did not prove beyond a reasonable doubt that the statements to the FBI were false or that they were material"; he seeks acquittal on Counts 10

1   through 12 on the grounds that "the government's evidence did not describe conduct constituting

2   contempt, witness tampering or obstruction of justice." *Id.*

3        1.   Counts 1–6

4        Much of Mr. Gerrans's argument as to Counts 1–6, premised on his newly asserted defense

5   that he was entitled to the money he took from Sanovas, relies on the Ninth Circuit's recent

6   decision in *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020).  *See* JNOV Mot. at 3–4.  He

7   argues:

> The change in the law in *United States v. Miller* has a significant
> impact here because the government's case relied heavily on
> allegations of deception.  The evidence at trial was insufficient to
> prove that Mr. Gerrans intended to cheat Sanovas of money, as the
> government failed to show that Mr. Gerrans was not entitled to
> receive that money from Sanovas.  While the government
> introduced evidence of the money that Mr. Gerrans *took from*
> Sanovas, it did not prove what money was *owed to* Mr. Gerrans.  In
> this respect, the Court must examine the trial record in light of
> *United States v. Miller*, because even if the government proved that
> Mr. Gerrans had a scheme to deceive, he was not guilty of Counts 1-
> 6 unless the government proved that he intended to cheat Sanovas
> out of money, which it did not do.

15   *Id.* at 4 (emphasis in original).

16        In *Miller*, the defendant served as "managing member and president" of an online retail

17   platform.  953 F.3d at 1098.  At some point, he started "experiencing personal financial

18   difficulties" and "began writing himself checks from one of [the company]'s bank accounts."  *Id.*

19   at 1099.  No one at the company was aware he was doing so.  *Id.*  Although he paid some of the

20   money back, Mr. Miller ultimately took about $330,000.  *Id.*  In order to "disguise his payments

21   [to himself], Miller often listed them in [the company]'s ledger as internal transfers between the

22   company's two bank accounts."  *Id.*  Ultimately, these false accounting records led to the

23   discovery of Mr. Miller's actions.  *Id.*  "[Mr.] Miller had also failed to report any of the money he

24   took as income on his tax returns."  *Id.* at 1099–100.  He was indicted  "on five counts of wire

25   fraud in violation of 18 U.S.C. § 1343 and four counts of filing false federal tax returns in

26   violation of 26 U.S.C. § 7206(1)."  *Id.* at 1100.

27        At trial, Mr. Miller's "chief defense was that he always intended to (and eventually did)

28   pay back the full amount he had taken from [the company].  He also argued that he always

United States District Court
Northern District of California

believed the funds to be loans that he was authorized to issue to himself." *Id.* In line with that theory, Mr. Miller "requested a jury instruction stating that, to be guilty of wire fraud, he must have intended to 'deceive and cheat'" his company. *Id.* In essence, his contention was that his "alleged belief that his withdrawals were simply 'loans' meant that he lacked an intent to cheat,'" and therefore could not be guilty of wire fraud. *Id.* at 1101. However, the trial court denied this request and, siding with the government, "delivered the Ninth Circuit's model jury instruction, which states that wire fraud instead requires only the intent to 'deceive *or* cheat' . . . the victim." *Id.* at 1100 (emphasis in *Miller* opinion, but not underlying briefing). Mr. Miller was ultimately convicted by the jury on all counts. *Id.*

He appealed his conviction, arguing that "the jury charge misstated the law by instructing that wire fraud under 18 U.S.C. § 1343 requires the intent to 'deceive *or* cheat' rather than the intent to 'deceive *and* cheat.'" *Id.* at 1098 (emphasis in original). The Ninth Circuit agreed and concluded that "the charge was erroneous." *Id.* It noted that, as other circuit courts have previously concluded, "the crime of wire fraud requires the specific intent to utilize deception to deprive the victim of money or property, *i.e.*, to cheat the victim." *Id.* at 1099. The court explained:

> [T]he wire fraud statute, in plain and simple language, criminalizes the use of interstate wires to further, not mere deception, but a scheme or artifice to defraud or obtain money or property, *i.e.*, in every day parlance, to cheat someone out of something valuable. It follows that to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions. In other words, a defendant must intend to deceive *and* cheat.

*Id.* at 1101.

Although the Ninth Circuit had previously upheld the contested instruction on several occasions, the court concluded that "the 'deceive or cheat' language in [the Ninth Circuit's] model jury instruction on wire fraud" is "no longer tenable in light of the Supreme Court's intervening ruling in *Shaw v. United States*, ——— U.S. ———, 137 S. Ct. 462, 196 L.Ed.2d 373 (2016)." *Id.* at 1102 (citing Manual of Modern Criminal Jury Instructions for the District Courts of the Ninth Circuit § 8.124 (2019)). The Ninth Circuit noted:

8

> In *Shaw*, the Supreme Court considered a jury instruction defining "scheme to defraud" for the purpose of the bank fraud statute as "any deliberate plan of action or course of conduct by which someone intends to deceive, cheat, or deprive a financial institution of something of value." The Court cast serious doubt on the accuracy of this instruction on the ground that "the scheme must be one to deceive the bank and deprive it of something of value."

*Id.* (internal citations omitted). While acknowledging that the language of the instruction at issue in *Shaw* was "not identical" to the Ninth Circuit's wire fraud instruction, it nonetheless relied on *Shaw* to "overrule our prior cases on this question and hold that wire fraud requires the intent to deceive *and* cheat — in other words, to deprive the victim of money or property by means of deception." *Id.* at 1103. Accordingly, the proper instruction for wire fraud now requires intent to "deceive *and* cheat" rather than intent to "deceive *or* cheat."

Despite this conclusion, the Ninth Circuit found the error to be harmless in Mr. Miller's case. *Id.* It found two reasons why the jury would have convicted Mr. Miller, even if it had been properly instructed. *Id.* First, "[Mr.] Miller's primary defense — that he was not guilty of wire fraud because he intended to pay back the funds he deceptively obtained from [his company] — is not a defense at all." *Id.* Indeed, the Ninth Circuit has made clear that "[i]f you embezzle from your employer you are not excused just because you had an honest intention of replacing the money, maybe with interest." *United States v. Treadwell*, 593 F.3d 990, 998 (9th Cir. 2010) (quoting with approval *United States v. Hamilton*, 499 F.3d 734, 736 (7th Cir. 2007)). Second, the court noted that Mr. Miller's other defense—that "he believed the funds to be bona fide loans that he was fully authorized to issue to himself, albeit by means of the deceptive ledger entries"— raised the possibility that Mr. Miller "while intending to deceive, did not intend to cheat." *Miller*, 953 F.3d at 1103. However, the court looked to other jury instructions that had been given at Mr. Miller's trial and concluded that there was "no way" the jury would have reached that conclusion. *Id.* It explained:

> Most importantly, the district court's instruction on the "scheme to defraud" element of the wire fraud counts told the jury that it must find that Miller "knowingly engaged in a scheme or plan to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises." If the jury had believed that there was any inconsistency between this language and the subsequent language about "deceive or cheat," they undoubtedly

1    would have sought further instruction, which they did not.

2    *Id.*

3        In Mr. Gerrans's case, the parties submitted an agreed-upon instruction for wire fraud that

4    was a slightly modified, but essentially similar, version of Model Jury Instruction 8.124 (the

5    instruction used in *Miller*).  *See* Docket No. 109.  Critically, the joint submission of Mr. Gerrans

6    and the government included the language challenged in *Miller*: "Third, the defendant acted with

7    the intent to defraud, that is, the intent to deceive or cheat."  *Id.*  The parties' submission was

8    modified by the Court only to include discussion of what may constitute a "wiring."  *See* Docket

9    Nos. 117, 137 (including the language "Within the context of wire fraud, the use of the internet,

10   fax, telephone or radio may constitute the use of a 'wire.'").  While defense counsel did not object

11   to the instruction—and, as noted above, affirmatively agreed to the language now being

12   challenged, *see* Docket No. 109—as Mr. Gerrans points out: "[a] plain error that affects

13   substantial rights may be considered even though it was not brought to the court's attention."

14   JNOV Mot. at 3 (citing Fed. R. Crim. P. 52(b)).[1]

15       Defendant's reliance on *Miller* is misplaced.  As in *Miller*, the jury here found that the

16   defendant did "deceive" and "cheat."  In *Miller*, the Ninth Circuit relied on "other language in the

17   jury instructions" to conclude that "there [wa]s no way" the jury might have concluded that Miller

18   "while intending to deceive, did not intend to cheat."  *Miller*, 953 F.3d at 1095.  Specifically, the

19   jury was instructed that it must find that Miller "knowingly engaged in a scheme or plan to

20   *defraud or obtain money or property* by means of false or fraudulent pretenses, representations, or

21   promises."  *Id.* (emphasis added).  The Ninth Circuit concluded that "[i]f the jury had believed that

22   there was any inconsistency between this language and the subsequent language about 'deceive or

23   cheat,' they undoubtedly would have sought further instruction, which they did not."  *Id.*  As in

24   *Miller*, the wire fraud instruction given by this Court contained the following statement: "First, the

25

26   ───────────────

27   [1] The Advisory Committee notes to Rule 52 say: "On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."  However, it does not mention a Rule 29 motion.  Nonetheless, there is no reason why the same principle would not apply.

