DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ROBIN L. HARRIS (CABN 123364)
LLOYD FARNHAM (CABN 202231)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7321
    robin.harris2@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:18-CR-00310 EMC |
| Plaintiff, | |
| v. | **UNITED STATES' SENTENCING MEMORANDUM** |
| LAWRENCE J. GERRANS, a/k/a LARRY GERRANS, | Date: November 4, 2020 |
| Defendant. | Time: 9:30 a.m. |
| | Honorable Edward M. Chen |
| | Courtroom 9, 19th Floor |

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

BACKGROUND..................................................................................................................2

DISCUSSION......................................................................................................................4

I.     Defendant's Objections to the PSR are Unfounded ...............................................4

II.    Sentencing Guidelines Calculation.......................................................................5

       A.    Loss Caused by the Offense Conduct is more than $3.5 Million.....................5

       B.    The Conduct Involved Sophisticated Means ..................................................8

       C.    The Adjustments for Obstruction and Crime On Pretrial Release are
            Appropriate.....................................................................................................9

III.   A Sentence of 180 Months is Warranted under the Factors of 18 U.S.C. § 3553(a) ...................10

       A.    There are a Number of Aggravating Factors Supporting a Significant Sentence............11

            1.    Gerrans Misled the Court in his Withdrawn Motion to Dismiss .........................11

            2.    Gerrans Engaged in a Campaign to Intimidate and Bully Witness
               Christopher Gerrans ......................................................................................13

            3.    Gerrans Has Expressed a Threat of Violence Directed at an Assigned
               Prosecutor Arising from a Pathological Fixation with the Prosecutor ................14

            4.    The Offense Conduct Damaged the Company and Its Investors ........................15

            5.    The Sentence Should Reflect the Need for Specific Deterrence and the
               Likelihood of Recidivism...............................................................................16

       B.    The Opinions of Dr. Ernst are Unreliable and do not Justify a Variance ......................17

CONCLUSION...................................................................................................................18

# **TABLE OF AUTHORITIES**

## **Federal Cases**

*United States v. Booth*, 309 F.3d 566 (2002) ............................................................... 6, 10

## **Federal Statutes**

18 U.S.C. § 1957 ...................................................................................................... 5

18 U.S.C. § 3147 ................................................................................................... 5, 10

18 U.S.C. § 3173 ...................................................................................................... 10

18 U.S.C. § 3553 ........................................................................................... 10, 11, 17

## **Federal Rules**

USSG § 1B1.3(a) ....................................................................................................... 5

USSG § 1B1.3(a)(2) ................................................................................................... 5

USSG § 2B1.1(b)(1) ............................................................................................... 5, 6

USSG § 2B1.1(b)(10) ............................................................................................. 5, 8

USSG § 3C1.1 ........................................................................................................... 9

USSG § 3C1.3 ...................................................................................................... 5, 10

**INTRODUCTION**

Defendant Lawrence Gerrans devised and operated several sophisticated fraud schemes over more than three years that resulted in more than $3.5 million dollars in actual loss to the victim investors in Sanovas, the Marin-based company he co-founded. Specifically, in his capacity as President and CEO of Sanovas, the defendant stole approximately $2.6 million in a six-week period for an all-cash purchase of an opulent home in San Anselmo. While the multi-million dollar theft for the house purchase was defendant's most brazen embezzlement from Sanovas, it was merely one facet of defendant's long-standing pattern of regularly stealing from Sanovas to fund his lifestyle, which was a standard of living far more lavish than what defendant could legitimately afford even with the generous salary Sanovas paid him.

Along the way, the defendant formed shell companies to launder and conceal that Sanovas was the source of his ill-gotten gains. He also created numerous false documents to cover up and retroactively attempt to justify his theft. The defendant furthered his fraud by lying to a newly-constituted Sanovas board of directors (BOD) by falsely telling the BOD (1) that he had liquidated his $500,000 IRA at Sanovas' inception in furtherance of Sanovas' business; (2) that the employment agreement he was requesting the BOD to approve was the same as the agreement currently in effect; and, (3) that he would not take any of the purported-approved money from Sanovas until the company was profitable, when in truth and fact, the defendant had already pilfered millions of dollars from Sanovas in the months leading up to the BOD meetings. The defendant also provided bogus documents and lied to the FBI during a voluntary interview conducted during the criminal investigation.

After he was indicted, the defendant's criminal behavior continued as he engaged in an audacious pattern of harassing and attempting to intimidate his brother, Chris Gerrans, a witness at trial. The defendant's continuous efforts to intimidate and retaliate against his brother culminated in a disturbing confrontation the defendant initiated at a San Rafael storage facility on August 13, 2019. During the altercation, the defendant verbally and physically assaulted Chris Gerrans, which resulted in the revocation of his bond and remand into custody on August 15, 2019.

On January 29, 2020, Gerrans was convicted at trial of all 12 counts in the second superseding indictment charging him with wire fraud, money laundering, making false statements, contempt,

attempted witness tampering and obstruction of justice. Dkt 144. The latter three charges and convictions were based on defendant's sustained campaign of harassment and witness intimidation after he was indicted and released on bond.

