SHAWN HALBERT (CSBN 179023)
214 Duboce Avenue
San Francisco, California 94103
Telephone: (415) 703-0993
shawn@shawnhalbertlaw.com

Attorney for Defendant LAWRENCE J. GERRANS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. CR 18-00319 EMC |
| v. | **DEFENDANT LAWRENCE J. GERRANS' SENTENCING MEMORANDUM** |
| LAWRENCE J. GERRANS, , | Hearing: November 4, 2020<br>Time: 9:30 a.m. |
| Defendant. | Court: Honorable Edward M. Chen |

**INTRODUCTION**

The man who stands before the Court is first and foremost a loving husband, father, brother, son and friend. As the many letters from family members and friends attest, Larry Gerrans has always been deeply concerned with decreasing suffering in the world and bringing laughter and support to others. He has been a dedicated, hard worker from the time he was a child. Motivated by an interest in medicine and the deaths of people close to him, Mr. Gerrans embarked on a life-long profession in marketing medical innovations that could cure disease. He devoted a tremendous amount of time and energy over the past decade to the company that he believed would find non-invasive surgical cures for cancer and ophthalmologic ailments and would disrupt the "big Pharma" model of putting people on expensive

1

medications rather than curing their illnesses. Sanovas was a labor of love in which Mr. Gerrans sought investments from people he knew and loved; he believed his company would become a publicly-traded success story that would revolutionize medicine and crowd-source funding. Mr. Gerrans' dedication and commitment to his work was equaled only by his fierce love for his family and community.

There have been many strong and divergent views of the facts presented by the government at trial and by the defense in connection with the post-trial motions. The Court is left with the critical task of imposing the appropriate sentence in this case. U.S. Probation recommends imposing an extraordinarily long sentence, which given Mr. Gerrans' age and health could effectively be a life sentence. The defense respectfully submits that such a sentence is not only unwarranted under the Guidelines but is also not in the interest of justice and is disproportionate to Mr. Gerrans' conduct.

Amidst the drama and emotional conflict in this case, it is important to remember that the government's case at trial was that Larry Gerrans stole money from Sanovas to buy a family home and pay taxes and that he then tried to hide his crime. This was not something like a Ponzi scheme, so the very good news is that the family home that Mr. Gerrans was convicted of purchasing still exists and has only increased in value; it can be sold and the money placed into a trust pending appeal so that the full amount of money taken can be returned to appropriate investors (rather than going to the executive branch of the government and leaving Mr. Gerrans with a restitution bill he will never be able to pay).

The serious and unwarranted post-trial allegations that Mr. Gerrans presents a physical danger to Chris Gerrans and/or AUSA Harris have become the tail wagging the dog in this case. U.S. Probation's guideline recommendation in this case of a very lengthy sentence, despite its recognition of a number of bases for downward departures and variances, is explicitly based on the claim that Mr. Gerrans made "two threats of violence to people involved in this case."

Chris Gerrans' late allegations, which were not raised at trial and have never been subject to cross-examination, that Larry Gerrans posed an actual danger to Chris and/or AUSA Harris, should be stricken from the PSR and cannot provide the basis for a higher sentence for Larry Gerrans. Further, by meeting personally with the probation office and providing material about the alleged threat to be

2

included in the PSR, as well as arguing to the Court that she personally feels Mr. Gerrans is a threat to her if he is released, AUSA Harris has impermissibly acted as both a prosecutor and the alleged victim in the case, giving her a personal interest in the sentence in this case and tainting any neutral evaluation of this aspect of the case by U.S. Probation or the Court.

In determining a sentence, the Court must begin with a lower guideline range than that in the final PSR, which contains two significant guidelines errors: First, the loss amount is incorrectly calculated, and second, the PSR incorrectly adds a three-level adjustment to the entire offense level for commission of three counts while on release, which misreads the guidelines. The correct final offense level should be 30 rather than 35, resulting in a **starting** guideline range of 97-121 months.

The defense submits a number of factors that support a below-guideline sentence in this case: (1) under USSG §5H1.6, a departure because Mr. Gerrans' incarceration will cause an irreplaceable, substantial and specific loss of essential caretaking and financial support to his family; (2) a downward variance based on the related emotional and psychological detrimental effect on Mr. Gerrans' children resulting from a lengthy incarceration; (3) Mr. Gerrans' low risk of recidivism; (4) the inhumane conditions that Mr. Gerrans has experienced during the past fifteen months of his incarceration at four different jails; and (5) Mr. Gerrans' record of sustained community service, including his involvement in youth sports and his church community.

Larry Gerrans has already suffered the excruciating punishment of going from the beloved head of his successful company to a convicted felon who has lost the company he aspired most of his adult life to build and has had his reputation destroyed by the news stories falsely portraying him as a violent and dangerous "liar and cheat." Removing Larry Gerrans from society for an extended period of time and effectively warehousing him helps no one and serves no punitive, rehabilitative or deterrent purpose.

## DISCUSSION

### A. APPLICABLE LAW

As this Court is well aware of the law governing sentencing, the defense will simply emphasize here that after determining the advisory sentencing range, district courts must consider the factors

Defendant's Sentencing Memorandum
CASE NO. CR 18-310  EMC

specifically identified in 18 U.S.C. § 3553(a) before imposing a sentence and to depart above or below the Guidelines range if appropriate. *See Cunningham v. California*, 549 U.S. 270, 286-87, 127 S.Ct. 856, 166 L. Ed. 2d 856 (2007). *United States v. Booker*, 543 U.S. 220 (2005) and its progeny do "not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). The Supreme Court emphasized that "the Guidelines are not only not mandatory on sentencing courts, *they are also not to be presumed reasonable.*" *Id.* at 352 (emphasis added). Courts must calculate the sentencing guidelines range and then, but then determine what sentence is actually appropriate for the specific individual in light of the 18 U.S.C. §3553(a) factors and explain the variance from the former if justified by the latter. *Id.*

## B. RELEVANT FACTUAL BACKGROUND

### 1. Personal Background

Larry Gerrans grew up as a loving child in a large family that was rife with dangerous dysfunction. The defense has previously submitted to this Court, under seal, the Forensic Psychological Evaluation of Mr. Gerrans by Dr. Teo Ernst. In connection with sentencing, the defense also submits the Addendum to the Report, Declaration of Shawn Halbert in Support of Defendant's Sentencing Memorandum ("Halbert Decl."), Ex. 1. The defense asks the Court to review these documents in connection with this sentencing. Because a detailed description of Mr. Gerrans childhood is included in the original report and concerns personal trauma, these important facts will not be repeated herein.

