DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ROBIN L. HARRIS (CABN 123364)
LLOYD FARNHAM (CABN 202231)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7321
robin.harris2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LAWRENCE J. GERRANS,<br>a/k/a LARRY GERRANS,<br><br>Defendant. | CASE NO. 3:18-CR-00310 EMC<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Date: November 4, 2020<br>Time: 9:30 a.m.<br>Honorable Edward M. Chen<br>Courtroom 9, 19th Floor |

**INTRODUCTION**

Defendant Lawrence Gerrans sentencing memorandum is notable for its lack of remorse and for sheer chutzpah in recommending a three to five year sentence to punish the defendant's multi-year fraud scheme and his contempt of this Court's bail and discovery protective orders, not to mention the fraud defendant attempted to perpetrate on the Court with his use of counterfeit documents to support a pre-trial motion to dismiss. Defendant's proposed downward variance range is 79% (at the low end) and 71% (at the high end) less than the applicable guideline range. Defendant's three to five year recommendation is objectively unreasonable and bears no relationship to his crimes nor his demonstrably high likelihood of recidivism. The 168-month guideline sentence recommended by Probation and the slightly higher 180-month sentence recommended by the government reflect the need to punish the defendant for his conduct and provide general deterrence against fraud and specific deterrence against the obstructionist behavior defendant brought to this case.

A substantial variance, such as the one defendant advocates, would send the wrong message to this defendant and the community at large. If the Court grants any variance, let alone such a significant variance, the defendant's decision to defy this Court's bail and discovery protective orders and his efforts to fraudulently secure a favorable outcome for himself in this case—including sponsoring counterfeit documents in a case-dispositive motion—will have paid off. The sentence imposed must be serious enough to protect the community from an economic predator who has shown time and again that he has no ability to conform to the laws of society and the rules of the judicial system.

Also, the government objects to any "private communications" between Shelly Gerrans and the Court (*see* Dkt 302, pg. 21). The government also objects to any further submissions in any format, including but not limited to, videos, audio recordings or further written or oral submissions (other than a defense allocution at the sentencing hearing if the defendant so chooses) that were not included in defendant's October 26, 2020 sentencing memorandum and the attachments thereto. The government's objection is based upon the Court's September 29, 2020 order requiring the same. Dkt 298.

This reply memorandum is filed pursuant to Criminal L.R. 32-5(c) and addresses (1) the components comprising loss; (2) the impact of grouping and the required 3-level enhancement for additional crimes while on pre-trial release; (3) consideration of the threats of violence defendant made

during the pendency of this investigation and prosecution; and, (4) the request for a downward variance insofar as the request is based on family responsibilities and/or caretaking or financial support.

## DISCUSSION

### A. Loss Attributable to Gerrans' Conduct is more than $3.5 Million

As discussed in the government's Sentencing Memorandum, the PSR correctly estimates the loss in this case by including various methods that the defendant used to improperly siphon money from Sanovas. There is no doubt that the funds he took were investor funds; as proved at trial the only source of incoming money to the company—other than a handful of sales of a camera model not approved for medical use—was money raised from investors. As such, the diversions of money by Gerrans was money that the company did not have to fund operations, pay tax obligations, pay vendors, hire employees, and use for other expenditures that would have been key to its success.

Regarding the largest amount of loss here, the $2,581,066 stolen to buy the house, the only argument made by the defendant is to raise yet again a rejected legal defense, asserting that the government did not prove that Gerrans did not believe he was entitled to the money. Dkt 302 at 13-14 (Def. Sentencing Memorandum). This argument, advanced for the first time after he was convicted, has been conclusively rejected by the Court in the order denying the motion for judgment, finding that Gerrans' belief that he was "entitled" to amounts up to the $2.5 million is not a defense to the fraud, and therefore this amount is unquestionably loss resulting from the relevant conduct in this case.

The defendant also disputes the inclusion of the amounts that Gerrans appropriated to himself for rent on his personal residence before the purchase of the 28 Greensburgh house, but he does not dispute the actual amount attributed to these payments, $195,000. Dkt 302 at 13. Instead, the defense theory that these amounts should be excluded from loss depends on arguments rejected by both the jury and the Court that Gerrans was entitled to the funds, and that they were "legitimate expenses" under Gerrans' agreements with the company. The defendant also seems to argue again, as he did at trial and in his failed post-trial motions, that his unusual and profligate use of Sanovas money to pay for personal living expenses (in addition to his salary) is justified because of the amounts Sanovas paid to Ehran Gunday upon Gunday's separation from and giving up control of the company he co-founded with Gerrans. However, neither of these arguments preclude the inclusion of personal rent in the loss calculation; this

is money that Gerrans diverted from Sanovas for his personal use, and was part of the same pattern of conduct and scheme to defraud in this case.

