1
2   SHAWN HALBERT (CSBN 179023)
    214 Duboce Avenue
3   San Francisco, California 94103
    Telephone: (415) 703-0993
4   shawn@shawnhalbertlaw.com

5   Attorney for Defendant Larry J. Gerrans

6

7                    UNITED STATES DISTRICT COURT
8
                     NORTHERN DISTRICT OF CALIFORNIA
9
                        SAN FRANCISCO DIVISION
10

11  UNITED STATES OF AMERICA          )   CASE NO. CR 18-00310  EMC
                                      )
12                                    )   **DEFENDANT'S MOTION FOR REVIEW OF**
                                      )   **DETENTION ORDER PURSUANT TO TITLE**
13       v.                           )   **18 SECTION 3145**
                                      )
14                                    )
                                      )   Date and Time:  November 4, 2020 at 9:30 a.m.
15  LARRY J. GERRANS,                 )   Court: Honorable Edward M. Chen
                                      )
16       Defendant.                   )
                                      )
17                                    )
                                      )
18  ─────────────────────────────────

19                          **INTRODUCTION**

20          Pursuant to Title 18 Section 3145(b), defendant Larry Gerrans moves this Court to review

21  Magistrate Judge Kim's Order Regarding Application for Release from Custody to Home Confinement,

22  filed under seal at Docket No. 271 on July 22, 2020, and to find that Mr. Gerrans is eligible for release,

23  pursuant to Section 3143(a)(1). This will enable Mr. Gerrans to self-surrender for his sentence once he is

24  designated. The defense also moves that the Court deny the government's motion to keep under seal the

25  letters written by Larry Gerrans and Chris Gerrans that form a significant basis for the prior detention

26  orders in this case.

27                                      1

28  Def's Motion for Revocation of Detention Order
    CASE NO. CR 18-00310  EMC

This Motion for a Review of Judge Kim's detention order is based on new information that this Court has never had an opportunity to consider.

In connection with sentencing, the defense has submitted to this Court a video sentencing submission as well as approximately 25 letters from people who have known Larry Gerrans for most or all of his life. Contrary to the image of an evil buffoon that the government conjured up at trial, the defense sentencing submission shows that for his entire life, Mr. Gerrans has been an intelligent and caring person who dedicated himself to improving the world and helping the people around him. He excelled academically and athletically but was known not just for his accomplishments but for his compassionate attitude towards others. Beginning at the age of twenty-two, he raised the two children whom Shelly already had when they met, and played and coached sports (50 children every year for sixteen years) over his entire lifetime. If he had a mean or violent streak, it would have revealed itself along the way in the arena of sports or raising children, whereas he was consistently voted most inspirational member of his sports teams and the children he coached revered and loved him, as did the children's parents. His entire family, including his two adopted children and three other children have attested to his gentle and kind nature.

Without exception, all of the letters submitted on behalf of Mr. Gerrans attest that he is a kind, generous and selfless person who would never commit violence towards any person. The very people who know Larry and Chris Gerrans, the large, close-knit Gerrans family (including Larry and Chris' father and step-mother, their law-enforcement officer paternal brothers, their sisters, their in-laws and other family members), who know about Chris' allegation and care about Chris' safety as much as anyone, have signed a letter in which they say directly that Larry is not a physical threat to anyone. *See* Exhibit 1. [1] More than a thousand people have signed on to a petition seeking Larry Gerrans' release.

---

[1] In order to create one less filing, all exhibits contained herein are deemed attached to a Declaration from Shawn Halbert, incorporated herein, affirming under penalty of perjury that these are true and correct copies of the attached documents to the best of my knowledge and information.

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

The Court ordered Mr. Gerrans detained pending sentencing primarily based on its concern that Mr. Gerrans was fixated on AUSA Harris and that Mr. Gerrans had allegedly told Chris in December, 2018 that he wanted to "take out" AUSA Harris, which Chris believed was a threat. If these things were true, they clearly would present a basis for detaining Mr. Gerrans. But they are not, as new evidence shows.

Mr. Gerrans had a reasonable belief that AUSA Harris' political activity presented an appearance of impropriety in this case. At the exact same time that Sanovas had offices on the very short road, Liberty Ship Way in Sausalito, and was pursuing a $70 million dollar investment in a warehouse (also on Liberty Ship Way) with Mayor Ray Withy and other members of the Sausalito City Council, AUSA Harris sent the first subpoena to Sanovas and also filed an application to be on Sausalito's City Council, listing as one of her top concerns for Sausalito the development of warehouses on the same small road where Sanovas wanted to develop a warehouse, Liberty Ship Way. Mr. Gerrans later learned from an attorney that Ms. Harris' City Council application listed an address that was "on the Hill" in Sausalito, a wealthy neighborhood that Mayor Withy had told Mr. Gerrans opposed development in Liberty Ship Way because it would hurt their property values. Mr. Gerrans, who continues to maintain his innocence, believed that his prosecution was politically motivated, particularly since the final indictment bore little resemblance to the initial subpoena. He believed that AUSA Harris should be removed from the case, her conflict of interest investigated, and that her supervisors should review the indictment. That is all he ever wanted, and that is all that he ever said in his letter.

As to Chris Gerrans, the Court never heard the true story of what happened between the two brothers. Larry Gerrans would never have been placed into custody in the first place in August, 2019 if his attorney (who was in the Ghost Ship trial at the time) had presented what actually happened. The demonstrable truth is that after a lifetime of Larry protecting and help cleaning up Chris' messes, in early August, 2019, Larry Gerrans received a trove of Sanovas emails in which he learned that the Sanovas bank account was almost empty, that Chris had taken $38,000 out of Sanovas in June-July 2019, that Sanovas had given CEO Katzman's friend $90,000 in June-July, 2019, that the government

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

had issued a May, 2019 subpoena from the government to Sanovas (c/o Katzman) revealing that Chris had actually embezzled more than a million dollars from Sanovas from 2014-2018 in more than 200 checks (rather than the 8 checks that Gursey Schneider and Orrick Herrington had discovered in 2018), and that Chris had gone behind Larry's back to work with Katzman to deny Larry compensation for electricity bills. This is all documented and but was never presented to any court prior to the April, 2020 bail hearing.

