EXHIBIT A

# Teo Ernst, Psy.D, ABPP
Board Certified Forensic Psychologist

1402 Park St. Suite C, Alameda CA 94501 • (510) 629-6993 • Licensed Psychologist in California – PSY 21972

**ADDENDUM to July 16, 2020 Forensic Psychological Evaluation of Lawrence Gerrans**

I submit this Addendum to address issues about my July 16, 2020 Forensic Psychological Evaluation of Lawrence Gerrans raised by Magistrate Judge Kim in the July 22, 2020 Order Regarding Application for Release from Custody, at pages 3-4.

In the Order, Judge Kim expressed concern that I did not review the third party's trial transcript who witnessed an interaction between Defendant and Chris Gerrans at Public Storage, or Chris Gerrans' trial testimony. In fact, I reviewed the trial testimony of the third-party witness, Mr. Swisher, which is listed under the sources of information in my 7/16/20 report as "012120-Swisher." Judge Kim expressed concern that I did not review Chris Gerrans' trial testimony before forming opinions regarding Larry's violence risk. Before forming the opinions outlined in my 7/16/20 report, I reviewed Chris Gerrans/ 302's, and the "Statement from Christopher Gerrans."  I have now examined the portions of Chris Gerrans' trial transcript which counsel has informed me relate to the bond issues and argument at Public Storage (pages 105-149; 224-228; 233-249). This review provides no basis to change my prior opinions, as I was previously aware of Chris Gerrans allegations against Larry Gerrans, as outlined in his testimony, that are relevant to Larry's violence risk, from other sources of information.

The July 22, 2020 Order further states that my report did not address Larry Gerrans' violation of the original bond, which led to the convictions for contempt, witness tampering, and obstruction of justice. (Order, page 4, lines 1-4.)  In fact, I did review the 04/08/20 Farnham Declaration and FBI 302's, which described Mr. Gerrans' behavior underlying these convictions. Additionally, on page 23 of my 7/16/20 report (HCR-20 Item R4), I explicitly considered the impact of Larry's convictions on counts 10-12 on his violence risk.

In the Order, the Court also expressed concern that I did not speak with Chris Gerrans. While I would have welcomed an opportunity to interview Chris Gerrans, I assumed this was not feasible, given that he was a cooperating witness in this case. My inference regarding Chris's credibility was based upon multiple sources of information, including lengthy collateral interviews with multiple family members. It is important to note that my assessment of any potential danger posed by Larry Gerrans is ultimately based on my evaluation of Larry Gerrans. Nevertheless, Chris's credibility was relevant to my opinion regarding Larry's violence risk, to the extent that it influenced the degree of confidence I could have in Chris's statements regarding relevant events.

As to Larry Gerrans' statements regarding his brother at the storage facility, I opined in my original report that Larry Gerrans' statement that he would have killed his brother if there had not been cameras did not lead me to conclude that he was at high, or even moderate risk, of violently harming Chris Gerrans.  In addition to the reasoning outlined in my initial report, I

draw upon research findings from the threat assessment literature in forming this opinion. Research indicates that threats of violence are common, with most threats being misplaced humor or a means of venting emotion, behind which there is no intention of actually enacting violence. Larry's statement regarding Chris likely falls into this category. The base rate of actual violence committed by individuals who make threats is low. Larry does not present with primary risk factors for violence among individuals who make threats, including communication of violent intent, substance abuse, pre-attack behaviors, or a violent plan.[1]  While Larry did present with risk factors for actual violence among threateners, including potentially having access to weapons, and the experience of significant psychological distress, these risk factors alone are insignificant to suggest a moderate or high level of risk, given the above contextual factors and the generally low base rate of actual violence among individuals who make threatening statements.   Of particular importance, a more critical factor in analyzing a threat is violent intent rather than the threats per se, particularly when an individual conveys that violence is justified as a way to solve one's problems, or that one has nothing to lose.[2]  I saw no evidence of violent intent or a belief system justifying violence against Chris during my evaluation.  This analysis was supported by the fact that Larry presents with no meaningful violence history, did not become violent towards Chris before his incarceration, and demonstrated a low risk for violence on two widely utilized violence risk assessment measure, the HCR-20-V3, and PAI Violence Potential Index.

I carefully considered the violence risk implications of Larry's alleged threat to the prosecutor. In an FBI 302 dated 1/8/20, Chris reported that in 2018 Larry told him that he knew where Robin Harris lived and then said, "Let's take her out," in a manner that Chris perceived to be a threat of violence. In a letter dated 5/8/20, Chris reported that Larry approached him with a plan to take out Robin Harris, but Chris did not reference Larry's alleged statement regarding where Ms. Harris lived in this letter. There are at least three possibilities to account for this important data point:

1) Chris accurately understood Larry to propose a plan to inflict violence on Ms. Harris in her home.
2) Chris may have fabricated Larry's statement to "take out" Robin Harris because this is in his legal interest, and perhaps due to a psychological need to perceive Larry in the most negative light possible to cope with the feeling of guilt related to testifying against his brother.  I have outlined my concerns regarding Chris's credibility in my 7/16/20 report.
3) There may have been a misunderstanding between Larry and Chris, which caused Chris to genuinely misconstrue that Larry was proposing engaging in violence towards Ms. Harris. Larry's plan to "take out" Ms. Harris may have referred to a plan to take her off his legal case. Moreover, Larry believes that Ms. Harris's residential location was

---

[1]M. Mitchell & G. Palk (2016) Traversing the Space between Threats and Violence: A Review of Threat Assessment Guidelines, Psychiatry, Psychology and Law, 23:6, 863-871
[2] S White & R. Meloy.  WAVR-21 A Structured Professional Guide for the Workplace Assessment of Violence Risk

meaningful because she lived near political players in Sausalito, who he perceives were opposed to Sanovas commercial growth and minority hiring initiatives, and whom he fears may have influenced Ms. Harris's behavior.  Given Larry's tendency to communicate in an expansive and tangential manner, it is possible that Chris mistook Larry's statements about taking Ms. Harris off the case, due to her residentially based political connections, as a plan to violently harm her.

Of these three possibilities, I consider it the least likely that Larry proposed a plan to Chris to engage in physical violence towards Ms. Harris at her home. During my evaluations, I saw no evidence of violent fantasies towards Ms. Harris or plans to harm her. Larry did not engage in violence toward Ms. Harris before his incarceration.  He does not present with the psychological profile of an individual with a high risk for violence, as I have previously described. Based on these considerations, I provided the opinion that Larry was at low risk for violence in my 7/16/20 report. Nevertheless, were it factually accurate that Larry intentionally proposed to Chris a plan to commit violence against Ms. Harris, this would clearly increase his violence risk to a high level.

Finally, I note that the Order states that I described Larry Gerrans' alleged statement that he wanted to "take out" the prosecutor as a preoccupation that is "understandable" and "normative." (Order, page 3, lines 23-24). This does not accurately reflect my opinions, as outlined in my initial report.  My opinion was that Mr. Gerrans' preoccupation with the prosecutor, as *expressed in the letters*, was not unusual given the prosecutor's effect on his life, justifiably or not.

Thank you for your consideration of this addendum.


Respectfully,

*Teo Ernst, Psy.D., ABPP*

Teo Ernst, Psy.D, ABPP
September 22, 2020