UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>        Plaintiff,<br><br>    v.<br><br>GERRANS,<br><br>        Defendant. | Case No. 18-cr-00310-EMC-1<br><br>**ORDER DENYING DEFENDANT'S AMENDED MOTION TO VACATE, SET ASIDE OR CORRECT CONVICTION AND SENTENCE UNDER 28 U.S.C. § 2255 AND DENYING REQUEST FOR EVIDENTIARY HEARING**<br><br>Docket Nos. 476, 485 |

## I.     OVERVIEW

Defendant, Lawrence Gerrans ("Mr. Gerrans" or "Gerrans") was charged with taking funds from Sanovas, a medical device start-up company, which he co-founded. He was alleged to have billed the company for personal expenses and was accused of taking millions of dollars from Sanovas by fraudulent invoices and book entries, using shell entities, and lying to the board of directors. The money was purportedly taken to purchase a multi-million-dollar home, extravagant jewelry and home furnishings, vacations, and expensive cars. Mr. Gerrans was subsequently interviewed by the FBI about the allegations in this case and was charged with having made false statements in response to cover up these crimes. After he was indicted, while released on bond, Mr. Gerrans was accused of violating the terms of the bond by intimidating, harassing, and improperly communicating with his brother, Christopher Gerrans, who was also the subject of a related FBI investigation. The jury found Mr. Gerrans guilty of all twelve counts charged.

Mr. Gerrans has since challenged this verdict in post-trial motions and on direct appeal. The Court rejected Gerrans' claim that he was entitled to a new trial because, among other reasons, he received ineffective assistance of counsel. Dkt. No. 285 at 20-21. Mr. Gerrans

United States District Court<br>Northern District of California

United States District Court
Northern District of California

1    appealed, and the Ninth Circuit affirmed the jury verdict.  Dkt. No. 429.  Mr. Gerrans' petitions

2    for rehearing *en banc* and for writ of certiorari were denied.  Dkt. Nos. 429, 434.  The Ninth

3    Circuit declined to find that Mr. Gerrans established a claim for ineffective assistance of counsel

4    on the record before it but left open the possibility that Mr. Gerrans could prevail in bringing such

5    a claim in a 28 U.S.C. § 2255 motion, after developing the record further.  *See* Dkt. No. 429 at 4.

6         At Mr. Gerrans' request, the Court appointed counsel for purposes of adjudicating such a

7    motion.  Thereafter, Mr. Gerrans' counsel filed the instant 28 U.S.C. § 2255 motion, requesting

8    that Mr. Gerrans' conviction and sentence be vacated, set aside, or corrected, and/or for the Court

9    to hold an evidentiary hearing in relation to that motion.  Dkt. Nos 476 and 477.

10        To establish entitlement to relief under 28 U.S.C. § 2255, the movant may show violation

11   of a federal right.  To this end, Mr. Gerrans asserts a series of constitutional claims: (1) Sixth

12   Amendment structural claims; (2) Sixth Amendment ineffective assistance of counsel claims; (3)

13   claim premised upon violation of his Fifth, Sixth, and Fourteenth Amendment right to testify; (4)

14   Fifth Amendment due process claim premised upon a prosecutorial conflict; and (5) First

15   Amendment claim for restricted access to his Bible throughout trial.

16        The Court finds that Mr. Gerrans has not established a Sixth Amendment structural claim;

17   the bar for such a claim is high and requires showing failures of trial counsel amounting to an

18   abandonment of his defense or deprivation of a trial.  Even if counsel's performance was wanting

19   in some respects, Mr. Gerrans falls short of showing his trial was foundationally unsound.  He also

20   has not established his right to autonomy over his defense was usurped.  These claims fail.

21        Mr. Gerrans also asserts that he received ineffective assistance of counsel.  Trial counsel's

22   performance was either not deficient, or, in the ways in which it was arguably deficient, the record

23   conclusively establishes prejudice did not flow from such deficiencies.  *Rodney v. Garrett*, No. 23-

24   15624, 2024 WL 4097461, at *6 (9th Cir. Sept. 6, 2024) ("there is no reasonable probability that

25   the result of his trial would have been different but for counsel's alleged errors").  As to the wire

26   fraud and money laundering charges, the crux of Mr. Gerrans' ineffective assistance claim is that

27   Mr. Gerrans' trial counsel should have pursued the defense that Mr. Gerrans believe he was owed

28   money from his company and was authorized to take that money unilaterally, negating fraudulent

1    intent and guilt.

2         The Court first finds that that is not a legally sound defense; where a defendant engages in

3    a deceptive scheme to take funds from his company—even if he thought he was entitled to the

4    money and was authorized to pay himself—he has the requisite intent to deceive and cheat under

5    the wire fraud statute.

6         Moreover, even if belief of entitlement to the stolen money were a legally available

7    defense, here the evidence at trial as to Mr. Gerrans' guilty intent was overwhelming, and thus he

8    has failed to show prejudice from any ineffective assistance of counsel.  Namely, the jury heard

9    evidence from three members of the Sanovas Board of Directors that Mr. Gerrans called a Board

10   meeting in early 2015 so that the Board members would approve resolutions of employment

11   agreements that would entitle Mr. Gerrans to large sums of money purportedly owed to him for

12   deferred compensation and other expenses.  But Mr. Gerrans lied during those meetings.  He hid

13   from the Board that by the time they had met, he had already transferred millions of dollars to

14   himself from Sanovas.  Meanwhile, he told the Board that any payment he was approving would

15   be paid in the future, after the Board determined that the company was financially healthy enough

16   to make the payments.  And the Board member testified if they had known Mr. Gerrans already

17   took millions of dollars, they would not have approved the resolutions.  Moreover, Mr. Gerrans

18   represented that he was entitled to repayment for having liquidated his IRA account to help get

19   Sanovas off the ground in 2009.  Really, he liquidated the IRA years later to purchase a Maserati

20   car and diamond for his wife.  Moreover, in months leading up to the transfers he made in early

21   2015, the jury heard evidence that he worked with his brother, who was in charge of company

22   finances at that time, to generate a mass number of invoices and input them into company records

23   reflecting that Sanovas owed his shell company thousands of dollars.  The invoices also reflected

24   that his wife, Shelly Gerrans was owed money for work she did for Sanovas; meanwhile the

25   couple testified under oath in the context of their bankruptcy proceeding that she was solely a

26   homemaker at that time.  In addition to these acts, the amounts that Mr. Gerrans took from

27   Sanovas do not line up with any line item or calculation of sums he purports he was owed.  Rather

28   than the sums being tied to some amount that Mr. Gerrans demonstrated he was owed by Sanovas,

the sums line up with a payment he made to purchase a multi-million-dollar home that had recently been offered to him for sale.

Put simply, if Mr. Gerrans believed he was owed the money he took and authorized to pay himself, there is no explanation as to why he did not act with transparency, instead of engaging in an elaborate scheme to deceive Sanovas; there is no explanation why he: (1) prompted a Board meeting to obtain resolutions establishing that he was owed backpay; (2) lied to the Board as to the fact that he had already paid himself millions of dollars in deferred compensation and made the Board think payments would occur in the future, with Board approval; (3) lied about his retirement account liquidation; (4) transferred funds to companies instead of himself, in decrements that do not correlate to sums he was owed; or (5) ordered  his brother to generate records substantiating his entitlement to reimbursements in bulk that were, at least in part, false. This behavior is incongruent with an innocent state of mind.  For this reason, and others discussed below, the Court cannot find Mr. Gerrans is entitled to § 2255 relief for ineffective assistance of counsel.

As for Mr. Gerrans' assertion that his right to testify was violated, Mr. Gerrans explicitly waived his right to testify on the record, after an exchange with this Court clarifying that he held this right, and the decision to testify was his alone.  He is not entitled to § 2255 relief on this basis.

Moreover, Mr. Gerrans being asked to reposition his Bible, so as not to improperly sway the jury, while being allowed to always keep it with him during trial, is not a cognizable constitutional violation.  This does not support § 2255 relief.

Turning next to the prosecutorial conflict Mr. Gerrans identifies regarding AUSA Harris's City Council campaign and the expansion of Sanovas at Liberty Ship Way, this circumstance does not support § 2255 relief; Harris's City Council platform and the expansion are not in conflict.

And finally, as to the prosecutorial conflict Mr. Gerrans raised regarding his potential threat to AUSA Harris's life, the Court finds that Gerran's allegation has been waived for untimeliness, or in the alternative, fails on its merits. Defendant's claim based on the asserted conflict of interest does not reveal a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair

United States District Court
Northern District of California

procedures" required to obtain relief under Section 2255.  *See Wright v. United States*, 732 F.2d 1048, 1057 (2d Cir. 1984).

In sum, the Court **DENIES** Mr. Gerrans' Motion to Vacate, Set Aside or Correct Conviction and Sentence under 28 U.S.C. § 2255 and **DENIES** Mr. Gerrans' request for an evidentiary hearing.  The Court denies Mr. Gerrans' motion in all respects, including his request for an evidentiary hearing; the files and records conclusively show that the movant is not entitled to relief as to these claims.

## II.    BACKGROUND

On July 12, 2018, a federal grand jury returned an indictment charging Mr. Gerrans with wire fraud and money laundering.  *See* Dkt. No. 1.  The charges stemmed from Mr. Gerrans' conduct as President and CEO of Sanovas Inc. ("Sanovas"), a medical and surgical device company.  *Id.*  Mr. Gerrans appeared on July 23, 2018, and was released on bond, subject to conditions set by Judge James.  *See* Dkt. Nos. 4, 5.  On August 27, 2019, a second superseding indictment was returned by the grand jury, adding charges of false statements, contempt of court, witness tampering, and obstruction of justice in connection with violations of the bond order.  *See* Dkt. No. 57 ("Sec. Sup. Ind.").

 In all, Mr. Gerrans was charged with twelve counts: five counts of wire fraud (counts 1-5), money laundering (count 6), three counts of false statements to the FBI (counts 7-9), and three counts of post-indictment misconduct (counts 10-12). *See* Sec. Sup. Ind.  Specifically, the indictment alleged that Mr. Gerrans committed a scheme and artifice to defraud his company of company funds.  Counts 1 through 3 alleged three wire communications transferring a total of $580,000 taken from Sanovas and used to buy a family home; Counts 4 and 5 respectively alleged transfers of $32,395.77 and $12,5000 for personal expenses using Sanovas funds to which he was not entitled. Count 6 alleged that Mr. Gerrans committed money laundering by transferring $2,303,966.42 of criminally derived property for the purchase of the home.  Counts 7 and 8 alleged that Mr. Gerrans violated Title 18 Section 1001(3) by making false statements to the FBI via false invoices from Halo Management Group ("Halo") to Sanovas for work in early 2010. Count 9 alleged another violation of Section 1001(3) based on the alleged submission to the FBI

5

of a false "Secured Promissory Note" from Mr. Gerrans and his wife to Hartford Legend Capital ("Hartford") on March 17, 2015. Counts 10 through 12 alleged that from July 2018 through August 13, 2019, Mr. Gerrans committed contempt, witness tampering and obstruction of justice arising out of his contact with his brother Christopher Gerrans.

A jury trial commenced on January 13, 2020, and the case was given to the jury on January 29, 2020. *See* Dkt. No. 143. That same day, the jury rendered a verdict, finding Mr. Gerrans guilty on all counts. *See* Dkt. No. 144.

On May 27, 2020, Mr. Gerrans filed his Motion for Judgment NOV, Dkt. No. 234, and his Motion for a New Trial, Dkt. No. 235. On June 12, 2020, Mr. Gerrans filed a Motion to Dismiss for Improper Government Conduct. *See* Dkt. No. 247. On August 7, 2020, the Court denied each motion including Gerrans' motions for judgment notwithstanding the verdict, Dkt. No. 234, new trial, Dkt. No. 235, to dismiss for improper government conduct, Dkt. No. 247, and motion to strike, Dkt. No. 234. Dkt. No. 285 ("JNOV Order"). In so doing, the Court rejected Gerrans' claim that he was entitled to a new trial because he received the ineffective assistance of counsel ("IAC") for, among other reasons, failure to investigate key evidence. *Id.* at 20-21.

Gerrans appealed, and the Ninth Circuit affirmed the jury verdict. Dkt. No. 429. The Ninth Circuit found that the record as it stood did not establish an IAC claim. *Id.* at 4. However, the Ninth Circuit opined that Mr. Gerrans was not precluded from conducting additional investigation and asserting his IAC claim pursuant to 28 U.S.C. § 2255. *Id.* One Judge dissented, finding that the record was sufficiently developed and established deficient performance and prejudice stating that "[h]ere, there is simply no conceivable tactical justification for defense counsel's flagrant abdication of the duty to fully prepare." *Id.* at 3. Specifically, Mr. Gerrans' trial counsel "never bothered to interview several key witnesses," and thus could not have made professionally responsible decisions regarding witnesses and evidence to present. *Id.* at 2.

On February 21, 2023, Mr. Gerrans filed a 28 U.S.C. § 2255 motion. Dkt. No. 435. Mr. Gerrans simultaneously filed a motion to appoint counsel for this motion. Dkt. No. 436. On May 12, 2024, the Court granted Gerrans' motion to appoint counsel. Dkt. No. 440. The Court reasoned that because the Ninth Circuit left IAC as an open question Mr. Gerrans should have the

1    benefit of counsel to present his argument. *See id.* Counsel was appointed on June 7, 2023. On

2    February 29, 2024, Mr. Gerrans, via counsel, filed the present motion to Vacate, Set Aside or

3    Correct Conviction and Sentence under 28 U.S.C. § 2255. Dkt. Nos 476 and 477 ("Mot.").

4    Gerrans also requested an evidentiary hearing in that motion. Dkt. No. 476.

### III.    LEGAL STANDARDS

6         Under 28 U.S.C. § 2255, the federal sentencing court is authorized to grant relief if it

7    concludes that "the sentence was imposed in violation of the Constitution or laws of the United

8    States, or that the court was without jurisdiction to impose such sentence, or that the sentence was

9    in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28

10   U.S.C. § 2255(a). If the court finds that relief is warranted under Section 2255, it must "vacate

11   and set the judgment aside" and then do one of four things: "discharge the prisoner or resentence

12   him or grant a new trial or correct the sentence as may appear appropriate." *United States v.*

13   *Barron*, 172 F.3d 1153, 1157 (9th Cir. 1999) (quoting 28 U.S.C. § 2255). Vacating the judgment

14   does not prevent the reinstatement of unchallenged counts when the court decides to resentence or

15   correct the sentence. *See id.* (district court erred in rescinding entire plea agreement and returning

16   the parties to the pre-plea status quo when the defendant established a lack of factual basis for a

17   guilty plea as to one of the counts to which he pled guilty).

18        Mr. Gerrans also requests an evidentiary hearing. A district court must grant an

19   evidentiary hearing on a defendant's 28 U.S.C. § 2255 motion if there is a factual dispute and the

20   defendant's version, if true, would warrant relief. *See United States v. Chacon-Palomares*, 208

21   F.3d 1157, 1159 (9th Cir. 2000). No hearing is required where the defendant's allegations, viewed

22   against the record as a whole, "do not state a claim for relief." *Id.* at 571 (citations omitted).

23   Similarly, no hearing is required "where the files and records conclusively show that the movant is

24   not entitled to relief," *United States v. Mejia Mesa*, 153 F.3d 925, 929 (9th Cir. 1998), or where

25   the pertinent facts are not in dispute. *McQueary v. Blodgett*, 924 F.2d 829, 833 (9th Cir. 1991).

26   The denial of an evidentiary hearing is reviewed on appeal for an abuse of discretion. *United*

27   *States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003).

28

United States District Court
Northern District of California

7

# IV.    DISCUSSION

Mr. Gerrans asserts that relief pursuant to 28 U.S.C. § 2255 is appropriate based upon violations of his: (A) Sixth Amendment right to structurally fair trial ("Structural Claims"); (B) Sixth Amendment right to effective assistance of counsel ("Ineffective Assistance Claims" or "IAC claims"); (C) Fifth, Sixth, and Fourteenth Amendment right to testify; (D) Fifth Amendment due process right to prosecutor without conflict; and (E) First Amendment right to access his Bible throughout trial. Mot. at 4-5. The claims are addressed in turn below.

## A.    Sixth Amendment: Structural Claims

Mr. Gerrans argues that his Sixth Amendment right was usurped due to violations impacting the structural validity of the trial. Unlike Sixth Amendment claims premised upon ineffective assistance of counsel, Structural Claims do not require a showing of resulting prejudice if the claim is established.[1]

### 1.    *McCoy* claim: Concession of guilt at trial

The Supreme Court has recognized a Sixth Amendment right to autonomy in making decisions as to the objective of one's defense. *McCoy v. Louisiana*, 584 U.S. 414, 421-22, 426-27 (2018). Generally, "[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" *Id.* at 421-22. However, certain decisions are reserved for the client including "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *Id.* To obtain relief under *McCoy*, the record must show: "(1) that defendant's plain objective is to maintain his innocence and pursue an acquittal, and (2) that trial counsel disregards that objective and overrides his client by conceding guilt." *People v. Eddy*, 33 Cal.App.5th 472, 482-483 (Cal. Ct. App. 2019) (citing *McCoy*, 584 U.S. at 421, 424-25). *See also Gonzalez v. Sullivan*, 2020 WL 2083970, at *10 (C.D. Cal. Mar. 25, 2020) (explaining that petitioner must unambiguously object to admission of guilt to establish *McCoy c*laim). In the case of a *McCoy* violation, the defendant need not

---

[1] The parties disagree as to whether the claims are procedurally barred. It is not entirely clear if the claims are barred. Because the claim fails on the merits the Court does not decide this issue.

1    separately establish prejudice because "the right is either respected or denied; its deprivation

2    cannot be harmless." *McCoy*, 584 U.S. at 427 (quotations omitted).

3            Here, Mr. Gerrans argues that his Sixth Amendment right to autonomy to decide the

4    objective of his defense was violated when counsel conceded his guilt at trial as to (a) money-

5    laundering and wire-fraud charges, and (b) the contempt charge, despite Mr. Gerrans' maintenance

6    of innocence as to both charges.  Mot. at 5-6.

7            There is no Sixth Amendment violation here.  As to the financial misconduct charges,

8    counsel did not admit guilt at trial.  And further, Mr. Gerrans has not asserted that he objected to

9    counsel's approach to argument on this issue, which is required to establish a *McCoy* claim.  As to

10   the contempt charge, counsel indeed effectually conceded guilt, but Mr. Gerrans likewise did not

11   assert that he objected to that concession; the same is true for the other post-release misconduct

12   charges.

13           Rather than conceding guilt as to the wire fraud charges, trial counsel argued that Mr.

14   Gerrans was not guilty because Mr. Gerrans took the money openly (rather than through

15   deception) and was entitled to the amounts owed.  *See* Dkt. No. 477-24, Declaration of Brian Getz

16   ("Getz Decl.") ¶ 10 (summarizing defense at trial).  Indeed, Mr. Gerrans' trial counsel, Mr. Getz

17   challenged whether the company Board members were deceived by Mr. Gerrans as the

18   government argued, emphasizing the members' sophistication and their belated complaints as to

19   Mr. Gerrans' behavior until *after* FBI investigations started (negating fraud).  Dkt. No. 180 at 109-

20   111, 124.  Mr. Getz highlighted the importance of Mr. Gerrans' contributions to Sanovas,

21   identified that Mr. Gerrans' counterpart, Erhan Gunday, was paid millions upon Gunday's

22   departure from the company, and pointed to contracts entitling Gerrans to the sums taken to

23   substantiate Mr. Gerrans' innocent state of mind (negating intent).  *Id.* at 105-106.  Rather than

24   conceding guilt, in closing Mr. Getz left the jury with the following: "When you get up and go

25   into that jury room, you've got one chance to get this right. And it's: Larry Gerrans is not guilty.