28

United States District Court
Northern District of California

defendant knowingly participated in, devised, or intended to devise a scheme or plan to *defraud*, or a scheme or plan for *obtaining money or property* by means of false or fraudulent pretenses, representations, or promises, or omitted facts." *See* Docket No. 137 at 15 (emphasis added). The instructions in the instant case are effectively identical, and, as in *Miller*, the jury's guilty verdict (which encompassed a finding in the government's favor as to this fact) establishes a finding that Mr. Gerrans cheated Sanovas.

The trial evidence makes that finding abundantly clear. *Miller* defines the meaning of the word "cheat" — "the crime of wire fraud requires the specific intent to utilize deception to deprive the victim of money or property, *i.e.*, to cheat the victim." *Miller*, 953 F.3d at 1099 (joining with what "other circuit courts have long held"); *see also id.* at 1101 ("[T]o be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions. In other words, a defendant must intend to deceive *and* cheat."); *id.* at 1103 (holding that "wire fraud requires the intent to deceive *and* cheat — in other words, to deprive the victim of money or property by means of deception"). As the government aptly puts it: "The uncontroverted evidence of the convoluted manner in which [Mr. Gerrans] transferred the money he took, and the steps he took to lie and cover . . . up the transfers, are evidence that proves he acted with an intent to defraud" when he took money from Sanovas. JNOV Opp. at 10. By way of example, the evidence of Mr. Gerrans's cheating included, *inter alia*: "his efforts to have the newly-constituted board of directors approve, or appear to approve, the huge payouts that Gerrans needed and had already stolen to purchase the house at 28 Greensburgh [Lane]," the "false statements [he made] to the board, both verbally and in the documents he gave them" in furtherance of that goal, including statements related to his contention that "he had used the IRA money for the company, and therefore was entitled to be repaid that amount including the tax penalties he had paid," his "omi[ssion to the board] that he had taken $2.6 million from Sanovas in the weeks prior" to the board meeting, Mr. Gerrans's preparation of false Halo invoices, his "[mis]use of the Sanovas American Express card" to pay for personal purchases and tax obligations, and the fact that many of these expenditures were later recorded in company books as "Materials and Supplies," "Payroll

United States District Court
Northern District of California

11

taxes," and "Accounts Payable," rather than compensation for Mr. Gerrans. *Id.* at 10–12; *see also* Omnibus Opp. at 14–15. In light of the abundant evidence of cheating put forward at trial—taking the money for personal use—a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Alarcon–Simi*, 300 F.3d at 1176. The jury here so found.

At the hearing on the pending motions, Defense counsel argued that there can be no intent to cheat—to "deprive a victim of money or property"—where the Defendant is owed the property taken. Mr. Gerrans tries to distinguish *Miller* on the grounds that Mr. Miller was not owed the money he purported to borrow from his company, whereas Mr. Gerrans contends that the money he took was money owed to him. *See, e.g.*, Reply in Support of Motion for Judgment NOV ("JNOV Reply") at 3, Docket No. 255 (clarifying that Mr. Gerrans's "entire argument as to Counts 1-6 is that the government failed to prove that Larry Gerrans cheated Sanovas out of money, in other words that he took money to which he was not entitled"). But Mr. Miller did argue he had intended to repay the entire loan amount and that he had the authority to loan himself the money; the court rejected his defense. Notably, Mr. Gerrans has pointed to no case in which a court has recognized a defense to a charge of fraud, theft, or embezzlement on the ground that the defendant was owed the money or property. Such an argument flies in the face of the legal system's longstanding refusal to allow persons to resort to extrajudicial self-help (particularly by violating criminal laws) rather than availing oneself of proper legal remedies. To be clear, Mr. Gerrans's now-asserted defense to wire fraud—that he was in fact owed the money he took—is rejected.

2.    Counts 7–9

Counts 7 to 9 pertain to false statements that Mr. Gerrans allegedly made to the FBI in June and September of 2017. *See* Docket No. 57. Mr. Gerrans seeks acquittal on these counts on the grounds that "the government did not prove beyond a reasonable doubt that the statements to the FBI were false or that they were material" and that the statements at issue were not within the jurisdiction of the executive branch. JNOV Mot. at 10–14. The government's position is summarized as follows:

> Gerrans was convicted of three separate false statements contained

1  |  in documents he provided to the FBI after he was asked during a
voluntary interview on June 5, 2017 about the large transfers to

2  |  himself, Halo Management, and Hartford Legend Capital in early
2015. The evidence at trial proved that those invoices (Counts 7 and

3  |  8) did not accurately reflect work done or money owned to Halo by
Sanovas, and that therefore these were false documents. The

4  |  evidence also showed that Hartford Legend Capital was a shell
corporation created to be a conduit for the money used to purchase

5  |  the house, and that [t]he purported "promissory note" (Count 9) he
provided to the FBI was false.

6  JNOV Opp. at 14.

7  As to the element of falsity, at trial, the "[t]he government alleged that Mr. Gerrans made

8  false statements to the FBI concerning false invoices from Halo Management Group to Mr.

9  Gerrans and his wife for the time period January through March 2010." JNOV Mot. at 11. The

10  government's contention was that the invoices had been "ginned up to try and falsely document

11  work that [Mr. Gerrans] and his wife did not do, but which they were claiming they did. And then

12  fake Hartford promissory note, that was made up out of whole cloth. So those are the false

13  statement counts, Counts 7, 8 and 9." *See* Jan. 29 Transcript at 4 (Ms. Harris's closing argument).

14  To support the contention that these invoices were false, the government argued that the Gerranses

15  had indicated they had no income during the relevant time period at a bankruptcy proceeding (at

16  which they were under oath) in April 2010. JNOV Mot. at 11. However, Mr. Gerrans now argues

17  that the statements made during the bankruptcy proceedings do not indicate that the Halo invoices

18  were false statements because during the bankruptcy proceeding Mr. and Mrs. Gerrans did not

19  know "that they would be able to obtain deferred compensation for the work they were doing

20  during that time to bring Sanovas to fruition." *Id.* Accordingly, "the statements made by Mr.

21  Gerrans in the bankruptcy proceeding were not inconsistent with the invoices. Nor would there

22  have been anything inappropriate about preparing the invoices after the fact." *Id.* at 11–12. Mr.

23  Gerrans also contends that the government failed to "prove beyond a reasonable doubt that the

24  'Secured Promissory Note' from Mr. Gerrans and his wife to Hartford Legend Capital was a false

25  statement." *Id.* at 12. This is because the entity "did exist" and was legally separate from the

26  Gerranses; the fact that the government argues it was not a bank and was "created to hide the flow

27  of money . . . does not mean that the loan itself did not exist." *Id.*

28  In response, the government highlights the following evidence, which was presented at

United States District Court
Northern District of California

13

1    trial and which supports the element of falsity:

2         • At the time of the April 2010 bankruptcy proceeding, Shelly Gerrans testified that

3            she was a full-time homemaker and that she had not worked for the past 10 years.

4         • Mr. Gerrans instructed Chris Gerrans to create the Halo invoices four to five years

5            after the work was allegedly completed, but to date them from 2010.

6         • The fact that the "loan" from Hartford Legend was not recorded on the title of the

7            Greensburgh Lane property, despite the fact that the property purportedly secured

8            the loan from Hartford Legend.

9         • The fact Mr. Gerrans "told the FBI that Hartford was a company that [Mr.] Gerrans

10           started before Sanovas" and that he funded it "with a $550,000 from [his]

11           retirement account," despite the fact that the funds transferred to Hartford were not

12           from Mr. Gerrans's retirement account, but were from Sanovas.

13        • The fact that when the Gerranses applied for and received a $750,000 cash-out loan

14           from Chase, they were required to disclose any liabilities or encumbrances against

15           the Greensburgh Lane property—whether recorded or not—but they did not

16           indicate that there were any loans or encumbrances against the property, despite the

17           fact that "[i]f the promise to repay documented in the Hartford note were

18           legitimate, and i[f] the loan was really 'secured by that certain real property at 28

19           Greensburgh Lane,' this fact would have been stated by [Mr.] Gerrans on the loan

20           forms."

21   *See* JNOV Opp. at 15–16.  Even accepting Mr. Gerrans's argument that he and Shelly Gerrans did

22   not disclose the Hartford loan on their loan application with Chase "because the Gerrans

23   controlled Hartford Legend and would and could not foreclose on the basis of that note," JNOV

24   Reply at 9, there was still more than sufficient evidence to conclude that a "rational trier of fact

25   could have found the essential elements of the crime [here, falsity] beyond a reasonable doubt.'"

26   *Alarcon–Simi*, 300 F.3d at 1176.  This is particularly true in light of the fact that the evidence

27   presented at trial "must be taken in the light most favorable to the verdict."  *United States v.*

28   *Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969).

United States District Court
Northern District of California

1     With respect to the element of materiality, Mr. Gerrans argues that the false statement in

2     this case "did not materially affect the investigation the government would otherwise have done."