U.S. Probation Office concludes that defendant is in Criminal History Category I, and that his conduct results in an Offense Level of 35, resulting in a Guidelines range for defendant of 168 to 210 months of imprisonment. The Probation Office's Presentence Report recommends a low-end guidelines sentence of 168 months of imprisonment, followed by five years of supervised release, restitution to the victim, and a $40,000 fine.

The government agrees with Probation's calculation of defendant's Guidelines range. Based upon numerous aggravating factors in this case (discussed *Infra*), many of which are not accounted for in the defendant's guideline range, the United States recommends a sentence of 180 months of imprisonment, followed by five years of supervised release, restitution, and a $40,000 fine.

## BACKGROUND

In the interest of brevity and because Court and the parties are familiar with the facts giving rise to defendant's convictions, the government has highlighted herein certain facts relevant to sentencing which were either not otherwise accounted for in the applicable guideline range or were developed during the extensive post-trial litigation that followed the jury trial. This post-trial litigation included two failed defense motions to release the defendant from custody, one of which was filed on an "emergency basis." Dkts 160, 186, 263. On both occasions, this Court and U.S. Magistrate Judge Sallie Kim found that the defendant had not shown by clear and convincing evidence that he was not a danger to one of the assigned prosecutors in the case, AUSA Robin Harris, and witness Chris Gerrans. The defendant's disturbing obsession with AUSA Harris, which included soliciting his brother to lie in wait outside the prosecutor's house and to "take her out" when she returned home from work is discussed below. The defendant also authored a series of letters from jail which reflect his continued fixation on the prosecutor and his contorted efforts to blame her personally for his criminal predicament.

The defendant's post-trial efforts also included a defense motion for a new trial which relied extensively on the declarations of Gary Krause, Kevin Day and Anne Hipshman. Dkt 235. These declarations were originally submitted in an August 12, 2019 pre-trial defense motion to dismiss the

indictment. Dkt 42. That motion was taken off calendar at the defendant's request on August 21, 2019. Dkt 51. The defendant never resubmitted his motion to dismiss prior to trial presumably because the November 14, 2019 deposition of Sanovas co-founder Ehran Gunday, taken in Athens, Greece, revealed that several of the documents relied upon in the declarations supporting defendant's motion were fraudulent. Specifically, Gunday credibly testified that the so-called December 3, 2013 "Unanimous Written Consent" was a counterfeit document and Gunday's purported "signature" on it was a forgery. The declarations in question also relied on a bogus "Shelly Gerrans Employment Agreement" purporting to document Mrs. Gerrans being hired by Sanovas as an "Administrative Assistant" in December 2009. The trial evidence, including Shelly Gerrans' own sworn testimony in the April 2010 bankruptcy proceedings, proved the falsity of this document.

Nevertheless, the withdrawn motion to dismiss is relevant to defendant's sentence for several reasons. First, as is discussed below, the defendant attempted to commit a fraud on this Court by filing a motion that he, though not his former counsel Brian Getz, clearly knew was based upon counterfeit documents. If the government had not been able to locate and arrange for the foreign deposition of Mr. Gunday, who in 2019 was living in a remote village in eastern Turkey, this Court might have been persuaded to rule on a dispositive defense pre-trial motion based on false evidence created and sponsored by the defendant.

Second, after the defendant was convicted and retained his current counsel, he continued to try to convince the Court to take action, including a request for a new trial, based upon these same tainted witnesses and bogus documents. Dkt 235. Even now, in the defendant's objections to the PSR, he has persisted in pursuing the specious argument that he was "owed" or was otherwise "entitled" to the money that he took from Sanovas. Defendant does so despite this Court's August 7, 2020 order conclusively holding: "To be clear, Mr. Gerrans's now-asserted defense to wire fraud—that he was in fact owed the money he took—is rejected." Dkt 285. The defendant's refusal to accept the facts, as proven at trial, and the law, as determined by this Court, is indicative of both a lack of remorse and a high likelihood of recidivism.

Finally, the defendant's guideline range does not include an enhancement for the number of victims he defrauded because Sanovas, as the corporate entity, was considered the victim for guidelines'

purposes. There were, however, more than 700 individuals who invested their money in Sanovas, many of whom suffered direct and proximate harm as a result of the defendant's fraud. The harm to these victims, some of whom have written directly to the Court, is discussed below and is another factor not accounted for in the guideline range that warrants the sentence recommended by the government.

## DISCUSSION

### I. Defendant's Objections to the PSR are Unfounded

The Probation Office disclosed to the parties the preliminary Presentence Report on July 29, 2020, and the defendant raised numerous objections to the report in a letter dated August 26, 2020.

On August 28, the government notified the Probation Office and the defendant that it agreed with certain of the objections, and outlined proposed changes to the PSR to reflect that agreement. The government did not agree with many of the defendant's other objections. A number of these objections are outlined in the Probation Office response to the objections, in an addendum to the PSR, and the Probation Office made some amendments in response, and declined to make amendments in response to other objections raised by the defendant.