Despite or perhaps because of the psychological and physical challenges he faced, Larry Gerrans was always positive and driven to be successful and to lift others up with him. During his childhood, he was an excellent student and participated in various after-school sports. At Novato High School, he lettered in three sports, was on the speech and debate teams, was a member of the Latin Club and the Futures Club, was on student council, and was voted "best personality" four years in a row. After 18 months at community college, he attended and graduated from Northern Arizona University, where he excelled academically and was president of the Student Athlete Council, being voted "most inspirational player" on his team. *See* Halbert Decl., Ex. 2 (Mr. Gerrans' diploma and transcript from Northern

4

Arizona University and newspaper article describing him being selected as most inspirational player on his football team). During a year he spent taking classes in Europe and playing football in the World League, he was mentored by an orthopedic doctor who noticed that Larry had an aptitude for anatomy and biology and encouraged him to go to medical school.

After graduating, Mr. Gerrans was working a number of jobs (including unloading trucks at UPS and working at an airport) when he met his current wife, Shelly Gerrans (nee Smith), in July 1993. He was only 22 years old and she was only 25 years old. Shelly was a working single mother with two children from different fathers. They met in Flagstaff, Arizona and fell in love at first sight. They moved to California a few months later and Mr. Gerrans began working at the first of the three Fortune 500 companies he would work at over the next fourteen years, first working as a surgical implant consult for Depuy Orthopedics (Johnson & Johnson) from 1993 to 1996, then at Stryker from 1996 to 2002, and then at Smith & Nephew from 2002-2006. With the exception of a brief financial failure when he and three young friends became involved in a large options deal involving a commodities transaction in Asia in 2005-2006, Larry was successful professionally, Halbert Decl. Ex. 3 (examples of awards and commendations Mr. Gerrans received while at Stryker).

Thus, following a path he had mapped out in early childhood, Mr. Gerrans took on substantial responsibility early on in his life. At the age of 22, he was working at a job that he described as "punching above his weight class," was in a serious relationship, and took responsibility for raising Shelly's five-year old son and caring for her daughter Sarah when she lived with them part-time. They settled in Danville in 1996. Shelly worked as a dental assistant and then at a restaurant while Larry started working at Stryker. They purchased their first home in 1998 and remodeled it while they lived in it until 2005. Their daughter Hailey was born in 2001, Kylie in 2003, and Mackenzie in 2005.

Over these same years, Larry's relationship with Chris was complicated. Chris struggled from an early age, and although Larry helped Chris to get a football scholarship at Weber State in Utah, Chris was kicked out early on after getting a felony conviction and jail time for theft. Still the caring older brother, Larry helped Chris get into Hartnell, where Chris was again kicked out. After Chris moved back

5

in with his mother, it was known by the family that he was using drugs, which affected the relationship between the two brothers. Chris was supposed to be in Larry's wedding but Chris was non-functional and did not even attend Larry's wedding to Shelly in 1999. The brothers came back into contact after their mother called Larry in 2001 to help Chris, who had been accused of two felony counts of lewd and lascivious acts with a child under 14 years of age. Larry spent $30,000 of his own money to pay part of the cost of an attorney to defend Chris, who eventually pled guilty to a misdemeanor in 2004. Larry again took Chris under his wing and tried to help Chris to get back on his feet. Chris struggled for the next number of years until Larry encouraged him to get his degree from University of Arizona online, which he eventually did before joining Sanvoas.

It is important that the Court is aware of the circumstances of the Gerrans' 2010 bankruptcy because it was used at trial as a weapon to suggest that the Gerrans were profligate people who, "fresh off of bankruptcy…"[1] proceeded to take money that did not belong to them. This false narrative is likely to have prejudiced Mr. Gerrans to the Court as it did to the jury. In fact, bankruptcy filings in California (and nationwide) were the highest in 2010 of any year from 2000 to 2019 because of the 2008 financial crisis.[2] The Gerrans were not a Great Gatsbyesque couple carelessly leaving wreckage in their wake; rather they were a young family with five children who had lost the home they built from scratch and the land it was on after the mortgage crisis and Shelly's serious health issues.

In 2003 and 2004, Larry and Shelly purchased twenty acres of property in El Dorado Hills to build a dream "forever" home. (They sold the home they had remodeled in Danville and purchased a

---

[1] Government Closing, 49:12-13 and 57:17-18. *See also* Government Closing at 41:12-1 ("There's only one big problem. Larry Gerrans has no money. He's fresh off a 2010 bankruptcy. You remember, you heard from the bankruptcy trustee. He and his wife have filed for personal bankruptcy. They have $4.7 million in liability.") and 58:2-5 ("[The IRA] was liquidated in 2013, April of 2013. In fact, the first liquidation happened at a time when Larry Gerrans was still in bankruptcy. The bankruptcy hadn't even been discharged, and he was liquidating his IRA and going on a spending spree.")

This was actually untrue. The Gerrans' bankruptcy was discharged on August 18, 2010.

[2] See https://abi-org.s3.amazonaws.com/Newsroom/State_Filing_Trends/FilingTrendsCalifornia.pdf at page 2 (showing number of bankruptcy filings in California for each year, with, for example, 39,205 bankruptcy filings in California in 2006; 260,210 bankruptcy filings in 2010; and 83,670 bankruptcy filings in 2015).

6

Defendant's Sentencing Memorandum
CASE NO. CR 18-310  EMC

track home in Serrano, CA, in 2005.) This home was a labor of love that they built from the ground up. *See* Halbert Decl., Ex. 5 (photographs depicting the construction on the Gerrans' home in 2006-2007). Mr. Gerrans' career continued to flourish and the home was completed in September 2007. In August, 2007, Shelly had a hysterectomy in which the surgeon left a device in her body, which made her ill but was not discovered until she collapsed and was hospitalized in October, 2007. Days later, the Gerrans were informed that CTX Mortgage, with whom they had a construction loan that was supposed to convert to a conventional 30-year mortgage after the home was built, was going to go into bankruptcy, that they could not get insurance on the note, and that the loan was due immediately. They were unable to get a new jumbo loan because of the financial meltdown. Facing legal fees connected with their medical malpractice suit and paying expenses on credit cards, the Gerrans struggled for a year and then filed for bankruptcy after learning in December, 2009 that an entity purchased their mortgage and was foreclosing on the property.

Building a company like Sanovas with Erhan Gunday was a dream that Larry had had for years, and he took the opportunity of a fresh start to do that. During the first few years, they operated out of their homes, raising money, attending surgeries and creating patents. While Mr. Gunday was dismissive of Shelly's contributions to Sanovas, he may not have even known about them; in fact, she was modern "girl Friday" for Larry Gerrans from the inception of Sanovas; although she never got a paycheck until much later, she worked tirelessly to do all of the hundreds of things necessary to support a startup, including arranging and booking all of Mr. Gerrans' substantial travel, preparing packets for investors, filing papers; and as the company started to grow, furnishing employees offices, stocking the fridges and ordering food for meetings, and cleaning. She also set up models in the offices and attended and set up booths at conferences. *See* Halbert Decl., Ex 6 (documents and photographs relating to the types of tasks that Shelly Gerrans performed at Sanovas in the early years of the company).