The defendant also faults the PSR for including the $52,500 that Gerrans wired out of the company in October 2014 and that trial evidence proved was used to purchase a Mercedes for his wife. In response to an objection from the defendant, the PSR also noted that the employment contracts themselves, cited by Gerrans to justify this improper payment, do not support Gerrans claim that he was entitled to this payment, or that any "car allowance" would accumulate and revert to him, if unpaid and would not justify a lump sum transfer years later. PSR, Addendum re Objections, ¶¶ 15-16. The PSR analysis is correct, and is supported by the evidence at trial showing that the transfer of the money used to purchase this car was taken out, in a lump sum, from the funds deposited by an investor that same day. The fact that Gerrans transferred the $52,000 to his shell company Halo bolsters the conclusion that this sum was improperly diverted from Sanovas to Gerrans and, thereafter, used by Gerrans to buy his wife the Mercedes. Gerrans is now trying to justify this large transfer just as he had attempted to justify the fraudulent fund transfers during the investigation and trial—by claiming after-the-fact he was "owed" this money by the company. As the Court has repeatedly held, this is not a defense to Gerrans' fraudulent transfers.

The defendant also raises two payments totaling $200,000 made by Gerrans in February 2016, one a wire of $150,000 to a Sanovas account, and another a transfer of $50,000 paid to the Sanovas American Express credit card. Defendant argues he should receive a credit against the loss total for these two payments. However, the evidence at trial showed that in December 2015, Gerrans applied for and received a mortgage loan from J.P. Morgan Chase in the amount of $750,000. TR 1/17/2020 at 59-61 (Brett Hellstrom). This large cash-out loan was secured by a lien on the house at 28 Greensburgh Lane—the property that Gerrans purchased with stolen Sanovas funds and held at that time in his name. It was just weeks after that large J.P. Morgan cash-out loan that Gerrans made these two payments to Sanovas, now claiming that he was loaning money to the company. These two payments back into Sanovas, using money that Gerrans obtained through a mortgage on the house he claimed as his own but which was purchased with stolen Sanovas money, should not count as a credit against the losses calculated in the PSR; this money was obtained through the charged scheme to defraud.

The amounts included in the PSR's calculation of loss are based on the detailed summary exhibits prepared by Phillip Villanueva that were prepared for and presented to the jury at the trial. The PSR appropriately included amounts from that summary. Exh. 279. It should also be noted that the PSR did not include all amounts on Exh. 279 that could have also been considered amounts taken by Gerrans: The total amounts that were transferred out to Gerrans, Halo, and Hartford—not including payroll paid to Gerrans of more than $1 million—totals more than $4.5 million. The loss figure in the PSR, $3,547, 688, is a reasonable estimate of the actual and intended loss resulting from the offense and relevant conduct. *See* USSG § 2B1.1, application note 3(C).

**B. The Defendant Committed Crimes While on Release and Obstructed the Due Administration of Justice**

The defendant argues that he was improperly assessed a 3-level enhancement under USSG § 3C1.3, claiming that because the crimes he committed while he was on pre-trial release (counts 10, 11 and 12) are grouped with counts 1 through 9, the crimes that he committed while on release are *ipso facto* erased and do not factor into his sentencing guidelines. Dkt 302, pg. 15. Not surprisingly, defendant cites no authority for this proposition. Counts 10, 11 and 12 were committed by defendant while he was on pre-trial release. The 3-level enhancement under USSG 3C1.3 for having committed these crimes while on release is added to the offense level for the grouped counts. Grouping does not void counts 10, 11 and 12 and nothing in Title 18 nor the sentencing guidelines suggests otherwise.

In fact, pursuant to the mandatory provisions of 18 U.S.C. § 3147, the term of imprisonment the Court imposes for counts 10, 11 and 12 "*shall* be consecutive to any other sentence of imprisonment." *Id*. emphasis supplied. There is no exception from this mandatory provision anywhere in Title 18 or the sentencing guidelines when crimes committed on release are grouped with other crimes the defendant also committed. Because the statutory enhancement required by 18 U.S.C. § 3147 applies—even the defendant does not dispute that counts 10, 11 and 12 were committed while he was on pre-trial release—the provisions of USSG § 3C1.3 apply. Section 3C1.3 requires a 3-level increase to the base offense level when, as here, the statutory sentencing enhancement under 18 U.S.C. § 3147 applies.