In August, 2019, Larry Gerrans was not worried about being convicted and believed the court would dismiss his case pursuant to his motion to dismiss. But he was furious at Chris because of what he found in the emails and felt that Chris had finally gone too far. At the Public Storage on August 13, 2019, Larry told Chris as much, that he needed to resign from Sanovas and that Larry was going to turn Chris over to the Department of Justice. It was only then, finally abandoned by Larry and fearing the government, that Chris went to the government and starting spinning his yarn. Contrary to what the government argued at trial, the brothers' argument at Public Storage could not have been about Chris' cooperation because Chris was not yet cooperating. At the time of the bail hearing, this Court also did not know what has now been presented in the post-trial briefing that Chris Gerrans committed demonstrable perjury at trial that goes directly to his credibility.

Chris Gerrans has never been subject to a cross-examination on the alleged threat. It is unreasonable for this Court to credit an alleged threat of violence from a person with a long history of drug use, multiple criminal convictions, a party to three restraining orders (1999, 2004, and 2013), who was kicked out of a casino for assaulting a woman in 2015, and has unexplained access to money enabling him to buy Range Rovers, Porches and Teslas.

This Court also has a report from a UCSF psychologist who conducted extensive testing and interviews of Mr. Gerrans and has concluded that he does not present a risk of violence to anyone in the community. This is consistent with the fact that Mr. Gerrans does not have a single disciplinary violation at four different jails, where he was incarcerated under highly stressful and dangerous conditions.

4

The defense is concerned that even an infinitesimal risk of violence against a prosecutor in the Court's mind would lead to a detention order. Thus Mr. Gerrans proposes that if the Court does not release him to the Bay Area, he be released to Flagstaff, Arizona, where Mr. Gerrans' brother-in-law has a rental property in which Mr. Gerrans can stay on GPS/electronic monitoring. This reduces to zero any concern that Mr. Gerrans could pose a risk to AUSA Harris. It cannot be ignored that he context for this bail motion is a global pandemic that exposes Mr. Gerrans to a sharply increased risk of death or permanent injury from contracting COVID-19, as laid out more fully in Mr. Gerrans Notice, Dkt No. 305, filed October 29, 2020.

## PROCEDURAL BACKGROUND

On April 14, 2020, this Court found that the defense was unable to show by clear and convincing evidence that Larry Gerrans does not pose a danger to AUSA Harris or Chris Gerrans. Dkt. 207. After learning that Mr. Gerrans was to be moved to the Los Angeles Metropolitan Detention Center in late July 2020, undersigned counsel filed a short, emergency motion based on newly discovered evidence. Dkt No. 263. The resulting Order from Judge Kim on July 22, 2020, Dkt No. 271, included material that the parties did not have an opportunity to brief and was based on a misunderstanding of the materials that Dr. Ernst reviewed in preparing his Forensic Psychological Report. Because this Court is more familiar with the underlying facts of this case and now has extensive personal background about Mr. Gerrans, and because this Court's review of the magistrate court's order is *de novo*, undersigned counsel will address issues raised by Judge Kim but the Order itself, which was based on only a five-page emergency submission from the defense, will not be the focus of the Motion.

Undersigned counsel's ability to communicate with Mr. Gerrans has been substantially limited since Mr. Gerrans was moved to Los Angeles Metropolitan Detention Center on July 27, 2020 and then the Nevada State Detention Center on October 8, 2020. As a result, Mr. Gerrans' sentencing was moved multiple times in light of counsel's access to Mr. Gerrans.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# LEGAL ARGUMENT

## A. APPLICABLE LAW

### 1. Sealing

"A sealing order may issue only upon a request that establishes that a document is sealable because, for example, the safety of persons or a legitimate law enforcement objective would be compromised by the public disclosure of the contents of the document." N.D.Cal. Crim. L.R. 56-1(b). Any request must be "narrowly tailored to seek sealing only of sealable material…." *Id.*

"[T]he right to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1902 (2017) (citations omitted). The "strong presumption in favor of access to court records" in civil and criminal actions can only be overridden if there are "sufficiently compelling reasons for doing so. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (a motion to seal documents which are part of the judicial record is governed by the "compelling reasons standard"). The sealing party bears the burden of meeting the "compelling reasons standard." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

To seal documents, a court must determine whether "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *In re Copley Press, Inc.,* 518 F.3d 1022, 1028 (9th Cir. 2008) (quotation marks and citation omitted). If a court determines that sealing is necessary, it must "articulate the factual basis for its ruling, without relying on hypothesis or conjecture," in order to allow for meaningful appellate review. *Foltz,* 331 F.3d at 1135. A district court abuses its discretion if it seals entire documents that "can be redacted easily to protect" certain information. *Id.* at 1137.

### 2. Bail

This Court has previously held that "the question of Defendant's release is governed by 18 U.S.C. Section 3143(a)(1)." Dkt 207 at 1, 2. Section 3142 permits a reopening of the bail hearing if

6

"information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).

Title 18 Section 3145(b), Review of a Detention Order, provides that where "a person is ordered detained by a magistrate judge…the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly."