26   He has not committed the crimes that he is accused of." Dkt. 180 at 125. *Cf. McCoy*, 584 U.S. at

27   417 (admitting that defendant "committed three murders.... [H]e's guilty"); *United States v. Read,*

28   918 F.3d 712, 720 (9th Cir. 2019) (finding counsel asserting insanity defense over defendant's

United States District Court
Northern District of California

9

objection violated Sixth Amendment autonomy right because an insanity defense is "tantamount to a concession of guilt").  Gerrans complains that the defense should have centered upon contractual entitlement and authorization to take the moneys, but this amounts to only a disagreement regarding the best defense to assert to achieved Gerrans' desired outcome: acquittal. But "what arguments to pursue" are within counsel's purview.  *McCoy*, 584 U.S. at 422.  *See also Samaniego v. Cates*, 2024 WL 923569, at *27 (S.D. Cal. Mar. 4, 2024) (finding decision to decline to seek jury instruction regarding involuntary manslaughter was strategy decision within attorney's purview).

Moreover, Mr. Gerrans does not assert that he objected to any concession that was made. *See* Dkt Nos. 477-25, Declaration of Lawrence Gerrans ("Gerrans Decl.")  ¶¶ 11-14.  This also prevents Mr. Gerrans from establishing a *McCoy* claim.  *See McCoy*, 584 U.S. at 419-420, 424-45; *People v. Lopez*, 31 Cal.App.5th 55, 66 (Cal. App. Ct. 2019) ("[W]e have found no authority, nor has [defendant] cited any, allowing extension of *McCoy*'s holding to a situation where the defendant does not expressly disagree with a decision relating to his right to control the objective of his defense."); *Thompson v. Bird*, 2023 WL 7389511, at *7 (E.D. Cal. Nov. 8, 2023), *report and recommendation adopted*, 2024 WL 457633 (E.D. Cal. Feb. 6, 2024) ("Without any evidence that defendant objected to counsel's concession, or otherwise made clear to counsel that he did not wish to concede guilt of simple assault during closing arguments, *McCoy* does not apply."); *Gonzalez*, 2020 WL 2083970, at *10 (similar); *People v. Franks* 35 Cal.App.5th 883, 891 (Cal. App. Ct. 2019) (finding *McCoy* inapplicable where the defendant denied guilt but never made clear a desire to pursue innocence as his defense).

Mr. Gerrans also argues trial counsel unconstitutionally conceded guilt as to the contempt charge.  Mot. at 6.  Counsel appears to have indeed conceded Mr. Gerrans' guilt as to this charge in closing argument even if inadvertently.[2]  However, Mr. Gerrans does not assert that he

---

[2] As to this count, the jury was instructed that contempt of court would be established if the prosecution proved that (1) "the court gave the defendant certain orders to limit his activities and conduct while released on bond pending trial"; (2) "the defendant disobeyed or disregarded those orders"; and (3) "the defendant acted willfully and knowingly in disobeying the court's orders." Jury Instructions at 23.  Counsel admitted each of these elements during closing.  Counsel stated defendant and his brother, Christopher Gerrans, had contact in the relevant timeframe. Dkt. No.

United States District Court
Northern District of California

expressed objections to counsel regarding counsel's admission of guilt.  *See* Gerrans Decl. ¶¶ 19-23 (discussing events surrounding contempt charge but omitting discussions with counsel on this issue); Getz Decl. ¶¶ 13-14.  This is fatal to the claim.  *See McCoy*, 584 U.S. at 419-420, 424-45; *Lopez* 31 Cal.App.5th at 66; *Bird*, 2023 WL 7389511, at *7.

2.      *Cronic* claim: Failure to defend

The Supreme Court has recognized a Sixth Amendment violation where there has "been an actual breakdown of the adversarial process during the trial of th[e] case," such that the prosecution was not required "to survive the crucible of meaningful adversarial testing."  *United States v. Cronic*, 466 U.S. 648, 656, 657-58 (1984).  In such a circumstance, the defendant need not make a separate showing of prejudice.  *Cronic*, 466 U.S. at 659 ("If counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable . . . . [N]o additional, specific showing of prejudice is required.").

To illustrate, the *Cronic* Court recognized the exception would be warranted in the extreme circumstances where defendant is denied counsel outright, or counsel was appointed so close to trial that it would be nearly if not entirely impossible for counsel to defend against charges.  466 U.S. at 659, 660-61 (citing *Powell v. Alabama*, 287 U.S. 45 (1932) (structural violation where defendants faced capital murder charges and trial counsel appointed day of trial and expressed lack of familiarity with local rules and inability to adequately represent defendants without additional time to prepare, for which he was denied)).  But in *Cronic*, the case at bar did not warrant

---

180 (January 29, 2020, Trial Tr.) at 121:4-21 ("[A]fter Larry Gerrans [the defendant] was released from court, under the terms of the bond, that . . . Chris Gerrans, went six times over to Larry Gerrans' house.").  And counsel admitted that (a) the conditions of release required no contact, and (b) Mr. Gerrans was aware of those orders and disregarded them by stating: "[h]e knew what the bond conditions were. He knew that [Lawrence Gerrans (defendant) and Christopher Gerrans (defendant's brother)] weren't supposed to meet." *Id.* at 121:15-16. Counsel argued that finding Mr. Gerrans to be in contempt was nonetheless not appropriate because "[t]hey're brothers. They've been together 40 years. It's on a different level. It's not some witness that was just involved in a particular case. It's family. It's his brother. How could they not have communication, given Chris's propensity for going over there so that the cousins could play together?" *Id.* at 121:15-21.  Though this argument may have emotional appeal, it is not a legally sound basis to find Mr. Gerrans innocent.  *See* Jury Instructions at 23 (describing elements of contempt charge which did not include e.g., excuse for family members).

11

United States District Court
Northern District of California

application of the exception because counsel had been given approximately one month extension to prepare for trial.  *See id.*  The sort of violation recognized in *Cronic* did not occur here, nor does Mr. Gerrans assert that it did.  Mr. Getz, Mr. Gerrans' trial counsel, entered his appearance on behalf of Mr. Gerrans in October 2018, Dkt. No. 20, over a year before trial commenced in January 2020, representing him through pretrial proceedings and the trial.  Dkt. No. 124.

Mr. Gerrans argues, however, that he was effectively denied an adversarial trial due to counsel's lack of defense, amounting to abandonment of his case.  Mot. at 6.  Specifically, Mr. Gerrans argues that counsel put forth no viable defense to any of the charges, called no witnesses, and introduced no exhibits.  *Id.*  This argument is unavailing.  The bar for applying *Cronic* is high. Indeed, *Cronic* is understood to be a narrow exception to the requirement of *Strickland* that a petitioner must demonstrate prejudice to establish a Sixth Amendment violation.  *Gallegos v. Ryan*, 820 F.3d 1013, 1034 (9th Cir. 2016).  For *Cronic* to apply "the attorney's failure must be complete" and the attorney must "*entirely* fail" to test the prosecution's case." *Bell v. Cone*, 535 U.S. 685, 697 (2002) (emphasis in original).  This violation occurs when "the attorney's failure to oppose the prosecution goes to the proceeding as a whole—not when the failure occurs only at specific points in the trial."  *Gallegos*, 820 F.3d at 1034.   For example, in *Gallegos*, the Court found that where counsel moved to suppress evidence before trial and developed factual evidence favorable to defendant via cross-examination at trial, the narrow exception recognized in *Cronic* did *not*, apply even if counsel's performance was ultimately deficient.

The high bar of *Chronic* is not met here.  The circumstances are similar here to those in *Gallegos*.  Mr. Gerrans' counsel engaged in extensive cross-examination of the government's witnesses.[3]  Further, counsel contested admissibility of evidence including via *in limine* motions. Dkt. Nos. 82, 92.  Counsel also moved to sever counts to be presented at trial, disputed jury instructions, and successfully argued for inclusion of a good faith jury instruction.  Dkt. Nos. 33, 34, 94, 105, 115, 117, 136, 178; Final Jury Instructions at 17.  And Mr. Getz offered a counter-

---

[3] *See, e.g.*, Dkt. No. 129 at 168 (Christopher Gerrans); Dkt. No. 130 at 208 (Christopher Gerrans); Dkt. No. 139 at 20 (Swisher); Dkt.140 at 63-76 (Nichols); Dkt. No. 141 at 29-38 (Richards); Dkt. No. 142 at 38-53 (Yarborough).

United States District Court
Northern District of California

narrative to the government's story in closing argument, pointing to the sophistication of the Sanovas Board of directors, value of Mr. Gerrans to the company, and comparable payouts to his counterparts in an attempt to undermine the existence of a fraudulent scheme and intent to defraud. Dkt. No. 180 at 105-106, 109-111, 124.  While Mr. Gerrans points to weaknesses in counsel's performance in *e.g.* failing to call certain witnesses, these weaknesses, even if established, do not amount to complete abandonment of the defendant.  *See Gallegos*, 820 F.3d at 1034.  *See also Holterman v. Morrow*, 81 F. App'x 136, 138 (9th Cir. 2003) (finding *Cronic* exception did not apply where trial counsel raised various arguments on appeal including challenging exculpatory evidence even if other issues could have or should have been raised; this was not a complete and total failure to defend); *Johnson v. Terhune*, 80 F. App'x 557, 560 n.3 (9th Cir. 2003) (holding that the district court's application of *Cronic* was erroneous where counsel believed his client was guilty and failed to offer mitigating evidence and to investigate the case because failure to adduce mitigating evidence is "of the same ilk" as other attorney errors subject to *Strickland* analysis); *cf. People v. Ruiz*, 89 Cal. App. 5th 324, 331–32 (Cal. Ct. App. 2023) (applying *Cronic* where counsel suffered mental illness resulting in counsel not remembering client's name).  Rather, the claims of deficient performance at issue are properly evaluated under *Strickland v. Washington*, 466 U.S. 668 (1984).

The Court **DENIES** Mr. Gerrans' 28 U.S.C. § 2255 motion insofar as it rests upon Sixth Amendment structural claim.

B.    Sixth Amendment: Ineffective Assistance of Counsel Claims

The Sixth Amendment to the United States Constitution protects a defendant's right to the "effective assistance of counsel."  *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984) (internal quotation marks omitted).  Counsel's assistance is ineffective when it falls "below an objective standard of reasonableness."  *Id.* at 688.  A convicted defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Id.* at 690.  Ineffectiveness claims "alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice."  *Id.* at 693.  To prove prejudice, "the question is whether there is a reasonable probability that, absent the errors,

13

the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "To prevail on Strickland's prejudice prong, there must be 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *United States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005) (citing *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112, (2011); *accord Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."). *See also Thornell v. Jones*, 144 S. Ct. 1302, 1310, 1314 (2024) (emphasizing, in the context of a habeas petition in a death penalty case "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result" and emphasizing the reviewing court's responsibility to evaluate the strength of all evidence in context of the record).

Mr. Gerrans argues that counsel performed deficiently for: (1) failure to communicate; (2) failure to offer adequate defenses at trial; (3) failure to request favorable jury instruction; (4) failure to conduct an adequate investigation; and (5) failure to call favorable witnesses and effectively cross-examine the government's witnesses. Mot. at 7-15.[4]  And Gerrans argues that the deficiencies prejudiced him as to each of the charges against him: (1) wire fraud and money laundering charges (counts 1-6); (2) false statements charges (counts 7-9); and (3) post-release misconduct charges (counts 10-12). *Id.* at 15-19. The Court addresses each set of charges in turn.

      1.    <u>Wire fraud and money laundering charges (counts 1-6)</u>

Mr. Gerrans was found guilty of five counts of wire fraud (counts 1-5) and one count of money laundering (count 6). *See* Dkt. No. 144 (Jury Verdict). Counts 1-3 for wire fraud and count 6 for money laundering relate to transfers that took place in early 2015; counts 4-5 of wire fraud relate to transfers in 2017. *See* Sec. Sup. Ind. ¶¶ 1-17, 19.

---

[4] Mr. Gerrans also argues that his right to testify was violated and failing to put him on the stand amounts to ineffective assistance of counsel. *See* Mot. at 30. Mr. Gerrans' right to testify and the related deficiency is addressed separately in Section IV.C.

United States District Court
Northern District of California

a.       2015-related charges (counts 1-3, and 6)

As to the 2015-related charges (counts 1-3, 6), the indictment listed factually that Mr. Gerrans transferred approximately $2.3 million to himself from Sanovas between January and March 2015, and charged Mr. Gerrans with defrauding Sanovas of $580,000 in March 2015 (wire fraud counts 1-3).  Sec. Sup. Ind. ¶¶ 1-17, 19.  To this end, the government alleged Mr. Gerrans transferred himself money on March 13-16, 2015 ($80,000 to the entity Halo on March 13, count 1; $250,000 to the entity Hartford on March 16, count 2; $250,000 to the entity Hartford on March 16, count 3).  *See id.*  ¶¶ 1-17, 19.  The money laundering charge, count 6, rested upon wire fraud counts 1-3; the indictment charged Mr. Gerrans with transferring approximately $2.3 million of funds for the purchase of a home, satisfying the elements of the money laundering claim: a monetary transaction by, through, and to a financial institution involving a value greater than $10,000 of criminally derived property.  *Id.* ¶¶ 16(s), 21.

Gerrans argues that trial counsel failed to investigate, leading to the omission at trial of: (1) testimony from Robert Farrell, former Chief Financial Officer of Sanovas; (2) documents that would have been uncovered from Farrell including his email exchanges with King & Spalding, an employment law firm; (3) the omission of testimony from Gary Krausz, an outside CPA resting upon employment and company governance agreements.  *See* Mot. at 15-20.  Gerrans argues that this evidence would have substantiated the argument counsel should have made at trial, that Gerrans was owed deferred compensation from 2009-2015, and that he had the authority as CEO to unilaterally pay himself back-owed moneys, without approval of the Sanovas Board of Directors ("Board").  *See id.* at 8-10, 15-20.  Thus, he lacked intent to defraud Sanovas.  *See id.*

As an initial matter, the Court has serious doubt as to whether counsel's performance was deficient in the first instance for failing to pursue this line of evidence and argument at trial.[5]  The

---

[5] For example, the record suggests that trial counsel evaluated Krausz's testimony and underlying employment contracts and made a strategic and perhaps ethically required decision not to pursue this line of evidence.  Krausz audited Gerrans' employment agreements and initially offered a declaration attesting that such agreements entitled Gerrans to compensation from Sanovas.  *See* Dkt. No. 42-1.  Gerrans' counsel initially filed the declaration with this Court on August 12, 2019, alongside Defendant's motion to dismiss.  Dkt. No. 42-1.  However, Counsel withdrew the motion to dismiss and Krausz's declaration two days after it was submitted.  *See* Dkt. No. 51 (August 21, 2019, Minute Entry).   The filing and withdrawal of this declaration supports that counsel made a

15

Court need not determine definitively whether counsel's performance was indeed deficient. Rather, the Court may assume, without deciding that counsel's performance was deficient for purposes of assessing an IAC claim. *United States v. Thomas*, 417 F.3d 1053 at 1056 n.1 (quoting *Strickland*, 466 U.S. at 697) ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). Even assuming counsel's performance was deficient, prejudice as required by *Strickland* did not flow from any such error.

### i.    Prejudice: Legal validity of defense theory

At the outset, the Court notes its view that the defense Mr. Gerrans identifies is legally unsound. The bailiwick of Gerrans' motion, as it pertains to these charges, is that counsel was ineffective in developing evidence of Gerran's subjective belief that he was entitled to the money he took from Sanovas, belief which would have negated the *mens rea* requirement for wire fraud. *See* Mot. at 9. Gerrans explains that under *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020):

> A scheme to defraud requires the defendant to deprive the victim of a property right *without a good-faith belief that he was authorized to do so*. *See id.* Mr. Gerrans was therefore not guilty of wire fraud if at the time he obtained funds from Sanovas, he believed that those funds were owed to him and that he was fully authorized to take them. If he held those beliefs, then he did not commit wire fraud even if he obtained the funds by deceptive means. *See id.* Moreover, whether Mr. Gerrans was actually authorized to pay himself those

---

reasoned decision not to pursue this line of evidence and argument, undermining its support for an IAC claim. *See Wharton v. Chappell*, 765 F.3d 953, 967 (9th Cir. 2014) (quoting *Strickland*, 466 U.S. at 690) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Sexton v. Cozner*, 679 F.3d 1150, 1156 (9th Cir. 2012) (noting that "a strategic decision" generally "cannot form the basis of a claim for ineffective assistance of counsel"). That decision may have been ethically required, because, for reasons discussed in the Court's JNOV Order, there was reason to believe that the Krausz declaration rested upon, at least in part, fraudulent documents. *See* Dkt. No. 285 (Order Denying Def's Motion for Acquittal, Motion for New Trial, Motion to Dismiss, and Motion to Strike) at 25-26. Further, "[a] claim of failure to interview a witness ... cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *opinion amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001) (amended on other grounds). Counsel reviewed Krausz' declaration, submitted it to the Court, and then withdrew that submission suggesting that this was a considered decision which generally does not support an IAC claim.

1    funds does not matter, so long as he genuinely believed that he was
     authorized to do so. *See id.*[6]

2    Mot. at 9 (emphasis in original).

3        For the reasons discussed below, the *mens rea* defense which Mr. Gerrans asserts his

4    counsel failed to fully develop is not a legally viable defense to wire fraud and thus there is no

5    prejudice under *Strickland*.

6        The federal wire fraud statute that Mr. Gerrans was charged with violating provides:

7        Whoever, having devised or intending to devise any scheme or
         artifice to defraud, or for obtaining money or property by means of

8        false or fraudulent pretenses, representations, or promises, transmits
         or causes to be transmitted by means of wire, radio, or television

9        communication in interstate or foreign commerce, any writings,
         signs, signals, pictures, or sounds for the purpose of executing such

10       scheme or artifice, shall be fined under this title or imprisoned not
         more than 20 years, or both.

11   18 U.S.C. § 1343.