3     JNOV Mot. at 13.  This was because "[t]he government was investigating everything having to do

4     with Larry Gerrans' financial relationship to Sanovas, and Mr. Gerrans' provision of these

5     documents to FBI Agent Richard did not alter a single thing he did."  *Id.*  The parties agree that

6     the standard for materiality "is whether the statement 'has a natural tendency to influence, or was

7     capable of influencing, the decision of the decisionmaking body to which it was addressed.'"

8     *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (quoting *Kungys v. United States*,

9     485 U.S. 759, 770 (1988)); *see* JNOV Mot. at 12; JNOV Opp. at 17.  They also agree that the FBI

10    took various actions as a result of the false statements.  *See* JNOV Reply. at 10; JNOV Opp. at 17.

11    As explained by the government, as a result of the false statements, the FBI acquired the 2010

12    bankruptcy hearing transcript, "took steps to determine whether Halo and Hartford were legitimate

13    business entities or just shell companies used by Gerrans," "reviewed available tax records for

14    these entities, as well as tax records of Gerrans individually," interviewed and obtained witness

15    statements, and obtained bank statements.  JNOV Opp. at 17–18.  In light of this evidence, the

16    government argues that the false statements were not only *capable* of influencing the FBI's

17    activities, but that they *actually* did influence the FBI's activities.  *Id.* at 17.  Mr. Gerrans argues

18    that this "interpretation of materiality would mean that literally any piece of evidence that the

19    government investigates is material," and that there is a difference between influencing an

20    *investigation* and influencing an agency action or decision.  JNOV Reply at 10.

21         The Ninth Circuit has found that a statement may be material when it affects the "decision-

22    making process."  *United States v. McKenna*, 327 F.3d 830, 840 (9th Cir. 2003); *see also*

23    *Weinstock v. United States*, 231 F.2d 699, 703 (D.C. Cir. 1956) (noting that, to be material, a

24    statement "must have some weight in the process of reaching a decision"); *see also United States*

25    *v. Bonds*, 784 F.3d 582, 585 (9th Cir. 2015) (Kozinski, J., concurring) ("Put another way, the

26    government must prove beyond a reasonable doubt that the charged conduct was capable of

27    influencing a decisionmaking person or entity—for example, by causing it to cease its

28    investigation, pursue different avenues of inquiry or reach a different outcome.").  In other words,

United States District Court
Northern District of California

15

a false statement is material when it "would tend to influence, *inter alia*, the course of the government's investigation." *United States v. Grant*, No. 18-CR-00391-EMC-1, 2020 WL 870948, at *1 (N.D. Cal. Feb. 21, 2020); *see also, e.g.*, *United States v. Safavian*, 649 F.3d 688, 691–92 (D.C. Cir. 2011) ("[S]o long as [the defendant's] false statements were capable of influencing the course of the FBI's investigation . . . those statements were material within the meaning of § 1001(a)(1)."); *cf. United States v. Mitchell*, 388 F.3d 1139, 1143 (8th Cir. 2004) (rejecting the argument that the statement in question was not material because the government would have investigated the implicated person anyway and stating that "[t]he test is not whether the false statement was the determinative factor in an INS decision, but rather, whether the statement had a natural tendency to influence the INS").

Here, the false statements that Mr. Gerrans presented to the FBI were "capable of influencing[] the decision of the decisionmaking body to which it was addressed," because— taking the counterfactual as an example—if they had shown that Halo had been legitimately accumulating invoices to send to Sanovas, such documents could have convinced the FBI to stop its investigation. The fact that they bolstered the Agency's conclusion that the investigation should proceed (as opposed to persuading it that the investigation should cease) does not make the statements immaterial. Moreover, the statements at issue were not only *capable of influencing* the FBI's investigation, they *did* influence the FBI's investigation. As FBI Special Agent Jason Richards explained, as a result of the false documents and representations by Mr. Gerrans, the FBI had to investigate the legitimacy of the Halo invoices, examine the flow of money between various entities connected to Mr. Gerrans, investigate the legitimacy of Hartford as a business enterprise, and review Hartford's tax records. *See* Transcript of January 21, 2020 Proceedings (Testimony of Jason Richards on Direct Examination) at 78–80, Docket No. 219. Accordingly, as with the element of falsity, it is clear that a rational jury could have concluded that the essential elements of the crime (here, materiality) were proven beyond a reasonable doubt. *Alarcon–Simi*, 300 F.3d at 1176. Again, this is especially true in light of the fact that the evidence presented at trial "must be taken in the light most favorable to the verdict." *Nelson*, 419 F.2d at 1241.

Finally, Mr. Gerrans argues that the statements at issue in Counts 7 and 8 were not within

16

United States District Court
Northern District of California

1  the jurisdiction of the Executive Branch.  JNOV Mot. at 14.  Specifically, he contends that "the

2  subject matter about which Agent Richards questioned Mr. Gerrans (in 2017) was whether he and

3  his wife had been entitled to receive income in 2010," but—because the statute of limitations for

4  wire fraud is five years—the government would have been unable to prosecute Mr. Gerrans for

5  conduct that took place in 2010.  *Id.*  He argues that the fact that he produced the invoices related

6  to the income he purportedly received in 2010 in 2017 "does not bring their subject matter within

7  the statute of limitations."  *Id.*  In response, the government argues:

> [T]he false Halo invoices were given to the FBI by the defendant in
> June of 2017, and were provided by Gerrans to purportedly explain
> transfers of Sanovas money in 2015.  The jury found that the
> documents were false, and were material to the FBI's investigation.
> The date on the purportedly false document is irrelevant to the
> question of whether the statement was made on a matter in the
> "jurisdiction" of the executive branch.  The FBI had an open and
> active investigation regarding Sanovas, and the defendant has not
> argued that there was anything improper about the FBI opening such
> an investigation.  When Gerrans provided these false invoices to the
> FBI in 2017, that action was in connection with the valid and active
> investigation, and therefore the false documents were
> unquestionably within the valid jurisdiction of the FBI.

15  JNOV Opp. at 19.  Put differently, Mr. Gerrans's production of false documents occurred in 2017,

16  although those documents implicated both testimony that was given and events that took place in

17  2010; thus, when Agent Richards questioned Mr. Gerrans in 2017, his questions about what

18  transpired in 2010 were not intended to investigate a basis for wire fraud charges arising from

19  actions taken in 2010 (for which the five year statute of limitations would have already run).

20  Instead, those questions were intended to determine whether the documents produced to the FBI in

21  2017 were false, and potentially to investigate evidence relevant to charges arising from Mr.

22  Gerrans's activities in later years.  This type of questioning is permissible, as an "overall scheme

23  can exist for many years prior to the actual execution of the scheme through a mailing or wiring

24  making up the unit of prosecution."  *Id.* at 20 (citing *United States v. Pharis*, 298 F.3d 228, 234

25  n.3 (3d Cir. 2002) (noting that "mailings that fall outside the statute of limitations can be

26  considered as evidence to prove later fraud that was within the statute of limitations")).  To

27  suggest that the limitations period is to be determined by the date the defendant ascribed to false

28  documents would perversely allow a suspect to take advantage of his falsities.

United States District Court
Northern District of California

3.      Counts 10–12

Mr. Gerrans's argument as to Counts 10–12, related to contempt, witness tampering, and obstruction of justice, merely reasserts "the reasons stated in the oral motion of prior counsel after the government rested its case" and "moves for an acquittal on those counts." JNOV Mot. at 15. At trial, defense counsel asserted that "there has to be something more than the kind of skirmish [between brothers] that the Court witnessed to suffice for adequate evidence to go to the jury on Count 10." *See* Transcript of January 22, 2020 Proceedings ("Jan. 22 Transcript") at 161–62, Docket No. 179. As to Count 11, defense counsel argued that "the Rule 29 argument . . . is that given the nature of the relationship -- that these were two brothers, that they had been together 40, 45 years, that there were ongoing family relationships -- the tension and discord that I would say naturally flows from a situation when one brother is going to testify against another makes the conduct that the Court has heard insufficient to go to the jury." *Id.* at 162. Finally, as to Count 12, defense counsel argued, "It -- without being repetitious, hopefully, as to my Count 11 argument, I will just say that the friction that occurred between the Gerrans, the history of their relationship, and the totality of the circumstances surrounding the facts of this case create an image that is insufficient to go to the jury on that count." *Id.* at 163.

As the government notes, Mr. Gerrans "offers no new argument or justification for judgment on those counts," and it argues that the "evidence proving these counts was straightforward and compelling, and is sufficient for a reasonable jury to have reached a verdict against the defendant." JNOV Opp. at 21. Specifically, the government argues that the trial evidence showed that "on numerous occasions" after his indictment, Mr. Gerrans met with his brother, Chris Gerrans, "usually in person, and that he discussed the criminal case and both intimidated and retaliated against Chris Gerrans for testifying in the grand jury." *Id.*; *see also* Transcript of January 15, 2020 ("Jan. 15 Transcript") at 116, 129, 138–39, Docket No. 129. It highlights the following evidence that was presented at trial:

- Testimony from Chris Gerrans indicating that he called Mr. Gerrans after learning of his indictment, and Mr. Gerrans said to him: "What the fuck?" and "I told you to take the Fifth." Chris Gerrans added that Mr. Gerrans "essentially was blaming

[Chris] for [Mr. Gerrans's] indictment." *Id.* (citing Jan. 15 Transcript at 116).