There are too many outstanding defense objections, most of which are frivolous, to discuss in detail here, but the United States continues to believe that the remaining objections are unfounded and do not warrant amendments, additions, or deletions to the PSR. In many cases, the defendant's so-called factual assertions made in his objections directly contradict the evidence introduced at trial and the verdicts reached in the case, and in other cases the objections rely on documents that were not presented at trial. Some of the objections raised by the defendant rely on the Kevin Day declaration—documents that were actually part of the withdrawn pre-trial motion. In other objections, the defendant makes assertions of "fact" with no actual factual support. It is also inappropriate to include arguments of counsel in the Offense Conduct section of the PSR, or to include "a defense position" regarding the interpretation of facts or to offer the defendant's opinion in the PSR that certain conduct was not criminal or improper. For these reasons, the government objects to the remaining proposed amendments to the PSR as offered by the defendant.

## II.    Sentencing Guidelines Calculation

The government agrees with the Guideline calculations recommended by U.S. Probation in the final PSR. Counts 1 through 9 are grouped with Counts 10 through 12. However, because the defendant committed counts 10 through 12 while he was on release, by statute (18 U.S.C. § 3147) the sentence on those counts must be imposed *consecutive* to the sentence imposed for counts 1 through 9. The calculations for the fraud, money laundering (counts 1 through 9) and obstructive counts (counts 10 through 12) are as follows:

| | | | |
|---|---|---|---|
| a. | Base Offense Level, § 2B1.1(a)(1) | | 7 |
| b. | Loss exceeding $3.5 million,, § 2B1.1(b)(1)(J) | | +18 |
| c. | Sophisticated Means, § 2B1.1(b)(10)(C) | | +2 |
| d. | Conviction of 18 U.S.C. § 1957, § 2S1.1(b)(2)(A) | | +1 |
| e. | Abuse of Trust or Special Skill, § 3B1.3 | | +2 |
| f. | Obstruction of Justice, § 3C1.1 | | +2 |
| g. | Commission of Offense While on Release, § 3C1.3 | | +3 |
| h. | Total Adjusted offense level | | 35 |

### A.    Loss Caused by the Offense Conduct is more than $3.5 Million

The PSR correctly concludes that the intended loss amount caused by Gerrans' scheme to defraud is $3,547,668, which includes the amounts that Gerrans embezzled in various ways for multiple purposes through the time period of the scheme, June 2014 through December 2017. PSR, ¶ 38.

Under the application instructions of the Sentencing Guidelines, specific offense characteristics, including the loss amount in fraud cases, should be determined considering "offense conduct" that includes all acts and omissions committed by the defendant, and all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a). [1] Gerrans was convicted of five counts of wire fraud, all alleged in the indictment to be in furtherance of a scheme to defraud. That scheme involved Gerrans converting and misappropriating Sanovas funds for his own personal use and benefit. For the determination of loss under the guidelines, the amounts that Gerrans misappropriated can be considered either actual loss, or intended loss—in either event the total

---

[1] The broadest scope or offense conduct is applicable here under USSG § 1B1.3(a), because under USSG § 1B1.3(a)(2) the charged offense of wire fraud is required to be grouped under USSG § 3D1.2(d).

amount misappropriated during the relevant time period should be considered the loss amount under USSG § 2B1.1(b)(1).  *See* Application Note 3.(A)(i) and (ii).

The loss calculation is not limited to, or cabined by, the particular amounts alleged in the wire fraud counts of the indictment;  the wire allegations are only a few of the many wires that were made in furtherance of the overall scheme alleged.  Instead, the Court is required to consider the entire loss attributable to the overall scheme, which as described above, must be considered as part of the relevant offense conduct.  The Ninth Circuit has flatly rejected defense arguments that loss under the fraud guidelines is limited to the counts of conviction.  *See, e.g., United States v. Booth*, 309 F.3d 566, 575 (2002) (under the Sentencing Guidelines "the district court correctly determined that it was required to take into account the entire loss inflicted by the common scheme").

The loss in this case includes the amounts Gerrans stole from Sanovas for the purchase of the house at 28 Greensburgh Lane, a total of $2,581,066.  As the government proved at trial, this amount was transferred to Gerrans himself, to his newly created shell company Hartford Legend Capital, and to Halo Management in 14 checks, transfers and wires from January 12 to March 16, 2015.  The entire amount used to purchase the house, represented by the amount transferred into the escrow account at Stewart Title, came directly from Sanovas, according to bank records and transaction documents summarized by trial witness Phillip Villanueva.  TR 1/22/20 at 65-72.  Trial Exhibit 275 summarized the movement of money used to purchase the house, and showed it all flowed from Sanovas.

The loss total under the sentencing guidelines also includes the non-payroll amounts that Gerrans pilfered directly from Sanovas, either as direct transfers to himself or to pay other personal expenses including his personal income taxes, rent on his personal residences, and to buy a Mercedes SUV for his wife.

Trial evidence and testimony proved that Gerrans used Sanovas money to pay his personal federal income tax liability for the years 2011, 2013, and 2014.  *See* TR 1/22/2020 at pp. 87-90 (Villanueva). All three payments for Gerrans' personal income taxes were drawn directly from the Sanovas bank account at Chase Bank.  *Id*. at 90. For just these three instances identified and described at trial, the total amount of Gerrans' personal income taxes that were paid for with Sanovas funds is $310,581.  Trial Exhibit 276.