Larry Gerrans' adulthood was characterized by the tremendous amount of time and energy he devoted to raising his family and helping other people. Even though he worked long hours, he spent every free moment participating in his children's lives, coaching their teams, and providing emotional

support. The defense asks the Court to read the letters received from family and friends, attached hereto as Exhibit A, in their entirety, as they reflect a person who is kind, generous, and went out of his way to help people in need. A few highlights from these letters include:

"When I was old enough, at the age of twelve, to understand the importance of stability and family unity, I moved in with Larry and my mother. I had called him Dad for so many reasons. If I had to define him in a word, that would be that- FATHER. A fathering light of guidance and wisdom. A rock, a stable venture into a big world I knew hardly anything about…Have you ever sat in a room with one person and felt like nothing could harm you? Not your nightmares, fears, past enemies, not even God's vengeance itself? I have. His name is Larry Gerrans and I took his last name when I was thirteen because I wanted to embody the man who taught me self-esteem, moral and ethical premises, to look into myself and against all odds, fight my battles with integrity and pride. To allow no one, not one single person to affect my duty in this life, and that was to be kind, honest and true in every venture. To work harder than those around me, to admit when I am wrong and to "know better" therefore always doing better… To take risks and be "that female entrepreneur," that female police officer, that female doctor. The world was my oyster because I had a man who looked me in the eye and stated that no matter what he would always be there. He has always held true to that promise. I am twenty-eight years old and, while grown and financially and emotionally independent, I will never outgrow the need of my father's comfort and guidance." (Sarah Gerrans)

"Larry isn't my biological father. However, he has done more for me, than any father could hope to do for their sons… I did my best to push his buttons and see what I could get away with. Larry never faltered. He was always there with a big smile, trying to get me to see that he was there not just for my mom, but for me as well. Day after day, month after month, he stuck around… for us both. …This man, who was barely old enough to begin starting a family, just committed himself to a pre-teen boy for the rest of his life… He was always the first person to congratulate me when I was victorious but was also there to catch me when I lost. Never one to use violence or anger as a teaching method, but rather using failure as an opportunity to help me learn from my mistakes….My father is a loving man, one of high moral character and values. He has raised 5 children, two of us whom are not even his biological children, and we can all attest to his love and compassion." (Brandon Gerrans)

"I only know Larry as an extremely hardworking businessman who spent countless hours at work. When he wasn't working, he was coaching soccer, watching Mackenzie ride, nightly barbecues, fixing so many things around the house, and spending time with the girls. When there was a problem, Larry would always offer his help or his expertise no matter how big or small. There are countless stories of Larry helping people with cancer or just people down on their luck and needing a helping hand. I do not claim to know anything about his business affairs, all I know is the deep bond and love between Larry and his family…All I know is the tears the girls cry for their Dad is unbearable for me to witness. Three young teenagers' lives will be forever changed without the support of their father they love so deeply." (Tricia Macwhorter)

"He was a quintessential family man. He was also there for his friends and extended family if ever there was a need…What stood out the most about Larry was his love, devotion and adoration of his wife and his 5 beautiful children. Aside from being great friends, Larry and his wife showed my family selflessness and the true meaning of friendship. In 2008 my then teenage daughter went missing. Without hesitation, Larry, Shelly and family came to our side…[and] assisted me with law enforcement and emotionally supported me in a way that was above and beyond what one would expect in that space. Their love and support kept me from losing my

8

mind and aided in the safe rescue and return of my daughter 8 days later…Due to the seriousness of the crime and threats from her perpetrators, their violent past and in spite of great risk to Larry and his family, they welcomed my daughter into their home on their secluded property to ensure her safety until her perpetrator was apprehended. How many "friends" can say they would do this? This tremendously selfless act, spoke volumes to me about Larry and Shelly's character. About their selflessness and friendship…. It is my honor to speak to his outstanding character and what I saw him as; a wonderful human being, father, friend, husband, brother, son and gifted innovator." (Vicki Meade)

"Larry has been a figurehead for this family for a while now… Larry was the person to step to the forefront to help. This was not a role we asked of him, but a role he volunteered for and accepted without pause or complaint. …I remember when I, my brother Robert, and our parents were stranded after our car had been stolen. Late in the night and frightened (at least frightening for my brother and I because we were so young), Larry didn't hesitate. He showed up despite working long hours and having his own family at home. And he showed up not just with himself, but with hot chocolate, donuts, and blankets for a cozy ride home. The manner and method of his response may seem trivial, but it underscores the way Larry thinks. He was as concerned with helping people as he was making them feel safe and comfortable at a distressing time.…Time and time again, Larry has been there for our family. Larry has always had a natural ability to find energy for those around him, not just within his own family." (Patrick Gerrans)

"Larry is my older brother by 13 years. My whole life Larry has been someone that I have admired, looked up to and he looked out for me. Larry is a good listener, understanding to life's circumstances and will tell you when he has no idea what you're going through, but will always offer sound reasonable advice. I see Larry as a loving husband to Shelly and loving father to his five children and a great uncle to my three children. Larry is always willing to help those in need, family, friend or stranger. I mentioned this in a previous letter to the court but I can't reiterate enough that his love, admiration, and fun he had as a dad shaped my want to be a father." (Robert Gerrans)

"In all the years I have known him, he has always been a very giving, generous person. He has a long history with our family and we consider him and his family as part of our family…My children consider him an uncle and my husband considered him a brother. He has always been a loyal friend and helped my children and I tremendously when my husband passed away 4 years ago. He made a great effort to be here for us and help us out when I needed to deal with getting my husband's affairs in order. He made time in his busy schedule and flew out to help me meet with lawyers and assist me with legal & financial issues. He has never asked for anything in return and has always been a devoted friend. From what I have observed over the years, he is an amazing father and husband…" (Jamie Sabatini)

"While in school I was broke (like most college students) and on more than one occasion I reached out for financial help and he extended his hand without question. In 2004 I was diagnosed with a Pituitary Brain Tumor and would need to have it removed quickly. I was 26 years old, newly married w/ 2 kids, self-employed with no insurance. I was scared, and our State Provided Ins. (Access) was sending me to a Surgeon that had never performed the procedure before, this added some anxiety to the whole thing. Larry reached out to me and introduced me to one of the top surgeons in the country, Dr. Kumar at UCSF. Still with no Ins. the out of pocket cost would not be affordable, so Larry again reach out to UCSF and Dr. Kumar and got them to reduce my cost to something affordable for me, this saved me tens of thousands of dollars and allowed me to get the surgery I needed. This is just my story; I know over the years I've heard of several others and would guess that there is 100s just like mine. As a man of faith, Larry helps people that's what he has always done…" (Darin Smith)

9

"Larry has coached two of my daughters in sports, and was a great coach. He put a great deal of time into the kids, and had a great ability to get the most out of them, was a great leader and role model for the girls, and provided for a great experience for kids and parents alike. He has always been generous with his time, and always goes the extra mile when anyone needs anything… [When we went hunting in Colorado] there are numerous examples of Larry's greater concern for the group or an individual, then him worrying about himself…I specifically remember multiple situations where a hunter's radio wasn't working, and Larry left his location to go check on another hunter/friend. He was selfless out there, and day in and day out, he was a great and steady friend there. I can honestly tell you, Larry is a good man, a great father, a great friend, helps those around him, and always offers a helping hand when anyone is in need. If anyone in our community needed anything, Larry was the first to jump in a car, call friends, and find a way to help. He is truly a value to our community." (Mike Dougherty)