To be clear, neither the sentencing guidelines, the commentary to the guidelines nor section 3147 carve out an exception for crimes that are committed on release that are grouped with other crimes

committed prior to the imposition of pre-trial release. To the contrary, "[t]his guideline [3C1.3] enables the court to determine and implement a combined 'total punishment' consistent with the overall structure of the guidelines, while at the same time complying with the statutory [18 U.S.C. § 3147] requirement." USSG § 3C1.3, commentary. The 3-level enhancement for committing a crime while on release ensures that the defendant will face additional consequences under the sentencing guidelines for his criminal behavior on release, even if his crimes on release are grouped with his other counts of conviction. It is for this reason that the Application Note to section 3C1.3 specifically commands: "The court will have to ensure that the 'total punishment' (*i.e.* the sentence for the offense committed while on release *plus* the statutory sentencing enhancement under 18 U.S.C. § 3147) is in accord with the guideline range for the offense committed while on release, *including*, [] the adjustment provided by the enhancement in this section." *Id.*, emphasis supplied. Here the guideline range for the crimes committed on release is 35, which *includes* the 3-level enhancement under USSG 3C1.3, as the application note requires. Indeed, to ignore the mandatory consecutive sentencing enhancement required by 18 U.S.C. § 3147, which triggers the 3-level enhancement, would be to eviscerate Congress' clear intent that there must be tangible consequences, *i.e.* a higher sentence than the defendant would have otherwise received if he commits additional crimes while on release.

**C. The Threats Defendant Made During the Pendency of the Criminal Case are Relevant to the History and Characteristics of this Defendant**

This Court can and should take into account the threat of violence made by Gerrans immediately following the verbal and physical altercation with Chris Gerrans on August 13, 2019. Gerrans' conduct that day led to him being charged and convicted of obstruction of justice and witness tampering. The angry and unhinged nature of Gerrans' behavior during the confrontation is not premised only on Chris Gerran' testimony, but is also based on the portions of the altercation that the security cameras captured, as well as testimony from a disinterested third party, Ryan Swisher. Swisher is the witness who testified that he also saw Gerrans loudly and aggressively confronting Chris Gerrans, and Swisher is the person who told law enforcement and the Court about Gerrans' statement that he would have killed Chris Gerrans. Baseless attacks on Chris Gerrans' credibility do not even begin to address the other evidence regarding the nature of the altercation and the threatening statement Gerrans made afterward. This

evidence can and should be considered by the Court because the incident at the storage facility is relevant to the offense conduct itself, and to the history and characteristics of the defendant under 18 U.S.C. § 3553(a).

As noted in the government's sentencing memorandum, the altercation at the storage facility was the last in a long string of episodes in which Gerrans was trying to exert control over and influence Chris Gerrans and the statements and testimony he would make in the investigation and trial. In context, both the anger and the threat of violence fit a larger pattern, a pattern of behavior that should be considered by this Court in fashioning an appropriate sentence.

The defendant also requests that the information about Gerrans' threat to kill a prosecutor assigned to the case be stricken from the PSR, and disregarded by the Court at sentencing. The information regarding the proposal by Gerrans to kill a prosecutor involved in the case was considered and relied upon by the Court in the context of Gerrans' repeated motions for release from custody following conviction. The information can and should be considered during the sentencing proceedings, as the Court considers the nature and circumstances of the offense and the history and characteristics of the defendant.

The defendant has tried and continues unsuccessfully to try to discredit Chris Gerrans' statements. In his sentencing memorandum defendant argues again, as he did in his motion for a new trial and for judgment of acquittal, that new materials contradict the "story at trial." Def. Memorandum at 18. As already extensively briefed in the motions for judgment and a new trial, the defendant intentionally mischaracterizes the evidence presented at trial. Defendant also ignores trial evidence that does not fit with his argument; in fact, in June 2019 Chris Gerrans told Lawrence Gerrans that Chris Gerrans knew he was going to be indicted for his embezzlement from Sanovas, and said he intended to take responsibility and plead guilty. TR 1/15/20 at 128-129. Then on July 1, 2019, defendant Gerrans passed instructions, using his father as an intermediary, directing that Chris Gerrans should not plead guilty until after Lawrence Gerrans' trial, and should alter his previous testimony—clearly an indication that Lawrence Gerrans understood that Chris Gerrans may be a witness for the government at trial well in advance of the altercation at the storage facility. *Id*. at 132-136.