### 3. Conflict of Interest and Appearance of Impropriety

"The Department of Justice holds United States Attorneys and their Assistants to exacting ethical standards, not least with respect to actual and apparent conflicts of interest. *See, e.g.*, U.S. Attorneys' Manual § 1-4.320(F) ("Employees may not engage in outside activities that create or appear to create a conflict of interest with their official duties. Such a conflict exists when the outside activity would . . . create an appearance that the employee's official duties were performed in a biased or less than impartial manner."). *United States v. Miller*, 953 F.3d. 1095, 1104 (9th Cir. 2020). "Moreover, federal law itself contains a criminal prohibition on prosecutors and other government employees 'participat[ing] personally and substantially' in a 'judicial or other proceeding' in which they have an interest. 18 U.S.C. § 208." *Id.* In Miller, the Court found that the AUSA role in the defendant's prosecution, though limited, "was a clear violation of his ethical and professional duties," *id.* at 1105, because the AUSA 'create[d] the appearance of having used his personal contacts in the Bureau as a means to pull strings in favor of an investigation. *See* U.S. Attorneys' Manual § 9-27.260(A)(3) ('In determining whether to commence or recommend prosecution or take other action against a person, the attorney for the government should not be improperly influenced by . . . [t]he possible affect [sic] of the decision on the attorney's own professional or personal circumstances.')." *Id.* The *Miller* court also noted that the AUSA also faced and violated his "obvious duty to report his conflict of interest (and presumptive recusal) to his supervisor as soon as possible. *See* U.S. Attorney's Manual § 3-2.170 ('A United States Attorney who becomes aware of circumstances that might necessitate his or her recusal or that of the entire office should *promptly*

7

notify [the general counsel's office] to discuss whether a recusal is required.') (emphasis supplied); *id.* § 3-2.220 (same recusal rules apply to AUSAs)." *Id.* at 1105.

## B.  ARGUMENT

The Bail Reform Act permits a reopening of the hearing where there is information not known at the time of the hearing that materially affects whether release should be granted. 18 U.S.C. § 3142(f). While the defense can identify specific important factors that are new, basically everything is new because the Court make its finding in April based on incomplete and incorrect evidence. New facts and evidence since the April bail hearing include the following:

- Mr. Gerrans' personal history over the past fifty years of his life, as contained in the defense Sentencing Memorandum and video sentencing submission, and related letters addressing his character and the absence of any violence in his nature;

- The option that Larry Gerrans be released with a GPS monitor to a residence in Arizona owed by Shelly Gerrans' brother and sister-in-law;

- A forensic psychological evaluation by Dr. Teo Ernst, which concludes that Mr. Gerrans poses a very low risk of danger or violence. The report includes an Addendum that responds to concerns in Judge Kim's Order, which were due in part to a mistaken belief that Dr. Ernst had not reviewed relevant materials in the case;

- Evidence that demonstrates that Mr. Gerrans' views about AUSA Harris's conflict of interest were not "disturbed" or "obsessive" but in fact reasonable given the appearance of impropriety in Ms. Harris running for public office on a platform that related to business development in the same small road where Mr. Gerrans had and was seeking to expand Sanovas at the same time that she served the first subpoena on Sanovas; and

- Evidence discovered by defense counsel after April, 2020 reveals that Chris Gerrans lied on the stand repeatedly on core issues and was not effectively cross-examined about issues relating to his credibility; further, new contemporaneous evidence unequivocally shows that the confrontation at Public Storage (which led to Mr. Gerrans' detention) had nothing to do with Chris Gerrans' alleged cooperation with the government, which started only **after** Larry told Chris to resign from Sanovas and threatened to report Chris to the Department of Justice for what was happening at Sanovas with Chris and Katzman.

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

### 1.   Mr. Gerrans Personal and Family History

While the defense would have preferred to file a motion to revoke Judge Kim's detention order earlier, it was clear that the Court needed to have additional information about the past fifty years of Mr. Gerrans' life before making a decision. The defense hereby incorporates the material in Defendant's Sentencing Memorandum, Dkt No. 302, including Exhibit A and the video sentencing submission. The defense will not recite those facts again here, but notes that Larry Gerrans has been nothing other than hard-working, diligent, caring and dedicated for his entire life. He has no history of violence whatsoever.

The letter signed by Gerrans' family members, who include Larry and Chris' two paternal brothers, who are law enforcement officers (Robert Gerrans is a Sergeant with the Oakland Police Department and Patrick Gerrans is a San Francisco police officer); Art Gerrans Sr (a former San Francisco police officer); their stepmother Carolyn; Gerrans sisters Jeannette and Annette. Patrick, Carolyn and Jeannette all specifically address the fact that Chris has struggled during his life and has issues, and that Larry was always the person who protected and helped him.

The defense also asks the Court to review the petition at change.org/larrygerrans -- a petition for Larry Gerrans' release established by his daughter that has now been signed by **1,359 members of the community** seeking Larry Gerrans' release, with many people adding comments to show their love and support for Larry Gerrans and commenting on his characteristic of non-violence.

### 2.   Mr. Gerrans May be Released to a Residence in Arizona

In her Order denying release, Judge Kim indicated that Mr. Gerrans should not be placed in a home with Shelly Gerrans because after the trial, Shelly discussed providing discovery covered by a protective order to Larry Gerrans' father, Art Gerrans, who had been potential witness in the case but was not called by either party. Dkt. 271, p. 4. While undersigned counsel believes that there is adequate information in this Motion to release Mr. Gerrans to home detention in his own home, and requests that the Court do that, the defense has also found another location to which Mr. Gerrans could be released – a home owned by Shelly Gerrans' brother and sister-in-law in Flagstaff, Arizona, far from Chris Gerrans

and AUSA Harris, where he would be on GPS/electronic monitoring. Counsel will provide the information to U.S. Pretrial Services to make an assessment. Shelly Gerrans' brother, Darin Smith, who has submitted a letter of support on behalf of Larry Gerrans, lives in Arizona and has a number of rental properties there. He is a designer and has his own drywall company, and his wife is a nurse. He has confirmed that Mr. Gerrans can live in a rental property in Flagstaff, Arizona effective November 1, 2020.