12       The elements of the crime are laid out in the Ninth Circuit Manual of Model Criminal

13   Instructions: (1) "the defendant knowingly [participated in] [devised] [intended to devise] a

14   scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false

15   or fraudulent pretenses, representations, or promises[, or omitted facts.] [Deceitful statements of

16   half-truths may constitute false or fraudulent representations]"; (2) "the statements made or facts

17   omitted as part of the scheme were material; that is, they had a natural tendency to influence, or

18   were capable of influencing, a person to part with money or property"; (3) "third, the defendant

19   acted with the intent to defraud, that is, the intent to deceive and cheat;" and (4) the defendant

20   used, or caused to be used, an interstate [or foreign] wire communication to carry out or attempt to

---

[6] The Court notes that as Mr. Gerrans has described the prejudice he suffered, his argument rests upon whether he believed he was entitled to the funds he took and believed he was authorized to take them (not whether he was as an objective matter so entitled). *See* Mot. at 9 (citing *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020)).  To this end, the perceived or actual legitimacy of the transfers at issue pertain to *mens rea*; his actual entitlement/authority, as Mr. Gerrans, is relevant to "substantiat[e] Mr. Gerrans' belief that he was entitled and authorized to take that money."  Reply at 4.  *See also United States v. Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 2017) (citing *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (explaining that a scheme to defraud is "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises").  *See also United States v. Kasprowicz*, 447 F. App'x 817, 818 (9th Cir. 2011) ("The defining characteristic of a scheme to defraud is actually deceit.").

carry out an essential part of the scheme." *Manual of Model Criminal Jury Instructions*, 15.32 (amended August 2023). *See also United States v. Galecki*, 89 F.4th 713, 737 (9th Cir. 2023) ("The elements of mail and wire fraud are: "(1) proof of a scheme to defraud; (2) using the mails or wires to further the fraudulent scheme; and (3) specific intent to defraud.").

The prior version of the Model Criminal Instruction stated the third element as "the defendant acted with the intent to defraud, that is, the intent to deceive or cheat." The most recent amendment changed the disjunctive between deceive "or" cheat to the conjunctive of deceive "and" cheat. The change was in response to the Ninth Circuit's decision in *Miller*. *Manual of Model Criminal Jury Instructions*, Comment to Instruction 15.32 (amended August 2023).

In *Miller,* the court recognized that, after the Supreme Court's decision in *Shaw v. United States*, 580 U.S. 63 (2016), and in accordance with the approach of other circuits, the jury instruction for the federal wire fraud statute should require a jury finding intent to deceive *and* cheat—not intent to deceive *or* cheat. *Miller*, 953 F.3d at 1103-04. The *Miller* Court explained that the purpose of the conjunctive jury instruction (cheat *and* deceive) is to distinguish between persons that utilize fraud generally and those that utilize fraud to *take money or property*. *See Miller*, 953 F.3d at 1101-02 ("to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions. In other words, a defendant must intend to deceive *and* cheat") (emphasis in original). In so holding, *Miller* cited *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993). 953 F.3d at 1101-02. In *Walters* a sports agent used deception not to take property from the NCAA, but to induce college athletes to sign secret representation contracts; *Walter* held this conduct did not fall under the wire fraud statute, because the defendant deceived but did not "cheat" the NCAA because what he did not take money or property. 997 F.2d 1219 (7th Cir. 1993). *Id.* However, nothing in *Walters* suggests that intent to cheat turns on whether the money or property taken from the possession of the victim in fact was owed to the perpetrator. Thus, under the definition of "cheat", there is no dispute that unlike the defendant in *Walter,* there is no doubt that Mr. Gerrans took money from Sanovas. *Cf. Walters*, 997 F.3d at 1225 ("None of the Supreme Court's mail fraud cases deals with a scheme in which the defendant

18

neither obtained nor tried to obtain the victim's property.").  This is so irrespective of his asserted defense that he believed he was legally entitled to the money.

Mr. Gerran' reliance on *Miller* to support this defense is unpersuasive.  The language in *Miller* upon which he relies is dicta.  In *Miller* the defendant issued loans to himself by the company using deceptive ledger entries.  *Id.* at 1009-1100.  *Miller* argued that as CEO he was authorized to issue himself loans, and thus, the jury instruction issued at trial, requiring intent to deceive *or* cheat was both erroneous and prejudicial.  *Id.* at 1103-04.  The *Miller* Court recognized that "[t]his defense did, in effect, raise the claim that Miller, while intending to deceive, did not intend to cheat.  But we are persuaded, based on other language in the jury instructions, that there is no way the jury made this determination."  *Id.* at 1103-04.  The Court ultimately determined that any such error was harmless because Miller was convicted of filing false tax returns, and the jury could not as a factual matter have convicted him if the money was obtained via loans.  *See id.* at 1104.  Thus, the jury could not have been persuaded that Miller issued himself a loan, i.e., that he acted pursuant to authority.  *Id.*  Accordingly, the *Miller* Court never had to, and did not decide, when and under what circumstances authorization and entitlement to money taken negates a wire fraud charge.  *Id*

The reading of *Miller* adopted by this Court accords with the Comment to the current Ninth Circuit Moden Criminal Jury Instructions:

> In *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020), the Ninth Circuit expressly considered [the disjunctive] instruction and held that wire fraud requires the intent to "deceive and cheat", thereby overruling prior holdings approving the "deceive or cheat" language in light of the Supreme Court's decision in *Shaw v. United States*, 137 S. Ct. 462, 469 (2016).  *Id.* at 1102.  *Miller* reasoned that "to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also **to deprive a victim of money or property by means of those deceptions**.  In other words, a defendant must intend to deceive and cheat." *Id.* at 1101.  *Miller* does not disturb [prior Ninth Circuit precedent] ruling that although the mail and wire fraud statutes expressly punish only those who "devise . . . or intend . . . to devise" a fraudulent scheme, those who "participate in" such a scheme also fall within the statute's ambit.  *Holden*, 908 F.3d at 399-401.  Miller also left unchanged the precedent that intent to repay "is not a defense to wire fraud."  *Miller*, 953. F.3d at 1103.

Comment to Ninth Circuit Model Criminal Jury Instruction 8.124 (emphasis added).   The

comment clarified:

> A defendant acts with the intent to deceive when he "make[s] false statements or utilize[s] other forms of deception[.]" *Miller*, 953 F.3d at 1101.  **A defendant acts with the intent to cheat when he engages in "a scheme or artifice to defraud or obtain money or property" and "deprive[s] a victim of money or property[.]" thereby "cheat[ing] someone out of something valuable."** *Id.*

> In clarifying the distinction between "deceive" and "cheat," *Miller* cites to *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993).  In *Walters*, the court reviewed the conviction for mail fraud of a sports agent who had defrauded the NCAA, not by stealing its property, but by inducing college athletes to sign secret representation contracts in violation of the Association's rules.  *Id.* at 1221. Finding that the agent had deceived, but not cheated, his victim, the Seventh Circuit reversed the agent's conviction, holding that the statute requires *"a scheme to obtain money or other property from the victim,"* and that while a deprivation of money or property is a necessary condition of mail fraud, "[l]osses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement" *Id.* at 1227.

*Id.* (emphasis added).  Thus, the Model Instruction recognizes that the "intent to cheat" element

simply requires an intent to obtain money or other property from the victim, not merely to deceive

the victim.  Nothing in the Comments suggest that the perpetrator's belief he was owed the money

and authorized to take it from the victim negates an intent to "cheat" (*i.e.* to take property or

money) under the statute.  *Id.*[7]  Mr. Gerran' asserted defense, if recognized, would permit

corporate actors to take moneys from companies through deception, sanctioning deceptive self-

help over transparent proper mechanisms for vindicating asserted rights.  *See* Dkt. No. 285 (JNOV

Order at 12).[8]

---

[7] This reading is sound. It is not clear how or why a CEO's general authorization to write checks and pay employees (when done legitimately) absolves him from engaging in a scheme of lies and fraudulent behavior in service of depriving his company of money.  Mr. Gerrans' argument, that a CEO may utilize deception to take funds from a company, offends foundational principles underlying corporate governance, including the duty to act in good faith and with transparency.
[8] Query whether if Gerrans's asserted defense that he was legally owed the money he took were sustained, such a defense could be asserted against other forms of theft or misappropriation of property such as embezzlement.

United States District Court
Northern District of California

1    Accordingly, the Court finds that no prejudice existed as to the wire fraud counts for any

2    failure to argue that Mr. Gerrans lacked the requisite intent based on the assertion that he believed

3    he was entitled to the money and had the authority to take it where he took it through deception.

4    Evidence that his counsel failed to develop and present at trial would not have provided Mr.

5    Gerrans with a legally viable defense, and thus there was no prejudice under *Strickland*.

6    To be sure, there is some ambiguity as to this issue in the Ninth Circuit panel's opinion in

7    this case.  *See Gerrans*, 2022 WL 73051, at \*2 ("Gerrans argues that his lawyer failed to present

8    evidence showing that he believed he was entitled to the money he took from Sanovas.  Those

9    arguments, *while relevant to his ineffective assistance of counsel claims*, do not show that the jury

10    could have convicted Gerrans without finding that he intended to cheat.") (emphasis added).

11    While the rather oblique reference may be read as suggesting there may be legal viability to the

12    intent defense Mr. Gerrans seeks to assert, it is noteworthy that the dissenting judge (who would

13    have reversed under *Miller*) stated the portion of the jury instruction requiring "'a scheme or plan

14    for obtaining money or property by means of a false of fraudulent [actions]' – necessarily implies

15    intent to **obtain money or property via deceptive means (and thus cheats**)".  *Id.* at 5 (Baker, J.

16    dissenting) (emphasis added).  This straightforward definition of "cheat" is consistent with the

17    current Model Instructions.  It does not encompass a lack of belief the perpetrator was legally

18    entitled to the money taken.  Nonetheless, for the avoidance of doubt, in view of the panel's

19    suggestion that evidence might be relevant to Mr. Gerran's ineffective assistance claims, the Court

20    reviews the evidence at trial to determine, assuming there is a legally viable defense of belief he

21    was owed the money he took, whether prejudice flowed from evidence counsel failed to elicit.  For

22    the reasons stated below, the Court finds that given the overwhelming evidence that Mr. Gerrans

23    did not act with a belief he was entitled and authorized to take the money from Sanovas, there is

24    no "reasonable probability that, but for counsel's unprofessional errors, the result of the

25    proceeding would have been different."  *Thomas*, 417 F.3d at 1056 (citing *Strickland*, 466 U.S. at

26    694).

27    ii.    Prejudice: Evidence

28    Gerrans points to the following evidence that should have been presented at trial, evidence

United States District Court
Northern District of California

that he asserts would help establish his innocent state of mind.

a.     Exculpatory Evidence

    _Farrell testimony_.  Farrell was the CFO of Sanovas from September 2012 through November 2013.  Dkt. No. 477-17, Declaration of Robert Farrell ("Farrell Decl.") ¶ 1.  Farrell attests, and could have testified, that per his understanding of Gerrans' employment agreement Mr. Gerrans was entitled to a salary and a bonus each year if milestones were met by the company. Farrell Decl. ¶ 9.  Further, for several years prior to 2013 Gerrans would have earned a bonus but the company often did not have sufficient funds to pay bonuses, and so, Mr. Gerrans was entitled to a lump sum payment in 2014 for deferred compensation from previous years.  _Id._ ¶¶ 9-10. Further, Farrell attests that as president and CEO of Sanovas "[Mr. Gerrans] had the authority to decide when the Company had sufficient funds, and thus when to take the deferred compensation. Larry had the authority to make this decision on his own and did not require approval from the Board of Directors or any other Sanovas employee."  _Id._ ¶ 10.  In other words, Farrell would have testified Mr. Gerrans was owed deferred compensation, at least as of August 2013, and Gerrans was authorized to decide when to take deferred compensation without Board approval.

    _K&S emails_.  Farrell also may have pointed trial counsel to emails had he been interviewed.  Specifically, Mr. Gerrans submits an email exchange between Farrell and King & Spalding ("K&S"), an outside law firm, that evaluated Gerrans' employment agreements in August 2013 and concurred with Farrell that Gerrans earned bonuses in previous years and should be paid a lump sum.  _Id._ ¶ 10 (citing Ex. B., USAO-FBI-002436 Email from Robert Farrell re Employment Docs to King & Spalding, 8-5-13).  Farrell did not personally attest to an amount that Gerrans was owed as of August 2013.  _See id._  However, an August 22, 2013, email from Farrell to K&S recounts that Mr. Gerrans was owed $723,900 as a deferred compensation as of that time for unpaid bonuses, salary, and expenses for years 2010-2012.  Dkt. No. 477-3, Declaration of Yevgeniy Parkman ("Parkman Decl.") Ex. B at 1, 2.  Another July 10, 2013, email from K&S reflects that the company would be taxed on unpaid compensation to its executives, and that the compensation would be considered unreported income for the company, but if the payments were made promptly the IRS may not impose a penalty.  Dkt. No. Parkman Decl. Ex. C at 2.  To this

United States District Court
Northern District of California

end, K&S opined that the company should set forth a clear plan including amounts, and time for payment of any deferred compensation. *Id.* In other words, the email would have supported that Mr. Gerrans was owed $723,900 as of August 2013 and there could be tax implications if that amount was not paid promptly.

Krausz testimony and employment agreements. Krausz is an outside CPA for the firm of Gursey Schneider LLP and evaluated documents that Gerrans sent to him, post-indictment, to discern sums owed to Gerrans by Sanovas according to those documents. *See* Dkt Nos. 477-15, Parkman Decl. Ex. C ("Krausz Supp. Decl.") ¶¶ 2-5, 477-16, Parkman Decl. Ex. D ("Krausz Decl.") ¶¶ 4-7. Krausz relied upon: Mr. Gerrans' 2010 employment agreement, 2012 employment agreement, 2015 agreement and omnibus resolution, made retroactive to January 2012 (modified by Board resolution on May 9, 2015). Krausz Decl. ¶ 9. Krausz opined that, per these documents, Gerrans was entitled to approximately $8.5 million in compensation: $1.1 million per the 2010 employment agreement, $1.37 per the 2012 employment agreement, $5.175 per the 2015 employment agreement (as amended by the Board in May 2015), and $0.8 million per a December 3, 2012, written Board resolution (as amended by the Board in May 2015). *Id.* ¶ 12. And further, Krausz opines that Gerrans was entitled to reimbursement from liquidation of his retirement account in 2013 and 2014 for $0.8 million. *Id.* ¶ 13. In other words, Mr. Krausz would have testified that Gerrans was entitled to $8.5 million from Sanovas per his agreements.

Analysis. This evidence provides some support for the assertion that Mr. Gerrans believed that he was owed deferred compensation and that he was authorized to pay himself that money as CEO—exemplifying his innocent state of mind as to the early 2015 transfers.

The probative value of the evidence, however, is limited. Farrell does not attest to a specific amount Gerrans was owed, even as of 2013 when Farrell was last at the company. *See generally* Dkt. No. 477-17, Farrell Decl. And Farrell, does not substantiate his opinion that Gerrans had unilateral authority to pay himself deferred compensation via, *e.g.*, citation to any corporate governance document. *See id.* ¶ 10. Further, the analysis from Krausz as to compensation owed to Mr. Gerrans was not generated until 2019, after litigation had ensued. *See* Dkt. No. 477-16, Krausz Decl. (dated August 2019). Though Krausz's opinion tends to support

United States District Court
Northern District of California

that Mr. Gerrans was entitled to back-owed compensation under employment agreements as an objective matter, Gerrans could not have been aware of that opinion when he effectuated the transfers of money to himself in 2015.  Thus, any testimony from Krausz is not very probative as to Gerrans' state of mind at the time of the transfers.

The testimony also rests, at least in part, upon fraudulent documents.  As discussed below, the 2015 Board resolutions, upon which Krausz relied, were obtained through lies to the Board. Dkt. No. 477-16, Krausz Decl. at 6.  And there is evidence in the record that agreements relied upon by Krausz, Farrell and K&S were fraudulent.  Namely, the 2009 agreement, purporting to hire Shelly Gerrans was signed only by Mr. Gerrans, *see* TX 106, and as explained below, is contradictory to Shelly Gerrans' sworn testimony that she did not work for Sanovas (or any other company) in that timeframe.  Moreover, Ehran Gunday testified that he did not sign the 2013 agreement though it bears his signature.  TX 105 at -008; Dkt. No. 477-2, Ex A ("Q. Okay. Is that your signature on the back of Government's Exhibit 105? A. Looks a lot like mine. But I did not sign this document.").  Even if counsel could have rebutted some of this evidence, at a minimum, this evidence undermines the probative value of the testimony of Krausz and Farrell resting on these documents.

Moreover, the amount of money Gerrans transferred to himself in early 2015 does not correspond to any amount of deferred compensation identified in the omitted evidence.  There is no obvious correlation which would have suggested a knowing tie between the amounts alleged owed and the amounts taken.  Gerrans transferred: $131,673.20 from Sanovas to himself (Jan. 9, 2015), TX 190, six checks amounting to $1,435,544.25[9] from Sanovas to Halo (Jan. 20, 2015-March 13, 2015) TX 195, two checks amounting to $314,750 to Hartford (March 13, 2015), TX 196, $80,000 from Sanovas to Halo (March 13, 2015), TX 198, $65,000 from Sanovas to himself as wire transfer (March 16, 2015), TX 203, $250,000 from Sanovas to Hartford (March 16, 2015) TX, 205.  These transfers amount to $2,276,967.45 from Sanovas to himself or his entities.

The omitted evidence at issue includes a 2013 email exchange between Farrell (former

---

[9] The check amounts were as follows: $340,000, $105,544.25, $100,000, $500,000, $140,000, $250,000. TX 195.

CFO) and K&S (law firm). *See* Dkt. No. 477-3 at 3. That email reflects that Gerrans was entitled to $723,900 in deferred compensation from 2010-2012. *Id.* But, Gerrans never made any transfer in that dividend in early 2015—individually or in any combination of transfers. *See* TX 190, 195, 196, 198, 203, 205. Gerrans also points to the Krausz declaration to substantiate that he was entitled to back-owed compensation. But none of the amounts listed in that declaration line up with the sums transferred. *See* Dkt. No. 477-16, Krausz Decl. at 6. Specifically, Krausz opined Gerrans was owed: $1,110,500 (2010 employment agreement), $1,370,767 (2012 employment agreement), $5,175,287 (2015 employment agreement), and $828,250 (December 3, 2013, Unanimous Written Consent Board Resolution – Reimbursement of Retirement Funds), totaling $8,484,804. *Id.* None of these amounts correspond to any transfer in early 2015, individually or in combination.

Instead of corresponding to back-owed compensation, the sums transferred appear to have been driven by a payment Gerrans made for a house in 2015. Calculating the sums listed above, the early 2015 transfers add up to just under $2.3 million. Roughly $2.3 million is also the amount of money Gerrans transferred from Hartford's bank account to Stewart Title for the purchase of a residence at 28 Greensburgh Lane in San Anselmo on March 17, 2015. *See* TX 44 (March 17, 2015 wire transfer in the amount of $2,303,966.42 to Stewart Title from Hartford); TX 46 (Final Buyer's/Seller's Closing Statement). For these reasons, the probative value of the omitted evidence regarding Gerrans' authority to pay himself unilaterally, and the entitlement to back-owed funds, is very limited. Meanwhile, as described herein, the evidence at trial as to Gerrans' intent to defraud the company was overwhelming; Gerrans behaved in a way that is not consistent with a good faith belief that the transfers were legitimate.

b.    Inculpatory Evidence.

Representations to the Board. Gerrans' behavior during and leading up to the Sanovas Board meeting on May 9, 2015, belies the assertion that Gerrans simultaneously believed he was permitted to take the money as he did from Sanovas in the months prior. Instead, it shows an inculpatory state of mind.

To this end, three members of the Sanovas Board testified during Gerrans' trial: Ken Koen,

Bruce Nichols, and Robi Georges.  *See* Dkt. No. 373, January 14, 2020, Trial Tr., at 144.