- Testimony from Chris Gerrans indicating that his brother gave him a burner or "throw-away" phone and instructions for communicating in code about the case (at trial, the government also produced the physical phone as evidence, together with the Post-It note that had the number of Mr. Gerrans's burner phone). *Id.* at 21–22 (citing Transcript of January 15, 2020 at 120); *see also* Transcript of January 15, 2020 proceeding at 120–22.

- Testimony from Chris Gerrans describing how Mr. Gerrans enlisted their father to relay messages to Chris Gerrans about the trial. *Id.* at 22 (citing Transcript of January 15, 2020 at 133–36). The message sought to be conveyed to Chris Gerrans through his father encouraged Chris Gerrans, *inter alia*, to delay his plea (and hence his cooperation) until after Defendant's trial.

- Testimony from both Chris Gerrans and Ryan Swisher about an altercation that took place between Mr. Gerrans and Chris at a San Rafael storage facility. *Id.* at 21–22 (citing Transcript of January 15, 2020 at 147; Transcript of January 21, 2020 at 22–23).

In reply, Mr. Gerrans argues, as to the contempt charge: (1) the burner phone was irrelevant since it was never used, (2) the note written by Art Gerrans, Sr., is irrelevant because no evidence suggests that Mr. Gerrans told his father to write it and/or show it to Chris Gerrans, (3) Chris Gerrans concedes that he started at least one of the conversations between himself and Mr. Gerrans, and there was no harm in Mr. Gerrans expressing his opinions about the idea that Chris should have invoked his Fifth Amended right and/or that Lawrence Gerrans was innocent. JNOV Reply at 14–15. However, even if (1) the burner phone was never used, (2) Mr. Gerrans did not direct his dad to show the note Art Gerrans, Sr., wrote to Chris (there was direct and credible testimony to the contrary), and (3) Chris Gerrans conceded that he "he started at least one" of the "numerous" conversations between him and Mr. Gerrans, there was still sufficient evidence— through Chris Gerrans's testimony, Ryan Swisher's testimony, and the physical production of the burner phone and Post-It note—for a rational jury to conclude that the essential elements of these

United States District Court
Northern District of California

1  charges had been proven beyond a reasonable doubt.  For example, Ryan Swisher, a disinterested

2  employee at the storage facility, testified: "Of the things I did hear [in the argument between Mr.

3  Gerrans and Chris Gerrans], one of which was that Larry was saying that the indictment was

4  bullshit.  And the second thing that I heard was that he felt that Chris had sold him up the river."

5  *See* Jan. 21 Transcript (Testimony of Ryan Swisher) at 8, Docket No. 139.  On this subject, Chris

6  Gerrans testified:

> [Mr. Gerrans] was screaming and yelling at me for cooperating with
> the -- with the subpoenas, and providing information.  He told me I
> was selling him out.  And he was telling me that he's going to get
> this company back.  He told me he wanted me to resign immediately
> from the company.  It's his company.  And when he gets his case
> dismissed and when he gets the company back, he's coming after
> me; he's going to take everything

11  Jan. 15 Transcript (Testimony of Chris Gerrans) at 146, Docket No. 129.  Taken together, this

12  testimony provides just one example of the strong, credible evidence that supported Mr. Gerrans's

13  convictions on Counts 10–12.

14  C.    Conclusion as to Motion for Judgment NOV

15         For the foregoing reasons, the Court **DENIES** the Motion for Judgment NOV on all

16  counts.

## V.    MOTION FOR NEW TRIAL

18  A.    Legal Standard

19         Under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant

20  a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "A district court's power

21  to grant a motion for a new trial is much broader than its power to grant a motion for judgment of

22  acquittal. . . . "  *United States v. Inzunza*, 638 F.3d 1006, 1026 (9th Cir. 2009) (quoting *United

23  States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992)).  Accordingly, a district court "'need not

24  view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so

25  doing evaluate for itself the credibility of the witnesses.'"  *United States v. Kellington*, 217 F.3d

26  1084, 1095 (9th Cir. 2000) (quoting *Alston*, 974 F.2d at 1211).

27  B.    Analysis

28         Mr. Gerrans's Motion for a New Trial is based on various allegations that his trial counsel

20

provided ineffective assistance of counsel ("IAC").  *See generally* MNT.[2]  He generally alleges that trial counsel failed to investigate key evidence, prevented Mr. Gerrans from testifying in his own defense, failed to request a key jury instruction, and failed to object to allegedly improper argument by the government.  *Id.*

1. Procedural Propriety

The government contends that Mr. Gerrans's IAC claims should be deferred to collateral proceedings because they cannot be evaluated on the record current before the Court.  Omnibus Opp. at 24–25.  In support of that contention, the government cites *United States v. Steele*, 733 F.3d 894 (9th Cir. 2013), which states that IAC claims "are 'generally inappropriate on direct appeal' and should be raised instead in habeas corpus proceedings."  733 F.3d at 897 (quoting *United States v. Ross*, 206 F.3d 896, 900 (9th Cir. 2000)); *see also United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984) ("[T]he customary procedure in this Circuit for challenging the effectiveness of defense counsel in a federal criminal trial is by collateral attack on the conviction under 28 U.S.C. § 2255.").  However, *Steele* also advised that the decision as to how to proceed belongs to the district court:

> We adopt the rule in *Brown* that "when a claim of ineffective assistance of counsel is first raised in the district court prior to the judgment of conviction, the district court may, and at times should, consider the claim at that point in the proceeding."  *Id.*  This decision is best left to the discretion of the district court.  *See United States v. Miskinis*, 966 F.2d 1263, 1269 (9th Cir. 1992) (remarking in context of appellate review that "the decision to defer resolution of an ineffective assistance of counsel claim is a discretionary one and depends upon the contents of the record").

> Requiring a defendant to wait for post-conviction relief has several consequences, including that a defendant may serve months in prison waiting for post-conviction arguments to be heard.  Lengthy delays necessarily entail concomitant weakening of memories and aging of evidence.

*Steele*, 733 F.3d at 897.  *Steele* recognized that "district courts face competing considerations" in deciding whether to adjudicate or defer IAC claims, and that such decisions will be informed by considerations such as: the need to relieve a defendant's attorney and appoint new counsel, the

---

[2] The Motion for New Trial at Docket No. 240-1 is an amended motion, which replaces the Motion for New Trial filed at Docket No. 234.  The citations in this order at to Docket No. 240-1.

existence of evidence in the record, and "the scope of the evidentiary hearing that would be required to fully decide the claim." *Id.* at 898. In addition, the Ninth Circuit noted that the defendant in *Steele* alleged "seven different 'possible sources'" of IAC and therefore the district court was "well within its discretion" to conclude that such a "broad-based" Rule 33 motion lacked the record necessary to adequately consider the defendant's allegations. *Id.* at 898, 899.

Although there are very few cases within the Ninth Circuit in which the district court has granted a Rule 33 motion on the basis of IAC, *see, e.g.*, *United States v. Jensen*, No. CR-08-054-JLQ, 2010 WL 3809988, at *10 (E.D. Wash. Sept. 27, 2010), courts have noted that advancing IAC claims through Rule 33 motions is "procedurally permissible." *United States v. Harkonen*, No. 08-CR-00164-RS-1, 2015 WL 4999698, at *7 (N.D. Cal. Aug. 21, 2015), *aff'd,* 705 F. App'x 606 (9th Cir. 2017) (noting wariness of analyzing such claims on direct motion but also stating that such a motion is "procedurally permissible"). As the court explained in *United States v. Munoz*, 605 F.3d 359 (6th Cir. 2010): "While we have certainly stated that, as a general matter, ineffective-assistance claims are best raised on habeas, this is only because in the mine run of cases, the record of trial counsel's allegedly deficient performance is not fully developed before that point. By contrast, we have not hesitated to consider ineffective-assistance claims outside the habeas context (most often, on direct appeal) if the parties have adequately developed the record. In cases like this one, where the district court has conducted an evidentiary hearing on the ineffective-assistance claim, deferring that claim until collateral review would serve no purpose." 605 F.3d at 374 n.10 (internal citations and quotation marks omitted).

Here, as discussed in greater detail below, Mr. Gerrans's IAC allegations assert that trial counsel failed to investigate key evidence, prevented Mr. Gerrans from testifying in his own defense, failed to request a key jury instruction, and failed to object to allegedly improper argument by the government. *See generally* MNT. The broad sweep of these allegations brings Mr. Gerrans's motion under the rubric of "broad-based" IAC motions that *Steele* identified as inappropriate for challenges under Rule 33. In this vein, the government contends that the decisions that Mr. Gerrans challenges "fall within the very heart of the kinds of decisions not liable to second-guessing on a bare record" and that "[t]he record currently contains little basis to

22

evaluate whether Gerrans' prior counsel's complained-of decisions were strategic or inadvertent, or otherwise within the wide range of acceptable professional assistance." Omnibus Opp. at 25. Notably, the motion is short on declarations as to what key witnesses, including trial counsel Mr. Getz, would actually testify to if called. The Rule 33 motion is based largely on representations and supposition.