Documents and testimony at trial also proved that Gerrans used Sanovas money, rather than money from his own salary, to pay the rent for his personal residence. During the time that Gerrans was employed by Sanovas, Gerrans and his family rented two houses, one at 29 Timothy Avenue in San Anselmo, and one 28 Greensburgh Lane in San Anselmo (the same house he later purchased with Sanovas funds). Analysis of Sanovas accounting records and bank records showed that from November 2010 to December 2014 Gerrans arranged for the transfer of more than $195,800 directly from Sanovas to pay for Gerrans' personal rental payments for those two residences. TR 1/22/2020 at p. 116; Exh. 279, at p. 16.

As part of the scheme to defraud, Gerrans also used the Sanovas American Express corporate credit card for personal expenses, which was yet another way Gerrans embezzled funds from Sanovas and its investors. The total personal expenses Gerrans stole by misusing the Sanovas American Express corporate credit card for personal expenses—including for items such as jewelry, pet food, laser skin treatments, bikini bathing suits, carpets, and property taxes—during the period March to June 2017 totals $117,271. Exh 279.

Trial evidence also proved that Gerrans embezzled $52,500 directly from Sanovas in October 2014 that was used to purchase a used Mercedes Benz for his wife. TR 1/22/2020 at 36-42 (Villanueva); TR 1/14/2020 at 70-72 (Christopher Gerrans); Exh. 182. Documents admitted as evidence at trial also showed that this withdrawal from Sanovas involved stolen money from a particular Sanovas investor, in an amount of $53,000, which had been deposited the same day that Gerrans withdrew $52,500 from the Sanovas account. TR 1/22/2020 at 43-44; Exh. 220 at 3398.

Finally, Sanovas accounting and bank records also shows that Gerrans stole additional money from Sanovas by having direct payments made to his personal account, which were separate from his regular payroll payments. Analysis of these accounting and bank records showed that the amount that Gerrans stole directly from Sanovas through direct, non-payroll payments totaled $291,250 and is part of the overall actual loss Gerrans' caused by his fraud schemes. *See* Exh. 279. These non-payroll amounts that Gerrans transferred to himself ($291,250) includes only payments between June 2014 and December 2017, and does not include payments in January and March 2015, months when Mr. Gerrans transferred more than $340,000 directly to his personal accounts, because most of those amounts were

used to purchase the house. (Excluding these months eliminates double-counting amounts Gerrans used to purchase 28 Greensburgh.)

In total, the loss to Sanovas as a result of Gerrans' fraud is $3,547,668, leading to an offense level adjustment of 18 levels.

## B.    The Conduct Involved Sophisticated Means

The defendant's scheme to defraud in this case involved sophisticated means under USSG § 2B1.1(b)(10) because in order to perpetrate and conceal the fraud the defendant used a number of shell entities, manipulated the accounting records of Sanovas, created and then relied on falsified documents and counterfeit agreements, and exploited the corporate structure and procedures of Sanovas including the board of directors. The PSR correctly concludes that the offense conduct warrants the 2-level adjustment to the base offense level. PSR ¶ 52.

The scheme to loot Sanovas of more than $2.5 million for the purchase of the house at 28 Greenburgh involved multiple sophisticated and planned actions. First, Gerrans directed his brother— whom Gerrans had put in charge of the finances at Sanovas only days earlier—to enter into the Sanovas accounting system scores of phony past-due Halo invoices. These invoices would purport to instantly create a liability on the company's book payable to Gerrans totaling more than $1.6 million. Exh. 274; TR 1/22/2020 at 32-34 (Villanueva).

Second, as part of the sophisticated means he used to accomplish his fraud, Gerrans devised to convene a board of directors of Sanovas and seek what would look later like approval for the extraordinary payouts of Sanovas money he intended to take. Beginning in January 2015, and for the first time since the departure of Ehran Gunday, Gerrans asked a board of new members to meet. At BOD meetings in March and May 2015, Gerrans made false statements to the board members, eventually successfully convincing the board to approve a new "compensation package" that included language about purported deferred compensation to Gerrans, huge retroactive bonuses, and reimbursement of funds that Gerrans said he had liquidated from his IRA and used for Sanovas. This board action was intended by Gerrans to provide cover for the $2.5 million payments that he had taken from Sanovas in the months leading up to the May meeting—and in fact he has continued in both his

objections to the PSR and in his post-trial motions to rely on the employment agreement approved by the board—through fraud—to justify his fraud.

Third, the defendant's use of shell companies, and the convoluted path of the funds to the escrow account used to purchase the house, was a concerted effort to conceal the purpose of the transfers from the books and bank accounts of Sanovas, and to hide the source of the funds from the perspective of the escrow company. This complicated money flow was described in testimony at trial. Exh. 275; TR 1/22/2020 at 65-72 (Villanueva).