"Larry Gerrans is one of the most respectful, kind, caring men I have ever met. He is also one of the most giving men I know. I've known him ever since I could remember and he's been nothing less than amazing. After my dad passed away, he continued to care for and take care of my family. We spent a lot of time with him and his family since I was very young and saw him and his family many times each year growing up…I remember when we were in the grocery store he bought food for the people behind us. He never made anyone feel anything but loved. He is the kindest, most generous man I've ever met, even to other people he's never met." (Adam Sabatini)

"Being a single, working mother in a new place was not easy. I don't know what I would've done without the support and kindness bestowed upon us by the Gerrans family. Nikyla would spend long weekends with them, Halloween, and continued to be on Larry's soccer team through the Fall 2018 season. Larry provided a strong and supportive male presence in my daughter's life and she highly respected him. He gave his whole heart to the soccer team, even though he was working hard and long hours at his company. He taught these girls how to be respectful, how to be team players, and provided a sense of community and leadership. When he was on the soccer field with them, he was fully committed and present. I respected that about him and I will always be grateful for the generosity that he and his wife extended to me and my daughter." (Angela Christian)

"He invited me over to his house several times to work on various projects regarding helping Veterans. I met his family through my visits and we all became friends…Larry is and has always been a very loving, caring and supporting person to those around him. He always was looking for ways to help out his community and those he loves and cares about. He was always very compassionate towards others, especially those who had any traumatic life experiences…Last year I went through a divorce, partially because of my combat-related PTSD from serving in the US Army during Operation Iraqi Freedom in 2003. Larry opened his home office to me where I stayed for a short period until I got back on my feet, even while he was fighting for his life in court….he is a very generous, trusting, open, genuine, caring, non-violent, and loyal human being. There is no fear of violence in any way. He uses his mind, determination and gratitude for life to help elevate the welfare of his fellow human beings." (Aaron Augustis)

**2. Sanovas**

While relevant facts about Sanovas will be discussed in connection with legal issues, it is important to the sentencing that the Court appreciate the extent of the company that Mr. Gerrans helped to build. The government suggested at trial that Sanovas was not so much a real company but rather was just a "slush fund" for Mr. Gerrans. In closing, the government even argued that investors put their

money "*in what they thought was* a startup medical device company…") (39:14-15). The defense addresses this allegation in part in the video submission to the Court,[3] and also notes the following:

As of 2017, Sanovas had hundreds of patents for a variety of medically significant and potentially lucrative devices. *See* Halbert Decl., Ex. 7 (2017 St. Onge Steward Johnston & Reens LLC listing of Sanovas patents). Based on these patents, the company was valued by an outside entity at 1.34 billion dollars (like a company like Amazon, valuation does not always reflect profit but potential worth). An example of one of the subsidiaries that provided such value to Sanovas was EagleEye BioScience, valued by Quist at approximately $100 million dollars. Halbert Decl., Ex. 8 (2018 Quist valuation of EagleEye BioScience, submitted under seal due to confidential proprietary information). As described in the Quist valuation, Sanovas sought to "create affordable, portable 'Technologies for the Masses' that will expand Minimally Invasive Surgery ("MIS"), globally." *Id.*[4] As referenced in the Quist valuation document, in 2017, Larry Gerrans had negotiated an agreement with the government of China that anticipated joint funding ventures involving tens of millions of dollars as well as the development of products in China. *See* Halbert Decl., Ex. 9 (2017 Agreement between Suzhou Industrial Park BioTech Innovation Center and Sanovas, Inc.)

The defense understands that the Court considers Mr. Gerrans guilty of acting fraudulently to obtain funds from Sanovas to purchase his home. However, it is important for the Court to understand a point that was never explained at trial, which was that Mr. Gerrans liquidated the IRA in 2013 so that he could get deferred compensation that he otherwise could not get from Sanovas at the time because of liquidity concerns. Mr. Gerrans was advised by an attorney that this meant he was liquidating his IRA

---

[3] The video submission is being submitted electronically at https://vimeo.com/472322152 (password to be provided to the Court and parties).

[4] The Quist valuation describes Sanovas' accomplishment as follows: "The Company's patented products enable surgeons to access, visualize, diagnose, measure and treat obstructed passageways in areas of the body that are inaccessible using currently marketed surgical tools. Sanovas products are designed to provide surgeons with faster, less- invasive, lower- risk and more cost- effective interventional treatments. … The Company has technologies with competitive advantages in the surgical camera market and the pulmonary disease markets, with proprietary products focused on airway management, lung cancer, chronic obstructive pulmonary disease, asthma and cystic fibrosis. Additional addressable markets include treatment of diseases and disorders of the six major organ systems that possess tubular anatomy."

Defendant's Sentencing Memorandum
CASE NO. CR 18-310  EMC

"in furtherance of the business of the company" because if he did not take income at that time, he could not stay with Sanovas. The "in furtherance of" language is the exact same language that was presented to the Board members when they ratified Mr. Gerrans' 2015 Employment Agreement. Mr. Gerrans never claimed to have literally put the IRA money into Sanovas.[5] Thus, the government's scathing presentation at trial that Mr. Gerrans had spent his IRA money on personal expenses, including a wedding ring (to replace the one his wife had sold when they went bankrupt), was a red herring that likely prejudiced Mr. Gerrans before this Court. In fact, Mr. Gerrans kept a careful record of how he spent the IRA money because it was effectively compensation from Sanovas that he believed Sanovas would have to repay in the future; significantly, most of that money went to rent and other living expenses, as well as a $30,000 payment to Chris to help him out financially. *See* Halbert Decl., Ex 10 (Larry Gerrans' handwritten notes documenting how the IRA fund was disbursed in 2013).

## C. SENTENCING GUIDELINE CALCULATION

There are two errors in the guideline calculations contained in the PSR. Additionally, the PSR erroneously recommends that Mr. Gerrans should not receive a downward departure or variance because of two alleged death threats.

### 1. Loss Calculation

The PSR, ¶ 38 and ¶51, incorrectly calculates a loss amount of 3.5 million-9.5 million rather than the correct loss amount of $1.5-3.5 million. The PSR bases its calculation on the following: $2,581,066 (home purchase); $310,581 (personal taxes); $195,000 (rent payments); $117,271 (American Express charges); $52,500 (Mercedes SUV); and $291,250 (direct, non-payroll payments to Lawrence Gerrans between June 2014 and December 2017); for a total of $3,547,668.[6]

---

[5] Under the Parole Evidence Rule, the language in the contract itself controls, and the contract signed by the Board does not say that Mr. Gerrans transferred the IRA money into Sanovas, only that the liquidation was in furtherance of Sanovas. Anyone claiming Mr. Gerrans said the money from the IRA was being deposited directly into Sanovas is mistaken or misinformed.