The defendant also continues to rely on a report prepared by a hired psychologist Dr. Teo Ernst, regarding the defendant's risk for violence. Defendant previously submitted the Ernst report in support of his motions for release from custody after conviction. The defendant also filed an addendum to that report with his sentencing memorandum, and in that addendum Dr. Ernst disputes certain conclusions and statements in an order issued by Magistrate Judge Sallie Kim regarding release. Dkt 303-1 (Halbert Declaration Exh 1). As discussed in the government's sentencing memorandum, Dr. Ernst's opinion regarding the relative risk of violence should not affect how the Court assesses the known facts regarding the defendant's statement about killing the prosecutor and his express threat to kill Chris Gerrans. The Court is in the best position to evaluate the information and testimony presented, and to weigh the credibility of Chris Gerrans and Ryan Swisher. Dr. Ernst has no basis to provide an opinion about the credibility of Chris Gerrans.

It is also of significance that the unsigned version of the addendum to Dr. Ernst's report (which is the version the defendant filed with his sentencing memorandum) differs from a signed version of the report that was provided to the government and the Probation Office in September 2020. On September 22, 2020, counsel for the defense provided to the government and the assigned Probation Officer a signed and dated "Addendum" to the report. A copy of Dr. Ernst's signed 09/22/2020 Addendum is attached hereto as Exh. A. The September 22, 2020 signed version of Ernst's addendum (but not the unsigned iteration recently provided to the Court) includes a paragraph discussing Dr. Ernst's views of the possibilities regarding Chris Gerrans' recounting of the threat to kill AUSA Harris. Dr. Ernst goes over these possibilities, including that (1) Chris Gerrans accurately understood the defendant to propose a plan to inflict violence on AUSA Harris, (2) he provided false information to help his case, or (3) there was a misunderstanding, and the statement to "take out" AUSA Harris may have meant having her removed from the case. Dr. Ernst concludes that if it were factually accurate that defendant Lawrence Gerrans proposed a plan to commit violence on AUSA Harris, Dr. Ernst would conclude that Lawrence Gerrans was at a high risk of violence. *Id*. Ernst's discussion about the plan of violence was omitted from the addendum recently submitted by the defendant to the Court, but the fuller discussion in the original version shows that even Dr. Ernst, if he assumed the accuracy of Chris Gerrans' statement, would agree that Gerrans poses a high risk of violence. *Id*. The latest version of Dr. Ernst's addendum,

eliminating, without explanation, the previous portion discussing the possibility that Gerrans poses a high risk of violence, is suspicious and should further cast doubt on the reliability and value of the conclusions reached by Dr. Ernst.

The defendant also makes a new and baseless argument that the government has "tainted" the evaluation of this case by the Court and the Probation Office by having AUSA Harris continue to participate in the prosecution of the case. This allegation is both unfounded and a red herring. There is no reason why the case cannot proceed to sentencing with the current team representing the United States. The defendant has not provided any facts or applicable law to back up the new "conflict of interest" claim, and in any event the non-existent so-called conflict was created by the defendant when he (1) proposed violence to AUSA Harris and then, (2) when his counsel attempted to overcome the burden to have him released with attempts to discredit and discount the allegations. And most significantly, the defendant has made no showing that arguments by AUSA Harris or the government in this case have tainted the neutral and fair consideration of the defendant by the Court. This unfounded allegation is a transparent and desperate attempt to try to improperly pressure the Court into disregarding relevant and significant information that bears on an appropriate sentence.

**II. A Substantial Variance Is Unwarranted**

The defendant requests this Court to vary downward to a range that is, at its average, approximately 75% less than the applicable guideline range. There are no mitigating circumstances to justify any downward variance, let alone the unprecedented, massive and unjustified variance the defense recommends. This is a case that clearly necessitates a significant sentence. The defendant has: (1) shown no remorse; (2) continued and escalated his crimes while on pre-trial release; (3) sponsored bogus documents in pre-trial litigation before this Court; (4) solicited his wife to smuggle contraband, including a laptop computer and cell phone, into jail; (5) threatened various individuals whose legitimate roles in the criminal case were adverse to him; and, (6) advanced the preposterous and insulting notion that this Court should give him a break at sentencing because he suffers from a "savior complex." Dkt 302, pg. 22. In actuality, defendant's pathology is characterized by acute narcissism and rampant greed, neither of which are "characteristics of the defendant," *see* 18 § 3553(a), that warrant anything other than a guideline sentence.

The main thrust of defendant's request for downward variance is his past role as the breadwinner for the family and the impact of incarceration on his children, only two of whom at ages 15 and 17 are living at home. PSR ¶ 77 and Dkt 302, pgs, 20-22. USSG § 5H1.6 provides the following framework: "[F]amily ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." The commentary to section 5H1.6 also gives a list of non-exhaustive circumstances that the Court "shall" consider in determining whether a departure is warranted under this policy statement. The listed relevant circumstances are: (i) the seriousness of the offense; (ii) the involvement in the offense, if any, of members of the defendant's family; (iii) the danger, if any, to members of the defendant's family as a result of the offense.