However, the defense will also take this opportunity to address an issue that was not actually briefed or argued before Judge Kim. In fact, Brian Getz is the person who gave Shelly Gerrans all of the discovery, shortly after the trial was complete, sending everything with Mr. Getz's son in a truck. Shelly Gerrans had no reason to believe that she could not look at the material. Nor did Larry Gerrans have any reason to believe that he could not work with his wife to try to go through the evidence he had mostly never seen, and to gain his father's help. The trial was over. It was only after the government complained about Shelly Gerrans having the discovery that Brian Getz asked Shelly to return the material to Mr. Getz, which she did.

In its April 14, 2020 Order, the Court stated that after Mr. Gerrans' bail was revoked, he tolerated violation of the protective order. Counsel is not sure what the Court has in mind, but notes that regarding the letter that the government submitted to the Court from the Fall 2019, wherein Mr. Gerrans asked if someone could send him in a computer and phone, it is vital to consider that Mr. Gerrans had not received a computer from his attorney – despite a court order. On August 28, 2019, Judge Hixson signed an Order stating that Mr. Gerrans should "be permitted to use a digital tablet for the sole purpose of reviewing discovery and legal materials from the media storage device that relate to his criminal case." Dkt No. 60. Mr. Gerrans' attorney gave him a computer or any ability to review the voluminous discovery in the case, and he barely saw him. In fact, in December 10, 2019, less than a month before trial, Shelly Gerrans sent an email to trial counsel Brian Getz asking why Mr. Gerrans did not have a computer or most of the discovery. *See* Exhibit 2, email from Shelly Gerrans to Brian Getz, December 10, 2019 (stating that Larry Gerrans is completely in the dark about his case, has very little discovery,

10

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310 EMC

and does not have the computer that he was supposed to get months ago). While Mr. Gerrans may have been desperate to have the computer that his lawyer would not give him, as well as a phone (which is incredibly common in detention facilities), nothing here suggests that Mr. Gerrans is a danger to the community or is a basis for detention.

### 3. Dr. Ernst's Report Provides a Professional Opinion that Mr. Gerrans does not Pose a Danger to AUSA Harris or Chris Gerrans

The defense previously submitted under seal to this Court the July 16, 2020 expert report of Dr. Teo Ernst, and has submitted the Addendum to his report as Exhibit 1 to the Declaration of Shawn Halbert in Support, Dkt No. 303-1. The report reflects the results of extensive testing of Larry Gerrans over a number of multi-hour sessions as well as Dr. Ernst's review of materials (including Mr. Gerrans' letters that referenced AUSA Harris). Dr. Ernst is a Board-certified psychologist, Assistant Clinical Professor in the UCSF Department of Psychiatry, and Adjunct Clinical Faculty at the Wright Institute in Berkeley, who has concluded that Larry Gerrans "does not present a greater risk of violence than the average community member," Ernst Report, p. 22, and that "it is [his] expert opinion that Larry presents a low risk for violence if released into the community." *Id.* at p. 23.[2] This evaluation is based on multiple lengthy meetings with Mr. Gerrans, extensive interviews of family members, and expert testing that is specifically designed to determine whether a person presents a risk of physical violence. In addition to the battery of tests described at page 2 of his Report,[3] Dr. Ernst administered The Violence Potential Index, a component of the Personality Assessment Inventory (PAI), as well as the HCR-20-V3, a widely utilized violence risk assessment instrument. The report concludes that, far from being a person

---

[2] Dr. Ernst noted that "Larry responded to his childhood upbringing by becoming identified with saving and rescuing others. This orientation is the exact opposite of the egocentricity and self-focus, which characterizes antisocial or psychopathic individuals. While psychopathic individuals live shallow emotional lives characterized by empathy deficits, Larry is over-attuned to the emotional pain of others and demonstrates codependent behaviors in which he sacrifices his own needs in an attempt to prevent others from suffering." *Id.* at page 18.

[3] Dr. Ernst's psychological testing included the Personality Assessment Inventory, Minnesota Multiphasic Personality Inventory-2 Restructured Form, Trauma Symptom Inventory – 2, Clinician-Administered PTSD Scale for *DSM-5*, and Barratt Impulsivity Scale, and HCR-20-V3.

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

with antisocial or psychopathic tendencies, Mr. Gerrans is "guided by an internal ethical system, is highly identified with providing for others, and demonstrates excessive rather than inadequate empathy."

The Addendum addresses concerns raised by Judge Kim. Dkt. 271. Some of these concerns were simply misunderstandings as to what materials Dr. Ernst had reviewed. As to the other concerns, Dr. Ernst explained that with respect to Mr. Gerrans' statement to a public storage employee that he would have killed his brother if there had not been a camera, "threat assessment literature" indicates that threats are usually venting and do not correlate to actual violence, Addendum at 2, especially when there is no evidence of violent intent. He concludes in the Addendum:

> I saw no evidence of violent intent, or a belief system justifying violence against Chris or the prosecutor, during my evaluation. This analysis was supported by the fact that Larry presents with no meaningful violence history, did not become violent towards Chris or the prosecutor prior to his incarceration, and demonstrated a low risk of violence on two widely utilized violence risk assessment measure, the HCR-20-V3 and PAI Violence Index.

Addendum at 2. A person who intends to harm someone does not vent to a relative stranger that he was angry enough to have killed another person, but would actually proceed to do it, which Larry did not.

Dr Ernst's assessment is completely consistent with the fact that every member of the Gerrans family (as well as numerous members of the community), knowing the evidence and the claim that Chris has made, have submitted letters to this Court saying that Larry Gerrans is not a violent person and would never physically harm another person.

### 4.  Mr. Gerrans' Letter about AUSA Harris Reflected his Reasonable Belief about an Appearance of Impropriety

#### a.  The Court Should Unseal the Bases for Mr. Gerrans' Detention

This Court's Order found that Mr. Gerrans' private letter to his wife "display[s] a disturbing fixation – almost an obsession – on Ms. Harris," and that his "wild conspiracy theory" and "elaborate plan to bring a civil lawsuit" "betray a troubled mind." Dkt. 207.