According to their testimony, Gerrans called for a telephonic Board meeting on March 5, 2015, to

approve omnibus resolutions to Mr. Gerrans' employment agreements with Sanovas.  The

resolutions would establish that Mr. Gerrans was owed additional bonuses from 2010, 2011, and

2012, that were to be paid to Mr. Gerrans as a lump sum in 2015, and that Mr. Gerrans would be

compensated for Mr. Gerrans having liquidated his retirement account ("IRA").  *Id.* at 17-18, 20-

21 (Georges), 147, 150-151 (Keon), 78-79, 83-85, 87-88, 98-100, 103, 115-16 (Nichols); TX 118

(agenda for Board meeting and proposed amended and restated employment agreement); TX 119

(amended and restated executive employment agreement).  After a failed attempt to push the

resolution through by telephonic hearing in March without an in-person meeting, which the Board

members would not agree to, the resolutions were eventually approved by the Board on May 9,

2015.  *See* Dkt. No. 373, January 14, 2020, Trial Tr. at 20-21.

Importantly, by the time the Board met on May 9, 2015, and approved the proposed

omnibus resolutions, Gerrans had already transferred over $2 million from Sanovas to himself (or

his entities, Halo and Hartford) between January 9 and March 16, 2015.  *See* Sec. Sup. Ind. ¶¶

16(a)-(n), 19; TX 190, 195, 196, 198, 203, 205.  Yet, uncontroverted evidence at trial established

that Gerrans did not disclose that he had already paid himself over two million dollars as of that

date, purportedly to make himself whole for back-owed compensation.  Dkt. No. 373, January 14,

2020, Trial Tr. at 22:18-24:12 (Georges testimony Gerrans did not disclose the payments), 26:22-

24 (similar); 151:22-25 (Keon testimony that Gerrans told him he had not taken deferred

compensation as of May 9th meeting); 152:23-25 (similar).  Rather, Gerrans made the Board

believe he had not yet taken any deferred compensation as of that time and that he would only do

so in the future if the Board first approved of the payments after assessing the financial health of

the company.  *Id.* at 101:3-15, 108:14-22 (Nichols testimony), 15:24-19:13 (Georges testimony

describing that he was led to believe, during the May 2015 meeting that payments for back-owed

compensation would be made to Gerrans at a future date in 2015), 23:23-24:12 (Georges

testimony that Gerrans calmed his worries about approving such large amounts to be paid to

Gerrans by assuring the Board that payments would not be made if they would jeopardize the

26

company's financial health); 151:17-21 (Keon testimony that Gerrans told him he would not take any money unless the company could afford it); *see also* TX 179 at 8 (resolution explaining that "to the extent the payment of such bonuses in 2015 would jeopardize the Corporation's ability to continue as a going concern, such annual bonuses will be paid as soon as practicable after the making of such payment would not jeopardize the Corporation's ability to continue as a going concern"). The future and contingent nature of the payouts at issue was a key detail; the Board members testified if they knew that Gerrans had already paid himself, they would not have approved the resolution of Gerrans' employment agreement, entitling him backpay. Dkt. No. 373, January 14, 2020, Trial Tr. at 153:1-5 (Keon testimony: "[i]f you had been told that Larry Gerrans had taken approximately $2.6 million from Sanovas in January, February and March of 2015, would you have ever approved the employment agreement he was asking the board to approve? A. No. Never"); 30:5-11 (Georges testimony that he would not have approved the resolution if he knew Gerrans had already paid himself).

It is not clear why, if Gerrans held a good faith belief that he was entitled to backpay and authorized to pay himself unilaterally, he would have lied to the Board about having made those payments or why he would promise to obtain Board approval before making payments for deferred compensation. This behavior is incongruent with Gerrans believing that (a) he was entitled to pay himself unilaterally; and (b) he was permitted to make the transfers that he did in early 2015.

Moreover, during this meeting, Gerrans asked the Board to approve a resolution establishing that he was entitled to reimbursement for liquidating his retirement account, on the basis that he used the funds to grow the Sanovas business during its inception. *See* TX 179 at 68 (resolution presented to the Board stating: "[t]he company further acknowledges that during the company's inception, the executive was paid as an independent contractor and had liquidated his personal retirement account in furtherance of the business of the company"). The Board members testified Gerrans told them he used the retirement money to fund the company when it started in 2009 and for purposes that directly furthered the business, such as research and development. Dkt. No. 373, January 14, 2020, Trial Tr. at 151, 152 (Keon testified Gerrans stated that he used IRA

United States District Court
Northern District of California

to start the company, and asked Board to reimburse him for those monies), 98-100, 103, 104-106 (Nichols understood used for Sanovas company purposes and would not have approved the payouts if he knew the IRA moneys were not used for Sanovas—R&D, business development and the like), 21 (Georges's testimony that he took into account IRA in approving employment resolution; believed he had invested own IRA moneys into account).  It does appear that Gerrans liquidated his personal IRA account.  TX 222.  However, Gerrans took funds from his IRA in a series of transfers from 2013 and 2014 (not in 2009 when the company started).  *See id.* at 20-132. And the jury heard evidence that Gerrans used the funds not for *e.g.*, research and development, but for the purchase of a Maserati car and diamond ring for his wife among other personal expenses.  TX 181, 186; Dkt. No. 140 (C. Gerrans) 264-26 (testifying that defendant Gerrans told him defendant Gerrans took funds from his IRA for the purchase of the Maserati car in 2013). Unsurprisingly, this falsity was consequential.  Board members testified that if they knew the money was used for other purposes not associated with growing the business, they would not have approved the resolution.  *See id.* at 27 (Georges testimony that if he knew Gerrans spent the money on personal use he would not have approved the resolution), 112 (Nichols testifying that if he knew that IRA funds not used for Sanovas would not have approved the resolution), 152-54 (Keon testifying that if knew Gerrans used the funds for personal use he would not have approved the resolution).  This behavior is also inconsistent with an innocent state of mind.

   <u>Use of shell companies</u>.  It was also established at trial that Gerrans transferred most of the moneys from Sanovas, not to himself, but to two companies that he operated (Halo and Hartford) with no demonstrated purpose for their existence other than to receive those funds (i.e., shell companies).  *See* Dkt. No. 219, January 21, 2020, Trial Tr. at 47-48; TX 280 (stipulation establishing that entities did not file tax returns, issue 1099s, or W-2 forms).  Gerrans also did not disclose this to the Board.  *See* Dkt No. 373, January 14, 2020, Trial Tr. at 26:22-27:3 (Georges testimony that Gerrans did not tell the Board he paid himself millions of dollars in early 2015 or that he made those payments not to himself as an individual but through payments to an entity); 152:9-12 (Keon testimony that Gerrans did not disclose he had made payments to himself through another company); 112:4-9 (Nichols testimony that Gerrans did not disclose that he paid himself

1    through a separate company).  It is not clear why, if Gerrans was entitled to backpay, thus

2    legitimizing the early 2015 transfers, he formed shell corporations to effectuate the transfers,

3    instead of issuing checks to himself as an individual, and why he hid that from the Board.  This

4    likewise undermines Gerrans' purported good faith in making the transfers.

5        Mass generation of invoices in 2014.  The jury also heard evidence that in July 2014, Mr.

6    Gerrans generated a mass number of invoices reflecting that Sanovas owed him and Halo

7    Management Group (his company) for work he and his wife Shelly Gerrans performed dating back

8    to 2009.  *See* Trial Ex. 259A.  Christopher Gerrans testified that in July 2014, Defendant Gerrans

9    directed him to enter hundreds of invoices into Sanovas's records dating back to 2009, purporting

10   to document these amounts owed.  Dkt. No. 129, January 15, 2025, Trial Tr. (testimony of

11   Christopher Gerrans) at 42; TX 259A (list of recorded invoices).  Chris Gerrans further testified

12   that the invoices Mr. Gerrans used to substantiate the record entries, though purporting to be from

13   2009 and prior years, appeared to him to be new documents that were "hot off the press," i.e.,

14   generated at one time in 2014.  Dkt. No. 129, January 15, 2025, Trial Tr. (testimony of

15   Christopher Gerrans) at 55.  And the invoices were, at least in part, reflective of false charges.  For

16   example, the invoices repeatedly charge Sanovas for work that Shelly Gerrans performed for

17   Sanovas in 2009 and 2010.  *See* TX 259A.  Yet, evidence established Shelly Gerrans did not work

18   for Sanovas in that timeframe; she testified under oath in relationship to a bankruptcy filing that

19   she was a full-time homemaker and earned no income in 2009 and 2010.[10]  *See* TXs 5, 2, 24.

20   Another invoice charged for "Halo Management Group Start Up Costs" in the year 2009.  *See* TX

21   259A at 1 (invoice no. 12312009HSU).  Meanwhile, Halo Management Group was started in

22   November 27, 2006, over three years prior.  *See* TX 280.  The invoices also reflected series of

23   payments were owed to Halo Management Group, while the record evidence establishes Halo was

24   a non-operational, defunct entity.  Halo never performed any corporate functions, such as paying

25   employees or filing taxes.  *See id.*  And Mr. Gerrans testified under oath in connection to his

26   February 2010 bankruptcy filing that Halo was not worth anything and never went anywhere.

27

28   ──────────────

[10] This issue is taken up in further detail below in Section IV.B.2.a. regarding Count 7.

1    Dkt. No. 228, January 13, 2020, Trial Tr. at 86:19-22.  If Mr. Gerrans was owed backpay as he

2    states, it is not clear why he would order that false record entries and invoices be generated, and

3    why they were generated in bulk at one time.

4         Summary.  Simply put, if Mr. Gerrans believed that he was authorized to transfer moneys

5    to himself in early 2015 as repayment for back-owed compensation from prior years, without

6    Board approval, it does not follow that Mr. Gerrans would have felt the need to engage in an

7    extensive pattern of deception: (1) prompting a Board meeting to obtain resolutions establishing

8    that he was owed backpay; (2) lying to the Board as to the fact that he had already paid himself

9    millions of dollars in deferred compensation and make the Board think payments would occur in

10   the future, with Board approval; (3) lying about his retirement account liquidation; (4) transferring

11   funds to companies instead of himself, in decrements that do not correlate to sums he was owed;

12   or (5) ordering that his brother generate records substantiating his entitlement to reimbursements

13   in bulk that were, at least in part, false.  This behavior is incongruent with Gerrans' good-faith

14   belief that he was authorized to pay himself unilaterally, or that he was entitled to the amounts as

15   he now says he was owed.  Gerrans does not currently argue, or set forth evidence, that reconciles

16   this glaring incompatibility between his conduct and his Gerrans' purportedly innocent state of

17   mind.

18        Given the limited probative value of the omitted evidence, viewed in context of the

19   overwhelming evidence presented to the jury regarding Gerrans' fraud and fraudulent intent, the

20   purported deficiencies by counsel did not prejudice Gerrans under *Strickland*.  *See, e.g.*,

21   *Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just

22   conceivable."); *United States v. Coleman*, 707 F.2d 374, 378 (9th Cir.), *cert. denied*, 464 U.S. 854,

23   (1983) ("[I]n cases with overwhelming evidence of guilt, it is especially difficult to show

24   prejudice from a claimed error on the part of trial counsel."); *Klvana v. State of Cal.*, 911 F. Supp.

25   1288, 1299 (C.D. Cal. 1995) (finding no prejudice for failing to present evidence negating

26   fraudulent intent in light of countervailing evidence presented establishing fraudulent intent).  The

27   Court rejects Gerrans' ineffective assistance claim as it pertains to wire fraud counts 1-3 and

28   money laundering count 6.

United States District Court
Northern District of California

1

c.    2017-related charges (counts 4-5)

2       The remaining two wire fraud counts rested upon Gerrans using the company's credit card

3   (1) on April 10, 2017, to pay $32,395.77 in property taxes on a house; and (2) on April 29, 2017,

4   to pay $12,500 for carpets for that house.  *See* Sec. Sup. Ind. at 7-8.

5       Gerrans argues that had counsel investigated the case properly, he would have put on

6   Farrell as a witness.  Mot. at 20-21.  Gerrans argues Farrell's testimony would have legitimized

7   the payments Gerrans made to himself in 2017.  *Id.*  The Court assumes, without deciding, that

8   counsel's performance was deficient in this respect for purposes of efficiency in assessing the IAC

9   claim.  *See Thomas*, 417 F.3d 1053 at 1056 n.1.  Prejudice did not flow from the asserted

10  deficiencies as to these charges.

11      At trial, the government put on evidence that Gerrans was one of a handful employees

12  allowed to use Sanovas' corporate American Express card.  Dkt. No. 374, January 15, 2020, Trial

13  Tr. at 66.  In 2017, the bills for that card were $30,000 to $50,000 per month and including

14  charges for:  Gerrans' property taxes, family vacations, luxury carpeting, swimwear, and a

15  birthday party his wife, Shelly Gerrans.  *Id.* at 116, 122-31, Dkt. 227, January 17, 2020, Trial Tr.

16  at 42-48, 55-57; Dkt. 219, January 21, 2020, Trial Tr. at 7, 12-13; TX 227.  Gerrans' brother,

17  Chris Gerrans, testified that at Gerrans' instruction, he improperly coded some of these expenses

18  as research and development expenditures to legitimize the payments.  Dkt. 374, January 15, 2020,

19  Trial Tr. at 137-38.  Further, Lloyd Yarborough, the company's controller, testified that Sanovas

20  paid about $176,000 for Gerrans' personal expenses from the company's inception through May

21  2013.  Dkt. No. 228 at 139-51, 51,163-67, 183 (Yarborough's testimony); Parkman Decl., Ex. H

22  (Yarborough's spreadsheet).

23      Farrell's testimony would have shown that Farrell conducted a review of expenses that

24  Gerrans charged to the company at and before 2013, and he concluded that all but $6,227.75 of

25  $172,222.74 were payable by Sanovas, per the Employment Agreement between Gerrans and

26  Sanovas, and the By-Laws referenced by that Agreement.  Farrell Decl. ¶ 6.  Farrell attests that in

27  his view the Employment Agreement was overly generous, but that the agreement provided that

28  Gerrans was entitled to charge certain expenses including for housing, storage, and family medical

31

1    expenses. *Id.* ¶ 8. Gerrans argues this evidence justifies payments discussed as being improperly

2    charged by Gerrans at trial, and would establish that Gerrans had a good faith belief that the credit

3    card charges identified in counts 4 and 5 were likewise justified expenses. Mot. 20-21.

4          This testimony does not pose a reasonable probability of engendering a different outcome

5    at trial as required to show prejudice under *Strickland*. Farrell's declaration and audit is most

6    impactful for contradicting Yarborough's analysis of personal expenses Gerrans charged through

7    **May 2013**. But that evidence was ancillary as to the charge at trial regarding payments made

8    years later in **April 2017**; Farrell did not assess the credit card charges at issue. *See* Sec. Sup. Ind.

9    at 7-8 (charging Gerrans for April 2017 charge of approximately $32,000 for property tax on

10   Gerrans' house and another charge the same month for $12,500 for luxury carpets). While Farrell

11   attests that company paid expenses including residential lease payments, relocation expenses,

12   storage costs, and family medical expenses as allowable company expenses and made in

13   accordance with GAAP, Farrell Decl. ¶ 7, Farrell does *not* specify that Gerrans was entitled to

14   charge property taxes to the company card or pay for carpeting in his house—i.e., the charges in

15   the indictment. *Id.* Farrell's attestation does little to prove that Gerrans had a good faith belief

16   that he was entitled to make the charges he did in 2017.

17         Accordingly, the declaration does not call into question the evidence at trial that showed

18   Gerrans knew he was not permitted to charge various items to the credit card because he told Chris

19   Gerrans to hide the charges through improper coding. Dkt. 374, January 15, 2020, Trial Tr. at

20   137-38. The attestation from Farrell also does not establish Gerrans thought it would be proper to

21   make other charges that same year for family vacations, swimwear, and a birthday party for his

22   wife. Dkt. 227, January 17, 2020, Trial Tr. at 42-48, 55-57; Dkt. 219, January 21, 2020, Trial Tr.

23   at 7, 12-13; TX 227. Gerrans' willingness to make those unauthorized charges strongly

24   establishes his lack of good faith in use of the card.

25         Accordingly, the Court finds prejudice did not flow from omission of this attestation in

26   light of its limited probative value and viewed in context of evidence at trial. *See Harrington*, 562

27   U.S. at 112 (likelihood of alternate result must be substantial); *Thomas,* 417 F.3d at 1056 ("To

28   prevail on *Strickland*'s prejudice prong, there must be a reasonable probability that, but for

United States District Court
Northern District of California

1   counsel's unprofessional errors, the result of the proceeding would have been different.").

2        2.      False Statements (counts 7-9)

3        The Court next turns to the counts 7-9, charges relating to statements Gerrans made to the

4   FBI in 2017.  In counts 7-9, the government alleged that Gerrans provided the FBI with three false

5   documents in violation of 18 U.S.C. § 1001(3).  *See* Sec. Sup. Ind. at 8-9.  Each count is addressed

6   in turn below.  To obtain a conviction as to the false statement charges, the government needed to

7   prove that the documents were false and that the false statements were material.  *See United States*

8   *v. Oren*, 893 F.2d 1057, 1063 (9th Cir. 1990) (requiring falsity and materiality).

9        a.      Count 7: Invoices for work performed by Shelly Gerrans

10       Count 7 involves three invoices that Gerrans provided to the FBI on June 5, 2017,

11  reflecting reflected money was due from Sanovas to Halo Management for work by Shelly

12  Gerrans titled "Executive Administration," with the invoices bearing dates ranging from January

13  to March 2010 of $5,000 per month for that period.  TX 215 (count 7).

14       Gerrans argues that counsel's performance was deficient for failing to interview Shelly

15  Gerrans and Farrell, and for failing to put them both on the stand at trial.  *See* Mot. at 22-23.

16  Gerrans argues that, had she been called at trial, Shelly Gerrans would have testified that invoices

17  Gerrans provided to the FBI, which reflected that Shelly Gerrans was owed backpay for work

18  performed for Sanovas were not false.  *See id.*  Gerrans also argues that Farrell would have

19  corroborated that Shelly Gerrans was owed deferred compensation at that time.  *Id.*

20       Assuming counsel's performance was deficient in this respect, there was no prejudice from

21  this purported failure.  At trial, the government put forth evidence to show that in 2010, during the

22  same time that the invoices appeared to show Gerrans and his wife Shelly Gerrans working for

23  Sanovas, Gerrans told a bankruptcy court trustee that they did not work for Sanovas and were not

24  earning any income—either paid out or accruing as an amount owed.  Dkt. No. 228, January 13,

25  2020, Trial Tr. at 64-96 (testimony of bankruptcy trustee David Gravell).  On April 13, 2010,

26  Gerrans and his wife answered questions under oath at a hearing conducted by the Bankruptcy

27  Trustee.  TX 5.  Shelly Gerrans testified that she was a full-time homemaker and that she had not

28  worked for the past 10 years.  *Id.*  She also confirmed that she was not owed money by anyone or

United States District Court
Northern District of California

any business.  On April 7, 2010, the Gerrans' filed a written "schedule of current income of individual debtors" electronically signed by both Larry and Shelly Gerrans.  TX 2.  Gerrans and his wife listed Shelly Gerrans' occupation as "homemaker" with no monthly income and included no monthly income for Gerrans.  *Id.*

Shelly Gerrans may have testified that she worked for Sanovas starting in late 2009 as an administrative assistant and office manager and submitted two documents in support: an LOI from 2009 and Employment Agreement from July 2010 entitling her to a yearly salary of $60,000 paid monthly and that as of 2015 she was owed deferred compensation.  Dkt. No. 477-20, Declaration of Shelly Gerrans ("S. Gerrans Decl.") ¶¶ 1-4 & Exs. A & B.  In an August 2013 email (not submitted alongside the Farrell declaration, but separately submitted alongside this motion) Farrell prepared a spreadsheet identifying that as of 2010 Gerrans was owed "60,000" for "Payments due Shelly," suggesting Shelly Gerrans was not paid her salary from 2010.  Dkt. No. 477-3, Ex. B. This email corroborates that the invoices generated in 2014 may well have reflected work that was performed previously and that if Shelly Gerrans did work in 2009 and 2010, she was not paid.