Nonetheless, Mr. Gerrans contends that the record before the court is adequate to address his IAC claims. *See* Defendant's Reply in Support of Motion for New Trial ("MNT Reply") at 7, Docket No. 252 (citing *Massaro v. United States*, 538 U.S. 500, 508 (2003) ("There may be cases in which trial counsel's ineffectiveness is so apparent from the record that appellate counsel will consider it advisable to raise the issue on direct appeal."); *see also United States v. Kimball*, No. 15CR0902-JLS, 2016 WL 4705436, at *2 (S.D. Cal. Sept. 8, 2016), *aff'd,* 715 F. App'x 716 (9th Cir. 2018) ("The Court maintains its belief that it is in a better position to determine the issues now, while the trial is fresh in the Court's memory and Defendant has the assistance of counsel, than to delay any inquiry into Defendant's ineffective assistance of counsel claim until a Section 2255 motion is filed."). When asked at the hearing whether he sought an evidentiary hearing, Mr. Gerrans declined. Nor has he provided anything in the way of a proffer showing what he might be able to demonstrate in a new trial.

Because Mr. Gerrans contends that the record before the court is adequate to address his IAC claims and asks the Court to adjudicate those claims, *see* MNT Reply at 7 (he also indicated as much as the hearing on July 15, 2020), and because the basis of the Court's ruling below can be made on the current record, the Court will address the merits.

2.     <u>Legal Standard for IAC</u>

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), established the standard for demonstrating constitutionally ineffective assistance of counsel. Under *Strickland*, the petitioner must show that (1) "the counsel's performance was deficient," *i.e.*, that it "fell below an objective standard of reasonableness under prevailing professional norms"; and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id*. at 687–88.

The "deficient performance" prong requires a defendant to demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' as guaranteed by the Sixth Amendment." *Id.* In evaluating a counsel's performance, there is "a strong presumption that the counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotation marks omitted). Under the "prejudice" prong, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### 3. The Merits of the IAC Claim

Mr. Gerrans frames the issue of IAC as follows: "The central theme of Mr. Gerrans' defense was that any money Mr. Gerrans took money from Sanovas was taken under the good faith belief that he was entitled to the entire amount as compensation. . . . However, trial counsel failed to develop the evidence needed to show that Mr. Gerrans lacked the requisite intent." MNT at 1. Put differently, Mr. Gerrans alleges that, although the Court gave an instruction on good faith (which permitted the jury to consider whether Mr. Gerrans "had an honest, good faith belief in the truth of the specific misrepresentations" alleged), "the jury did not hear adequate evidence or testimony to find that Mr. Gerrans" had acted in good faith. *Id.* at 1–2. As noted above, Mr. Gerrans contends that—had defense counsel investigated key evidence, prepared Mr. Gerrans to testify in his own defense, requested a key jury instruction, and objected to allegedly improper government argument—he would have been able to show that he had a "good faith belief that he was entitled to the entire amount [he took from Sanovas] as compensation." *Id.* at 1.

However, as discussed in the context of Mr. Gerrans's Motion for Judgment NOV, Mr. Gerrans's theory that entitlement to the money was a defense is wrong; it is not a legally viable defense. Good faith belief in the truth of his statements is one thing; good faith belief in entitlement to the money taken though knowing fraud and deception is another. The alleged failure of his trial counsel to develop evidence in support of a non-defense cannot constitute

24

"ineffective assistance" under *Strickland*. *See, e.g.*, *Butcher v. Marquez*, 758 F.2d 373, 376 (9th Cir. 1985) (no ineffective assistance where counsel's strategic decision not to pursue a particular strategy "would have been fruitless or even harmful" to the client).

Even if Mr. Gerrans's theory was a viable one, there is reason to believe that counsel made reasonable strategic decisions in determining how to proceed at trial. For one thing, for many of the witnesses discussed by Mr. Gerrans as people who should have been called to testify at trial, it is obvious from the record that their testimony could have come at a great cost to his case. For example, Mr. Gerrans contends that Art Gerrans, Jr., could have provided testimony that would have "undermined the government's theory that Larry Gerrans fraudulently created the invoices to justify taking the money to purchase the Greensburg[h] Lane home when it tied, as Art Gerrans would have explained, to cleaning up larger accounting issues." MNT Reply at 12. However, the record of his FBI interview makes clear that Art Gerrans, Jr., would have provided very mixed testimony, had he been called. *See* Exh. 22 to Docket No. 235-1 (FBI Interview Record – Art Gerrans, Jr.) (describing Mr. Gerrans's compensation as "disgusting," noting that Mr. Gerrans never said Halo was doing work for Sanovas, he never saw Shelly Gerrans working for Sanovas, and noting that Mr. Gerrans once attacked him with a baseball bat while at Sanovas). Thus, it seems highly likely that such a decision was a reasonable, strategic calculation by counsel, rather than ineffective assistance. In addition, the record also strongly suggests that trial counsel made a strategic decision to not call Gray Krausz or Ann Hipsham, as they had previously provided declarations in support of Mr. Gerrans's Motion to Dismiss, which defense counsel later withdrew prior to its consideration by the Court. *See* Docket No. 51. Among other things, Mr. Krausz's opinion was based on false and fraudulent documents. Thus, defense counsel was certainly aware of the testimony that they would be able to offer and determined that at least some of that testimony to be unhelpful (or even harmful). Rather than suggesting IAC, such decisions would instead appear to suggest strategic decision-making by counsel. *See Wharton v. Chappell*, 765 F.3d 953, 967 (9th Cir. 2014) (quoting *Strickland*, 466 U.S. at 690) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Sexton v. Cozner*, 679 F.3d 1150, 1156 (9th Cir. 2012) (noting that "a strategic

decision" generally "cannot form the basis of a claim for ineffective assistance of counsel").

As to whether trial counsel committed IAC by failing to prepare Mr. Gerrans to testify, Mr. Gerrans concedes that "courts have rarely found ineffective assistance of counsel related to a defendant's right to testify," but he argues that counsel failed to provide him with discovery documents prior to trial, never adequately explained that the decision to testify was Mr. Gerrans's decision alone, and did not prepare him to testify, despite the fact that Mr. Gerrans insisted that he wanted to testify.  MNT at 33.  As the government points out: "Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify."  Omnibus Opp. at 30 (quoting *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)).  The *Joelson* court explained:

> The trial court "'has no duty to advise the defendant of his right to testify, nor is the court required to ensure that an on-the-record waiver has occurred.'"  Rather, if the defendant wants to testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer.  Thus, waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so.

*Joelson*, 7 F.3d at 177.  However, there is no need to infer waiver or presume assent to trial counsel's strategy here because Mr. Gerrans explicitly waived his right to testify during the trial.  The Court engaged in the following colloquy with Mr. Gerrans and his counsel (out of the presence of the jury):

> **THE COURT:**  . . . So in terms of the presentation of defense as we have discussed earlier, maybe you can state for the record what –
>
> **MR. GETZ:**  Yes.  The defense is prepared to rest. I would invite the Court to extract a waiver from Mr. Gerrans of his right to testify. I have discussed this issue with him many times, and I believe he's prepared to waive his right to testify.
>
> **THE COURT:**  All right.  Mr. Gerrans, I just want to make sure that you are aware that you do have the right to testify.  Of course, you have the right not testify, as well, as I instructed the jury.  But I want to make sure that this is a decision you've made; you've consulted with your attorney and have made this decision carefully, and are prepared to waive your right to testify.
>
> **THE DEFENDANT:**  Yes, sir.  Through the fine ways of Mr. Getz, I'm going to waive it.

26

1

**THE COURT:**  All right.  Then we'll note that for the record.

2 Jan. 22 Transcript at 164.  As the government observes, Mr. Gerrans did not appear to have (and

3 he certainly did not express) any reservations about waiving this right; he asked no questions of

4 the Court and made no indication that he had any reservations about the waiver.  *See id.*; *see also*

5 Omnibus Opp. at 31.

6 The Ninth Circuit has rejected claims that someone was denied his or her right to testify

7 when there was no indication at trial that he or she wanted to testify and was prevented from doing

8 so.  *See, e.g.*, *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (rejecting claim that defendant

9 was denied his right to testify because "at no time during the trial did [he] ever indicate that he

10 wanted to testify or that he was prevented from doing so by counsel" and because his attorney

11 "had very good reason" for advising him not to testify); *United States v. Jackson*, 13 F. App'x

12 581, 583 (9th Cir. 2001) ("The district court asked Jackson's attorney at trial, in Jackson's

13 presence, whether the defense was planning to rest.  After consulting with Jackson, his attorney

14 responded that Jackson would rest without putting forth a defense.  At no time did Jackson

15 indicate to the court that he wanted to testify.  Jackson's own statement at sentencing confirms that

16 he was aware of his right to testify, and had acquiesced (albeit reluctantly) in his lawyer's tactical

17 decision that he not take the stand.  We thus conclude that Jackson knowingly and intentionally

18 relinquished his right to testify.").  Even where there is evidence of undue pressure, the Ninth

19 Circuit has declined to find that a defendant's rights were infringed.  *See, e.g. Joelson*, 7 F.3d at

20 177 (noting that it was "inadvisable" for judge to advise defendant to follow his attorney's advice

21 about not testifying, but that the error was "not so egregious that [the defendant's] ability to

22 knowingly and intentionally waive his right to testify was impaired").