Finally, the scheme involved the creation of phony documents to create a false justification for the fraudulent payouts, and these bogus documents were later provided to the FBI during the investigation. The jury convicted Gerrans of false statements relating to certain Halo invoices and a fake promissory note payable to Hartford. The defendant's creation of an elaborate backstory, complete with counterfeit documents, further demonstrates the sophistication and planning involved in this offense.

## C. The Adjustments for Obstruction and Crime On Pretrial Release are Appropriate

The appropriate calculation of the offense level includes a 2-level enhancement based on the defendant's convictions for obstruction of justice. *See* PSR ¶ 46. In comments and objections directed to the Probation Office, the defendant has objected to this 2-level enhancement for obstruction, based on the incorrect argument that since the obstruction counts of conviction (counts 10, 11 and 12) are grouped with the fraud counts, the obstructive conduct is somehow eliminated from consideration under the guidelines. However, the Sentencing Guidelines make it clear that the defendant does not get a "free pass" to commit obstructive crimes and then avoid the consequences of those crimes simply because his numerous other fraud crimes have a higher overall guidelines calculation. Application Note 5 to USSG § 3C1.1 (Obstruction or Impeding Administration of Justice) states: "If the defendant is convicted both of an obstruction offense [here, count 10—contempt, count 11—witness tampering and count 12—obstruction of justice], the count for the obstruction offense[s] will be grouped with the count[s] for the underlying offense…[here wire fraud and money laundering]." Significantly, the Application note explicitly and unconditionally confirms: "The offense level for that group of closely related counts will be the offense level for the underlying offense *increased by the 2-level adjustment specified in this*

*section*, or the offense level for the obstruction offense, whichever is greater." *Id.*, emphasis supplied. In this case, the offense level for the fraud counts is greater than the offense level for the obstruction offenses. Therefore, as the PSR correctly determined, the offense level for the grouped counts is increased by "the 2-level adjustment specified in this section." *Id.*

In this same vein, the defendant argues that he should not be assessed a 3-level enhancement for having committed counts 10, 11 and 12 while on release. Once again, both the sentencing guidelines (USSG § 3C1.3) and Title 18 U.S.C. § 3147 make it crystal clear that the defendant is incorrect. Pursuant to 18 U.S.C. § 3147, the sentence for an offense committed while on release (here counts 10, 11 and 12) must run consecutively to the sentence for the originally charged crimes (counts 1 through 9). The government provided the defendant with appropriate sentencing notice that, if he were convicted of counts 10, 11 or 12, he would be subject to the sentencing enhancement under 18 U.S.C. § 3147. The Second Superseding Indictment specifically identifies counts 10, 11 and 12 as being brought subject to both the identified substantive criminal statute *and* the statutory penalties encompassed by 18 U.S.C. § 3173. Dkt 57. Accordingly, as is the situation here, "a statutory sentencing enhancement under 18 U.S.C. § 3147 applies, increase the offense level by 3 levels." USSG § 3C1.3.

### III.    A Sentence of 180 Months is Warranted under the Factors of 18 U.S.C. § 3553(a)

Defendant orchestrated several particularly pernicious fraud schemes over multiple years, stealing millions of dollars from Sanovas' investors, many of whom were retired schoolteachers, PSR ¶ 43, and are now unable to work to earn back the money they lost as a result of the defendant's fraud. Other victim investors were cancer survivors or spouses of those who died of cancer, PSR ¶ 42, who are now unable to retire "because of Larry's greed." *Id.* As is set forth *infra*, the defendant also caused incalculable harm to Sanovas, PSR ¶ 40, by lying directly to shareholders, manipulating and altering investment documents to increase his control over shareholder equity and failing to pay employer owed taxes on salaried Sanovas' employees. *Id.*

The defendant's criminal conduct was a grotesque betrayal of the company he was entrusted to lead, the victim investors in Sanovas and, most tellingly, this Court when he repeatedly violated his bond and sponsored phony documents in this criminal case to support a meritless pre-trial motion to dismiss the indictment. *See* Dkt 42 and accompanying declarations and exhibits. The defendant

committed his crimes pathologically, lying directly to victim investors and the BOD, creating fraudulent Halo invoices and a fake Hartford promissory note to try and falsely explain the source of the $2.6 million he stole directly from Sanovas to buy his lavish home and engaging in an escalating campaign of witness intimidation and harassment during the pendency of this case. There are no mitigating circumstances to explain defendant's crime spree. His acts were driven solely by greed to sustain a lifestyle filled with fancy sports cars, opulent family vacations, extravagant jewelry, an over the top 50th birthday party for his wife that included multiple bottles of Silver Oak wine, handmade designer rugs and furnishings, spa treatments and elective cosmetic procedures. All of this was paid for from Sanovas' coffers. In the world of white collar criminals, the defendant's unrelenting criminal behavior, his desire to "win" at all costs, his lack of insight into his own actions and his complete contempt for this Court's orders—both the release bond and the discovery protective order—set him apart as among the most heinous to have been prosecuted in this district in many years.

For all of the reasons contemplated by § 3553 and the Sentencing Guidelines, an appropriate sentence is a total of 180 months, 168 months on counts 1 thorough 9, to be served consecutively with 12 months for counts 10, 11 and 12.