[6] The description of Objection No. 6 in the PSR does not accurately describe the defendant's objection to the loss calculation, as contained in defendant's PSR Objections.

Defendant's Sentencing Memorandum
CASE NO. CR 18-310  EMC

Because the PSR calculates that Mr. Gerrans is in a higher loss amount by a very small amount of money ($47,668) - there are a number of reasons that the loss amount is at least $47,669 less than that calculated by U.S. Probation; the Court merely needs to find that $47,669 of the alleged loss has not been proven to move Mr. Gerrans down to the lower guideline of a $1.5million – 3.5 million loss. The Court can reduce the loss guideline by finding that $47,669 in any of these categories has not been proven as loss:

First, regarding the $195,000 of rent payments that the PSR includes in its loss calculation, these rent payments were not alleged as part of the conspiracy in the Second Superseding Indictment and thus are not relevant conduct. Further, as clearly explained in the contemporaneously prepared documents, CFO Robert Farrell told Gunday that certain of Mr. Gerrans' rent payments to which Gunday had objected (including rent to Declaris of $53,400) were fairly included in legitimate expenses under the employment agreements. *See* Dkt 235-1 at p. 108. As the government discovery shows (and the government did not allege was illegal), Mr. Gunday took $185,000 in "relocation expenses" to pay for travel and rent in a little over a year, in addition to substantial amounts of compensation. *See* Dkt 254-1.

Second, there is no dispute that Larry Gerrans lent more than $200,000 of his own money to Sanovas in February, 2016, which is confirmed by bank account statements and credit card bills produced in discovery that have previously been provided to Court and were given to U.S. Probation, Halbert Decl., Ex. 11 and Dkt 254-12, as well as and a contemporaneous email from Larry Gerrans to Chris Gerrans on February 12, 2016, Dkt 235-1 at 318-319 (confirming to Chris Gerrans that Larry Gerrans paid a corporate Sanovas American Express bill of $50,000 and that on February 12, 2016, Larry wired $150,000 from his person account to cover Sanovas' Payroll, Medical and PG&E). The loss amount for the purpose of the guideline cannot be increased by the amount that the Gerrans spent on the American Express card in 2017 but not reduced by the equivalent amount that Mr. Gerrans loaned the company from his personal funds in 2016.

Third, the government never proved the amount to which Mr. Gerrans was entitled in his employment agreements, and thus, the amount Mr. Gerrans took over the amount he was owed, if any, is

unknown. The PSR states that this Court found that Mr. Gerrans was not entitled to that money in its August 7, 2020 Order. The Court did not make that finding, but held that the government simply had to show that Mr. Gerrans obtained the money for his home via deception, not that he was not legally entitled to it.

Fourth, this Court has documentation that as of August, 2013, Sanovas' attorneys and CFO Robert Farrell had determined that Messrs. Gunday and Gerrans were entitled to deferred compensation, bonuses, and car allowances from 2010 through 2012, and that Mr. Gerrans in particular was entitled to $723,000. *See* Ex. 235-1 p 125-126. As part of his Separation Agreement, independent from the past car allowances, Mr. Gunday himself received $21,518.14 based on 18 months of a car allowance for January, 2014 through June, 2015. 235-1 128-129. See also Exhibit C to Gunday Separation Agreement (giving him $32,400 for car allowances from 2010 to 2012). 235-1. Rather than credit this material, the PSR includes its own legal interpretation of the employment agreements and concludes that Mr. Gerrans was not entitled to take compensation or expense allowances outside of the same calendar year. PSR Objections ¶ 16. The probation office exceeds its role by attempting to perform an independent legal and ERISA analysis of these contracts; the assertion in the PSR is at odds with the analysis of ERISA attorney Eleanor Bannister, who informed Messrs. Gunday and Gerrans in 2013 that they needed to collect their payback and expense allowances from 2010-2102 as quickly as possible. Halbert Decl. Ex 5 FBI 2434. The $52,000 for the car that the PSR includes in the loss amount for Mr. Gerrans is encompassed in the car allowances to which Mr. Gerrans was entitled from 2010 to 2014. *Compare* car allowances received by Gunday with approval by King & Spalding and Pillsbury in 2014: $32,400 from 2010-2012, unknown amount for $2013, and $21,518.14 for 2014-2015 (as described above).

For all of the above reasons, even assuming the convictions and relevant conduct, the range should be no higher than $1,500,000-$3,500,000.[7]

---

[7] While the Court need not reach the issue in light of the foregoing, consideration of the alleged $291,250 "direct, non-payroll payments" in 2014 and well as the rent payments are also barred by the failure of the government and U.S. Probation to follow the local criminal rules. The government repeatedly declined to provide undersigned defense counsel with a list of what materials it had provided to Probation. In defense counsel's August 26, 2020 objection letter to U.S. Probation, she asked for the

14

## 2. Enhancement and Grouping Error

The guidelines provide for an increase of three offense levels for crimes that are committed while a person is on release. USSG §3C1. Paragraph 57 of the PSR, which applies this increase to the *total offense level*, is in error because Mr. Gerrans did not commit Counts 1-9 (which form the basis for the guideline calculations under USSG §2S1.1 in paragraphs 49-56 of the PSR) while he was on release. A three-level increase in this guideline would be appropriate only if Mr. Gerrans had committed the financial fraud and money laundering (which are the main drivers of the guideline) while on release.

The §3C1.3 enhancement is properly applied by calculating a separate guideline for Counts 10-12 under USSG §2J1.2 (Obstruction of Justice), since those counts were the only ones committed while Mr. Gerrans was on release. The sentencing guidelines direct that where a defendant is convicted both of an obstruction offense *and* an underlying offense with respect to which the obstructive conduct occurred, the counts group and the offense level is the greater of *either* (a) the offense level for the underlying count as increased by the 2-level obstruction enhancement, *or* (b) the obstructive conduct.[8]

Here, the offense level for the underlying offenses in Counts 1-9 is Offense Level 32 (PSR ¶¶ 56, 58). The offense level for Counts 10-12 is calculated pursuant to USSG §2J1.2 and even with the 3-offense-level increase for committing the crime while on release, is substantially lower than 32. As the offense level for the underlying offense (increased by a 2-level adjustment for obstruction) is higher than

---

source of the $291,250 figure as well as the $195,000 of rent payments. Information regarding the rent payments and the alleged $291,250 direct, non-payroll payments was not provided to the defense by the government and U.S. Probation until *after* the final PSR had issued. Because Mr. Gerrans was moved from LA MDC, he has never seen the documents that were ultimately identified by the government and Probation.

[8] *See* Application Note 8 to §3C1.1. "Obstructing or Impeding the Administration of Justice" ("Grouping Under §3D1.2(c).—If the defendant is convicted both of an obstruction offense (e.g., 18 U.S.C. § 3146 (Penalty for failure to appear); 18 U.S.C. § 1621 (Perjury generally)) and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of §3D1.2 (Groups of Closely Related Counts). *The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section,* or *the offense level for the obstruction offense, whichever is greater.*") (emphasis added).