All three of these factors weigh heavily *against* any departure or variance from the applicable guideline range. First, the twelve counts of conviction are extremely serious. The fraud convictions caused incalculable harm to Sanovas and its investors. The contempt, witness tampering and obstruction convictions strike at the very heart of the criminal justice system and were a systematic attempt by the defendant to thwart the court's truth finding process.

Second, several of defendant's family members, including his wife, were involved in his criminal offenses. Shelly Gerrans signed the fake Hartford promissory note, knowing full well that she and her husband had not taken a loan to buy 28 Greensburgh Lane. The phony promissory note which Shelly Gerrans signed as a "co-borrower" was the basis of the defendant's conviction on count 9. Mrs. Gerrans also signed the bogus "Shelly Gerrans Employment Agreement" which was backdated to December 18, 2009, some four months prior to her sworn testimony in the bankruptcy court in which she affirmed that she was not employed outside the home and had been a full-time homemaker for the past 10 years. Mrs. Gerrans and her husband also discussed smuggling contraband into jail, PSR ¶ 33. In fact, Magistrate Judge Kim specifically noted the defendant's wife's involvement with his criminal activity as a factor weighing against releasing him to live at home with his wife. As Judge Kim aptly concluded: "Given Defendant's wife's involvement in these communications and involvement in Defendant's attempt to obstruct justice and tamper with witnesses, the placement of Defendant in his home with Shelly Gerrans does not create a safe environment." Dkt 271, pg. 4 (under seal). Judge Kim's factual finding, standing alone, militates against a downward variance based on "family ties and responsibilities."

The third factor, danger if any, to members of the defendant's family as a result of the offense also weighs heavily against the defendant's stated basis for a variance. Both this Court and Judge Kim have separately concluded that the defendant's release from custody poses a safety risk to Chris Gerrans, the defendant's brother. Dkt 207 and 271. This demonstrable safety risk to a member of the defendant's family is further borne out by the vitriolic efforts the defendant has recently engaged in to try to retroactively discredit Chris Gerrans' whose testimony both the jury and this Court found credible. *See e.g.* Dkt 302, pg. 18. Defendant's tortured and thoroughly unconvincing efforts include what can only be called a deeply pathological "explanation" about his threat that he would have killed Chris at the storage facility if there were not so many cameras running at the facility. Defendant now argues that his statement that he would have killed Chris "is not a threat in any sense of the word. If everyone who said 'I could have killed him!' was a danger, a lot of people would be locked up." Dkt 302, pg. 17. This extraordinary and unconvincing explanation of defendant's death threat flies in the face of this Court and Judge Kim's findings that the defendant has not shown by clear and convincing evidence that he is not a danger to his brother.

Next, defendant argues that his role as the financial provider for his family is a basis for a downward variance. It is true that, prior to his indictment, defendant's wife and children lived a life of extraordinary privilege. Defendant showered his wife with expensive jewelry, a lavish birthday party and a Mercedes SUV; his children went to private school, had a horse, were treated to "kids spa" outings and extravagant vacations to Hawaii and London, to name but a few of the "financial" and "caretaking" items the defendant provided. There was and is only one problem: All of these perks were financed by money the defendant stole from Sanovas. We respectfully submit that the loss of a lifestyle that was funded by fraud is not a basis for a downward variance and, instead, is yet another reason for the Court to impose a sentence within the applicable guideline range.

Moreover, the family has lived in a luxury home for nearly six years, a home bought entirely from money their father stole. The same goes for their lost lifestyle; their father provided them with the trappings of wealth that were, regrettably, funded by his embezzlement from Sanovas. The defendant's role as a provider was illusory and fueled by fraud. The Gerrans' family's false lifestyle and the loss of the perks that came with the years of theft should not and cannot be rewarded with a substantial

variance. To do so would be to send a truly troubling message to the defendant and the community that "crime pays." Here defendant's long-running crime spree paid for his family's grand house, fancy cars, a diamond ring, lavish vacations, and more. That the defendant will be incarcerated for a significant period of time and no longer able to steal to provide for his family in the style they falsely became accustomed to is not and should not be a basis for a downward variance.

**CONCLUSION**

Based on the foregoing, the United States requests the Court to impose a guideline sentence as described in the government's October 26, 2020 sentencing memorandum.

DATED: October 30, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

/s/
ROBIN L. HARRIS
LLOYD FARNHAM
Assistant United States Attorneys