While the government has made great efforts to keep secret both the document that serves as the basis for Mr. Gerrans alleged "fixation" on Ms. Harris (Larry Gerrans' letter), as well as the document alleging the threat (Chris Gerrans' letter), it is manifestly unfair to Mr. Gerrans for this conclusion to be

12

part of the public record in a Court order published on Lexis, and yet for these letters to be kept secret. Nor should the fact that AUSA Harris ran for local public office on a platform that expressed concern about development at the exact same small street where Mr. Gerrans' business was located and he sought to complete a $70 million buildout, be kept secret.

Further, Chris Gerrans' letter itself is highly relevant to an objective assessment of his credibility because it arguably betrays an unbalanced mind. His method and mode of expressing himself, as well as his attack on undersigned counsel, should not be hidden from the public if the defense chooses to publicly file it. Chris Gerrans was not a secret cooperator, not is his allegation about Larry a secret in any sense of the word. The government should not be able to rely on Chris Gerrans' words and yet keep the source documents secret.

Chris Gerrans' false accusation against his brother and this Court's reading of Larry Gerrans' personal letters have done unfathomable damage to Mr. Gerrans' relationships and reputation. Not only is Mr. Gerrans detained, but the Court's order is public and there was media coverage of the hearing.[4] If Mr. Gerrans wishes to publicly file these sealed materials, there is no basis under Ninth Circuit law to withhold the evidence on which the Court's order and the news story were based.

### b. AUSA Harris' Actions Created an Appearance of Impropriety about which Mr. Gerrans had Every Right to be Concerned

The Court's April 14, 2020 court order was based in part on the conclusion that Mr. Gerrans' letter to his wife evidenced a "disturbing fixation – almost an obsession" with AUSA Harris. But at the time, the Court had absolutely no basis for understanding Mr. Gerrans' concern, and was relying on inaccurate and incomplete information that AUSA Harris gave the Court at the bail hearing on April 9,

---

[4] A newspaper article published on April 9, 2020, "Ex-CEO's Threat To Kill Prosecutor Snarls COVID Release Bid," published the same day as the hearing, quoted AUSA Harris as arguing that "Gerrans had 'a clear intent to kill me,' adding that 'he knew where I lived' and he planned to do it after she got home from work," and quoted this Court as saying that "letters written by Gerrans from jail show that he appears to have 'a vendetta' against Harris and 'paints her as part of a conspiracy' to ruin him." https://www.law360.com/articles/1262357/ex-ceo-s-threat-to-kill-prosecutor-snarls-covid-release-bid

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

2020 and information that was not known to undersigned counsel at the time because she had not received any discovery.

In fact, Mr. Gerrans had an objectively reasonable concern, which he expressed both to his attorneys and in private letters to his family, that AUSA had a conflict of interest in investigating and prosecuting Mr. Gerrans. Through 2017, Sanovas had businesses and office space in Sausalito (as well as San Rafael). Sanovas had received preliminary authorization from the United States Citizenship and Immigration Service (USCIS) for $150 million in economic development in Marin City/Sausalito and San Rafael in 2016, $70 million dollars of which was going to go to developing a big warehouse on Liberty Ship Way in Sausalito, California (the same small road where Mr. Gerrans had established Sanovas in 2012).[5] Mr. Gerrans thought that African American and Latino workers from Marin City, which had high rates of unemployment, could be helped by the program. However, in order to finalize the EB-5 process, both San Rafael and Marin City/Sausalito needed to sign off on their acknowledge of the economic report about the unemployment numbers (Target Unemployment Areas have unemployment rates higher than the national average). San Rafael Chamber of Commerce signed off on the San Rafael portion of the report in August 2016, but Sausalito had delayed.

Mr. Gerrans was working with economist Michael Kester of Impact DataSource to interface with Brian Crawford, Director of the County of Marin Community Development Agency, and Kate Sears, Southern Marin's Representative on the Marin County Board of Supervisors. *See generally* Exhibit 3. On August 30, 2016, Impact DataSource was emailing Supervisor Kate Sears for her support for a TEA

---

[5] A description of the EB-5 program can be found at https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program. In 2016, Sanovas received authorization to seek $150 million of investment through the USCIS EB-5 program, which consisted of 300 visas at an investment of $500,000 per visa (to be paid by the foreigner seeking the visa). An EB-5 application requires ten minority hires for every $500,000 invested. To qualify for the USCIS program, the jobs must be created in a Target Economic Area (TEA). To qualify, the municipality has to sign off on their acknowledgment of the economist report that verifies that the unemployment rate in the TEA exceeds the national unemployment rate. The purpose of the USCIS program is to promote economic growth and hire minority labor. Mr. Gerrans chose San Rafael and Marin City/Sausalito to invest his money.

14

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

certification for 30 Liberty Ship Way for Sanovas, noting that the site was within a special targeted

employment area (TEA). *Id. See also* October 11, 2016 letter from Brian Crawford to Jason Law – EB-5

Program, Governor's Office of Business and Economic Development, State of California, re Sanovas'

request for a new project at 30 Liberty Ship Way, Sausalito. Exhibit 4. Sanovas Investment

Communications Director Kim Kouri met with Sausalito Mayor Ray Withy in December, 2016 re the

EB-5 program that Sanovas hoped to put in Sausalito. *See* Exhibit. 5. Mayor Withy informed Ms. Kouri

that there was strong anti-growth sentiment in Sausalito and that petitions from people on "the Hill" in

Sausalito did not want development on Liberty Ship Way because they thought that it would affect their

property values and that the minority labor could lead to crime; he called it a NIMBY issue.[6]

Sanovas was exploring two separate parcels of land on Liberty Ship Way, including the

Mechanics Building, that were possible sites for what Mr. Gerrans described to Mayor Withy as a $70

million buildout. *See* Exhibits 6 and 7. Mr. Gerrans met with Mayor Withy on January 7, 2017, after

which Mr. Gerrans told Mr. Withy he would be supplying information "to help educate you **and the**