However, this evidence does not rebut the substantial evidence at trial that Shelly Gerrans never in fact performed work for Sanovas and thus that the invoices were false for, at a minimum, purporting that she did.  Specifically, the evidence and argument Gerrans points to does not account for the fact that in the bankruptcy petition, Shelly Gerrans attested that she was only a homemaker (*i.e.*, not employed) as of February 2010, and had been for the prior decade.  *See* Dkt. No. 228, January 13, 2020, Trial Tr. at 68.  Farrell's testimony would not have been helpful on that point because he could not have firsthand knowledge of her work in 2010, as he only joined the company in September 2012 through November 2013.  Farrell Decl. ¶ 1.  Nor does he attest to having any knowledge of work Shelly Gerrans performed (he makes no mention of her in his declaration).  *See id.*  Gerrans does not point to additional evidence substantiating that Shelly Gerrans indeed performed work for Sanovas in late 2009 or early 2010.  On the contrary, the jury heard a voice recording from Shelly Gerrans stating that "I've been a stay-at-home-mom for ten years" in connection with that bankruptcy filing.  *See* Dkt. No. 170, January 29, 2020, Trial Tr. at 32-33.  Chris Gerrans also testified at trial that he suspected invoices that Gerrans provided him

34

1    reflecting that Shelly Gerrans ever performed work for the company were illegitimate because he

2    always knew her to only be a "stay-at-home mom."  Dkt. 374, January 15, 2020, Trial Tr at 36-37.

3    Testimony by Shelly Gerrans would be highly susceptible to impeachment and Farrell was not a

4    percipient witness as to any work performed by Shelly before he joined the company.

5    Accordingly, this evidence does not have a reasonable probability of changing the outcome at

6    trial; Gerrans has not established prejudice as to this count.  *See Harrington*, 562 U.S. at 112

7    (likelihood of alternate result must be substantial); *Thomas*, 417 F.3d at 1056 ("To prevail on

8    *Strickland*'s prejudice prong, there must be a reasonable probability that, but for counsel's

9    unprofessional errors, the result of the proceeding would have been different.").

10                      b.    Count 8: Invoices for work performed by Mr. Gerrans

11           Count 8 involves invoices that Gerrans provided to the FBI on June 5, 2017, reflecting that

12   money was due from Sanovas, to be paid to Halo Management Group for work by Larry Gerrans

13   for "Management Services" during January to March 2010 of $21,875 per month for that period.

14   TX 216; Sec. Sup. Ind. at 8.  Specifically, the documents provided were fashioned as invoices

15   from Halo Management Group to Sanovas dated: January 1, 2010, for "Larry Gerrans –

16   Management" (Invoice No. 01012010HLG); February 1, 2010, for "Larry Gerrans –

17   Management" (Invoice No. 02012010HLG); and March 1, 2010, for "Larry Gerrans –

18   Management" (Invoice No. 03012010HLG).  Trial Ex. 216.  Each of the invoices reflect that

19   payment should be made by check payable to Halo Management Group.  *See id.*

20           At trial the government put on evidence that the invoices were generated in 2014, though

21   bearing dates in 2010.  Gerrans argues that counsel should have argued and put on evidence that

22   the invoices given to the FBI were not false because, even if they were generated in 2014, though

23   bearing dates in 2010, the documents reflected accurate information, *i.e.*, an amount payable for

24   work performed by Mr. Gerrans on the dates listed on the documents (January 1, February 1, and

25   March 1, 2010).  *See* Mot. at 21-24; TX 216.  To this end, Mr. Gerrans argues that Mr. Farrell's

26   testimony would have supported that Gerrans was not paid his full salary for work during that

27   time.  Specifically, Farrell attested that Gerrans performed work in the years leading up to 2013,

28   that the company met milestones that entitled Gerrans to be paid for his salary during that time,

1   but that the company had insufficient funds to pay him.  Farrell Decl. ¶ 9.  In an August 2013

2   email, Farrell attached a spreadsheet itemizing that Gerrans had a deferred salary as of April 30,

3   2010, of $333,333.  Dkt. No. 477-3, Parkman Decl., Ex B. at 3.

4          The government indeed proved falsity of this document, in part, through evidence at trial

5   showing that the invoices were generated in 2014 rather than on the dates that the documents

6   reflected.  Specifically, Chris Gerrans testified that in July 2014, Defendant Gerrans directed Chris

7   Gerrans to enter into Sanovas' accounting software a number of Halo invoices, dating back to

8   2009.  Dkt. No. 374, January 15, 2020, Trial Tr. at 42; TX 259A.  Chris Gerrans testified that over

9   several days in July 2014, Chris Gerrans entered the Halo invoices on the Defendant's spreadsheet

10  and after he finished, Chris Gerrans printed out a report showing the newly entered invoices and

11  brought this report to the defendant, who was in his office.  Dkt. No. 374, January 15, 2020, Trial

12  Tr. at 55.  When Chris Gerrans got to the defendant's office, the defendant pulled out a binder

13  filled "with every Halo invoice reflected in [the] spreadsheet."  *Id.*  Although some of the Halo

14  invoices were dated 2009, five years earlier, "the binder was new. The documents were crisp. It

15  looked like it was hot off the press."  *Id.*  The government argued that this testimony supported

16  that the documents were created long after 2010—the dates that appear on the Halo invoices, TX

17  216, establishing that they were false documents.

18         But this was not the only evidence at trial establishing falsity of the invoices.  The

19  government also put on evidence that Mr. Gerrans was not owed money, at least through Halo,

20  which was essentially a sham or shell entity.  To this end, Halo was not entitled to payment from

21  Sanovas as the invoices reflected.  As referenced previously, Mr. Gerrans and his wife filed a

22  bankruptcy petition on February 24, 2010.  TX 1 at 7; Dkt. No. 228, Jan. 13, 2020, Trial Tr. at 64.

23  Mr. Gravell, the bankruptcy trustee working on their case testified at trial.  *See* Dkt. No. 228,

24  January 13, 2020, Trial Tr. at 64.  In connection with the bankruptcy petition, Mr. Gerrans

25  testified under oath that the company he started called Halo was not worth anything and never

26  went anywhere since its inception in 2006, and he was not owed any payments in connection with

27  that company.  *Id.* at 86.  This is corroborated by the fact that the corporation was formed in 2006,

28  but the entity never filed tax returns, issued 1099s, or W-2 forms, or otherwise indicated that it

United States District Court
Northern District of California

36

United States District Court
Northern District of California

1   was operational.  TX 280.  Mr. Gravell also asked Mr. Gerrans if he was owed any money at all in

2   April 2010, and Mr. Gerrans testified that he was not; he did not state that he was owed money for

3   work that he had done through Halo or in connection with it as of that time.  Dkt. No. 228, Jan. 13,

4   2020, Trial Tr. at 86, 20-23.  Indeed, Mr. Gerrans did not report any income from Halo

5   Management at any time leading up to or through the proceeding.  *Id.* at 88-89.

6          The omitted evidence from Farrell may have shown that Mr. Gerrans performed work for

7   Sanovas in late 2009 or early 2010 and payments were outstanding.  But the evidence does not

8   negate falsity of the document.  Mr. Gerrans may have done work for Sanovas; but per his sworn

9   testimony, Halo did not.  It was a defunct, non-operational entity through its inception in 2006 to

10  at least April 2010.  Moreover, the invoices were generated as part of a bulk invoice creation event

11  in July 2014, evidently to justify transfers Gerrans would make shortly thereafter, and this also

12  undermines the reliability of the invoices.  Accordingly, the evidence and argument does not have

13  a reasonable probability of engendering a different outcome at trial; the evidence does not negate

14  falsity of the documents.  *See Harrington*, 562 U.S. at 112 (likelihood of alternate result must be

15  substantial); *Thomas,* 417 F.3d at 1056 ("To prevail on *Strickland*'s prejudice prong, there must be

16  a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

17  would have been different.").

18               c.    Count 9: Promissory note

19         Count 9 concerned a promissory note issued to Shelly and Defendant Gerrans.  The note

20  stated that a loan of roughly $2.3 million was issued to Gerrans and his wife by Hartford Legend

21  Capital Enterprises LLC ("Hartford") secured by the property at 28 Greensburgh Lane.  TX 217.

22  Gerrans provided the Hartford promissory note to the FBI in September 2017, in response to

23  subpoenas, and it purported to be signed by "borrowers" Lawrence and Shelly Gerrans.  Dkt. No.

24  219, January 21, 2020, Trial Tr. at 72-73; TX 217.

25         To establish the falsity of the note, the government put on evidence that the title of the

26  property at 28 Greensburgh Lane did not reflect any encumbrances upon the property, as would be

27  required per the note.  To this end, at trial, Brett Hellstrom, a Chase Bank employee, testified that

28  in December 2015, Gerrans applied for and received a $750,000 cash-out loan from Chase.  Dkt.

37

1  No. 227, January 17, 2020, Trial Tr. at 61-62.  That application required that Gerrans disclose any

2  liabilities or encumbrances against the 28 Greensburgh Lane property, whether recorded or not.

3  *Id.* at 69.  But Gerrans did not state on the loan applications that there were encumbrances against

4  the property, including the $2.3 million loan in the note.  *Id.*; TX 187.  This evidence, as the

5  government argued and the jury accepted, delegitimized the statement made in the Hartford note

6  that it was "secured by that certain real property at 28 Greensburgh Lane," because that

7  encumbrance was required to be documented but was omitted from the December 2015 loan form.

8  TX 217.[11]

9       Gerrans argues counsel's performance was deficient for failing to argue that Gerrans and

10  his wife thought they did not need to disclose the promissory note in their loan application because

11  they controlled the Hartford entity.  But Gerrans does not offer any evidence legitimizing that he

12  or his wife held this view.  No document excepts from disclosure notes owed to an affiliate entity.

13  Money owed is money owed.  Trial counsel was not unreasonable in not pursuing this

14  unsubstantiated theory.  "[A] lawyer's performance does not fall to the level of a Sixth

15  Amendment violation under *Strickland* simply because the lawyer fails to pursue any and all non-

16  frivolous strategies." *Johnston v. Mitchell*, 871 F.3d 52 (1st Cir. 2017).  Further, any such

17  testimony would be weak evidence having little impact at trial; it strains credibility to assert that

18  Gerrans or his wife thought the encumbrance need not be reported when they were explicitly

19  asked to report encumbrances.  No prejudice resulted from omitting this irrational testimony.

20       Gerrans also argues that trial counsel was ineffective for failing to argue that any falsity

21  related to the promissory note was not material.  Mot. at 23.  Gerrans argues that to establish the

22  charge at issue, the falsity must be material in that it resulted in a change of position by the FBI in

23

24  [11] The government also put on evidence that Hartford was essentially a sham or shell entity,
further showing that the note was illegitimate.  Specifically, evidence showed that Hartford was
25  incorporated by Gerrans on February 13, 2013.  Dkt. No. 219, January 21, 2020, Trial Tr. at 47-
48, 61; TXs 69, 280.  Gerrans opened a bank account in its name a few days later.  Dkt. No. 219,
26  January 21, 2020, Trial Tr. at 60; TX 280.  The entity did not file tax returns, issue 1099s, or W-2
forms.  Dkt. No. 219, January 21, 2020, Trial Tr. at 47-48; TX 280.  Yet, when Gerrans was
27  interviewed by the FBI on June 5, 2017, he told the FBI Hartford was started before Sanovas, and
was funded with $550,000 from a retirement account that Gerrans had.  Dkt. No. 219, January 21,
28  2020, Trial Tr. at 64.  However, funds transferred to Hartford in 2015 were not from a retirement
account but from Sanovas and were not related to any retirement account.

1  their investigation.  *Id.* at 23-24 (citing *United States v. Peterson*, 538 F.3d 1064, 1073 (9th Cir.

2  2008)).   To this end, Gerrans asserts, the promissory note involves how Gerrans structured the

3  purchase of the home after he took money from Sanovas but does not impact whether and how he

4  received that money.  *Id.* at 22-23.  Accordingly, it could not have impacted the FBI's

5  investigation.  *Id.* at 23-24.

6       "The Supreme Court has explained that the customary common law test for materiality in

7  false statement statutes such as § 1001 is whether the statement 'has a natural tendency to

8  influence, or was capable of influencing, the decision of the decision-making body to which it was

9  addressed.'" *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (citations

10  omitted).  There is no requirement that an agency action actually be influenced, or that the

11  statement be capable of "materially" influencing an investigation, in order to prove a Section

12  1001(3) count.  *United States v. Somsamouth*, 352 F.3d 1271, 1276 (9th Cir. 2003) ("[A]ctual

13  influence on agency action is not an element of the crime." (internal quotation marks and citations

14  omitted)).  Finally, "the materiality requirement in false statement cases does not turn on whether

15  the agency's regulatory distinctions are wise or consistent as a matter of policy; it contains no

16  embedded question of substantive reasonableness."  *Peterson*, 538 F.3d at 1073 n.5 (citation

17  omitted).

18       The heart of the wire fraud charges required the FBI to untangle the relationship between

19  Gerrans, Sanovas, Halo, and Hartford in order to understand the legitimacy of at least $580,000

20  transferred from Sanovas to these entities on March 13 and March 16, 2015 (the bases of wire

21  fraud counts 1-3).  *See* Sec. Sup. Ind. ¶ 19.  And the money laundering charge rested upon the

22  transfer from Hartford's bank account on the March 17, 2015, in the precise amount of

23  $2,303,966.42; *i.e.*, the "loan" reflected in the promissory note issued on the same date. *See id.* ¶

24  21.  The legitimacy of that promissory note shed light on whether Hartford was legitimate, or a

25  shell entity that Gerrans was using as a vessel to siphon money.  The promissory note elucidated

26  the relationship between Gerrans, Hartford, and Sanovas, and thus had a "tendency to influence, or

27  was capable of influencing" the FBI's investigation, and indeed did influence the FBI's activities.

28  *Peterson*, 538 F.3d at 1072.  This argument is weak at best; the promissory note was a piece of the

1    puzzle that the FBI needed to untangle to pursue charges against Gerrans.  This unmeritorious

2    argument does not have a reasonable probability of changing the outcome at trial, and counsel was

3    not objectively unreasonable for failing to make it.  *Smith*, 477 U.S. at 536 ("[E]ffective legal

4    advocacy involves selectivity of arguments based on their strength.").

5         As to the false statement claims, counsel's performance was either not deficient or

6    prejudice did not flow from the deficiency.  Gerrans' IAC claim as to these charges fails.

7         3.    Post-indictment conduct (counts 10-12)

8         The government also charged Gerrans with three counts related to his post-indictment

9    interactions with Christopher Gerrans.  *See* Sec. Sup. Ind. at 9-11.

10        Count 10 charged Mr. Gerrans with contempt under 18 U.S.C. § 401(3), and accused Mr.

11   Gerrans of violating a July 23, 2018 order releasing him on bond with the conditions that he not

12   "harass, threaten, intimidate, injure, tamper with, or retaliate against any witness, victim,

13   informant, juror, or officer of the Court, or obstruct any criminal investigation" and have "no

14   contact w/ [Christopher Gerrans] re: criminal case outside [the] presence of [Christopher Gerrans']

15   counsel."  *Id.* at 10; Dkt. No. 5 (Order Setting Conditions, July 23, 2018).

16        Count 11 charged Mr. Gerrans with witness tampering under 18 U.S.C. § 1512(b)(1),

17   accused Mr. Gerrans of knowingly obstructing his brother Chris Gerrans from testifying beginning

18   sometime after July 23, 2018, and continuing through August 13, 2019.  Sec. Sup. Ind.

19        Count 12 charged Mr. Gerrans with obstruction of justice under 18 U.S.C. § 1503, accused

20   Mr. Gerrans of using threats of force and by a threatening communication attempting to impede

21   the due administration of justice in the criminal prosecution of Mr. Gerrans, also beginning

22   sometime after July 23, 2018, and continuing through August 13, 2019.  *See id.* at 10-112.  *See*

23   *also* Dkt. No. 180 at 36-38 (jury instructions as to these offenses).

24        At trial the government put forth evidence that on several occasions Gerrans met with

25   Christopher Gerrans to discuss the criminal case and to intimidate, harass, threaten, or retaliate

26   against Chris Gerrans to stop him from testifying, constituting contempt of the bond order, witness

27   tampering, and obstruction of justice.  Specifically, the government put on evidence that Mr.

28   Gerrans engaged in a series of threatening tactics, including giving Chris Gerrans a throwaway

United States District Court
Northern District of California

1   phone to communicate, sent an intimidating text message in March 2019, pressured his brother not

2   to testify during a June 2019 family event, and using their father to communicate with Chris

3   Gerrans not to implicate Gerrans.  Dkt. 374, January 14, 2020, Trial Tr. at 95-107.  The

4   interactions came to a head on August 13, 2019, when defendant confronted Chris Gerrans at a

5   storage facility in San Rafael where, an altercation ensued.  *Id.* at 112-46; Dkt. No. 219, January

6   21, 2020, Trial Tr. at 21-36.

7                    a.   Deficient Performance

8           Gerrans alleges that counsel's performance was deficient because he did not review the

9   release order under which Gerrans was being charged with contempt of court.  Getz Decl. ¶ 14.

10  The Court agrees.  Trial counsel could not have made an informed decision about the best defense

11  to the charge of violating that order without even understanding what the order required.  *See*

12  *Sanders*, 21 F.3d at 1456 (counsel has obligation to investigate such that he can make informed

13  decisions about defense).  Counsel should be expected to review such a fundamental document

14  regarding his client's case. *See Vega v. Ryan*, 757 F.3d 960, 962 (9th Cir. 2014) (counsel's

15  performance deficient as a matter of law where counsel failed to review client's file during

16  representation); *Evans v. Lewis*, 855 F.2d 631 (9th Cir. 1988) (finding deficient performance

17  where counsel failed to review available documents).