23 While Mr. Gerrans now contends that he was deprived of his right to testify because his

24 lawyer failed to inform him properly of this right and/or prepare him to do so (such that he would

25 not have indicated during trial that he wished to do so, and therefore that the abovementioned

26 cases are inapposite), trial counsel represented in Court (with Mr. Gerrans present) that they had

27 discussed the issue "many times," and Mr. Gerrans affirmed to the Court that he had "consulted

28 with [his] attorney and have made th[e] decision carefully."  Jan. 22 Transcript at 164.

1    Accordingly, there is no credible support in the record that Mr. Gerrans had not seriously weighed

2    the possibility of testifying.  Mr. Gerrans failed to establish that trial counsel's performance was

3    deficient on this issue.

4           Finally, Mr. Gerrans also contends that trial counsel committed IAC by failing to object

5    when the government made improper arguments during the trial.  MNT at 35.  While the Ninth

6    Circuit has concluded that failing to object to "improper comments" can constitute ineffective

7    assistance, *see, e.g.*, *Zapata v. Vasquez*, 788 F.3d 1106, 1111 (9th Cir. 2015) ("counsel's failure to

8    insulate the jury from the prosecutor's grossly improper comments constituted ineffective

9    assistance"), the record does not support Mr. Gerrans's contention that the government made

10   improper statements during the trial.

11          First, Mr. Gerrans argues that the government "misstated the terms on which Mr. Gunday

12   separated from the company," which "was of great significance in light of the fact that the

13   government alleged at trial that in Counts 1-3 that Mr. Gerrans was not entitled to the $580,000 he

14   took from the company in March 2015."  MNT at 35; *see also id.* (alleging the government's

15   argument indicated "Mr. Gerrans *was not entitled to his deferred compensation*"[3]).  However, as

16   noted numerous times above, the fact that Mr. Gerrans believed he was entitled to the money that

17   he took from Sanovas does not exonerate him, and therefore his attorney's alleged failure to object

18   to the government's statements as to the terms of Mr. Gunday's separation agreement does not

19   constitute ineffective assistance.

20          Next, Mr. Gerrans highlights the following passages from the government's closing

21

22   _____

23   [3] The Court also notes that, to the extent Mr. Gerrans contends that the money he took from
     Sanovas was money owed to him as deferred compensation, he did not account for that money in
24   his tax returns.  It was only after he was indicted that he filed amended returns accounting for that
     money.  *See, e.g.* Transcript of July 15, 2020 Hearing at 60, Docket No. 277 (**MS. HARRIS (for the
25   government):  "**After Mr. Gerrans was indicted and caught with his hands in the cookie jar, he
     did file amended tax returns.  There was a stipulation between the parties not to introduce those
26   amended post-Indictment tax returns because they were so incriminating.  They basically
     acknowledged the tax fraud that he had committed and the fact that he did not legitimately believe
27   he was entitled to that income.").  Although the parties stipulated not to introduce the amended
     returns at trial, had counsel argued that Mr. Gerrans was entitled to the money as deferred
28   compensation, the Court could well have admitted the tax returns as impeachment.  Thus,
     counsel's failure to advance such an argument was a reasonable strategic choice and does not
     constitute ineffective assistance.

United States District Court
Northern District of California

1    argument:

2         Over the past few weeks you have heard a great deal of testimony
          and you have seen evidence and documents that have proven beyond
3         a reasonable doubt that Larry Gerrans is a liar and a thief.  He stole
          millions of dollars from Sanovas's investors.  These investors had
4         no idea that the money they were investing in what they thought was
          a startup medical device company would actually be used by Larry
5         Gerrans to buy himself a $2.6 million luxury home, a Mercedes
          SUV for his wife and to pay for extravagant personal items that
6         Larry Gerrans charged on Sanovas's American Express card, and
          had Sanovas write the checks for.
7
          You remember, you heard from the bankruptcy trustee.  He and his
8         wife have filed for personal bankruptcy.  They have $4.7 million in
          liability.  He can't even get a car loan, let alone a home loan.  But
9         his desire to buy the house and to live a lifestyle that was far, far
          beyond his means led him to embark on a scheme to loot and steal
10        from Sanovas.

11   MNT at 37 (quoting Jan. 29 Transcript at 38, 41).  He argues (1) that these assertions improperly

12   suggested that Sanovas was "just a slush fund for Mr. Gerrans," (2) that the government

13   impermissibly focused on his character when "the only relevant legal issue was whether Mr.

14   Gerrans was legally entitled to the money, not the government's moral judgment about how he

15   spent his money," and (3) that the reference to his prior bankruptcy was an implicit attack on him.

16   *Id.* at 37–38.

17        First, to the extent that Mr. Gerrans believes the prosecutors suggested that Sanovas was

18   *only* a slush fund for him, that was clearly not what the government contended.  For one thing, the

19   government never doubted the general bona fides of Sanovas and the substance of its business

20   mission.  It elicited testimony and evidence at trial indicating that Sanovas raised between 20 and

21   30 million dollars from investors (*see* Jan. 13 Transcript (Testimony of Mr. Yarborough on Direct

22   Examination) at 14, Docket No. 142).  The government accused Mr. Gerrans of taking only a few

23   million dollars of Sanovas's assets.  The government did not assert the company was *only* a slush

24   fund for him.

25        The government's discussion of the bankruptcy wasn't just to attack Mr. Gerrans, as Mr.

26   Gerrans suggests.  To the contrary, it was to show the financial impossibility (in the absence of the

27   money he took from Sanovas) of his acquisition of some of the things he acquired in the years

28   following the bankruptcy proceeding.

29

1    Finally, to the extent that Mr. Gerrans challenges attacks on his character (*i.e.* calling him a

2    "liar and a thief"), as the government points out, "the prosecution described the defendant

3    consistently with what the evidence showed—that he intentionally made false statements and

4    provided false documents (lying) to steal (thief) from Sanovas."  Omnibus Opp. at 37 (citing

5    *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("The prosecution is permitted to

6    use 'argumentative characterizations . . . during argument.'")).  Thus, trial counsel's failure to

7    object to these various lines of argument by the government did not constitute ineffective

8    assistance of counsel.

9    C.    Conclusion as to Motion for New Trial

10           For the foregoing reasons, the Court **DENIES** the Motion for Judgment NOV on all

11   counts.

12              **VI.        MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT**

13   A.    Legal Standard

14           The bases for Mr. Gerrans's motion to dismiss are the alleged presentation by prosecutors

15   of false and misleading evidence, as well as the false portrayal of evidence in closing argument.

16   On those grounds, Mr. Gerrans seeks reversal of all of his convictions, as well as dismissal of the

17   second superseding indictment and all charges against him.  "To obtain a reversal for prosecutorial

18   misconduct, a defendant must [in addition to establishing such misconduct] demonstrate that he

19   was prejudiced by the misconduct."  *United States v. Hinton*, 31 F.3d 817, 824 (9th Cir. 1994)

20   (citing *United States v. Christophe*, 833 F.2d 1296, 1301 (9th Cir. 1987)).  "Reversal is warranted

21   only if it is more probable than not that the [prosecutorial] misconduct materially affected the

22   verdict."  *Id.* (quoting *Christophe*, 833 F.2d at 1301).  Thus, the Court must evaluate the

23   prosecution's alleged misconduct in the context of the entire trial.  *Id.*  Put differently, the Court

24   must ask whether the government's actions "so infected the trial with unfairness as to make the

25   resulting conviction a denial of due process."  *Hein v. Sullivan*, 601 F.3d 897, 912 (9th Cir. 2010)

26   (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  "A defendant bears the burden of

27   proving prosecutorial misconduct and reversal of a defendant's conviction is warranted only 'if it

28   appears more probable than not that the alleged misconduct affected the jury's verdict.'"  *United*

United States District Court
Northern District of California

30

*States v. Emerson*, 266 F. App'x 695, 696 (9th Cir. 2008) (quoting *United States v. Daychild*, 357 F.3d 1082, 1099 (9th Cir. 2004)).

B.    Analysis

    1.    Presentation of Misleading Evidence

Mr. Gerrans contends that the government presented misleading and incomplete evidence in the form of testimony from the former Sanovas controller (Mr. Yarborough) and former Chief Technology Officer (Mr. Gunday), which was allegedly contradicted by other evidence available to, but not presented by, the government.  Specifically, Mr. Gerrans contends that:

> [D]espite possessing evidence from Sanovas' Chief Financial Officer Robert Farrell that there was nothing improper about Mr. Gerrans' claimed business expenses in 2013, the government introduced false and misleading testimony from Lloyd Yarborough that Mr. Gerrans was stealing money from Sanovas in 2013. Further, by not requiring Erhan Gunday to produce documents related to his 2014 Separation Agreement with Sanovas, the government deprived the jury of evidence that, at the time he left Sanovas in 2014, Mr. Gunday received exactly the same amount of money that Mr. Gerrans had received for business expenses in 2013.