### A. There are a Number of Aggravating Factors Supporting a Significant Sentence

#### 1. Gerrans Misled the Court in his Withdrawn Motion to Dismiss

One of the most significant aspects of the "nature and circumstances" of the defendant's offense conduct is that defendant continued his brazen criminal behavior after he was indicted. Not only did the defendant engage in a disturbing pattern of witness intimidation and attempted obstruction of justice while he was on pre-trial release, but he also tried to perpetrate a fraud on this Court. On August 12, 2019, the defendant filed a motion to dismiss the indictment. Dkt 42. This motion was supported by declarations from Gary Krausz, Anne Hipshman, Fred Davis and Kevin Day. One of the documents Krausz relied on in formulating the opinions and conclusions in his declaration was a December 18, 2009 employment agreement purporting to memorialize Shelly Gerrans hiring as an Administrative Assistant at Sanovas. Dkt 42-1. This document, which became Trial Exhibit 106, was demonstrably fraudulent.

In addition to the fake Shelly Gerrans employment agreement, the defendant foisted on the Court yet another, and even more problematic, phony document. Exhibit G to the Krausz declaration was a so-called "Unanimous Written Consent" dated December 3, 2013, which was supposedly signed by Sanovas' co-founder Ehran Gunday and the defendant. Dkt 42-1, pgs. 90-93. This document was Trial Exhibit 105 and was a counterfeit document with a forged signature of Gunday. The Court is all too familiar with the mountain of evidence the government presented at trial proving the falsity of both of these documents. Indeed, as the Court observed in its August 7, 2020 order denying all of defendant's post-trial motions: "Among other things, Krausz's opinion was based on false and fraudulent documents." Dkt 285, pg. 25.

The criminal pre-trial motions practice in federal court is entirely dependent on the honesty and integrity of the parties to the litigation. Prior to indictment, it is the government's responsibility to investigate and determine whether documents a defendant used in support of a scheme are fraudulent. However, neither the government nor this Court are responsible for investigating the authenticity of documents a defendant sponsors during the course of litigation after indictment. The Court and the government are entitled to rely upon documents that the defense proffers in a dispositive motion, such as the motion to dismiss the defendant filed in this case.

In this case, the defendant's motion to dismiss was based on several bogus documents that, if not revealed, could have resulted in this Court making a significant ruling based upon counterfeit materials. If the government had not been so dogged in locating Ehran Gunday in Turkey, the fraudulent nature of Trial Exhibits 105 and 106 might never have been exposed. To be clear, when Mr. Getz was made aware of the phony Exhibits (105 and 106), he did not renew the motion to dismiss. But, it was the defendant who provided the fake documents to the various declarants, knowing that these documents were bogus and fully intending to have the Court make a ruling in his favor based on fraud. This alarming circumstance, which is not accounted for in the applicable guideline range, is an exceptional aggravating factor supporting the 180 month sentence the government recommends.

### 2. Gerrans Engaged in a Campaign to Intimidate and Bully Witness Christopher Gerrans

The evidence at trial showed a campaign by defendant Lawrence Gerrans to bully and intimidate Chris Gerrans, a witness who testified at trial. The campaign began soon after Gerrans learned that Chris Gerrans had been subpoenaed to testify before the grand jury. At trial, Chris Gerrans testified about a number of incidents in which Gerrans exerted both explicit and subtle pressure on Chris Gerrans, including repeatedly telling him to assert the Fifth Amendment rather than testify and attempting to convince Chris Gerrans to alter or delay his testimony. Trial evidence addressed the following episodes:

- During a July 2018 phone conversation, Gerrans told Chris Gerrans he should have asserted the Fifth Amendment rather than testify before the grand jury, and Gerrans blamed Chris Gerrans for his indictment handed down by the grand jury. TR 1/15/20 at 116 (Chris Gerrans).

- Later in July 2018, Gerrans made a surprise and uninvited visit to Chris Gerrans' house where he lived with his wife and child. Gerrans was "in a rage" and angry, and demanded to know what Chris Gerrans told to the grand jury and whether he "took a deal." During that meeting, Gerrans also provided Chris Gerrans with a "burner" mobile phone to communicate with him in secret about the criminal case—which Gerrans knew was in violation of court-ordered bond conditions. *Id*. at 117-122.

- In about March 2019, Gerrans again arrived uninvited to Chris Gerrans' residence late at night, at about 10:30 or 11 p.m., a couple minutes after he sent a text message that Chris Gerrans understood to mean "I see you." Gerrans again told Chris Gerrans he should have asserted the Fifth Amendment in his testimony, and said that he was aware of Chris Gerrans' theft of money from Sanovas. *Id*. at 123-125.

- In July 2019, Gerrans used their father to pass a message to Chris Gerrans regarding his testimony at the upcoming trial, requesting that Chris Gerrans delay his guilty plea to his own conduct, and to state that Gerrans did not know about Chris Gerrans' theft from

Sanovas, and to change his prior testimony about how Gerrans used the money he withdrew from an IRA. *Id.* at 132-135.