Defendant's Sentencing Memorandum
CASE NO. CR 18-310 EMC

the offense level for the obstruction offenses, the offense level for all of these "closely related counts" is 32 as per Application Note 8 to §3C1.1.

### 3. The PSR Erroneously Bases its Sentencing Recommendation on the False Allegation that Mr. Gerrans Threatened to Kill Two People

The government's allegations, which figure prominently in the PSR, that Larry Gerrans poses an actual danger to Chris Gerrans and/or AUSA Harris and threatened them, should be stricken from the PSR and cannot provide the basis for a higher sentence for Larry Gerrans on the current record.

As a preliminary matter, the government has tainted any neutral evaluation of the matter by U.S. Probation or the Court by (1) having AUSA Harris meet personally with U.S. Probation Officer Goldsberry and provide her with material about the alleged threat to be included in the PSR, and (2) having AUSA Harris argue to the Court repeatedly that she personally feels Mr. Gerrans is a threat to her if he is released, an argument not only for punishment but for incapacitation. AUSA Harris has impermissibly acted as both a prosecutor and the alleged victim in the case, giving her a personal interest in the sentence in this case and creating a conflict by asking the Court to protect her personally.[9]

In this case, the alleged death threats are not being treated as enhancements but are being used to justify an extraordinarily long sentence for a $2.7 million fraud case where, even under the government's theory, Mr. Gerrans' attempt to hide the fraud had no effect on the government's ability to

---

[9] AUSA Harris has characterized Mr. Gerrans as more dangerous than an MS-13 member (4/2/20 hearing at 14:21:1-15) and being like Al Capone (7/15/20 at 60:24-61:2). The reality is that he is a person who has not had a single disciplinary issue during the 15 months he has been incarcerated in four different jails and who has no history of violence. The appellate court will decide if AUSA Harris' participation in the case at trial, while being the senior attorney on the case, provides a basis for a new trial. "Members of a U.S. Attorney's staff should not participate 'in a particular investigation or prosecution if such participation may result in a personal . . . conflict of interest, or the appearance thereof.' 28 U.S.C. § 528. Although a stronger showing of conflict is required for prosecutorial recusal, *United States v. Isaacson*, 752 F.3d 1291, 1308 n.11 (11th Cir. 2014), we 'categorically forbid[] an interested person from controlling the defendant's prosecution," *United States v. Siegelman*, 786 F.3d 1322, 1329 (11th Cir. 2015) (emphasis omitted). The Supreme Court has recognized '[t]he requirement of a disinterested prosecutor," because '[a] prosecutor exercises considerable discretion' in a criminal proceeding, and these decisions 'are all made outside the supervision of the court.' *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987)." *United States v. Spiker*, 649 Fed. Appx. 770 (2016 U.S. App. LEXIS 8293) (finding that AUSA's failure to recuse himself from the case involving death threats from defendant was plain error).

Defendant's Sentencing Memorandum
CASE NO. CR 18-310 EMC

try its case whatsoever.[10] The Court now has substantially more evidence than it did when it heard about the threats at the bail hearing, and defense counsel is now familiar with the record, unlike at the bail hearing in April.

The credibility of the threats rests on the shoulders of Chris Gerrans.[11] It is difficult to understand why the government or the Court would find Chris' word more credible than Larry's. The Gerrans family is a large, close family who care equally about Larry and Chris and value Chris' safety, and yet **every single member of the family** – including Larry and Chris' father and step-mother, brothers, sisters, in-laws and other family members –  have signed a letter in which they say directly that Larry is not a physical threat to anyone. Despite Chris Gerrans' claims that he was not close to the rest of the family and was scared of Larry, the reality was that the family was very close, and Larry was Chris' best man at his wedding and held his daughter in the hospital, and that Chris' family frequently came to Larry and Shelly's home. *See, e.g.* Halbert Decl., Ex. 12. The defense has submitted a plethora or letters to the Court from people who have known Mr. Gerrans over the course of his whole life and who attest to his character for exceptional kindness and the lack of a violent or threatening nature. They are people who grew up with Mr. Gerrans or have seen him in every kind of situation, including through years of sporting events and coaching, a place where a bad temper and lack of impulse control would be noticed.

---

[10] Normally, "[t]he burden of proof for a factual finding underlying a sentencing enhancement depends on the magnitude of the finding's effect on the sentencing range. As a general rule, a preponderance of the evidence standard applies, but the Government must meet a higher standard—proof by 'clear and convincing evidence'—in cases where there is 'an extremely disproportionate impact on the sentence.'" *United States v. Valle*, 940 F.3d 473 (9th Cir. 2019) (quoting *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001). However, in this case, the alleged threats are being used to counteract Mr. Gerrans' substantial bases for downward departures and the inclusion in the PSR will affect everything from Mr. Gerrans' designation to his eligibility for programs and time credits.

[11] Larry Gerrans' statement to the Public Storage guy that he was so angry he would have killed his brother is not a threat in any sense of the word. If everyone who said "I could have killed him!" was considered a danger, a lot of people would be locked up. As described in the Addendum to Dr. Ernst's report, even if Mr. Gerrans had made a threat rather than saying he would have killed him, "threat assessment literature" indicates that threats are usually venting and do not correlate to actual violence, Addendum at 2, especially when there is no evidence of violent intent.

Defendant's Sentencing Memorandum
CASE NO. CR 18-310  EMC

It is also difficult to understand how the government or the Court would trust Chris over Larry. As Dr. Ernst notes, the best predictor of a person's future is the past; in considering a physical threat, one need only compare Larry's history and numerous letters of support from people of all walks of life to Chris' long history of drug use, multiple criminal convictions, being a party to three restraining orders (1999, 2004, and 2013, one of which involved a child), being kicked out of a casino for assaulting a woman in 2015, having his first real job as an adult at Larry's company, having unexplained access to money enabling him to buy Range Rovers, Porches and Teslas, and admitting at trial to embezzling more than a million dollars over four years at Sanovas. His prior conviction involving a child exposes him to extreme danger in custody and his father testified in the grand jury that Chris told him he was going to a country club and that he was scared of prison.

It is critical for the Court to know – contrary to the story at trial -- that Chris did not start cooperating with the government until **after** the confrontation at Public Storage when Larry threatened to turn him in to the Department of Justice. At the time of Larry and Chris Gerrans' confrontation at the Public Storage on August 13, 2019, the evidence shows that **Chris Gerrans was not cooperating with the government**. Prior to the confrontation, the last time that Chris Gerrans had made a proffer to the government was when he met with the government in October, **2017**, while represented by Sanovas' attorneys at Orrick Harrington. Chris Gerrans did not meet again with the government to debrief until **after** Larry confronted him at the Public Storage, called him a sell-out, and threatened to turn him over to the Department of Justice. *See* Halbert Decl., Ex. 13 (Chris Gerrans FBI 302s from October, 2017, August 2020 (including Chris Gerrans entering into formal proffer agreement with the government). The

Defendant's Sentencing Memorandum
CASE NO. CR 18-310  EMC

only subpoena that Larry and Chris discussed at Public Storage was the one Larry had discovered

showing that Chris had actually embezzled 200 checks rather than eight.[12] [13]

Unless the Court holds an evidentiary hearing at which defense counsel is permitted to cross-examine Chris Gerrans and the government is able to prove these extremely serious allegations, they should not be included anywhere in the PSR or used in any way in connection with sentencing.