**City Council**" (emphasis added) on the TEA Assessment and how it would affect Sausalito. Exhibit 6.

(As Mayor, Mr. Withy was on the City Council). Mr. Gerrans explained to Mr. Kester how Mayor

Withy indicated to Mr. Gerrans that he (Withy) would likely need to take Mr. Gerrans' proposal to the

City Council. Exhibit 8, email from Larry Gerrans to Michael Kester, January 8, 2017. Mr. Withy

indicated that he was receptive to Sanovas' application but needed to "manage the anti-growth and anti-

traffic sentiments in Sausalito." *Id.* Mr. Gerrans was told by Sausalito Mayor Ray Withy, a member of

the Sausalito City Council, that there was opposition to development on Liberty Ship Way from a

wealthy group of residents who lived "on the Hill" overlooking the Sausalito Bay, who were concerned

that the development could decrease their property values and increase parking problems and crime

because of new labor. (USAO-MISC-001367-1368). Mayor Withy explained that he would need to take

Mr. Gerrans' planned development up with the Sausalito City Council. In February/March, 2017, Mr.

---

[6] Mr. Gerrans would testify to these facts under oath. Counsel has not been able to get a signed declaration because of limited contact.

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

Gerrans subsequently learned that his lease at 30 Liberty Ship Way would not be renewed because Sausalito wanted to go in "another direction."  *Id.* Mr. Gerrans continued to pursue two other properties on Liberty Ship Way through 2017 but was unable to get the City Council or Mayor Withy to get Sausalito's sign off for the EB-5 application.

In May, 2017, while Mr. Gerrans' request to invest $70 million dollars in Sausalito including on a buildout on Liberty Ship Way was still pending, AUSA Robin Harris sent the first subpoena to Sanovas. Later than month, Ms. Harris filed her application to be on the Sausalito City Council, listing one of her top three platforms concerns about warehouse development on Liberty Ship Way. Exhibit 9 Ms. Harris listed as the second of the three most important issues facing Sausalito the "[p]otential warehouse development in the vicinity of Liberty Ship Way" and need to balance the aesthetics against the interests of economic development and the attendant "safety" issues.[7] *See also* USAO-MISC-001368. The home address listed on Ms. Harris' application was in an area above "the Hill" in Sausalito, south of Liberty Ship Way.[8]

Mr. Gerrans knew nothing about this application until 2018, when an attorney brought it to his attention after finding Ms. Harris' application on the internet shortly after Mr. Gerrans was indicted. When Mr. Gerrans saw the address that Ms. Harris had listed on her City Council Application (which was on the internet), he was distressed to find that she lived "on the Hill" above the Sausalito Bay, the location that Mayor Withy had said opposed development in Liberty Ship Way. Mr. Gerrans also learned that Ms. Harris' platform had been concern about warehouse development on Liberty Ship Way.

At the bail hearing, AUSA Harris told the Court that while her City Council Application was filed in 2017, Sanovas had left Liberty Ship Way and "the city of Sausalito in 2015, at the end of 2015."

---

[7] The Application is available online but counsel is submitting a redacted version that shows only the cover page and the first page of the Questionnaire.

[8] The address that AUSA Harris address listed on her Application is redacted on the copy filed with this Motion, but can be provided. Attached as Exhibit 11 is a map of the small road, Liberty Ship Way.

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

In fact, Sanovas had twenty-three Sanovas companies and subsidiaries domiciled in Sausalito in 2017,[9] and still had office space on a small circular road ("Liberty Ship Way"). More significantly, as described above, Sanovas was waiting for Sausalito to sign-off on an economist's report that Sausalito qualified as a Targeted Economic Area (meaning it had an unemployment level higher than the national average), and had a proposal pending with Sausalito to allocate money from the EB-5 program for a $70 buildout of new facilities on Liberty Ship Way in Sausalito.

AUSA Harris' issuance of her first subpoena to Sanovas in May, 2017, while Sanovas' proposal to Sausalito and its City Council for a $70 million buildout on Liberty Ship Way was still pending, and her simultaneous application for Sausalito City Council wherein she ran on a platform of limiting industrial development on Liberty Ship Way, constituted an appearance of impropriety in Ms. Harris' initiation of the case against Sanovas. Mr. Gerrans' desire, expressed in a private letter, to have Ms. Harris investigated *by attorneys* was not "obsessive" and the letter did not even hint at using anything other than legal means to remove Ms. Harris from the case.

This was not some tiny, obscure project. Mr. Gerrans had been actively promoting economic growth and expansion consistent with what he had seen in China for the Marin and Sonoma business corridor after the exodus of Medtronic and Boston Scientific and other biotechnology companies. He had spoken at the Marin Economic Forum on that subject. Not only were Mr. Gerrans and other Sanovas representatives meeting with Mayor and Sausalito Council Member Withy, but Mr. Gerrans was in contact with numerous state and local officials, including Senator Feinstein's Office. *See* Exhibit 12. Mr. Gerrans not unreasonably was bothered by the coincidence in timing between AUSA Harris' subpoena and her Application for City Council in Sausalito created a conflict of interest or at least an appearance of impropriety. Mr. Gerrans raised this issue with his attorneys and specifically identified the buildings where Sanovas was seeking to expand as being 80 and 85 Liberty Ship Way. Exhibit 13.

Given that AUSA Harris would certainly have been exploring these issues in Sausalito in the months preceding her application, that AUSA Harris listed on her application her top concerns were

---

[9] *See* Exhibits 7 and 10.

economic development, and commercial development in Liberty Ship Way, and that the address she listed in the application was on the hill overlooking Liberty Ship Way, where residents had petitioned the Mayor of Sausalito not to allow further commercial development, Mr. Gerrans' worry that the investigation was improper was not the product of a disturbed or obsessed mind.