18          Gerrans also argues counsel's performance was deficient because counsel did not interview

19  employees at the storage facility, Ryan Swisher and Alice Huante, who witnessed interaction

20  between Mr. Gerrans and his brother Christopher Gerrans (the subject of the release order).  *See*

21  Getz Decl. ¶ 2; *see* Gerrans, Sr. Decl.; Gerrans, Jr. Decl.; Dkt. No. 477-12, Declaration of Michael

22  Portman ("Portman Decl.") ¶¶ 1-2 & Exs. A & B (letters from Swisher and Huante).  Defendant

23  Gerrans also argues counsel's performance was deficient for failing to interview and put on

24  exculpatory testimony Arthur Gerrans Sr. and Jr. that would have contradicted Chris Gerrans'

25  testimony about interactions between Mr. Gerrans and his brother and would have testified to

26  Chris Gerrans' character of untruthfulness.  Mot. at 13.

27          The Court is skeptical that the decision not to call Arthur Gerrans Jr. and Sr. as witnesses

28  was deficient.  Counsel reviewed the FD-302 of Arthur Gerrans Jr. Opp., Ex. A (Nov. 12, 2019,

United States District Court
Northern District of California

FD-302 Art Gerrans Jr.).  Aside from stating Chris was unreliable, Arthur Gerrans Jr. also told the FBI that Gerrans' compensation was "disgusting," that Gerrans never told him Halo was doing work for Sanovas, that he never saw Shelly Gerrans working for Sanovas, and that Gerrans attacked him with a baseball bat when he confronted Gerrans about using company money to buy the house.  *Id*.  Rather than constituting deficient performance, counsel's decision not to call A. Gerrans Jr. as a witness reflects a well-supported strategic decision.  *Sexton*, 679 F.3d at 1156 (a "a strategic decision" generally "cannot form the basis of a claim for ineffective assistance of counsel").  Moreover, Mr. Getz reviewed the grand jury testimony from Arthur Gerrans Sr., which stated his view of Chris Gerrans' untruthful character, and included his account of events surrounding the post-indictment charges.  *See, e.g.*, Mot., Ex. E at 21, 34-42. Gerrans Sr.'s testimony would also have corroborated that Mr. Gerrans used his father to communicate with Chris Gerrans about not disclosing Mr. Gerrans' involvement in taking money from Sanovas.  *Id.* at 16-18, 24-25.  And it would have included inculpatory evidence about Mr. Gerrans' motive for taking money from Sanovas (buying the house he was renting), and that he endeavored to get written Board approval after the fact.  *Id.* at 43-44.  On that point, Gerrans Sr.'s testimony would have been damning to the *mens rea* argument Mr. Gerrans offers (that Mr. Gerrans thought he was authorized to take funds unilaterally without Board approval).  Gerrans Sr. testified that Mr. Gerrans took money from Sanovas in early 2015 because "Larry was renting a house and the guy he was renting from was gonna sell it and Larry says 'Well, I don't want to move.'"  *Id.* at 43-44. He continued that "So that was that and then I guess he took the money.  I think one time he told me that he verbally talked to the Board about doing it and they said well, okay, and then within six weeks they had a meeting *and they authorized him to do it*."  *Id.* (emphasis added).  This testimony indicates Mr. Gerrans believed he needed Board authority to issue the payments to himself that he did.

   "A claim of failure to interview a witness ... cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel."  *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *opinion amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001) (amended on other grounds).  "When the record clearly shows that the lawyer was well-informed,

and the defendant fails to state what additional information would be gained by the discovery he or she now claims was necessary, an ineffective assistance claim fails." *Id.* Mr. Getz knew what the two had to say regarding untruthfulness of Chris Gerrans, and the events surrounding the post-indictment charges and decided not to introduce that testimony. More to the point, given the inculpatory evidence from Gerrans Sr. and Jr. that undoubtedly would have been elicited on cross-examination, in all likelihood, counsel made a wise strategic choice not to call him as a witness. *Sexton*, 679 F.3d at 1156 (a "a strategic decision" generally "cannot form the basis of a claim for ineffective assistance of counsel"). Thus, here was no deficient performance by counsel in this regard. *Id.*

Even if there was a deficiency in counsel's performance, there was no prejudice sufficient to warrant relief under *Strickland. See Thomas*, 417 F.3d 1053 at 1056 n.1 (quoting *Strickland*, 466 U.S. at 697) ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

        b.    <u>Prejudice</u>

Gerrans argues that he was prejudiced because counsel failed to call as witnesses Arthur Gerrans Jr. and Sr., who would have (a) impeached the credibility of Chris Gerrans; and (b) rebutted his accounting of events between Gerrans' release in July 2018 and August 2019 underlying the charge. Mot. at 24-29. Gerrans also argues he was prejudiced by failing to put on exculpatory testimony from Huante and Swisher, employees at the storage facility that witnessed the August 13, 2019, incident between the two brothers. *Id.*

Chris Gerrans' testimony regarding Mr. Gerrans' threatening and intimidating him during the August 2019, incident would not have been overcome by the purported exculpatory evidence that Mr. Gerrans identifies.

Chris Gerrans testified that on that date, defendant Gerrans confronted Chris Gerrans at a storage facility in San Rafael where, according to Chris Gerrans, an altercation ensued. Dkt. No.

374, January 15, 2020, Trial Tr. at 146.  He testified that while there, he left his truck running, with his cell phone inside, while he went in the storage unit to retrieve something.  *Id.* at 112-13. When Chris came out, his truck had disappeared.  *Id.* at 113-14.  Chris went to the storage facility's main office, from which he saw his truck parked across the street, where he saw that Gerrans had taken it.  *Id.* at 114-15.  Then Gerrans came into the office and angrily stated that Chris had "sold me out down the river."  *Id.* at 115-16.  Chris Gerrans testified that the two went outside of the storage facility, where Gerrans was yelling at him for cooperating with subpoenas, for providing information and that "I was selling him out," and that he "when he gets his case dismissed and when he gets the company back, he's coming after me; he's going to take everything."  *Id.*  at 117-18.  Chris Gerrans said that defendant Gerrans was loud and angry and that Gerrans "punched" Chris Gerrans "in the chest."  *Id.*  Thereafter Chris Gerrans left.  *Id.* at 119.

Ryan Swisher testified on this date he received a phone call from the property manager, Alice Huante.  Dkt. No. 219, January 21, 2020, Trial Tr. at 21.  She conveyed that there was an altercation going on between two men and needed assistance.  *Id.*  Thereafter, Swisher went to the facility.  *Id.*  He described that Gerrans was upset with Chris Gerrans, and that Gerrans was engaging in a "quite agitated discussion," while Chris Gerrans was just "taking in what Larry had to say."  *Id.* at 23.  Swisher asked the men to step outside because the engagement was "inappropriate in our office."  *Id.*  After they stepped outside, Swisher testified that he saw them continuing to argue, that Gerrans engaged in "hand waving and continued anger" toward Chris Gerrans while in Chris Gerrans' personal space.  *Id.*  He then saw Gerrans make physical contact with Chris Gerrans, which he described as a "poke."  *Id.* at 25.  Swisher testified that he heard Gerrans say that the "indictment was bullshit," and that Chris Gerrans "had sold [Gerrans] up the river."  *Id*.  After Chris Gerrans left, Gerrans returned to the reception area.  *Id.* at 36.  Swisher testified that Gerrans told Swisher that "it was his brother Chris that had . . . caused all the problems" and that "if there . . . weren't as many cameras on, he would have killed [Chris Gerrans]."  *Id.*

The jury was presented soundless video surveillance of the altercation outside of the

United States District Court
Northern District of California

reception area, capturing much of the interaction, though not all of it, including the poke/push. *Id.* at 26-37. The video was played for the jury during trial, and showed Chris Gerrans leaving his vehicle, and Gerrans running into the vehicle and driving the truck off the property. *Id.* at 28-32. Thereafter, it shows Gerrans talking to Chris Gerrans while moving his hands and pointing in the reception area of the facility. *Id.* at 31-32. Next, it shows Swisher arriving. *Id.* at 32-33. Chris Gerrans and Gerrans then went outside. *Id.* at 34-35. Gerrans was gesturing and pointing at Chris Gerrans with a red face while Chris was standing, appearing only to be listening. *Id.* at 35. The two then went out of view of the camera. *Id.*

Gerrans argues he was prejudiced because counsel did not introduce exculpatory evidence from Swisher and Huante (storage facility employees). Namely, the two attested that they did not think Mr. Gerrans was actually going to kill his brother. *See* Parkman Decl., Exs. A, B. And, if they had been asked, they would have testified that they called the police because three FBI agents arrived at the facility after the incident and instructed them to call the police. *See* Mot., Exs. A, B. Thus, Gerrans argues, the jury was left with the impression that the employees were so scared by the incident they felt they had to call the police. However, on cross examination Mr. Getz elicited testimony to the same effect: "Q. . . . why [ ]didn't [you] call the police while all of this was going on? A. **It didn't seem like we needed to alert the police. There was no harm being done at that moment, to raise concern of a police matter.**" Dkt. No. 219 at 44 (emphasis added). The jury was not given the impression that the incident was so severe the employees felt they were in any imminent danger while it was happening. Hence the additional evidence would have added nothing. Any distinction as to why the employees called the police after the fact would have minimal impact on the jury's assessment of the event, given that the jury heard a play-by-play recounting of the event from Swisher, corroborated by videotape evidence (and by Chris Gerrans' testimony).

Testimony from Arthur and Gerrans Jr. and Sr. would not have been able to rebut this recounting of events because they were not present for it. As to Chris Gerrans' character, Gerrans argues counsel should have elicited exculpatory testimony that Chris Gerrans was not a truthful person, along with evidence that Chris Gerrans minimized his own embezzlement and that he was

45

United States District Court
Northern District of California

1   particularly motivated to testify to receive a lesser sentence in his own case because of a prior

2   conviction. Mot. at 25-26.[12]   This evidence regarding Chris Gerrans' untruthfulness and/or bias is

3   not reasonably probable to have changed the outcome.  Aside from the discrepancy of whether

4   Gerrans "poke[d]," Dkt. No. 219 at 21 (Swisher), or "punched," Dkt. No. 374 at 146 (C. Gerrans)

5   Chris Gerrans, the two accounts by Swisher and Chris Gerrans were nearly identical.  Both

6   witnesses testified that Mr. Gerrans said his brother sold him up the river (each conveying the

7   same idiom), and testified to the same key events including the car being taken, Mr. Gerrans

8   engaging in hand gesturing and pointing, and that Chris Gerrans was not yelling back but

9   passively listening.  Moreover, most of the incident was corroborated by video evidence, showing

10  Mr. Gerrans taking his brother's car, pointing and gesturing at Chris Gerrans while red in the face,

11  while his brother stood passively.  Testimony about Chris Gerrans' untruthfulness would not have

12  been consequential regarding the storage facility incident because Chris Gerrans' account was

13  thoroughly corroborated.[13]

14          Gerrans also argues counsel should have put on Arthur Gerrans Jr. and Sr. as witnesses to

15  rebut other interactions between Mr. Gerrans to Chris Gerrans.  Namely, the jury also heard

16  testimony from Chris Gerrans that in March 2019 Gerrans texted him two eyeballs and "I U,"

17  which was "creep[y]." Dkt. 374 at 95-96.  He also testified that during a June 2019 family event

18  Mr. Gerrans pressured his brother to convey that Mr. Gerrans knew nothing about his brother

19  _____

20  [12] Trial counsel did attempt to admit Chris Gerrans' prior conviction for purposes of impeachment.
    Dkt. No. 92 at 1-3.  Though, counsel did not argue the conviction was admissible to prove bias
21  rather untruthfulness.

22  [13] Defendant Gerrans also argues that he would have testified himself that he was not arguing with
    Chris Gerrans about the case, but an unrelated business issue. Mot. at 27-28.  As discussed below,
23  Gerrans waived his right to testify.  *See* Section IV.C.  Thus, this argument does not support an
    IAC claim.  *See, e.g.*, *Ramirez v. Yates*, 2012 WL 2050430, at *25 (E.D. Cal. June 6, 2012), *aff'd*,
24  548 F. App'x 447 (9th Cir. 2013) (finding movant failed to show entitlement to federal habeas
    relief on ineffective assistance of counsel claim where he remained silent at trial with respect to
25  his request to testify); *United States v. Nohara*, 3 F.3d 1239, 1243–44 (9th Cir.1993) (claim of
    ineffective assistance of counsel due to denial of right to testify precluded where there is express
26  waiver by counsel and defendant remains silent in response to such waiver).  In any event, this
    testimony would be of little import. Swisher testified that Mr. Gerrans stated that the "**indictment**
27  was bullshit."  Dkt. No. 219 at 25 (emphasis added).  In light of this testimony, testimony from
    Mr. Gerrans that the argument did not have to do with the case against Gerrans would not be
28  believable and does not have a reasonable probability of changing the outcome at trial.

1    taking money from Sanovas, *id.* at 97-98, and that Mr. Gerrans communicated to him through their

2    father to not share inculpatory information including that defendant used IRA money for

3    something other than Sanovas, that he knew about the checks Chris Gerrans wrote and to delay

4    pleading guilty, *id.* at 104-107.

5            Defendant argues that Gerrans Sr.'s testimony would have contradicted Chris Gerrans

6    because Gerrans Sr. only recounted relaying the message regarding defendant not knowing

7    anything about the checks that Chris Gerrans wrote.  Mot. at 27-28.  Aside from the discrepancy

8    about the precise message Gerrans Sr. passed on to defendant Gerrans, Gerrans Sr.'s testimony

9    would have largely corroborated Chris Gerrans' account of events.  Gerrans Sr. testified that

10   during a June 2019 family picnic, defendant Gerrans told Gerrans Sr. that he planned to have a

11   talk with his brother, Chris Gerrans and wanted Gerrans Sr. to be there.  Mot., Ex. E at 16.

12   Defendant told Chris Gerrans to tell the FBI that defendant "[i]nitially knew nothing about the

13   checks that [Chris Gerrans] wrote."  *Id.* at 17.  Moreover, Gerrans Sr. testified that defendant

14   conveyed messages to Chris Gerrans to convey to the FBI that defendant "had no knowledge of

15   these checks initially."  *Id.* at 24-25.  This is still supportive of the jury's finding of guilt because

16   Gerrans Sr. passed on a message to Chris Gerrans not to divulge inculpatory testimony regarding

17   taking funds from Sanovas, which is pertinent to the criminal case against Gerrans.  *See* Section

18   IV.B.1 (wire fraud charges premised upon siphoning funds from Sanovas).  And the testimony of

19   Gerrans Jr. would have lent credence to defendant Gerrans' threatening behavior because he told

20   the FBI that defendant Gerrans attacked him with a baseball bat when Gerrans Jr. confronted

21   defendant Gerrans about using company money to buy his house.  Opp., Ex. A (Nov. 12, 2019,

22   FD-302 Art Gerrans Jr.).  This testimony would have done little to dismantle Chris Gerrans'

23   version of events.

24           Even if counsel could have successfully undermined Chris Gerrans' testimony as to events

25   prior to the August 2019 storage facility incident, in light of that event, such exculpatory evidence

26   was not reasonably probable to have changed the outcome.  Setting aside Chris Gerrans'

27   testimony, the testimony from Swisher and video evidence from that day established that Mr.

28   Gerrans took his brother's car, yelled and pointed at him, exclaimed that his brother "sold [him]

47

United States District Court
Northern District of California

1   up the river" (i.e., betrayed him), that the "indictment was bullshit," that "it was his brother Chris

2   that had . . . caused all the problems" and that "if there . . . weren't as many cameras on, he would

3   have killed [Chris Gerrans]." Dkt. No. 219 at 34-36.    This alone constituted harassment,

4   threatening, intimidation or retaliation against a witness.  (18 U.S.C. § 401(3) (Count 10),

5   charging Mr. Gerrans with a violation of July 23, 2018, order releasing him on bond with the

6   conditions that he not "harass, threaten, intimidate, injure, tamper with, or retaliate against any

7   witness, victim, informant, juror, or officer of the Court, or obstruct any criminal investigation). It

8   also established that Mr. Gerrans spoke with his brother about the case outside of the presence of

9   attorneys by referencing the "indictment." *Id.* (ordering "no contact w/ [Christopher Gerrans] re:

10  criminal case outside [the] presence of [Christopher Gerrans'] counsel."); Dkt. No. 5 (Order

11  Setting Conditions, July 23, 2018)).  These threats and intimidation against Chris Gerrans in

12  relation to the case also satisfied the elements of the witness tampering and obstruction of justice

13  charges, which required showing the: knowing obstruction of his brother Chris Gerrans from

14  testifying, and attempting to impede the due administration of justice in the criminal prosecution

15  of Mr. Gerrans. *See* 18 U.S.C. § 1512(b)(1) (Count 11); 18 U.S.C. § 1503 (Count 12).

16      In sum, the omitted testimony would have largely corroborated Chris Gerrans' accounting

17  of events regarding the violation of Mr. Gerrans' bond order prior to the August 13, 2019,

18  incident.  The August 13, 2019, events were established by an objective witness, Swisher, and by

19  way of video evidence.  That event alone proved the charges against Mr. Gerrans.  Thus, the

20  evidence Mr. Gerrans argues should have been presented at trial does not pose a reasonable

21  probability of changing the outcome.  Mr. Gerrans did not suffer prejudice from the alleged

22  deficiencies of counsel. *Cf. Harrington*, 562 U.S. at 112 ("The likelihood of a different result

23  must be substantial, not just conceivable.").[14]

24

25  [14] Mr. Gerrans also argued that he was prejudiced because counsel failed to present evidence and
    argument regarding Mr. Gerrans giving Chris Gerrans a throwaway phone to communicate about

26  the case.  Mot. at 24. At trial, Chris Gerrans testified that Defendant Gerrans gave Chris a
    throwaway phone to communicate about his case. Dkt. No. 374 at 91-94. Chris Gerrans asserted

27  that Defendant Gerrans gave him this phone on "a Saturday" in the "early afternoon." *Id.* at 88. He
    testified that this was the Saturday "a week" after a "telephone conversation" they had "on a

28  Sunday, the 15th" of July 2018.  *Id.* at 87. The Saturday after July 15 was July 21, 2018—two
    days before there was an order setting Gerrans' bail conditions. *See* Dkt. No. 5. Therefore, if this

United States District Court
Northern District of California

1    4.    Other IAC arguments

2        Gerrans also argues that counsel's performance was deficient for: (1) failing to

3    communicate; (2) failing to adequately cross-examine witnesses; and (3) failing to request a

4    favorable jury instruction.  These purported deficiencies also do not support an IAC claim.

5        a.    Failure to communicate and convey plea offer

6        In *Missouri v. Frye*, the Supreme Court held that counsel "has the duty to communicate

7    formal offers from the prosecution to accept a plea on terms and conditions that may be favorable

8    to the accused."  566 U.S. 134, 145 (2012).  While Mr. Getz attested that there was a statement

9    made by Robin Harris, (AUSA) that she was interested in settling the case, Getz Decl. ¶ 9, Mr.

10   Gerrans does not attest or assert that there was ever a formal plea offer made by the government.

11   There is thus no deficiency under *Frye* regarding failure to communicate a formal plea offer.  *See,*

12   *e.g.*, *Greenspan v. Cate*, 2014 WL 197749, at *36 (S.D. Cal. Jan. 16, 2014) (no IAC claim for

13   failure to convey a possible offer under *Frye* as prosecutor never formally extended an offer);

14   *United States v. Mendoza*, 2012 WL 6061729, at *1 (S.D. Cal. Dec. 5, 2012) (no IAC claim under

15   *Frye* for failure to adequately pursue possible plea offer).