Defendant's Motion to Dismiss for Prosecutorial Misconduct ("MTD") at 2, Docket No. 247. Regarding the money that Mr. Gerrans allegedly stole in 2013, he contends that the "centerpiece of th[e government's] argument was the testimony of Lloyd Yarborough" related to a spreadsheet of suspicious expenses he compiled.  *Id.* at 5.[4]  In light of the fact that "[t]he government was in possession of an email from Chief Financial Officer Robert Farrell to Erhan Gunday on May 31, 2013, in which Mr. Farrell, who was Mr. Yarborough's boss, went through item by item of the expenses to which Mr. Gunday and Mr. Yarborough had objected and explained why the expenses

---

[4] Mr. Gerrans also argues that it was improper for the government to argue that he started out stealing small amounts of money and that his "biggest opportunity where he could steal millions of dollars came when he gained control of Sanovas" because the buying to the DeClaris house and Mr. Gunday's departure had nothing to do with one another.  *Id.*  However, the government's argument did not imply that the two had anything to do with each other, nor is the idea that he stole small amounts of money earlier on inconsistent with the evidence presented at trial (especially the testimony of Mr. Yarborough and Mr. Gunday).  Mr. Gerrans also asserts that the government's arguments about delaying his fraudulent scheme until he could fire Mr. Yarborough were improper because he was never aware of the spreadsheet Mr. Yarborough created.  *Id.* However, the government did not assert (at least not in closing argument) that the spreadsheet was the sole basis upon which Mr. Yarborough was fired.

1    were permissible under the Employment Agreements and the by-laws," Mr. Gerrans contends that

2    the prosecution presented misleading testimony and offered improper argument.  *Id.* at 6.

3    Essentially, by fully crediting the Farrell email, Mr. Gerrans argues that "it was false that Mr.

4    Yarborough had uncovered illicit expenses." *Id.* at 8.  He states that the government's "fail[ure] to

5    call Robert Farrell as a witness or introduce the significant worksheet he prepared that identified

6    the legitimacy of Mr. Gerrans' expenses . . . was intentionally misleading." *Id.* at 7.

7         As a threshold matter, to the extent that Mr. Gerrans's arguments on this point rely on the

8    theory that his alleged entitlement to the money he took from Sanovas is a defense, as the Court

9    explained above, that theory is rejected.

10        Moreover, the government notes that the email in question "was produced to the defense

11   during pre-trial discovery but was not introduced at trial by either party.  Nor was Farrell called as

12   a witness [by the defense] for obvious reasons" such as the fact that during his FBI interview he

13   "opined that payments by Sanovas to Halo amounted to 'double' billing by the defendant and were

14   a clear conflict of interest."  *See* Omnibus Opp. at 41.  Thus, in its closing arguments, the

15   government "refer[ed] directly to trial testimony (here [by] Yarborough and Gunday, . . .) but not

16   to an email that was never introduced at trial by either party." *Id.*  In addition, Mr. Farrell's email

17   did not mention anything about Mr. Gerrans's "use of company money for a family Hawaiian

18   vacation and a family Bay Club membership," and it certainly did not state that such expenses

19   were legitimate business expenses. *Id.*  Because "[t]hese were the only [two] items on

20   Yarborough's spreadsheet that the prosecutor referred to in closing as "small thefts that were

21   totally inappropriate and wrong," *id.*, neither the government's alleged failure to present Mr.

22   Farrell's 2013 email to the jury (or call him as a witness), nor its argumentation during closing

23   was improper.

24        Mr. Gerrans also argues that the government improperly deprived the jury of the

25   opportunity to learn that "Mr. Gunday received the exact amount of money Mr. Gerrans had

26   received for business expenses in 2013," by "not requiring Erhan Gunday to produce documents

27   related to his Separation Agreement."  MTD at 7.  Specifically, he asserts that the government

28   "admitted into evidence at trial Mr. Gunday's 2014 Separation Agreement that on its face was

incomplete, missing significant exhibits [specifically, Exhibit C] such as how the money Mr. Gunday received was calculated." MTD at 8. He further asserts that the omitted exhibits would have shown a calculation of the deferred compensation owed to Mr. Gunday and severance pay calculated at a rate of $300,000 per year, a rate that the government derided when it came to Mr. Gerrans. *Id.* at 9. He also contends that the government improperly argued that Mr. Gunday's separation agreement indicated that Mr. Gerrans was not entitled to deferred compensation because the agreement did not mention such compensation for him. *Id.* His contention is that the government omitted this evidence because it would have demonstrated that, consistent with his contentions, Mr. Gerrans was *entitled* to the money he took from Sanovas. *Id.* at 9–10. But again, that is not a legal defense.

The government notes that it produced Mr. Gunday's separation materials to the defense on the very same day that it received them. Omnibus Opp. at 43. Thus, defense counsel "could have asked about Exhibit C, but did not," and perhaps more importantly "Mr. Gerrans was also present by telephone at the Rule 15 deposition [of Mr. Gunday] and was given the opportunity to confer privately with his attorney after the government finished its direct examination." *Id.* Given his familiarity with the separation agreement, he could have instructed his attorney to inquire about the missing exhibits and/or any other line of questioning that might have been critical to his defense. Accordingly, it is likely that the reason defense counsel did not ask about the missing exhibits was "because he knew full well that the settlement agreement memorializing the payout that was given to Gunday did not contain any reciprocal provision" for Mr. Gerrans. *Id.*

In addition, the government's contention—that Mr. Gerrans was not entitled to a reciprocal payout—is reinforced by two additional facts. First, Mr. Gunday testified in his deposition that he would have refused to sign the agreement had it provided a reciprocal payout for Mr. Gerrans. *See* Omnibus Opp. at 44. That testimony was credible. Second, the government also notes:

> At no point during either the March 6, 2015 or the May 9, 2015 BOD meetings, did the defendant tell the BOD he was entitled to the same payout that Gunday received under Trial Exhibit 113. Instead, defendant told a completely different set of lies to the BOD to try and get the BOD to approve prospective payments to him. Specifically, the defendant told the BOD that he had liquidated his IRA at Sanovas' inception in furtherance of the business and that the

1
     employment agreement he wanted the BOD to approve was for
     prospective payment and was the same as the agreement currently in
2
     effect.

3
*Id.*; *see also* Jan. 14 Transcript (Testimony of Bruce Nichols) at 45, Docket No. 140 ("So I

4
understood it that he had used his personal money, specifically his IRA, to help fund the ongoing

5
concern of the company.  You know, in the areas we discussed before.  To keep it going.").  Put

6
more simply, if Mr. Gerrans believed that he was entitled to an equivalent payout, he would

7
certainly have informed the board of that position while he was advocating for an updated

8
compensation agreement rather than coming up with a false justification for the compensation he

9
sought.  Accordingly, the Court is unpersuaded by Mr. Gerrans's contention that the government

10
improperly deprived the jury of an opportunity to learn certain details of Mr. Gunday's separation

11
from Sanovas.

12
    2. <u>Presentation of Evidence Known to Be False (Contact with Chris Gerrans)</u>

13
    As discussed in the context of his Motion for New Trial, Mr. Gerrans also asserts that the

14
government presented evidence to the jury that it knew to be false regarding the contact and

15
interactions between Mr. Gerrans and Chris Gerrans (which formed the basis of Counts 10 to 12).

16
MTD at 11.  First, he asserts that evidence exists that demonstrates that the confrontation between

17
Mr. Gerrans and Chris Gerrans at Public Storage was not about Mr. Gerrans's criminal trial.  MTD

18
at 11–12.  However, some of this evidence took the form of emails, to which the government did

19
not have access, *see* Omnibus Opp. at 45 ("[N]one of the 'evidence' that the defendant is now

20
presenting to the Court is newly-discovered evidence.  It was already in the possession of the

21
defendant or his counsel, and in many cases was not in the possession of the government.").  In

22
addition, as discussed above, Mr. Gerrans's argument wholly discounts the testimony that was

23
given at trial, even though that testimony was entirely credible.  For example, Ryan Swisher, an

24
employee at the storage facility (and a disinterested party), testified: "Of the things I did hear, one

25
of which was that Larry was saying that the indictment was bullshit.  And the second thing that I

26
heard was that he felt that Chris had sold him up the river."  *See* Jan. 21 Transcript (Testimony of

27
Ryan Swisher) at 8, Docket No. 139.  The argument also brushes aside the details of Chris

28
Gerrans's trial testimony:

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

> [Mr. Gerrans] was screaming and yelling at me for cooperating with
> the -- with the subpoenas, and providing information.  He told me I
> was selling him out.  And he was telling me that he's going to get
> this company back.  He told me he wanted me to resign immediately
> from the company.  It's his company.  And when he gets his case
> dismissed and when he gets the company back, he's coming after
> me; he's going to take everything.

5   Jan. 15 Transcript (Testimony of Chris Gerrans) at 146, Docket No. 129.  As discussed above,

6   contrary to what Mr. Gerrans now contends, this testimony constituted strong, credible evidence

7   that the confrontation between Mr. Gerrans and Chris Gerrans at Public Storage *was* about Mr.