- In August 2019, Gerrans confronted Chris Gerrans at a storage facility in San Rafael after first stealing Chris Gerrans' truck, and crushing Chris Gerrans' iPhone and throwing it in the back of the truck. Gerrans then returned to the storage facility, and during an angry tirade, physically assaulted Chris Gerrans, demanded that Chris Gerrans resign from Sanovas, and threatened that after the case is dismissed he was "coming after" Chris Gerrans. *Id.* at 142-150.

These episodes show that Gerrans waged a long campaign to exert leverage and pressure against his younger brother, with the obvious goal of bringing him into the fold—and to shape Chris Gerrans' testimony in the case, or to prevent him from testifying at all. Though the defendant was convicted of obstruction of justice and witness tampering for corruptly influencing Chris Gerrans' testimony—and as discussed above this conduct results in an adjustment in the guidelines—the breathtaking scope and unrelenting nature of the bullying and intimidating behavior is an aggravating factor in this case.

3. **Gerrans Has Expressed a Threat of Violence Directed at an Assigned Prosecutor Arising from a Pathological Fixation with the Prosecutor**

Another aggravating factor that should be considered in the sentencing of defendant Gerrans is his personal and obsessive fixation with one of the prosecutors assigned to the case. The issue has been previously presented to and considered by the Court in the context of Gerrans' multiple requests for release pending sentencing, and, therefore, the government will only summarize herein the most salient facts.

Leading up to the trial in this case, the defendant Gerrans told Chris Gerrans that they should "take out" AUSA Harris, the prosecutor assigned to the case. The defendant stated that he knew where the prosecutor lived and that he and Chris Gerrans should wait outside her home and "take her out" as she returned home from work. *See* Dkt 188 at 3, Dkt 189 (under seal) Exh. A. Chris Gerrans understood the statement as a threat of violence toward the prosecutor. *Id.* In a ruling on a motion for release post-conviction, the Court found that the Chris Gerrans' statement regarding the threat to the prosecutor is credible. Dkt 207 at 3.

The government also presented to the Court letters written by the defendant to his wife from jail. Dkt 189, Exhs. B, C, D. The defendant's letters accuse AUSA Harris of conspiring to prosecute and harm Gerrans, and state Gerrans' baseless conspiracy theory that AUSA Harris is vindictively and unjustly targeting Gerrans based on a perceived bias rooted in local politics. These letters show an abnormal and unreasonable fixation and obsession with AUSA Harris that corroborates the animosity contained in the threat Gerrans made to "take her out." In the April 14, 2020 order, the Court concluded that the threat and the statements in the jail letters were "troubling," and that "the risk of danger to Ms. Harris cannot be ignored." Dkt 207 at 3.

The personal, abnormally hostile and focused fixation with AUSA Harris, and the threats to her safety as demonstrated by the defendant's own statements, is also an overarching circumstance that should be considered in determination of an appropriate sentence.

### 4. The Offense Conduct Damaged the Company and Its Investors

The victim of Gerrans' fraudulent schemes is Sanovas, and the individual investors who supplied all the money for the company. The company's current CEO, Jerry Katzman, submitted a letter to the Court in advance of sentencing, as did three victim investors.

The submission from the CEO on behalf of Sanovas describes the harm that Gerrans inflicted well beyond the theft of funds that were the subject of the criminal trial and conviction. The letter states that the money to fund Sanovas, more than $60 million total, came from more than 700 individuals. According to the company, Gerrans' conduct in this case damaged the company because it interfered with its core mission, to develop novel medical devices. This is because Gerrans diverted money and resources to himself that should have been used to further the development of Sanovas products. When he was terminated, Gerrans left behind a company that may be unable to advance and repay its investors, in part based on his mismanagement, unpaid taxes, and continued litigation costs as the company tries to wrestle control from Gerrans.

The investor letters describe the trust that these individuals placed in Gerrans, believing that he would deliver on his promises to develop and sell the medical devices Sanovas was working on. The letters describe the scope of the harm caused by Gerrans here: (1) betrayal of the investors, including retirees who were counting on at least some of the promised returns to their investments, (2) the possible

destruction of any value to the company, because it was not and will not be able to develop the products and enter viable businesses as promised, and (3) the pilfering and loss of the amounts Gerrans stole, which was money that came from the investors and was supposed to be used to further the company. Though the guidelines calculation proposed by the Probation Office does not include an adjustment for the number of victims, because the direct victim of Gerrans' theft was Sanovas, the Court should consider the full scope of harm here, namely more than 700 individuals who supplied all the funding for the enterprise—and the dream of medical breakthroughs— that Gerrans betrayed with his crimes.