## D. NUMEROUS FACTORS SUPPORT DOWNWARD DEPARTURES AND VARIANCES

Mr. Gerrans respectfully requests a downward variance departure from the Guidelines' recommendation to allow for a sentence of three to five years. There is at least one specific ground for a downward departure from the Guidelines range as well as ample reason to support a downward departure based on the Court's discretion to do so when justified by the circumstances. Here, the defendant's family obligations and lack of criminal history warrant a sentence outside the advisory guideline system.

---

[12] Prior to being remanded into custody for his argument with Chris Gerrans, in late July/early August, Larry Gerrans was given access to Sanovas emails by an interested party. Larry read the emails around August 7, 2020 and discovered that he Sanovas bank account was essentially empty and that in June and July 2019, Steve Bayern collect $90,000 and Chris Gerrans received $38,000 from Sanovas in June and July, 2019, *see* Halbert Decl., Ex. 14 (June and July 2019 Sanovas bank statements). As described in earlier filings, Larry also discovered that Chris was working with Katzman so as not to reimburse Mr. Gerrans for the high cost of refrigerating all of the cadavers and tissues banks that were being stored on Mr. Gerrans' property at home, as well as the May, 2019 subpoena from FBI Agent Jason Richards to Katzman at Sanovas inquiring about over 200 fraudulent checks written by Chris Gerrans between 2014-2018, comprising approximately 1.2 million dollars. When Mr. Gerrans discovered all of this information, he contacted his criminal and civil attorneys with the email that has previously been submitted to this court entitled "Chris is a SELL OUT" and urged his attorneys to turn Chris over to the Department of Justice.

[13] As the defense also demonstrated in post-trial briefing, Chris Gerrans lied at trial. He testified that he embezzled using approximately 50-60 checks (169:14-17) and that he did not start stealing money until after Larry purchased his home in March, 2015 in response to Larry's theft, whereas in fact Chris' embezzlement included more than 200 checks and he stole more than $209,000 from Sanovas from July 2014 to December 2014; more than $174,000 in January and February 2015, and more than $150,000 before Mr. Gerrans purchased his home. Chris Gerrans was also not cross-examined about recent crimes and false statements to which he admitted in his December 10, 2019 interview with the FBI, where he admitted to including a false statement in his loan documents, asking his father to lie for him, and depositing money into his wife's name in order to build her credit. Bates FBI 2552-2553.

19

### 1. Family Ties and Responsibilities

Under the Sentencing Guidelines, the Court may make a downward departure from the applicable guideline range if a sentence within the guideline range:

> (i) will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family; (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. . . . (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family; (iv) The departure effectively will address the loss of caretaking or financial support.

USSG §5H1.6. Mr. Gerrans' family has been left virtually penniless, and this conviction has had an extraordinarily consequential impact on Mr. Gerrans' wife and children. Mr. Gerrans has been the primary wage earner for the entire life of their family. His family will be left with nowhere to live in the midst of the current global pandemic. While Shelly hopes to go back to school and work, she is going to have an extremely challenging time financially caring for her two daughters who are still at home.

### 2. Impact of Incarceration on Gerrans Children

In addition to the loss of financial and caretaking support created by Mr. Gerrans' incarceration, there are numerous studies impacting the negative affect on children whose parents are incarcerated. "Incarceration breaks up families, the building blocks of our communities and nation. It creates an unstable environment for kids that can have lasting effects on their development and well-being." The Annie E. Casey Foundation, *A Shared Sentence: The Devastating Toll of Parental Incarceration on Kids, Families, and Communities* 1 (2016).[14] "[P]arental incarceration leads to an array of cognitive and noncognitive outcomes known to affect children's performance in school" Leila Morsy & Richard Rothstein, Economic Policy Institute, *Mass Incarceration and Children's Outcomes: Criminal Justice Policy is Education Policy* (2016).

Mr. Gerrans' 15 months of incarceration, and the fact that he was literally ripped from his daughter's arms by ten law enforcement agents in the federal building, with the attendant loss of contact

---

[14] http://www.aecf.org/m/resourcedoc.aecf-sharedsentence-2016.pdf

Defendant's Sentencing Memorandum
CASE NO. CR 18-310 EMC

with Mr. Gerrans and constant fear that he will contract Covid and die or be permanently damaged, have already affected the family, as Shelly Gerrans will communicate in private to the Court. Mr. Gerrans was an emotional anchor for his family, including his teenage daughters who are at a critical stage of their development. While having a parent incarcerated is never easy, losing their father for an extended period at such a critical juncture in their lives will surely have lasting effects on his children. A lengthy incarceration will have further detrimental impact on Mr. Gerrans' children.

### 3. Low Risk of Recidivism

One of the critical issues for the Court to consider is the need to specifically deter Mr. Gerrans from future criminal conduct. (There is no issue of general deterrence as what has happened to Mr. Gerrans would strike fear into any would-be criminal's heart). The Sentencing Guidelines recognize that all white collar cases in general have defendants with lower rates of recidivism, but Mr. Gerrans has essentially no chance of recidivism. He had no record of financial crime in his past – to the contrary he has an impressive professional background. Further, his felony conviction will permanently prevent him from ever being able to run his own company. It is extremely unlikely that he will ever have a job other than one with a paycheck.

### 4. Mr. Gerrans' Conditions of Confinement over the Past Year and Three Months

The fifteen months that Mr. Gerrans has served in custody should count for substantially longer than a typical fifteen months. A person convicted of wire fraud and money laundering would typically be in a minimum-security camp with the opportunity for education and employment. However, this Court must consider the inhumane, traumatizing and almost unbelievable conditions of confinement that Mr. Gerrans, who had never before spent a day in custody, has experienced since August, 2019 When he was placed into custody in Santa Rita Jail, Mr. Gerrans did not receive his medications for a month, and not only experienced conditions of confinement that included rat feces in his food and dirty clothes, but he was surrounded by people who were using drugs and was traumatized after he watched a young man detox, be beaten by guards, and ultimately die in front of him. In Santa Rita he also caught MRSA, a flesh-eating disease and lost a portion of the tissue on his toes. He was in tremendous pain and actually

21

had to urinate on his own feet because Santa Rita would not give him proper medication. He had this staph infection for 9 months, including during trial.