With this history in mind, it is important that there is no reference to any inappropriate threat or consideration of the use of force against AUSA Harris. When AUSA Harris is mentioned, Mr. Gerrans' concern is purely legal. He is adamant that she has a conflict of interest and that she should be replaced with a different prosecutor. *See, e.g.* USAO-MISC-001330, describing the need for a defense attorney who is "highly experienced heavy weight with passion and without fear of the government or big money Sausalito pushes around" in order to "go after both the City of Sausalito + the DOJ + Harris" and USAO-MISC-001398-99, saying he needs a civil rights lawyer and constitutional scholar who can litigate conspiracy and prosecutorial misconduct.

Whether AUSA Harris' conduct rises to the level of an appearance of impropriety is a legal question and this Court may feel that it does not, but the fact that Mr. Gerrans believed that it did and was frustrated that Mr. Getz did not raise the issue in no way suggests that he had any improper intent toward AUSA Harris. Neither did his interest in having an investigation into Sausalito and its political establishment's opposition to economic growth (including Sanovas' application) or Ms. Harris' role. (USAO-MISC-001371). *See also* USAO-MISC-001400, describing getting intelligence on Robin Harris' conflict of interest and conspiracy with Sausalito to keep Sanovas out of Sausalito and a letter to his father, where Mr. Gerrans said that he thought that AUSA Harris was too "emotionally vested" (sic) in his case and that there were too many coincidences that suggested a conflict of interest. USAO-MISC-001471.[10]

---

[10] The letters also show that Mr. Gerrans felt targeted by the government because of the force they used in dealing with him. He describes agents carrying AR-15s down his street when they came to serve a lien on his home (USAO-MISC-001371). He also describes AUSA Harris having him arrested outside of court after a status appearance by ten agents who used unnecessary force, throwing him against a wall as he was holding his teenage daughter's hand, and his having to see his wife and daughters traumatized by it. (USAO-MISC-001361, 1392).

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310 EMC

1    Given all of these circumstances. Mr. Gerrans wanted to get Ms. Harris off the case and even sue

2    her; but that opinion does not make him dangerous.

3         5.   **New Evidence About Chris Gerrans**

4         The Court's April 14, 2020 Order was founded on the Court's conclusion that Chris Gerrans had

5    "in general" been a credible witness at trial. Cross-examination has aptly been described as the

6    "greatest legal engine for the discovery of truth ever invented." *Lilly v. Virginia*, 527 U.S. 116, 124

7    (1999). Another engine for the discovery of truth is the presentation of affirmative evidence, something

8    that Mr. Gerrans' counsel did not do either. Facts that were not presented to this Court as of the bail

9    hearing on April 9, 2020 include indisputable documentary evidence that Chris lied at trial about when

10   his fraud at Sanovas began (by about eight critical months and hundreds of thousands of dollars) and

11   lied about Larry's alleged participation in Chris' own fraud. Nor was this Court informed that the

12   confrontation at Public Storage on August 13, 2019 arose after Mr. Gerrans saw a collection of emails in

13   which he learned (1) that the government had sent a May, 2019 subpoena to Sanovas c/o Katzman

14   showing that Chris had embezzled more than a million dollars using 200 checks from 2014-2018, rather

15   than the 8 checks Chris had admitted to Larry and Orrick Herrington in 2018; (2) that Chris had taken

16   $38,000 out of Sanovas' bank accounts in June-July, 2019 and the new CEO Katzman had given his

17   friend Steve Bayern $90,000 in "consulting fees" during the same two months; (3) and that Chris was

18   working with Katzman to deny Larry repayment of thousands of dollars in PG&E fees that Larry had

19   incurred when he saved all of the material from Sanovas' tissue bank by refrigerating it at his home after

20   Katzman unplugged it. This Court now has contemporaneous emails in which Larry Gerrans told his

21   attorneys in August, 2019 that Chris was a "sell out" (as heard by the Public Storage employee) and

22   should be turned over to the Department of Justice. Most critically, the government's false argument at

23   trial that Larry's confrontation with Chris at Public Storage concerned Chris' cooperation with the

24   government in Larry's criminal case (a fact to which Chris did not actually testify) cannot be true

25   because Chris did not start cooperating with the government until immediately **after** Larry confronted

26

27                                                19

28   Def's Motion for Revocation of Detention Order
     CASE NO. CR 18-00310  EMC

him at Public Storage and demanded his resignation from Sanovas and said that he should be turned over to the Department of Justice.

At this point, it should also be crystal clear that Larry Gerrans never had an argument at Public Storage with Chris Gerrans about Larry's criminal case, which was the reason that Larry Gerrans was remanded in August, 2019. It is undisputed that just days before the confrontation at Public Storage, on August 8, 2019 Larry Gerrans sent at email to trial attorney Brian Getz, as well as Larry Murray (an attorney who briefly represented Mr. Gerrans) which stated:

> Subject: Chris Gerrans is a SELL OUT!
>
> Jerry Katzman has coopted Chris to write a Demand Letter to Sheppard Mullin in an attempt to documents that I am not being cooperative with the company, that I am withholding information and that I have stole company property. All of this is a lie.
>
> Nonetheless, this is ALL I needed to see! I am sick! I am done with Chris! Let's turn him over to the DOJ and fry his lying, cheating and thieving ass!

*See* Halbert Declaration in Support of Motion to Dismiss, Dkt. 247-1, Ex. 7. This is of course exactly what the Public Storage employee testified he heard Larry say to Chris, that Chris was a "sell out." Mr. Gerrans was also emailing his attorneys shortly before his confrontation with Chris that he believed that Katzman and Bayern (with whom Chris was closely working and from whom he had received $38,000 in two months from the Sanovas bank account) were running Sanovas into the ground.

And in fact, although trial counsel did not raise this, the argument could not have been about Chris Gerrans' cooperation because Chris Gerrans was *not* cooperating at the time of the argument at Public Storage; according to the 302s, Chris Gerrans did not start cooperating with the government until *after* the incident at Public Storage (wherein Larry threatened to turn Chris over to the Department of Justice) *See* USAO-FBI 2360-2369.