16       Further, Gerrans argues that counsel's performance was inadequate for insufficiently

17   conveying his approach to trial strategy to Gerrans.  Mot. at 7-8.  However, Gerrans does not

18   explain how he was prejudiced in this respect.  *See id.* at 8 (asserting that "[h]ad counsel

19   communicated effectively, there is a reasonable probability that Mr. Gerrans' trial would have

20   gone differently," without explaining how or why). For the reasons stated above, even had

21   counsel's trial plan been more completely conveyed to Mr. Gerrans, the Court is not persuaded

22   that this would have resulted in additional evidence being elicited and even if it were, that would

23   not likely have affected the outcome of trial.  Without more, this supposed lack of communication

24   _____

25   incident occurred at all, it would have occurred before a contempt was possible.  Gerrans argues
     he was prejudiced by counsel's deficient performance for failing to elicit testimony that this
26   incident involving the throwaway phone occurred before the release order setting conditions of
     bond was issued, calling into question the contempt charge (count 10).   However, the jury would
27   not have rested its finding of contempt based on Gerrans giving Chris Gerrans the phone because
     Chris testified that the two never used this phone. Dkt. No. 374 at 91-94.  The bond order
28   precluded the two from communicating about the case outside of counsel; since the two did not
     use the phone, the jury's finding of contempt would not have rested on the phone.

1    does not support an IAC claim.  *See United States v. Rogers*, 769 F.2d 1418, 1425 (9th Cir. 1985)

2    (ineffective assistance claim based on inadequate consultations must factually demonstrate the

3    benefit to be gained from additional consultations).

b.    Failure to adequately cross-examine witnesses

5    Mr. Gerrans also asserts, in one sentence that Mr. Getz' performance was deficient for

6    failing to adequately cross-examine the government's witnesses and introduce impeachment

7    evidence.  Mot. at 14 ("Counsel also failed to effectively cross-examine and introduce evidence

8    that would have undercut or impeached the government's witnesses.").  But Mr. Gerrans offers no

9    examples of deficient cross-examination.  Such an unsupported assertion cannot support a

10   *Strickland* claim.  *See Samaniego v. Cates*, 2024 WL 923569, at *40 (S.D. Cal. Mar. 4, 2024)

11   ("unsupported assertions . . .do not surmount the strong presumption that counsel acted in a

12   reasonable and strategic manner") (citing *Strickland*, 466 U.S. at 689).

c.    Failure to request favorable jury instruction

14   Mr. Gerrans argues that counsel's performance was deficient for failing to request a more

15   favorable wire-fraud instruction.  Mot. at 10-11.  The Court instructed the jury that Mr. Gerrans

16   committed wire fraud if he "acted with the intent to defraud, that is, the intent to deceive *or*

17   cheat[.]"  Final Jury Instructions at 32 (emphasis added).  The Ninth Circuit determined that this

18   instruction was erroneous on appeal, because wire fraud requires intent to deceive *and* cheat.

19   *Gerrans*, 2022 WL 73051, at *1 (citing *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020)).

20   Counsel's performance was not deficient.  Counsel is obliged to make, or at least to

21   evaluate an argument that was sufficiently foreshadowed in existing law."  *Leeds v. Russell*, 75

22   F.4th 1009, 1020 (9th Cir. 2023) (internal quotation marks and brackets omitted).  At the time of

23   the trial, there was some case law suggesting that intent to deceive *and* cheat was required.  *See*

24   *United States v. George*, 713 F. App'x 704, 705 (9th Cir. 2018) (requiring intent to deceive and

25   cheat).  However, at that time the Ninth Circuit model instruction stated that intent to defraud

26   required a jury to find "intent to deceive or cheat."  *See* Manual of Model Criminal Jury

27   Instructions for the District Courts of the Ninth Circuit § 4.13 (9th Cir. 2010 ed., revised March

28   2022); *see also Miller*, 953 F.3d at 1100 (recognizing that as of March 2020 the Ninth Circuit's

United States District Court
Northern District of California

50

1    model jury instruction states that wire fraud requires only the "intent to deceive *or* cheat")

2    (emphasis in original).  It strains credibility to say that counsel behaved unreasonably in following

3    the Ninth Circuit model instruction.  *See United States v. Mazzeo*, 735 F. App'x 465, 466 (9th Cir.

4    2018) (no deficiency where counsel allowed jury to be instructed based on Ninth Circuit model

5    jury instructions).  The Ninth Circuit's decision in *Miller* clarified the correct instruction, but that

6    decision was rendered in March 2020, after the trial concluded in this matter on in January 2020.

7    *See* Docket. No. 144 (Jury Verdict).  Counsel thus did not behave unreasonably for failing to ask

8    for the more favorable instruction.

9         In any event, no prejudice resulted.  The Ninth Circuit held that the jury instruction error at

10   issue was harmless, because a second instruction was issued which required that the jury must find

11   that "Gerrans knowingly engaged in a scheme to defraud or obtain money or property by dishonest

12   means."  *Gerrans*, 2022 WL 73051, at *1.  The second instruction "ensured that the jury would

13   not have convicted Gerrans of wire fraud unless it found that he intentionally cheated Sanovas of

14   funds."  *Id.*  Thus, even if counsel's performance was deficient, the Ninth Circuit has already

15   determined that any such error was harmless; this basis for the IAC claim fails.  *Thomas,* 417 F.3d

16   at 1056 ("To prevail on *Strickland*'s prejudice prong, there must be a reasonable probability that,

17   but for counsel's unprofessional errors, the result of the proceeding would have been different.").

18        The Court **DENIES** Mr. Gerrans' 28 U.S.C. § 2255 motion insofar as it rests upon Sixth

19   Amendment IAC claims.

20   C.   Fifth, Sixth, and Fourteenth Amendments: Right to testify

21        Gerrans also argues that he is entitled to relief under to 28 U.S.C. § 2255 because his right

22   to testify was violated.  He argues that him not testifying is a constitutional violation on its own:

23   that counsel's performance was deficient in this respect.  Mot. at 14-15, 29-30.

24        The Supreme Court has recognized a constitutional right to testify in one's own defense

25   pursuant to the due process clause of the Fourteenth Amendment, the Compulsory Process Clause

26   of the Sixth Amendment, and as a corollary to the Fifth Amendment's guarantee against

27   compelled testimony.  *Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987).  "Waiver of the right to

28   testify may be inferred from the defendant's conduct and is presumed from the defendant's failure

United States District Court
Northern District of California

51

to testify or notify the court of his desire to do so." *Id.* A defendant who wants to reject his

attorney's advice and take the stand may do so "by insisting on testifying, speaking to the court, or

discharging his lawyer." *Id.*

In the present case, Gerrans explicitly waived his right to testify in the following exchange

between the Court, Gerrans, and his counsel (out of the presence of the jury):

> **THE COURT:** . . . So in terms of the presentation of defense as we
> have discussed earlier, maybe you can state for the record what –
>
> **MR. GETZ:** Yes.  The defense is prepared to rest. I would invite
> the Court to extract a waiver from Mr. Gerrans of his right to
> testify.  I have discussed this issue with him many times, and I
> believe he's prepared to waive his right to testify.
>
> **THE COURT:** All right.  Mr. Gerrans, I just want to make sure
> that you are aware that you do have the right to testify.  Of course,
> you have the right not testify, as well, as I instructed the jury.  But I
> want to make sure that this is a decision you've made; you've
> consulted with your attorney and have made this decision carefully,
> and are prepared to waive your right to testify.
>
> **THE DEFENDANT:** Yes, sir.  Through the fine ways of Mr. Getz,
> I'm going to waive it.
>
> **THE COURT:** All right.  Then we'll note that for the record.

Dkt. No. 179 at 164.

Gerrans recognizes that a defendant cannot claim that he was deprived of his right to

testify where "[n]either the prosecution nor the court was given any reason to think the defendant

desired to testify." *United States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990).  However, he

asserts there were two reasons that the prosecution and the Court were made to think the waiver

was not knowing or voluntary. Mot. at 30.  Specifically, counsel stated "I would invite the Court

to *extract* a waiver from Mr. Gerrans of his right to testify."  *Id.* (citing Dkt. No. 179 at 164).  The

word "extract," he argues, should have signaled that the waiver was not voluntary.  *Id.*

Additionally, in another proceeding in magistrate court, trial counsel "threatened to have Mr.

Gerrans gagged if he spoke against his wishes":

> **THE COURT:** I don't know if there's anything to add to that and I
> don't know if you want -- your client's raising his hand, so if he
> wants to address the Court, it's up to you, but --

1      **MR. GETZ:** Well, he does want to address the Court and he's not going to because --

2      **THE COURT:** And most attorneys or all of them, really, don't advise that as being in your interests, your own interests, because you might say something that you'll regret.

3

4      **MR. GETZ:** I don't want him to address the Court, and I'll ask to have him gagged if he starts to speak.

5

6      Dkt. No. 75-2 (Tr. August 15, 2019, hearing) at 7.  Gerrans argues that the prosecutor was aware

7      of that exchange, and it should have shown to the prosecutor that Gerrans desired to testify but did

8      not know he could assert that right.  Mot. at 30.

9              Taking the second argument first, the term "gag" was used during a hearing before

10     Magistrate Judge Laporte on a motion to revoke bond on August 15, 20219.  *See* Dkt. No. 44.

11     Counsel was attempting to prevent Gerrans from making statements to the Court about the events

12     that occurred on August 13th, just days prior, underlying the contempt charge at trial, before the

13     two had an opportunity to fully review and discuss the allegations regarding those recent events.

14     Dkt. No. 75-2, at 6.  Rather than reflecting an improper attempt to prevent Gerrans from asserting

15     his right to testify at trial, counsel was preventing Gerrans from incriminating himself during a

16     motion hearing before Gerrans or counsel digested charges.  *Id.*  Importantly, Judge Laporte

17     responded by *declining* to issue such an order, and instead, suggesting to Gerrans that he heed his

18     attorney's advice stating: "*Well, I don't know if I can order that,* but it is against your own

19     interests.  You *should* listen to your attorney's advice."  *Id.* at 7 (emphasis added).  Rather than

20     confirming to Gerrans that his attorney could prevent him from speaking, he learned from that

21     exchange that the Court would *not* issue such a "gag" order, though it might make *suggestions* to

22     Gerrans for his own protection.  In any event, that proceeding clearly had nothing to do with

23     Gerran's right to testify at trial.

24             This Court's exchange at trial would have remedied any confusion as to whether it would

25     prevent Gerrans from exercising or waiving his right to testify at trial.  This Court stated: "Mr.

26     Gerrans, I just want to make sure that you are aware that you do have the right to testify.  Of

27     course, you have the right not testify, as well, as I instructed the jury.  But I want to make sure that

28     this is a decision you've made."  Dkt. No. 75-2 (Tr. August 15, 2019, hearing) at 7.  This made

1    clear it was Mr. Gerran's voluntary decision whether to testify at trial; he was under no gag order.

2         As to Gerrans' next argument, the term "extract" is insufficient to alert the Court that

3    Gerrans wanted to testify.  Trial counsel's use of the term is not extraordinary; in context it was

4    casual jargon and raised no red flag.  And any arguable indication of reluctance was offset by

5    Gerrans himself who immediately after confirmed his waiver explicitly.  A defendant may

6    voluntarily decide not to testify even if somewhat reluctantly.  *See United States v. Jackson*, 13 F.

7    App'x 581, 583 (9th Cir. 2001) ("The district court asked Jackson's attorney at trial, in Jackson's

8    presence, whether the defense was planning to rest.  After consulting with Jackson, his attorney

9    responded that Jackson would rest without putting forth a defense.  At no time did Jackson

10   indicate to the court that he wanted to testify.  Jackson's own statement at sentencing confirms that

11   he was aware of his right to testify, and had acquiesced (albeit reluctantly) in his lawyer's tactical

12   decision that he not take the stand.  We thus conclude that Jackson knowingly and intentionally

13   relinquished his right to testify.").  Even where there is evidence of pressure from the judge, the

14   Ninth Circuit has declined to find that a defendant's rights were infringed.  *See, e.g. United States*

15   *v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993) (noting that it was "inadvisable" for judge to advise

16   defendant to follow his attorney's advice about not testifying, but that the error was "not so

17   egregious that [the defendant's] ability to knowingly and intentionally waive his right to testify

18   was impaired").  The record herein establishes that Gerran's waiver was both knowing and

19   voluntary.

20        Because Gerrans waived his right to testify, his related ineffective assistance claim

21   premised upon his lack of testimony must be rejected.  *See, e.g.*, *Ramirez v. Yates*, 2012 WL

22   2050430, at *25 (E.D. Cal. June 6, 2012), *aff'd*, 548 F. App'x 447 (9th Cir. 2013) (finding movant

23   failed to show entitlement to federal habeas relief on ineffective assistance of counsel claim where

24   he remained silent at trial with respect to his request to testify); *United States v. Nohara*, 3 F.3d

25   1239, 1243–44 (9th Cir.1993) (claim of ineffective assistance of counsel due to denial of right to

26   testify precluded where there is express waiver by counsel and defendant remains silent in

27   response to such waiver); *McElvain v. Lewis*, 283 F.Supp.2d 1104, 1118 (C.D. Cal.2003) (finding

28   that where petitioner remained silent when trial counsel rested without calling him as a witness

1    that petitioner waived right to testify and cannot claim ineffective assistance of counsel due to trial

2    counsel's failure to call him as a witness).  Given his express waiver, the Court finds that Gerrans'

3    lack of testimony at trial does not support relief under 28 U.S.C. § 2255.

4         The Court **DENIES** Mr. Gerrans' 28 U.S.C. § 2255 motion insofar as it rests upon Mr.

5    Gerrans not testifying at trial.

6    D.    Fifth Amendment: Prosecutorial Conflict

7         Gerrans also argues that he is entitled to relief pursuant to 28 U.S.C. § 2255 because Robin

8    Harris, who prosecuted the case against him, had an interest in the litigation, rendering the trial

9    fundamentally unfair.  Mot. at 30-33.

10        The parties disagree as to whether this claim is procedurally barred.  The claim was not

11   raised on appeal by Gerrans, which ordinarily prevents the claim to be raised in collateral review.

12   *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350-51 (2006) ("The general rule in federal habeas

13   cases is that a defendant who fails to raise a claim on direct appeal is barred from raising it on

14   collateral review.").  Gerrans argued in his motion, albeit summarily, that trial counsel was

15   ineffective for failing to raise this issue in the first instance and that appellate counsel was

16   ineffective for failing to raise them on appeal.  Mot. at 31-32; Dkt. No. 476 at 3.  The Court asked

17   for supplemental briefing to discern the burden of proof regarding ineffective assistance when it is

18   asserted in response to the defense of a procedural bar (i.e., defense to a defense).  *See* Dkt. No.

19   489 (May 9, 2024, minute entry); Dkt. No. 490 (Gerrans Supp. Mot.); Dkt. No. 491 (Government

20   Supp. Mot.). *United States v. Werle*, sets forth the standard:

> In the context of a § 2255 motion, procedural default is an
> affirmative defense. That means the defendant does not bear the
> burden of pleading cause and prejudice in his motion. Instead, the
> Government bears the burden of raising the procedural default
> defense. Once the Government establishes a defendant's procedural
> default, the burden shifts to the defendant to demonstrate cause and
> prejudice sufficient to overcome it. Only if the record conclusively
> establishes the defendant cannot overcome the procedural default,
> may the district court deny the petition without a hearing."

26   35 F.4th 1195, 1201–02 (9th Cir. 2022).

27        The question then is whether "the record conclusively establishes the defendant cannot

28   overcome the procedural default."  *See id.*  If not, the petition may not be denied without a

United States District Court
Northern District of California

1    hearing.  To this end, Gerrans has submitted additional declarations from trial and appellate

2    counsel establishing that neither considered raising the conflict at all.  Dkt. No. 490-1 (Declaration

3    of Shawn Halbert) ¶¶ 1-3; Dkt. No. 490-2 (Second Declaration of Brian Getz) ¶¶ 1-2.  Where

4    counsel simply fails to consider or to investigate the viability of a defense, this performance may

5    be deemed deficient to the extent that it is a potentially meritorious one.  *See Franklin v. Johnson*,

6    290 F.3d 1223, 1236 (9th Cir. 2002) (holding that representation was ineffective when counsel

7    "simply failed to consider or to investigate the viability of a . . . defense"); *Cirilo-Munoz*, 404 F.3d

8    at 530 (granting habeas relief based on appellate counsel's failure to raise meritorious claim on

9    direct appeal).

10           Notably, however, Gerrans told this Court he **would raise** the issue of a potential

11   prosecutorial conflict of interest on direct appeal in Defendant's Sentencing Memorandum.  *See*

12   Docket No. 302, page 16, n. 9 ("The appellate court will decide if AUSA Harris' participation in

13   the case at rial, while being the senior attorney on the case, provides a basis for a new trial").

14   Gerrans then **failed** to raise this argument in the direct appeal.  The argument is deemed waived

15   and should not be considered in this Section 2255 petition.  *Sanchez-Llamas v. Oregon*, 548 U.S.

16   331, 350-51 (2006) ("The general rule in federal habeas cases is that a defendant who fails to raise

17   a claim on direct appeal is barred from raising it on collateral review"); *U.S. v. Apfel*, 97 F.3d

18   1074, 1076 (8th Cir. 1996) (relief under Section 2255 is limited to that which could not have been

19   obtained on direct appeal).  Even if that failure could be excused because trial and appellate

20   counsel provided ineffective assistance, the claim fails on the merits.  *Rodney v. Garrett*, No. 23-

21   15624, 2024 WL 4097461, at *6 (9th Cir. Sept. 6, 2024) ("there is no reasonable probability that

22   the result of his trial would have been different but for counsel's alleged errors").

23           Gerrans argues that Ms. Harris, the AUSA that prosecuted his case, was conflicted in two

24   respects: (a) while she was investigating Gerrans and Sanovas, Ms. Harris was also running for

25   Sausalito City Council on a platform opposing warehouse development near Liberty Ship Way

26   while Sanovas sought to expand in that area; and (b) Gerrans expressed an intent to kill her, which

27   Ms. Harris learned of in the days leading up to trial.  Mot. at 30-33.  Crucially, Gerrans does not

28   point to prejudice that resulted from the identified conflicts, such as, *e.g.*, filing overbroad and

1    unsubstantiated charges against Gerrans or seeking an unfair sentence; he does not identify any

2    discrete ways in which prosecution's investigation or behavior at trial was impacted. *See id.*;

3    Reply at 16-19; Dkt. No. 490 at 2-4. Rather, Gerrans asserts (albeit incorrectly) that such a claim

4    requires no showing of prejudice, and is thus structural in nature, and infected the trial as a whole,

5    rendering it fundamentally unfair. *See id.*

6        The record establishes that Ms. Harris learned for the first time on Wednesday, January 8,

7    2020 that Gerrans had made a statement about Ms. Harris to Defendant's brother, Chris Gerrans,

8    two years prior to trial, saying to Chris "Let's take her out." FBI Form FD-302, Docket No. 194.

9    The first day of trial followed that discovery merely three business days later, on Monday, January

10   13, 2020. Gerrans has stated that he never said these words, and that further, they were actually

11   about taking her out of the City Council race politically. Dkt. No. 209 (April 16, 2020, Hearing

12   Tr.) at 12, 25. Ms. Harris has acknowledged at the bail hearing on April 9, 2020, that she believed

13   Chris Gerrans' viewpoint, that the statement was in fact about a threat to her life, not her political

14   position. *Id*. at 27.