8   Gerrans's criminal trial.  Moreover, Mr. Gerrans has presented nothing tending to show that the

9   government presented evidence on this issue that it *knew* to be false, especially to the extent that

10  his argument relies on emails and documents that were in the exclusive possession of defense

11  counsel.

12      In addition, as in his Motion for Judgment NOV, Mr. Gerrans challenges the evidence

13  presented related to burner phones and the conduct of Art Gerrans, Sr.  MTD at 14–16.  First, Mr.

14  Gerrans again argues (as he did in the Motion for Judgment NOV), that the government

15  improperly suggested and argued that he was not permitted to contact or see Chris Gerrans at all,

16  outside the presence of counsel (which he contends frames the arguments the government

17  advances as to the burner phones and the conversation that Art Gerrans, Sr., had with Chris

18  Gerrans).  *Id.* at 14 (quoting Jan. 29 Transcript (Government's Closing Argument) at 96 ("And

19  most of all, [Mr. Gerrans] had contact with Chris Gerrans repeatedly, outside the presence of Chris

20  Gerrans's counsel.  So that's Count 10."))  However, this line of argument overlooks the fact that

21  the government repeatedly "recited the entire bond condition regarding contact with Chris

22  Gerrans" and that the actual bond was in evidence.  Thus, there is little reason to think that the

23  government misled the jury about the nature of the contact permitted between the two brothers; to

24  the contrary, their representations were accurate (not only because the government recited the

25  entire bond condition multiple times, but also because the bond itself was in evidence).

26      In addition, Mr. Gerrans contends that because he *was* permitted to see Chris Gerrans at

27  any time, provided he did not speak with him about Mr. Gerrans's criminal case, there was no

28  need to provide Chris with a burner phone because he could talk with him whenever he wanted.

1    In other words, Mr. Gerrans's contention appears to be that because a burner phone would not

2    have made it *easier* to communicate secretly with his brother (a contention of which the Court is

3    skeptical), the existence of a burner phone does not make it more likely that Mr. Gerrans

4    committed contempt of court.  But one could reasonably infer the purpose of a burner phone was

5    to facilitate secret conversations.  Thus, even if the jury was fully aware of the fact that Mr.

6    Gerrans and his brother could be in contact about anything other than Mr. Gerrans's criminal case

7    (as the jury was), it could have concluded that Mr. Gerrans's provision of a throw-away phone to

8    his brother evidenced an intent to evade the conditions of release, thus constituting contempt.

9         Mr. Gerrans also argues that several aspects of the government's treatment of the

10   testimony of Art Gerrans, Sr., were improper.  MTD at 15–16.  First, he contends that Art Gerrans,

11   Sr. testified at the grand jury proceeding that Larry Gerrans did not know of Chris Gerrans's theft

12   from Sanovas, and therefore that his directive to Chris Gerrans that he tell the FBI that Mr.

13   Gerrans knew nothing of that theft did not violate the bond because it had nothing to do with *Mr.*

14   *Gerrans's* criminal case.  *Id.* at 15.  Second, he contends that Art Gerrans, Sr., repeatedly told the

15   grand jury that he did not write down three things to tell Chris Gerrans on Mr. Gerrans's behalf.

16   *Id.*  He argues that this information was critical for the jury to properly assess Chris Gerrans's

17   credibility.  *Id.* at 16.

18        In response, the government first notes: "On November 5, 2019, the government also

19   provided the defense with the complete transcripts of the grand jury testimony of Christopher

20   Gerrans and Arthur Gerrans Sr.  Accordingly, any grand jury testimony by either Chris Gerrans or

21   Art Gerrans, Sr., that the defendant currently claims was either exculpatory or impeaching was

22   provided to the defense approximately 10 weeks before the trial commenced."  Omnibus Opp. at

23   5.  It also adds:

24            [T]here were some differences between the testimony of Art Gerrans
             Sr. and Chris Gerrans, and the grand jury transcript of Art Gerrans
25           Sr. was disclosed to the defense ten weeks before trial for that
             reason.  There was nothing improper about not questioning Chris
26           Gerrans about these discrepancies (though the defense could have)
             because Art Gerrans Sr.'s testimony was not credible on many of the
27           issues raised by the defendant.  And, of course, the government
             produced Art Gerrans Sr.'s grand jury transcript to the defense well
28           in advance of trial giving the defendant plenty of time to subpoena

1    and call Art Gerrans Sr. as a witness if he thought doing so would
     help his defense.

2    Omnibus Opp. at 48.  In light of both the fact that the defense had the grand jury transcripts and

3    could have subpoenaed Art Gerrans, Sr., as a witness, but chose not to, and the fact that the

4    government concluded that his grand jury testimony on the issues raised now was not credible, the

5    evidence does not support the conclusion that the government presented false or misleading

6    testimony in light of the grand jury testimony of Art Gerrans, Sr.

7            3.    False Portrayal of Evidence in Closing Argument

8            Finally, Mr. Gerrans contends that the government engaged in prosecutorial misconduct by

9    offering improper argument during its closing.  First, as in his Motion for New Trial, he contends

10   that the government improperly suggested that "Sanovas was not *actually* a startup medical device

11   company at all even though investors *thought* it was, implying it was actually just a slush fund for

12   Mr. Gerrans."  MTD at 17.  However, as discussed above, this is not accurate.  There was

13   undisputed testimony and evidence at trial that Sanovas raised between 20 and 30 million dollars

14   from investors (*see* Jan. 13 Transcript (Testimony of Mr. Yarborough) at 14, Docket No. 142) and

15   that it had more than 50 employees at one point; the fact that the government accused Mr. Gerrans

16   of taking several million dollars did not imply the entirety of the company was a mere slush fund

17   for Mr. Gerrans.

18           Second, Mr. Gerrans again argues that "the only relevant legal issue was whether Mr.

19   Gerrans was legally entitled to the money, not the government's moral judgment about how he

20   spent his money" and that "rather than arguing whether there was evidence that Mr. Gerrans took

21   money to which he was not legally entitled, government counsel attacked Mr. Gerrans' character,

22   calling him a thief and a liar and accusing him of spending extravagantly."  MTD at 17.  However,

23   as noted repeatedly, the Court rejects the now offered defense that Mr. Gerrans believed he was

24   legally entitled to the money.  It was not improper (even if it was insulting) for the government to

25   refer to Mr. Gerrans as a "liar and a thief."  *See Sayetsitty*, 107 F.3d at 1409 ("The prosecution is

26   permitted to use 'argumentative characterizations . . . during argument.'").  That is what the

27   evidence showed.

28           Finally, Mr. Gerrans again argues (as he did in his Motion for New Trial) that "the

reference to the amount of Mr. Gerrans's prior bankruptcy liability was an implicit attack on him, whereas there was no evidence in the record about the reasons for the bankruptcy" (which he alleges related to Shelly Gerrans's serious medical issues).  *Id.*  However, as discussed above the government had good-faith and legitimate reasons for introducing evidence from the prior bankruptcy proceeding (*e.g.*, to show that Shelly Gerrans was not working in 2010, to show that neither of them believed themselves financially owed anything by any entity, and to show that they would not have had access to a home loan at the time they purchased the Greensburgh house).  Accordingly, the government's reference Mr. Gerrans's prior bankruptcy liability was not "an implicit attack on him," as he now contends.  Instead, it was relevant and probative evidence in the government's case.

4.     Subsequent Objection and Motion to Strike Objection

As noted in the procedural background, above, after briefing on the Motion to Dismiss completed, the government objected to declarations and evidence that Mr. Gerrans filed with his reply.  *See* Docket No. 256.  Mr. Gerrans moved to strike that response.  *See* Docket No. 258.  The government specifically requests that the exhibits attached to the reply and several paragraphs of the declaration of Shawn Halbert (which constitutes the conclusions and arguments of counsel) be struck.  *See* Docket No. 256 at 2.  The exhibits include bank records, grand jury testimony, checks written on the Sanovas account, the Gerranses' quitclaim deed, emails, and promissory notes.  *See* Docket No. 254.  Mr. Gerrans moves to strike this response as being out of compliance with this district's local rules.  *See* Docket No. 258.

However, because consideration of the evidence provided in the exhibits does not change the conclusions reached by the Court and because Mr. Gerrans's motions are all being denied, the Court **DENIES** the government's objection and Mr. Gerrans's Motion to Strike the Objection as moot.

C.     Conclusion as to Motion to Dismiss for Prosecutorial Misconduct

For the foregoing reasons, the Court **DENIES** the Motion to Dismiss for Prosecutorial Misconduct.

38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## VII.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Mr. Gerrans's Motion for Judgment NOV, **DENIES** Mr. Gerrans's Motion for New Trial, and **DENIES** Mr. Gerrans's Motion to Dismiss for Prosecutorial Misconduct.  The government's objection to evidence and Mr. Gerrans's Motion to Strike are **DENIED** as moot.

This order disposes of Docket Nos. 234, 235, 247, and 258.


**IT IS SO ORDERED**.


Dated: August 7, 2020

_____
EDWARD M. CHEN
United States District Judge