### 5. The Sentence Should Reflect the Need for Specific Deterrence and the Likelihood of Recidivism

Defendant's inability to cease committing crimes and his continued attempted victimization of members of the community, including his own brother and one of the prosecutors in this case, while he was under federal indictment is a significant aggravating factor in this case. So is the fact that the defendant attempted to commit a fraud on this Court in order to improperly secure dismissal of the indictment against him. Either one of these factors, standing alone, would warrant a very lengthy sentence when combined with the twelve counts of conviction. But, these aggravating factors are just the tip of the iceberg. The defendant violated this Court's discovery protective order by providing discovery, including FBI 302's of a cooperating witness, to his wife, who in turn showed them to her father-in-law, who testified before the grand jury and was listed on the government's witness list. After he was indicted, the defendant inveigled his father and stepmother to act as intermediaries in his efforts to tamper with Chris Gerrans' testimony. PSR ¶ 29. He also solicited his wife to try to arrange to smuggle a contraband computer tablet and cell phone into jail. PSR ¶ 33.

Most important, the defendant has shown absolutely no remorse for his conduct and the significant harm that he has caused his victims. He has repeatedly blamed others for his predicament: his brother, the prosecutor, his trial attorney and, this Court. The defendant has demonstrated a pervasive and pathological denial about his behavior which speaks to an alarmingly high likelihood of recidivism. This poor prognosis is further supported by the continued criminal behavior the defendant has exhibited while on release and during his incarceration.

Section 3553(a)(2)(C) requires the Court to consider the "need to protect the public from further crimes of the defendant." The defendant has demonstrated in this very case that he is a recidivist criminal. A sentence of 180 months is needed in order to protect the public from a defendant who has demonstrated to this Court that he is an unrepentant itinerant fraudster. We respectfully recommend a sentence of 168 months on counts 1 through 9, to be followed by a consecutive 12-month sentence on counts 10 through 12, for a total of 180 months imprisonment, to be followed by 5 years of supervised release, a $1200 special assessment, a $40,000 fine and restitution as ordered by the Court.

### B. The Opinions of Dr. Ernst are Unreliable and do not Justify a Variance

In connection with one of the defendant's motion for release from custody after conviction, the defendant submitted a report from a psychologist named Dr. Teo Ernst. This report, which is also referenced in the PSR at ¶ 82, purports to conclude that Gerrans was at a low risk for violence, including violence targeting one of the assigned prosecutors and witness Chris Gerrans. The self-serving and unreliable conclusions presented by an "expert" hired by Gerrans, and any additional opinions or conclusions by Dr. Ernst, should be given no weight in the determination of the sentence.

In his report submitted to the Court and the Probation Office, Dr. Ernst relied only on information from the defendant himself and a handful of selected family members, and contains two seemingly contradictory themes: (1) Gerrans suffered trauma as a child and "stressors" as an adult, and (2) Gerrans is successful, accomplished, connected to his family and community, and empathetic. Dkt 265 (filed under seal).[2] The report also makes unwarranted and baseless assumptions and conclusions regarding the evidence at trial, including engaging in unsupported speculation that Chris Gerrans' testimony at trial and his statements made to law enforcement were unreliable.

Dr. Ernst's conclusions contradict findings by this Court regarding the defendant's danger and other factual issues, including the credibility of Chris Gerrans. Dr. Ernst opines, again based only on his rank speculation, that defendant's express threat to "take out" the prosecutor and defendant's statement to witness Ryan Swisher that he "would have killed" Chris Gerrans if there were not so many cameras at

---

[2] The report of Dr. Ernst was filed under seal, but in this brief, as with prior briefs addressing this report, the government is only generally describing the conclusions or is addressing issues and information in the report previously raised and relied upon by the defendant in public filings.

the storage facility, were only "figures of speech." Dkt 265 (Under Seal Report). This astonishing conclusion is contradicted by the facts presented at trial and in connection with the defendant's motions for release. For example, this Court concluded that the defendant's jail letters to his wife exhibited a "disturbing fixation" with AUSA Harris, and that the risk of a danger to AUSA Harris "cannot be ignored" particularly given the defendant's temper as displayed during the storage facility incident. Dkt 207 at 4. Magistrate Judge Sallie Kim, who made findings in an order on a subsequent failed motion for release, also concluded that Dr. Ernst's opinions were unpersuasive: In an order denying a renewed motion for release, Judge Kim stated that Dr. Ernst's report is based on "unfounded speculation and in some cases simply ignores evidence." Dkt 271 (under seal).

Dr. Ernst's report also reaches unfounded and speculative conclusions about Gerrans' letters, written from jail to his wife that reflect Gerrans' preoccupation with the prosecutor and the defendant's bizarre fixation on the perceived personal nature of the prosecution in this case. The Ernst report also includes dubious conclusions regarding the threat, (which both this Court and Judge Kim deemed credible) to the prosecutor made by Gerrans prior to the trial in this case. Dr. Ernst's report represents a biased and one-sided view of the circumstances, and either ignores or mischaracterizes facts and testimony, and his conclusions should not be given any weight in this proceeding.

CONCLUSION

Based on the foregoing, the United States requests the Court to impose a sentence of 168 months on counts 1 through 9 to be followed by a consecutive 12-month sentence on counts 10 through 12, for a total of 180 months imprisonment, to be followed by 5 years of supervised release, a $1200 special assessment, a $40,000 fine and restitution as ordered by the Court.

DATED: October 26, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____/s/_____
ROBIN L. HARRIS
LLOYD FARNHAM
Assistant United States Attorneys