After he was asked to become a spokesperson for detainees protesting their conditions of confinement at Santa Rita, Mr. Gerrans was punished for exercising his civil rights by being transferred to Marin County Jail, where he was locked up in solitary confinement for months, not leaving his cell for three days at a time, not seeing or talking to another human being, and having almost no phone calls home (he had one hour every three days to shower and call home). The conditions at the next jail – San Francisco County Jail – are notoriously bad, so bad that the jail had to be closed down, and of course by March, 2020, the pandemic had begun. When Mr. Gerrans was moved to LA MDC, he was either in solitary confinement or locked in his cell 23.5-24 hours per day. He slept in a cell infested with ants and was placed in a cell with a Covid-positive patient. Most recently, at Core Civic in Nevada, Mr. Gerrans was in complete lockdown until he was recently moved into a room that is like an airplane hangar where he cannot sleep, there are riots, and it is also infested with bugs (including worms in the food). These conditions have emotionally and psychologically affected Mr. Gerrans and should not be conditions of confinement for any human being.

### 5. Past Good Works and Future Contribution

While not explicitly a factor outlined in the Guidelines, Mr. Gerrans' past good works—and potential for future contribution—should be considered when considering whether a downward departure is appropriate. The evidence in this case also unequivocally shows that Mr. Gerrans has been actively involved in his community for his entire life. He has coached years of team sports, he has been an important part of his religious and other communities, as described in the letters submitted to the Court.

### 6. Other Factors

The Court may also consider that the main crime alleged in this case was Mr. Gerrans using company funds to buy a family home when his landlord was selling it. The Court has substantial information about Mr. Gerrans' background of childhood abuse and trauma that created a "savior

22

complex" in him; after the loss of the home his family had built in the financial crisis of 2008 and Shelly's substantial health issues from the years 2007-2012, followed by a battle with co-founder Erhan Gunday that almost led Mr. Gerrans to leave the company but instead resulted in Gunday's exit from the company with a lot of stock and a 1.5 million dollar payout at a time when Mr. Gerrans could not even afford to buy a car. Mr. Gerrans was desperate to put a life-mask on himself and his family by providing them a permanent place to live. He certainly could have chosen a smaller house, but the essence of the offense was buying a home for his large family. This home still exists. It has increased in value. This Court can preside over an agreement between the parties in which the home is sold, the mortgage is paid, and the money is spent paying back any investors that the Court believes should be paid (the most likely candidates would be those who invested in Sanovas between January-March, 2015). This is not a crime that has to leave any victim harmed.

## E. OBJECTIONS TO THE PSR

The PSR contains many inaccuracies but the only additional ones that the defense will discuss herein are as follows:

Regarding the letter from Jerry Katzman: The evening before the final PSR was due, the government produced a letter from Sanovas CEO Katzman that purported to be a "victim letter." It is nothing of the sort. In fact, the letter does not address in any way the effect of the use of Sanovas funds to buy Mr. Gerrans' home in 2015, and instead levels wild accusations against Mr. Gerrans, none of which were ever raised in the criminal case and cannot be considered by this Court. Mr. Katzman is currently in a lawsuit with Sanovas investors and may be sued civilly by other investors because he is dismantling Sanovas and removing subsidiaries in ways that are making the Sanovas stock worthless. His allegations belong in a civil lawsuit, and given that they are entirely without factual support, cannot be considered by this Court.[15]

---

[15] By way of background, it is worth nothing that Mr. Katzman and his partner Steve Bayern appear to be grifters who took the company from Mr. Gerrans while promising him they would get tens of millions of dollars of investment. "Dr" Katzman has lost his medical license in two states – New York and Florida – and spent the first 40 plus pages of his civil deposition describing the various lawsuits to which he has been a party. When Mr. Gerrans was on Wall Street in 2018, shortly before the first indictment was issued, he had been introduced to Jerry Katzman and Steve Bayern, who told Larry

Defendant's Sentencing Memorandum
CASE NO. CR 18-310  EMC

Regarding the alleged Victim and Restitution Letters: The PSR includes letters from three investors who also happen to be three of a very small number of investors who have sued Sanovas. They are not victims of Mr. Gerrans' criminal conviction because, as noted in the PSR, the victim in this case is Sanovas. Nor does the PSR comply with the requirements for providing notice or supporting information for restitution sought by former Sanovas Board members.

## F. CONCLUSION

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary…." 18 U.S.C. § 3553(a). Here, the sentence the PSR recommends exceeds that mandate and by a lot. The Probation Report recommends a high sentence in part on the basis that Mr. Gerrans' lacks insight into his crime because he denies it. The federal criminal justice system is not one that tolerates assertions of innocence without a substantial penalty. Recognizing that an innocent man at his parole hearing will not be released from custody unless he admits guilt, the defense cannot say anything other than that Mr. Gerrans truly believed that he was entitled to the funds that he took from Sanovas for his home, for a myriad of reasons that did not come to light at a trial. And he emphatically never attempted to influence his brother's testimony or threaten to physically harm anyone. Already subject to a five-offense level-increase resulting from not "accepting responsibility" and for obstruction of justice (raising his guideline range in the final PSR by six years at the low end and eight years at the high end), Mr. Gerrans should not be further punished for not embracing the guilty verdict.

Mr. Gerrans is deeply remorseful for many things he did and would change much about what he did at Sanovas in order to have stayed at the company and salvaged his investors' investment and trust.

---

Gerrans that they could get him a $5 million dollar bridge loan and $20 million dollars in investment right away. They convinced Larry Gerrans to pay them tens of thousands of dollars per month in consulting fees to bring in tens of millions of dollars in financing for Sanovas. It was not until Larry Gerrans had to resign as Chairman of Sanovas in December 2018 that he discovered Katzman's malfeasance (for example, paying his friend Bayern $90,000 in two months from June-July 2019). Mr. Katzman is currently taking measures that are devaluing the shares of the people who originally invested in Sanovas. He himself has not paid payroll taxes for Sanovas and his claim that Sanovas should have received government Covid relief, when the company experienced no losses due to Covid, indicates only that Mr. Katzman was intending to get government money without merit.

Defendant's Sentencing Memorandum
CASE NO. CR 18-310 EMC

But the punishment should fit the crime, and even under the government's theory of the case, this is a financial crime. There are many defendants who get probation for a loss of this amount and almost no defendants who get anywhere close to the amount of time that U.S. Probation has recommended.

In applying the parsimony principle, a district court should impose the *shortest* sentence possible that, (1) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; (2) deters future criminal conduct; (3) protects the public from the defendant and (4) provides the defendant with the "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2) (described as "the parsimony provision." *United States v. Jimenez-Beltre*, 440 F.3d 514, 525 & n.8 (1st Cir. 2006)). A long term of imprisonment is not necessary to punish Mr. Gerrans any further, as his entire life has been destroyed; as described above, no further deterrence is needed of warranted, nor does the public need to be protected as Mr. Gerrans will not be able to run his own company; and finally, it is counter to any rehabilitative or socially constructive purpose to incarcerate Mr. Gerrans for any extended length of time.

For the foregoing reasons, the defense respectfully requests that the Court sentence Mr. Gerrans to a term of imprisonment of between three to five years in custody.

Dated: October 26, 2020                    Respectfully submitted,

_____/s/_____
SHAWN HALBERT
Counsel for Defendant Larry Gerrans