Chris Gerrans has never been effectively cross-examined on any subject and has not been cross-examined at all about the alleged statement about AUSA Harris. It is ironic that it is the word of Chris Gerrans, who had a history of felony theft, misdemeanor cruelty to a child, involvement in three domestic violence restraining orders, and was barred from a casino for assaulting a hostess in 2015, even

20

before he pled guilty to a federal felony for stealing more than a million dollars from Sanovas over the course of four years, that is being used to incarcerate Larry.

Further, there is new substantial evidence affecting Chris Gerrans' credibility that were not known to the Court or the defense in April. There can be no dispute that Chris Gerrans lied at trial about key facts.

- Chris Gerrans testified at trial that his embezzlement from Sanovas started in early 2015 and was in direct response to Larry Gerrans' alleged theft of money for his home: "[A]round that time Larry had taken $2.6 million for the purchase of his home. I thought what's good for the goose is good for the gander." RT 1/15/20 at 100:1-4. This was a lie. From July 2014 to December 2014, Chris Gerrans stole more than $209,000 from Sanovas using 37 false checks. *See* Supplemental Halbert Declaration ("Supp. Halbert Dec."), Dkt. 254, ¶¶ 12-18, Exs 3-9. In January, 2015, he stole more than $100,000 via 11 false checks; in February 2015, $74,000 via 9 false checks; in March 2015, more than $150,000 via 13 false checks. *Id.* This all was before Larry purchased the house and directly impeaches Chris Gerrans' lie that his brother's misconduct (buying the house) was the reason for his own.

- Chris Gerrans testified that after Larry gave him a $10,000 check because Chris Gerrans' cat needed a vet, Larry started giving him more inappropriate bonuses that Larry Gerrans knew about and signed. RT 1/15/20 at 99. This was a lie. The records (select pages of thousands of bank documents that were part of a government trial exhibit) show that while Larry Gerrans personally signed two bonus checks for Chris Gerrans on July 1, 2014 and September 2, 2014, that were appropriately labeled bonuses for Chris' additional "comptroller duties," and no fraudulent check representing money stolen by Chris Gerrans from July, 2014 to March, 2015 was signed by Larry Gerrans. Chris Gerrans used a signature stamp to steal money via approximately 70 checks from July 2014 to March 2015, using that distinct rubber stamp to embezzle on the same days when Larry was personally signing numerous checks to vendors. Supp. Halbert Decl., Dkt. 254, ¶¶ 12-18, Exs 3-9,

- Chris Gerrans lied at trial when he testified that at the time Larry allegedly inappropriately took money for his home, Sanovas was "$3 million in debt…[and Chris] was being beat up daily by vendors, workers, consultants, demanding payment." RT at 1/15/20 at 76:9-10. In fact, Chris was embezzling more than $500,000 during that time and all of the vendors were being paid – hundreds of checks written by Larry Gerrans to vendors and other professionals like attorneys and the bookkeeper, some for tens of thousands of dollars. Supp. Halbert Decl., Ex 11.

Further, this Court now has grand jury testimony from Art Gerrans Sr showing that Chris Gerrans has a motivation to lie because of his fear that his conviction relating to abuse to a child will subject him to retribution in prison, that Chris believed he was going to a "camp" in exchange for his testimony, and that Art Gerrans Sr disputed Chris' account about the content of the note he showed to Chris, which was a substantial part of Chris' testimony about alleged obstruction.

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

Given Mr. Gerrans' fervent belief that AUSA Harris should be taken off the case, Chris Gerrans' statement that Larry told Chris in December 2018 that Larry wanted to "take out" AUSA Harris is not obviously a call to violence. It clearly could have been a misunderstanding by Chris as to what Larry meant, because Mr. Gerrans wanted to take Ms. Harris off the case because of her City Council application and thought that the location of her home overlooking Liberty Ship Way was part of the conflict of interest. (Notably, in his May 8, 2020 letter to the Court, Chris Gerrans did **not** adopt the part of the FBI 302 that alleged that he said Larry wanted to go to AUSA Harris' house). As this conversation was said to have occurred in 2018, it is not credible that Chris Gerrans would not have told this to the government for more than 14 months, after he had been cooperating since late August 2019, if he believed that his brother, Larry, had made a true threat.

As to his motive to come up with this alleged threat, fourteen months after it was allegedly made and after more than ten debriefings with the government? By January, 2020, AUSA Harris had Larry's letter to Shelly accusing AUSA Harris of misconduct. If her reaction to that letter is anything like the Court's, she did not like that letter. No one wants to go to prison, but Chris Gerrans, with his prior conviction involving a child that exposes him to extreme danger in custody, and with his own father testified in the grand jury that Chris told him he was going to a country club and that he was scared of prison, had every reason to respond as the government wanted him to in January, 2020. And as argued in defendant's sentencing memorandum, if it were true that AUSA Harris took Chris' statement seriously, then she needed to recuse herself from the case, as her continued presence on the case and work with AUSA Farnham has created a complete conflict of interest in the case.

## CONCLUSION

It should not be forgotten that Mr. Gerrans was convicted of stealing money from Sanovas to buy a home, and of trying to interfere with his brother's testimony. He was not convicted of a violent act and he has never committed a violent act. The basis for detaining him rests on the word of a non-credible, interested witness who has never been cross-examined about his statement. The defense respectfully requests that the Court release Mr. Gerrans to home confinement in light of the lack of any evidence that

Def's Motion for Revocation of Detention Order
CASE NO. CR 18-00310  EMC

1   he is a danger to the community, and in light of the risks posed to him by contracting Covid-19 while

2   incarcerated.

3

   Dated: October 30, 2020                                    Respectfully submitted,
4

5

6                                               _____/s/_____
                                                SHAWN HALBERT
7                                               Counsel for Defendant Larry J. Gerrans

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                              23

28   Def's Motion for Revocation of Detention Order
     CASE NO. CR 18-00310  EMC