15       Gerrans's purported threat to Ms. Harris was included in the Pre-Sentencing Report

16   ("PSR"). PSR, Docket No. 292, Page 9. The PSR recommended 168 months, at the high end of

17   the Guideline range of 135-168 months. *Id*. at 32. On November 4, 2020, the Court sentenced

18   Gerrans to 135 months—an amount at the low end of the Guidelines, Court's Sentencing Order,

19   Docket No. 319, and below the recommendation of the PSR and that of the Government. US

20   Sentencing Memorandum, Docket No. 301.

21       The scope of a collateral attack under Section 2255 is narrowly limited. "Error that may

22   justify reversal on direct appeal will not necessarily support a collateral attack on a final

23   judgment." *U.S. v. Addonizio* 442 U.S. 178, 185 (1979). Thus, the scope of Defendant's collateral

24   attack here remains "far more limited." *Id*. Relief under Section 2225 is available only where

25   there is "a fundamental defect which inherently results in a complete miscarriage of justice" or "an

26   omission inconsistent with the rudimentary demands of fair procedure." *Hill v. United States*, 368

27   U.S. 424, 428 (1962); *U.S. v. Apfel*, 97 F. 3d at 1076 (relief under Section 2255 is reserved for a

28   "transgression of constitutional rights and for a narrow range of injuries that could not have been

United States District Court
Northern District of California

57

1   raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice.").

2          A stronger showing of a conflict of interest is required for prosecutorial recusal, than for

3   the recusal of a judge.  *See, e.g.*, *United States v. Isaacson*, 752 F.3d 1291, 1308 n.11 (11th Cir.

4   2014).  Even when a judge has knowledge of a threat against them, this does not automatically

5   require recusal.  *See United States v. Dehghani*, 550 F.3d 716, 721-22 (8th Cir. 2008)

6   (emphasizing that an empty threat does not require recusal); *United States v. Holland*, 519 F.3d

7   909, 915 (9th Cir. 2008) (agreeing that "recusal is not automatic on the mere basis of the judge's

8   knowledge of the threat" (quoting *United States v. Gamboa*, 439 F.3d 796, 817 (8th Cir. 2006)));

9   *United States v. Yousef*, 327 F.3d 56, 169-70 (2d Cir. 2003) (determining that threat did not

10  require recusal); *United States v. Yu-Leung*, 51 F.3d 1116, 1120 (2d Cir. 1995) (holding that

11  judge's behavior after being advised that defendant made a death threat against him demonstrated

12  no basis for defendant's personal bias claim).  *A fortiorari*, no automatic disqualification rule

13  applies to prosecutors.  *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810-11 (1987)

14  (recognizing that establishing a prosecutorial conflict of interest requires showing a more severe

15  conflict than establishing the conflict of a judge; the "standards of neutrality for prosecutors are

16  not necessarily as stringent"); *Spiker*, 649 F. App'x at 771 (explaining that "a stronger showing of

17  conflict is required for prosecutorial recusal" relative to other conflicts) (quoting *United States v.

18  Isaacson*, 752 F.3d 1291, 1308 n. 11 (11th Cir. 2014))[15].

19         Because Defendant made no objection at trial, and failed to raise the issue on direct appeal,

20  even if the claim is not waived, the Court reviews this potential conflict of interest for "plain

21  error."  *United States v. Cotton*, 535 U.S. 625 (2002); *US v. Rodriquez*, 398 F.3d 1291, 1298.

---

[15] This approach to a Fifth Amendment structural claim for prosecutorial conflict is in accord with jurisprudence regarding Sixth Amendment structural claims. *Cronic* establishes that where counsel entirely fails to defend at trial no showing of prejudice is needed; the trial is structurally unsound. 466 U.S. at 659, 660-61.  But, as explained previously, *Cronic* is understood to be a narrow exception to the requirement of *Strickland* that a petitioner must demonstrate prejudice to establish a Sixth Amendment violation.  *Gallegos*, 820 F.3d at 1034.  For *Cronic* to apply "the attorney's failure must be complete" and the attorney must "*entirely* fail" to test the prosecution's case." *Bell*, 535 U.S. at 697 (emphasis in original).  Indeed, the structural claim applies in extreme circumstances such as where defendant is denied counsel outright, or counsel was appointed so close to trial that it would be nearly if not entirely impossible for counsel could defend against charges, 466 U.S. at 659, 660-61, or where counsel was mentally ill such that he could not remember his client's name, *Ruiz*, 89 Cal. App. 5th at 331-32.

There must be (1) error (2) that is plain, and (3) that affects substantial rights.  If all three are met, an appellate court on direct appeal may exercise discretion to notice a forfeited error only if (4) the error seriously affects the fairness, integrity or public reputation of the judicial proceedings.  *Id.*

Here, there was no plain error.  The present case is unlike the extreme case of *United States v. Spiker* where there was a clear threat to the prosecutor.  In *Spiker*, the Eleventh Circuit found that the prosecutor was conflicted in a perjury case against the defendant. 649 F. App'x at 771.  There, the defendant not only expressed his intention to kill the lead prosecutor to fellow inmates, *he tried to carry this out on multiple occasions*.  *Id.*  First, the defendant sought help from an inmate to find a hitman who could kill the prosecutor.  *Id.*  Thereafter, the government learned of the plan and the defendant again attempted to solicit an undercover officer to kill the prosecutor.  *Id.* at 771-72.  Eventually, the defendant attempted to carry out the murder by concealing a sharpened metal shank on his person before a court appearance while planning to lure the prosecutor close enough to stab in the neck.  *Id.* at 772.  The plan was thwarted because the weapon was confiscated at security.  *Id.*  The defendant also threatened to murder Magistrate Judge Morris, presiding over the case, who recused himself.  *Id.*  The circumstances in *Spiker* were severe.  *Cf. United States v. Greenspan*, 26 F.3d 1001, 1005 (10th Cir. 1994) (concluding that recusal was required because the judge learned before sentencing that defendant had conspired to kill him and his family, the conspiracy allegedly spanned several states and included a number of persons who contributed large sums of money to hire a "hit man" and judge's behavior contributed to the appearance of bias).  Moreover, the defendant's threat and attempt to solicit murder were known for over a year, all the while the prosecutor persisted in prosecuting the defendant.  *Spiker* at 773.  This fact, combined with the fact that the defendant received a high-end guideline sentence, led the Eleventh Circuit to find that the error of the disinterested prosecutor affected the defendant's substantial rights.  *Id.* at 774.

Here, in contrast, there was a single somewhat ambiguous statement made by Gerrans over two years prior to trial, with Gerrans denying he said it, and in the alternative saying he meant "Let's take her out," as a reference to the City Council election.  Dkt. No. 209 (April 16, 2020, Hearing Tr.) at 12, 25.  There was no evidence it was repeated or that Gerrans had taken any steps

59

to carry out the putative threat.  Further, the threat was disclosed to Ms. Harris on the eve of trial; recusal at that point would have completely disrupted the trial schedule.  Again, this stands in contrast to a case where the threat of a real and extreme conflict of interest was apparent long before trial.

Further, it is noteworthy that not all prior interactions between a prosecutor and a defendant are severe enough to require a prosecutor's removal from the case.  *See Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (recognizing an appearance of impropriety but ultimately finding no constitutional error because defendant was "found guilty beyond a reasonable doubt on ample evidence after a fair trial before an unbiased jury."); *United States v. Bolden*, 353 F.3d 870, 878-79 (10th Cir. 2003) (reversing disqualification of an entire United States Attorney's office) ("disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary."); *United States v. Luger*, 837 F.3d 870, 873 (8th Cir. 2016) (recognizing prosecutor would have a conflict due to prior representation of the defendant as his defense attorney but ultimately finding no constitutional error because prosecutor had been adequately screened from the case).  Conflict requiring disqualification must meet a high bar.

Even if the threat were specific, concrete, and sufficiently imminent to warrant Harris' recusal, any error warranting reversal of a conviction must "affect substantial rights."  This element "almost always requires that the error 'must have affected the outcome of the district court proceedings'"; there must be a reasonable probability of a different result, a probability "sufficient to undermine confidence in the outcome."  *United States v. Rodriguez*, 398 F.3d 1291, 1299 (*quoting United States v. Dominguez Benitez*, 542 U.S. 74 (2004).  The defendant has the burden of persuasion with respect to prejudice.  *United States v. Olano*, 507 U.S. 725, 734 (1993).

*Wright v. United States*, 732 F.2d 1048, (2d Cir. 1984) is illustrative.  In *Wright,* the Second Circuit recognized an appearance of impropriety where the prosecutor's wife was a lawyer who had repeatedly petitioned government agencies to investigate defendant's misdeeds, had been assaulted by defendant's "minions," and "almost certainly harbored personal animosity" against the defendant."  *Id.* at 1055.  However, the court ultimately found no constitutional error because

60

the defendant was "found guilty beyond a reasonable doubt on ample evidence after a fair trial

before an unbiased jury." *Wright*, 732 F.2d at 1056.  Even taking the facts "as their worst against

the Government," the court held the past interactions between the defendant and the prosecutor's

wife did not present the "spectacle of a prosecutor[] using the 'awful instruments of the criminal

law' for [the] purpose of private gain." *Id*. at 1058, citing *McNabb v. United States*, 318 U.S. 332

(1943).  Dismissal of an indictment for prosecutorial misconduct, "after a conviction following a

fair trial to an unbiased jury" would be "strong medicine." *Id*. at 1055.  Furthermore, the

defendant did not allege misconduct approaching the "flagrant and unconscionable" incidents that

warranted dismissals of indictments in the past and failed to present evidence of "specific

misbehavior" of the prosecutor. *Id*. at 1057.

Here, Gerrans has failed to meet his burden of proof sufficient to undermine the verdict.

Given the threat was not disclosed until the eve of trial, it did not affect the prosecutorial decision

to investigate, indict the Defendant, or affect the conduct of all proceedings leading up to trial.

And since all the evidence and witnesses and proposed jury instructions had already been

disclosed in pretrial filings and proceedings by the prosecution, it did not affect the overall trial

strategy of the government. *Cf. Wright* (finding no constitutional error following a fair trial where

there was a clearer argument that the prosecutor's conflict of interest could have affected the

prosecutor's decision to indict the defendant).  Defendant points to no "specific behavior"

suggesting Mr. Harris changed her trial plan or engaged in any egregious conduct at trial as a

result of the threat. *Wright* at 1057.  And in sentencing, the Government recommended a

Guideline sentence.  US Sentencing Memorandum, Docket No. 301.  Moreover, the Court

exercised its own judgment and discretion in imposing the sentence after considering the briefs

and arguments of both parties, the comprehensive pre-sentence report prepared by probation, the

Guidelines and the factors under Section 3553, imposing a sentence that was at the bottom of the

guidelines range and below that sought by the Government. *See* Court's Sentencing Order,

Docket No. 319.  The sentence imposed by the Court was driven by the Court's assessment of the

factors under Section 3553(a), including Mr. Gerran's complete lack of remorse.  Where, as here,

the effect of the putative error is at best uncertain, Defendant fails to meet his burden of showing

1    substantial rights were affected.  *Rodriquez* at 1300.[16]

2        Given the ambiguous and undeveloped nature of the putative threat here, and the timing of

3    its disclosure on the eve of trial, permitting the trial to proceed without recusal of the prosecutor

4    and the delay and disruption that would have ensued, any error did not seriously affect the

5    fairness, integrity or public reputation of the judicial proceeding.  This is not an egregious case

6    where, *e.g.*, the facts suggest that the strong possibility that the prosecuting attorney may have

7    abdicated her responsibility or "utilize[ed] the criminal process to advance their own pecuniary

8    interest."  *See Wright* at 1057-58 ("at the very most, and the allegations scarcely go this far," the

9    defendant was "deprived [] of the chance that, with another prosecutor, he might have

10   undeservedly escaped indictment and consequent conviction for crimes of which he was properly

11   found to be guilty.")

12       In conclusion, particularly in light of the limited scope of review under Section 2255, even

13   if the claim were not waived by his failure to seek Ms. Harris' recusal at trial, and even if Ms.

14   Harris should have recused on the eve of trial, in light of the facts of this case, Defendant's claim

15   based on the asserted conflict of interest does not reveal a "fundamental defect which inherently

16   results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary

17   demands of fair procedures" required to obtain relief under Section 2255.  *Wright* at 1057 (citing

18   *Addonizio*, quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)).  Here, there is nothing to

19   suggest any conduct by the prosecutor that was untoward or was in any way affected by the

20   alleged threat.   Nor was the ultimate sentence imposed by the Court at the bottom of the

21   Guidelines range arguably affected thereby. In short, there was no "manifest injustice" in

22   sentencing. *United States v. Baker*, 790 F.2d 1437 (9th Cir. 1986) (finding no fundamental defect).

23       Accordingly, the Court finds that Gerran's allegation of prosecutorial misconduct

24   regarding Ms. Harris and any threats made by Gerrans has been waived for untimeliness, or in the

United States District Court
Northern District of California

---

[16] Even if the Defendant's right to be prosecuted by a "disinterested" prosecutor is violated because the prosecutor had a personal "axe to grind against the defendant" and warrants a more lenient standard of prejudice as the Second Circuit suggested in the *Wright* (which predates the Eleventh Circuit's decision in *Rodriguez* by two decades and does not govern in this Circuit), there still must be a "reasonable potential for prejudice."  *Wright*, 732 F.2d at 1056.  For the reasons stated above, there is no such reasonable potential.

alternative, fails on its merits.

As for the second conflict Gerrans points out, the Court finds that Ms. Harris's position regarding candidacy for Sausalito City Council does not establish a prosecutorial conflict rendering Gerrans' conviction and sentencing infirm. Gerrans points to an application by Ms. Harris to the City of Sausalito for the City Council Vacancy, dates May 17, 2017, to support that Ms. Harris was opposed warehouse development in the Liberty Ship Way vicinity. Dkt. No. 308-9 at 2. Gerrans argues that at the time, he was seeking to expand Sanovas operations at Liberty Ship Way where the company's headquarters had been located. *See* Mot. at 31 (citing Dkt. Nos. 308-3 through 308-8 and 308-10 through 308-13).

Ms. Harris stated in her application that, "[p]otential warehouse development in the vicinity of Liberty Ship Way" is a "top three issue[ ]" that the City would face in the next two years. Dkt. No. 308-9 at 2. Ms. Harris recognized that this poses a problem because of important needs on both sides of the issue:

> Potential warehouse development in the vicinity of Liberty Ship Way. This issue presents a difficult challenge in terms of balancing the interests of preserving the unique characteristics of the Baymodel area versus the strong economic potential that exists for developing abandoned warehouses for use as safe work spaces for artists and other professionals. Given the explosive growth of the Dogpatch area in San Francisco following warehouse development there, it is natural that potential development of Sausalito's warehouses (and the safety issues in doing so) will be an important issue facing our City in the next two years.

*Id.* Rather than reflecting opposition to warehouse expansion, Ms. Harris's position reflects a middle-of-the-road approach. Her platform was not at odds with the Sanovas expansion. To the extent there is some tension, it is minimal, and is a far cry from a prosecutorial conflict that would render the trial structurally unsound. *Cf. Spiker*, 649 F. App'x at 771.[17]   In any event, for the

---

[17] The Court also rejects Gerrans' request for discovery on this point. Reply at 17. The application does not evidence a conflict. Without more, there is no "good cause" warranting additional discovery, Rule 6(a) of the Rules Governing Section 2255 Proceedings, which states: "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."

1   reasons stated above, there is no evidence that her position on the warehouse development pit her

2   against Mr. Gerrans or that in any way could have affected her judgment as a prosecutor in this

3   case.

4       The Court **DENIES** Mr. Gerrans' 28 U.S.C. § 2255 motion insofar as it rests upon a

5   prosecutorial conflict claim.

6   E.      First Amendment: Access to Bible

7       The parties disagree as to whether this claim is procedurally barred.  It is not entirely clear

8   if this claim is barred because it was not raised on appeal.  *See Sanchez-Llamas v. Oregon*, 548

9   U.S. 331, 350-51 (2006) ("The general rule in federal habeas cases is that a defendant who fails to

10  raise a claim on direct appeal is barred from raising it on collateral review.").  In any event, this

11  claim fails on the merits.

12      At the conclusion of venire in this case, the following exchange occurred between the

13  Court and the prosecutor:

14          MS. HARRIS: . . . . [T]he defendant has a Bible on his counsel table
            that is very prominently displayed, that the government objects to,
15          and thinks is --

16          THE COURT: Has [a] what?

17          MS. HARRIS: A Bible -- as inappropriate, and should not be
            brought into court, or in any way shown to the jurors during this
18          process, or at any other point.

19          THE COURT: All right. I'm going to ask that that be covered in
            some way.
20
            MS. HARRIS: It should be removed. It should not be here.
21
            THE COURT: Even a briefcase, or something like that.
22
            MS. HARRIS: That would be fine.
23
            THE COURT: Not visible. Okay.
24
            MS. HARRIS: That would be fine, Your Honor. Thank you.
25
    Dkt. No. 230 at 196-97.
26
        Gerrans argues his limited access to the Bible rendered the proceeding fundamentally
27
    unfair.  Dkt. No. 32-33.  There is no cognizable constitutional right to have a Bible displayed
28

United States District Court
Northern District of California

prominently throughout trial.  Gerrans points to cases discussing permissibility of *wearing* religious attire in the courtroom.  *United States v. James*, 328 F.3d 953, 957-58 (7th Cir. 2003) (it "is difficult . . . to see any reason why a Jew may not wear his yarmulke in court, a Sikh his turban, a Muslim woman her chador, or a Moor his fez" but finding no constitutional right to do so if the rules do not allow headgear); *United States v. Mendlowitz*, No. 21-2049, 2023 WL 2317172, at *1 (2d Cir. Mar. 2, 2023) (unpublished) (noting that defendant would be wearing his yarmulke during trial).  Mr. Gerrans was not prevented from wearing traditional religious attire, or even prevented from having his Bible.  He was simply asked to move it.  He cites no authority establishing this repositioning violated his rights or otherwise tainted the trial, as he was still permitted to have his Bible with him so long as not prominently displayed.  This was appropriate. *See Kipp v. Davis*, 971 F.3d 866, 881 (9th Cir. 2020) (noting most circuits have ruled that when a Bible enters the jury room, jury has been improperly exposed to an external influence).

The Court **DENIES** Mr. Gerrans' 28 U.S.C. § 2255 motion insofar as it is premised upon a First Amendment violation.

## V.     CONCLUSION

The record conclusively establishes that Mr. Gerrans is not entitled to relief under 28 U.S.C. § 2255 premised upon: (1) Sixth Amendment structural claims; (2) Sixth Amendment ineffective assistance of counsel claims; (3) violation of his Fifth, Sixth, and Fourteenth Amendment right to testify; (4) violation of his Fifth amendment right to relief for a prosecutorial conflict of interest; and (5) First Amendment claim for restricted access to his Bible throughout trial.  Mr. Gerrans' Motion is **DENIED.**

//

//

//

//

//

//

//

1          This Order disposes of Docket No. 476. This Order also disposes of Docket No. 485 as it is

2   moot.

3

4          **IT IS SO ORDERED**.

5

6   Dated: October 1, 2024

7

8                                                    _____

9                                                    EDWARD M. CHEN
                                                     United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28